# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

|  |  |
|---|---|
| DYFAN, LLC, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | :    C.A. No. 6:19-cv-00179-ADA |
|  | : |
| TARGET CORPORATION, | : |
|  | : |
| Defendant. | : |
|  | : |

## DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    TARGET'S CONSTRUCTIONS OF THE DISPUTED TERMS ARE
SUPPORTED BY UNREBUTTED EVIDENCE ...............................................2

    A.    Only Target Has Offered Evidentiary Support for Its Constructions. ................... 2

    B.    Terms 6-30 (the "Code" / "Computer Code" / "Application" and "System"
Limitations) Are Governed by 35 U.S.C. § 112, 6 ............................................... 3

        1.    Dyfan's Stated "Intent" During Prosecution is Irrelevant ......................... 4

        2.    The *Zeroclick* Decision is Clearly Distinguishable .................................. 5

        3.    The System Components Recited in the Respective Claims Are
Insufficient Structure to Perform the Entire Reited Function ..................... 8

    C.    The Constructions of Terms 1-5 Cannot Be Divorced From the Teachings
of the '584 Provisional and '197 Application ....................................................... 10

        1.    "identifier including at least three fields" ('899 cl. 1) (Term 3).............. 12

        2.    "an address portion" ('899 cls. 1, 7, 9, 11, 30; '292, cl. 4) (Term 4)........ 13

        3.    "shopping mall" ('899 cls. 2, 7, 12, 30; '292 cls. 4, 13, 26, 29)
(Term 2) ..................................................................................................... 14

        4.    "building including a plurality of facilities therein" ('292 cls. 1, 15,
28) (Term 1)............................................................................................... 15

        5.    "output, via the at least one mobile device" / "causing to be output,
via the at least one mobile device" / "cause to be output, via the at
least one mobile device" ('899 cls. 1, 7, 9, 11; '292 cls. 1, 15, 28)
(Term 5) ..................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Akamai Techs. Inc. v. Limelight Networks, Inc.*, 629 F.3d 1311 (Fed. Cir. 2010)..................11, 13

*Apex Inc. v. Raritan Comput. Inc.*, 325 F.3d 1364 (Fed. Cir. 2003)................................9

*Biogen Inc. v. Berlex Labs.*, 318 F.3d 1132 (Fed. Cir. 2003) .................................11, 13

*Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*, 382 F.Supp.3d 586
    (E.D. Tex. May 10, 2019).........................................................................4

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572 (Fed. Cir. 1996) ....................17

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337
    (Fed. Cir. 2008)................................................................................4

*Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292 (Fed. Cir. 2015), *overruled on
    other grounds* by *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017)
    (en banc)...................................................................................10, 16

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351
    (Fed. Cir. 2008)..............................................................................14

*Oatey Co. v. IPS Corp.*, 514 F.3d 1271 (Fed. Cir. 2008)..................................15

*PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359 (Fed. Cir. 2005)..............12, 16

*Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) ...................................10, 12, 16

*Seachange Int'l, Inc. v. C-COR, Inc.,* 413 F.3d 1361 (Fed. Cir. 2005) .........................4

*SuperSpeed, LLC v. Google, Inc.*, No. H-12-1688, 2014 WL 129225
    (S.D. Texas Jan. 14, 2014)....................................................................6

*Williamson. Williamson v. Citrix Online, LLC,* 792 F.3d 1339 (Fed. Cir. 2015)
    (*en banc*) ................................................................................6, 9

*Zeroclick, LLC v. Apple Inc.,* 891 F.3d 1003 (Fed. Cir. 2018) ..........................1-2, 5-8

**Statutes**

35 U.S.C. § 112, 6............................................................................3, 4, 8

## I.    INTRODUCTION

Dyfan's claim construction arguments are consistent with its prosecution strategy to broaden the claim scope through extremely lengthy claims consisting primarily of functional claim language.  However, its arguments are inconsistent with the evidentiary record and with fundamental claim construction principles.  In its Opening *Markman* Brief ("Dyfan Op. Br.", Dkt. 32), Dyfan tries to prop up its functional claiming (and the resulting breadth of claim scope) by making arguments that are wholly divorced from the inventors' actually disclosed invention. The disconnect between the original invention and Dyfan's arguments is reflected throughout Dyfan's Opening Brief, including even Dyfan's "Overview of the Patents-in-Suit," which characterizes and cites to new material added to the patents in October 2017, rather than the original material included by the inventors, when they filed their original disclosure in March 2011.  Dyfan Op. Br. at 1-2 *citing* 1:22-31[1], 1:22-50, 2:8-11, 38:20-23, 2:21-40.

Dyfan arranged its arguments in two groupings.  First, for the §112, ¶6 disputed terms (Dyfan Op. Br. at 12-16), Dyfan only makes attorney argument; and that argument lacks any evidentiary support (whether intrinsic or extrinsic), and is legally incorrect.  Dyfan's remarkable first argument—that Dyfan can "opt out" of the Court's requirement to resolve claim construction disputes by simply stating to the Patent Office that terms were "not intended to be construed under §112, ¶6" (*id*. at 12)—has been soundly rejected by the Federal Circuit.  And Dyfan's second overarching argument is based on a misunderstanding and/or mischaracterization of the *Zeroclick* case in which the Federal Circuit vacated a district court's construction of terms under §112, ¶6 because the court's decision had "*no* evidentiary support."  In sharp contrast to

---

[1] The "Summary" of the Patents-in-Suit (*e.g.*, '899 Patent at 1:20-2:43) was added to the disclosure of the '197 Application when the '899 Patent was filed on October 16, 2017, and it mirrors the language of claim 1 of the '899 Patent between col. 29, ll. 9 – col. 30, ll. 49.

the facts of *Zeroclick*, it is Dyfan, rather than Target, that proffers *zero* evidence in support of its arguments. Dyfan Op. Br. at 12-16. Target has identified significant intrinsic evidentiary support for its §112, ¶6 constructions, and substantial supporting extrinsic evidence in the form of Dr. Goldberg's expert testimony. Target Op. Br., Dkt. 31, at 1-8, 15-23, Ex. I. Furthermore, Dyfan's transparent prosecution strategy of adding many lengthy, functional, software-based limitations, most of which lack any link whatsoever to the applicants' disclosure, makes this case the poster child for application of the §112, ¶6 statute.

For the second grouping of disputed terms (Dyfan Op. Br. at 5-12), Dyfan seeks to avoid any constructions. To advance its non-construction arguments, Dyfan incorrectly posits that the Court need not construe the terms, absent lexicography, or a clear and unmistakable disavowal, in the specification. Dyfan Op. Br. at 4; *see also id.* at 6-12 (relying solely on the claim language as "evidence"). Dyfan effectively argues that the Court should ignore the context of the specifications, unless the specification reflects lexicography or a disavowal. Dyfan's argument flies in the face of long-standing Federal Circuit precedent requiring that claims must *always* be read in light of the specification and its teachings at the time of the invention, and that constructions *cannot* be divorced from the specification and the record evidence. These principles are especially critical here where the claim language intentionally has little resemblance to the inventors' actual purported and disclosed invention. *See, e.g.,* Target Op. Br. at 1-8, 23-28.

## II.   TARGET'S CONSTRUCTIONS OF THE DISPUTED TERMS ARE SUPPORTED BY UNREBUTTED EVIDENCE

### A.   Only Target Has Offered Evidentiary Support for Its Constructions.

In its Opening Brief, Target set forth significant intrinsic evidentiary support for its respective constructions of each of the disputed terms, where each of Target's proposed

constructions / claim construction positions align closely with the inventors' description of the invention. Indeed, Target identified that, as first described in the '584 Provisional, the original invention purported to improve prior art location-based systems by adding a location-specific header onto, or in lieu of, the existing header of messages, and routing such messages to devices based on information in the location header rather than network (*e.g.*, IP) addresses in the existing header. Target Op. Br. at 1-3. And, Target identified that the '197 Application (and parent to the Patents-in-Suit) did not depart from the invention of the '584 Provisional, but, in many instances throughout the specification, emphasized that the invention concepts were not limited to any particular structure. *Id.* at 1, 3-6. In doing so, the applicants confirmed that those structural aspects of the disclosure were not part of the invention. *Id.* Target also identified that, after multiple rejections of the claims of the '197 Application (rejections which were ultimately upheld on appeal to the PTAB), the applicants' prosecution strategy became to draft extremely lengthy claims (each two columns or more) which recited many functional, software-based limitations for which neither the '584 Provisional, nor the '197 Application, disclosed any specific structure or algorithms. *Id.* at 1-2, 7.

On the other hand, in its Opening Brief, Dyfan fails to even mention the '584 Provisional or the '197 Application, and cites to virtually no intrinsic evidence (other than the language of the claims themselves) and no extrinsic evidence to support its arguments. Because Dyfan elected not to identify any supporting evidence (whether intrinsic or extrinsic) for its arguments in its Opening Brief, Target's evidence is both overwhelming and unrebutted.

**B.  Terms 6-30 (the "Code" / "Computer Code" / "Application" and "System" Limitations) Are Governed by 35 U.S.C. § 112, 6**

In addition to providing a detailed overview of the disclosure of the '584 Provisional and '197 Application (Target Op. Br. at 1-6), and of Dyfan's attempt, during prosecution, to expand

the claim scope beyond the invention disclosed in such applications (*Id.* at 1-2, 6-7), Target also provided, for each of the disputed §112, ¶6 terms, substantial supporting extrinsic evidence in the form of Dr. Goldberg's expert testimony.  Dyfan submitted no contrary evidence, including no identified support in the intrinsic record nor expert testimony, in support of its arguments that terms 6-30 are not governed by §112, ¶6 terms.  Dyfan Op. Br. at 12-16.

       1.    <u>Dyfan's Stated "Intent" During Prosecution is Irrelevant (Terms 6-30)</u>

Rather than submit supporting evidence, Dyfan first argues that "[d]uring prosecution, Dyfan specifically informed the patent examiner that no claim was intended to be construed under § 112, ¶ 6." *Id*. at 12 (internal citations omitted).  Dyfan's apparent argument is that a patentee can draft claims using functional language and then avoid the application of §112, ¶6 simply by informing the Patent Office that it did not "intend" for this functional language to be governed by §112, ¶6. *Id*.  This identical argument has been soundly rejected by the Federal Circuit, as illustrated by the court's opinion in *Cypress Lake:*

> Plaintiff argues that the patentee stated in the prosecution history that 'it should be noted that no claims are intended to be construed under 35 U.S.C. paragraph 6' . . . But whether a claim limitation invokes § 112, ¶ 6 is a 'question of law.' And under the controlling precedent, the Court concludes that Defendants have rebutted the presumption that § 112, ¶ 6 does not apply. In other words, a patentee cannot 'opt-out' of this legal determination by stating that his 'intent' is for it not to apply. In addition, the Federal Circuit has noted that the 'inventor's subjective intent is irrelevant to the issue of claim construction.' *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.,* 540 F.3d 1337, 1347 (Fed. Cir. 2008). 'Courts must view the prosecution history not for applicant's subjective intent, but as an official record.' *Seachange Int'l, Inc. v. C-COR, Inc.,* 413 F.3d 1361, 1375 (Fed. Cir. 2005).

*Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*, 382 F.Supp.3d 586, 616 (E.D. Tex. May 10, 2019).  Thus, Dyfan's prosecution-related argument can be dismissed out of hand.

2.      The *Zeroclick* Decision is Clearly Distinguishable (Terms 6-30[2])

Dyfan next suggests that the Federal Circuit's opinion in *Zeroclick* is controlling, as to whether phrases including "program" and "[user interface] code" can be subject to §112, ¶6. Dyfan Op. Br. At 13.  Dyfan is wrong for two reasons.  <u>First</u>, the Federal Circuit's finding that these terms were not subject to §112, ¶6 was on the basis that the defendant (Apple) did not provide any evidentiary support for such a construction and the district court "failed to undertake the relevant inquiry and make related factual findings [to support such a construction]." *Zeroclick, LLC v. Apple Inc.,* 891 F.3d 1003, 1005 (Fed. Cir. 2018).  The Federal Circuit found that "Apple failed to carry its burden, and the presumption against the application of § 112, ¶ 6 to the disputed limitations remained unrebutted. . . .   The court relied on Apple's arguments, contrasting them against Zeroclick's contentions, *but pointed to no record evidence* that supports its ultimate conclusion regarding whether § 112, ¶ 6 applies to the asserted claims . . . ." *Id.* at 1007-1008 (emphasis added).

The facts in the present case certainly are distinguishable.  Target provided a detailed analysis of the intrinsic record, which is supported by a 70+ page declaration of Dr. Goldberg (Dkt. 31 at Exhibit I), as to how a person of ordinary skill in the art ("POSITA") would interpret the claim language and the specifications.[3]  In other words, Target's analysis and evidentiary support certainly is sufficient for the Court to find that (i) the claims do not recite sufficient structure to perform the entire respective function recited in each of Terms 6-30, and (ii) the

---

[2] In its Opening Brief, Dyfan appears to mistakenly group Term 20 under the "system" limitations rather than the "code" limitations.  Dyfan Op. Br. at 13-16; Dkt. 32, Ex. C at 7-8.

[3] As identified above, Target's evidence is not only overwhelming, but also unrebutted by Dyfan (who provided *no* supporting evidence).  *Id.*; *cf.* Dyfan Op. Br. at 12-16.

disclosure in the '584 Provisional and '197 Application fails to disclose a respective algorithm sufficient to perform the entire respective function recited in each of Terms 6-30.[4] Target Op. Br. at 2-6, 9-23, Exh. I. at 8-73.

<u>Second</u>, the Federal Circuit's decision in *Zeroclick* reflects a fact-dependent analysis that was informed by the particular claims and specification at issue in that case.  In *Zeroclick*, the Federal Circuit found the claims included a detailed recitation of specific structure for performing "relatively simple functions" (including that the particular recited structure was tied to "existing programs"), and very close link between the claims and the detailed disclosure of specific structure for performing these functions in the specification:

> Claims 2 and 52 of the '691 patent, for example, recite '[a] graphical user interface,' which their preambles make clear, may comprise 'an update of an **existing** program' using a two-step method.  *See, e.g.,* '691 patent, col. 81 ll. 6-28 (emphasis added). Claim 19 of the '443 patent similarly tethers 'user interface code'—code meant to be updated using two configuration changes recited in the claim—to the code 'stored in a memory connected to the processor.' '443 patent, col. 82 ll. 10-29. That processor is in turn 'configured to receive from the screen information regarding locations touched by the user's finger.' *Id.*  *Given that '[t]he basic concept behind both of the patents-in-suit is relatively simple,' J.A. 3, a person of ordinary skill in the art could reasonably discern from the claim language that the words 'program,' as used in claims 2 and 52 of the '691 patent, and 'user interface code,' as used in claim 19 of the '443 patent, are used not as generic terms or black box recitations of structure or abstractions, but rather as specific references to conventional graphical user interface programs or code, existing in prior art at the time of the inventions.*
>
> Indeed, the distinction drawn between the graphical user interfaces in the prior art and the improvement to such interfaces in the claimed invention—laid bare in the written descriptions supporting the asserted claims—bolsters that conclusion. *See, e.g.*, '691 patent, col. 3 ll. 3-20 (disclosing that 'the programming design for all

---

[4] Dyfan also relies in passing on the *SuperSpeed* district court opinion.  Dyfan Op. Br. at 13 *citing SuperSpeed, LLC v. Google, Inc.*, No. H-12-1688, 2014 WL 129225, *22-23 (S.D. Texas Jan. 14, 2014).  Notably, *SuperSpeed* is not controlling on this Court, was decided prior to the *Williamson* decision, and relies heavily on prior precedent that was expressly overruled by the Federal Circuit in *Williamson*.  *Williamson v. Citrix Online, LLC,* 792 F.3d 1339, 1348-1349 (Fed. Cir. 2015) (*en banc*), *superseding* 770 F.3d 1371 (Fed. Cir. 2014); *SuperSpeed,* 2014 WL 129225 at *22-24.  Thus, Dyfan's reliance on this case is equally misplaced.

graphical interfaces has been based with the mindset of using the movement of the mouse (or other pointer device) to locate a graphical user interface (GUI) control in conjunction with the double click, the click, the up and down button press to activate the function of the GUI control,' but that the invention claimed in the patent 'provides the design of the computer interface to the **movement** of the pointer alone' (emphasis added)); '443 patent, col. 3 ll. 3-15 (same); *see also* '691 patent, col. 1 ll. 31-39 (disclosing that 'the concept of activating some element of a GUI without clicking is known,' and further that the nearest prior art 'described the typical embodiment of the conventional graphical user interface GUI and how it could be generated by a computer'); *id.* at col. 6 ll. 15-19, col. 11 ll. 12-40 (noting backward compatibility, 'enabl[ing] all existing GUI's [*sic*], which would only have their traditional click methodology, to automatically be changed to add or replace it with the Zeroclick methodology' as a 'definite benefit' of the Zeroclick invention over the 'well accepted conventional methodology').

Apple *produces no other evidence, intrinsic or extrinsic* to the asserted patents, that casts doubt on that conclusion.

*Id.* at 1008-1009 (original emphasis in bold) (emphasis added in italics); *see also id.* at 1005-1006 (showing claim 2 of the '691 patent and claim 19 of the '443 patent in their entirety).

Accordingly, the *Zeroclick* opinion is of no moment in view of the facts and circumstances of this case.  Indeed, in sharp contrast to the *Zeroclick* disclosure that referenced existing, specific and known structures for performing certain functions, when the Dyfan applicants drafted the '197 Application, they repeatedly emphasized that the invention concepts were not limited to any particular structure.  Target Op. Br. at 1, 3-6; *cf. Zeroclick*, 891 F.3d at 1008-1009.  Furthermore, after multiple prior art rejections of prior claims (which rejections were ultimately upheld by the PTAB in 2019), the Dyfan applicants filed a series of "continuation" applications which ultimately issued as the two Patents-in-Suit.  Target Op. Br. at 1-2, 7.  In each of the Patents-in-Suit, the applicants' claims recited many special-purpose, software-based limitations (including Terms 6-30) for which no specific structure nor algorithm

for performing the entirety of each respective function was either recited or disclosed.[5]  *Id*. at 1-2, 6-7, 15-23; *cf. Zeroclick*, 891 F.3d at 1008-1009.  Moreover, the '197 Application repeatedly emphasized that any structure that remotely bears any association with the particular recited functions in the disputed limitations (of which there is very little to begin with) do not limit the claim scope.  Target Op. Br. at 3-6, 15-23.  Thus, the Dyfan disclosure and Dyfan claims are the antithesis of the claims and disclosure of the patents-at-issue in *Zeroclick*.

As a result, Target's significant and unrebutted evidence supports the Court finding, for each of the disputed "code" limitations (Terms 6-15, 20), that: (i) the Dyfan claim language does not connote definite structure for performing the particular recited function, such that these limitations are governed by 35 U.S.C. § 112, ¶6, and (ii) the disclosure at the time of the invention (whether March 2011 or March 2012) does not disclose an algorithm for programming a general purpose computer or microprocessor to perform the particular recited function, such that these limitations render the claims indefinite[6].  Target Op. Br. at 15-20.

3.  The System Components Recited in the Respective Claims Are Insufficient Structure to Perform the Entire Recited Function (Terms 16-19, 21-30[7])

There is no dispute that the claimed "system" is limited to the recited components of such system, namely (for representative terms 16, 17, 21, 28, and 29) "a building," "at least one broadcast short-range communications unit," "a plurality of mobile devices," "code" (or

---

[5] To be clear, Target does not argue that every functional limitation recited in the claims is governed by §112, ¶6, but rather only asks the Court to resolve disputes regarding limitations that recite functions for which there is clearly no recited or disclosed specific structure.

[6] Dyfan does not even argue, let alone submit any evidence, that the '584 Provisional and/or the '197 Application discloses an algorithm for programming a general purpose computer or microprocessor to perform the particular recited function of *any* of the disputed "code" limitations.  Dyfan Op. Br. at 12-16.

[7] *See* n. 2 above.

"computer code" or "application") "configured for execution by at least one of the plurality of mobile devices," and "at least one server."  However, Dyfan's argument is that the analysis ends there, *i.e.* that no further analysis is necessary (or permitted) to determine whether these components constitute sufficiently specific structure to perform the entirety of the particular recited function of such "system."  Dyfan Op. Br. at 15-16.  Dyfan cites to no supporting precedent for this "form over substance" proposition, and there is none.  *See, e.g.*, *Williamson*, 792 F.3d at 1348 ("We have not [] blindly elevated form over substance when evaluating whether a claim limitation invokes § 112, para. 6.")

There also does not appear to be any dispute that each of the "system" limitations (Terms 16-19, 21-30) recite respective special-purpose computer functions including, for representative terms 16, 17, 21, 28, and 29, "caus[ing]" "subsequent output of different visual information" at least (i) "after the indication of the user input is received," and (ii) "after an initial instance of the output of the visual information is caused" (and, for certain claims (*e.g.*, '899 Patent claims 1, 7, 9, 25), also (iii) "without requiring [necessitating] additional subsequent user input").  Target Op. Br. at 20-23; Dyfan Op. Br. at 15-16; *see also, e.g.*, Exhibit J, Transcript of November 12, 2019 Deposition of Dr. Goldberg ("Goldberg Depo. Tr.") at 167:2-168:13, 176:20-177:5, 188:8-21, 186:4-13.  What Dyfan fails to comprehend by its "form over substance" argument in its Opening Brief (and similarly during its questioning of Dr. Goldberg during his deposition) is that each disputed limitation's recitation of "system" does not even specify whether any particular one of the recited "building," "short-range communications unit," "plurality of mobile devices," "code" or "server" components of the "system," or any particular combination of these "system" components, performs these respective special-purpose computer functions recited in each of Terms 16-19 and 21-30.  Target Op. Br. at 20-23; Goldberg Depo. Tr. 165:23-167:14.

As such, Target's unrebutted evidence shows that the claims fail to recite a sufficiently definite structure for performing the entirety of these respective special-purpose computer functions, and, therefore, each of these "system" limitations is governed by §112, ¶6. *Williamson*, 792 F.3d at 1348-1349; *Apex Inc. v. Raritan Comput. Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003) (preponderance of the evidence is the standard of proof used when determining whether a § 112, ¶6 presumption has been rebutted).  And, Dyfan does not even argue, let alone submit any evidence, that the '584 Provisional and/or '197 Application discloses an algorithm for programming a general purpose computer or microprocessor to perform the particular recited function of any of the disputed "system" limitations.  Dyfan Op. Br. at 15-16.  Therefore, Target's significant and unrebutted evidence also supports the Court finding that these "system" limitations render the claims indefinite. Target Op. Br. at 23-26.

### C.   The Constructions of Terms 1-5 Cannot Be Divorced From the Teachings of the '584 Provisional and '197 Application

For each of the non-§112, ¶6 disputed terms (1-5), Dyfan continues to obfuscate the parties' dispute (and its attempt to expand the claim scope into something it clearly did not invent) by asking the Court not to construe these terms.  Dyfan's underlying argument regarding these terms—that the Court is compelled to give each of these terms their full breadth in a vacuum and disconnected from the specification, absent lexicography, or a clear and unmistakable disavowal—is simply wrong.  Dyfan Op. Br. at 2-4; *see also id.* at 6-12 (relying solely on the claim language as "evidence").  This argument flies in the face of long-standing Federal Circuit precedent requiring that claims must *always* be read in light of the specification and its teachings at the time of the invention, and that constructions *cannot* be divorced from the specification and the record evidence.  *See, e.g., Microsoft Corp. v. Proxyconn, Inc.,* 789 F.3d 1292, 1298 (Fed. Cir. 2015) ("Claims should *always* be read in light of the specification and

teachings in the underlying patent" and "[e]ven under the broadest reasonable interpretation" (a broader standard than the *Phillips* standard required by the Court here), the construction "*cannot be divorced from the specification and the record evidence.*") (emphasis added), *overruled on other grounds* by *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017) (en banc); *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005). These principles are especially critical here where the claim language appears to intentionally have little resemblance to the inventors' actual purported and disclosed invention. *See, e.g.,* Target Op. Br. at 1-8, 23-28.

Furthermore, in cases like this one, where the inventors clearly identified what their invention was in the '584 Provisional (Target Op. Br. at 2-6), Dyfan's expression (whether during prosecution of the Patents-in-Suit or the '197 Application or during subsequent litigation such as the instant case) that it intended its claims to cover more than the disclosed invention should be entitled to little weight. *Honeywell Int'l, Inc. v. ITT Indus.,* Inc., 452 F.3d 1312, 1318-1319 (Fed. Cir. 2006); *Akamai Techs. Inc. v. Limelight Networks, Inc.,* 629 F.3d 1311, 1325-1328 (Fed. Cir. 2010); *Biogen Inc. v. Berlex Labs*., 318 F.3d 1132, 1140 (Fed. Cir. 2003) ("Where, as here, the written description clearly identifies what his invention is, an expression by a patentee during prosecution that he intends his claims to cover more than what his specification discloses is entitled to little weight.").

As outlined by Target in its Opening Brief, in the inventors' original disclosure (which is incorporated by reference in the '197 Application and the Patents-in-Suit), the inventors clearly identified the problem they intended to solve as the lack of a convenient method of directly sending and receiving various messages to a specific physical location. Target Op. Br. at 2. The inventors also clearly identified their invention directed to solving this problem:

> The *invention* described herein provides a means and function for *delivering messages to certain physical locations and for collecting data from certain*

> *locations*. The approach *uses a location header* in the communication process that
> a location aware proxy server can understand *to route messages to mobile*
> *terminals* via a variety of wireless and wire-line communication networks.

Target Op. Br. at 3 *citing* Ex. A at 21 (emphasis added); *see also id.* at 2-3 *citing* Ex. A at 13, 16,

18.  Thus, here, the written description at Dyfan's alleged time of the invention clearly identified

the invention as adding a location-specific header onto, or in lieu of, the existing header of

messages, and routing messages to devices based on information in the location header rather

than network (*e.g.*, IP) addresses in the existing header.  *Id.*; *Phillips v. AWH Corp.*, 415 F.3d

1303, 1312 (Fed. Cir. 2005); *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359,

1363 (Fed. Cir. 2005).

Dyfan's argument for each of terms 1-5 boils down to telling the Court that it is

compelled to wholly ignore this original disclosure, and the clear identification of the invention

in such disclosure, because, many years later, Dyfan drafted claims in an attempt to expand the

claim scope onto something it clearly did not invent.  Dyfan Op. Br. at 2-12; Target Op. Br. at 1-

7, 23-28.  This argument is not only wrong as a matter of law, but it is rooted in ignorance of a

fundamental public policy rationale associated with claim construction, namely that "the public

is entitled to take the patentee at his word."  *See, e.g.*, *Honeywell*, 452 F.3d at 1318-1319.

1.    <u>"identifier including at least three fields" ('899 cl. 1) (Term 3)</u>

Dyfan acknowledges that Target's proposed construction of Term 3 flows directly from

the applicants' disclosure and description of the invention.  Dyfan Op. Br. at 9-10; Target Op.

Br. at 23.  Notably, Dyfan does not offer any evidence contradicting Target's evidence that a

POSITA would understand field to mean "an identifier subdivided into at least three data

locations" in the context of the specification.  Target Op. Br. at 23.

In addition to its argument premised on a fundamental misunderstanding of the law (*see*

§II.C above), Dyfan also incorrectly argues that substituting Target's construction into the claims

12

would cause confusion between, on the one hand, the "fixed location" of the "at least one broadcast short-range communications unit" in the "building" and, on the other hand, the "at least three data locations" of the "identifier" stored on such "broadcast short-range communications unit":

> a building including one or more facilities each including at least one broadcast short-range communications unit having a fixed location and configured to:
>
> > store [an identifier subdivided into at least three data locations]

As illustrated above, the alleged confusion is pure fallacy. Target's construction, which is the only construction proposed by either party and is also the only construction supported by the intrinsic record and extrinsic evidence, should be adopted as it is the plain and ordinary meaning of the disputed phrase in the context of the Patents-in-Suit and at the time of the invention.

### 2.   "an address portion" ('899 cls. 1, 7, 9, 11, 30; '292, cl. 4) (Term 4)

Dyfan again acknowledges that Target's proposed construction of Term 4 flows directly from the applicants' disclosure and description of the invention. Dyfan Op. Br. at 10-11; Target Op. Br. at 23-24. As outlined by Target in its Opening Brief, its construction of "an address portion" as "a header identifying the destination of the message" is consistent with the description of all embodiments in the '584 Provisional and the '197 Application which describe messages including a "network address header" (*e.g.*, "TCP/IP or UDP/IP address header") (identifying the network destination) and a "location address header" (identifying the location destination). Target Op. Br. at 23-24. Dyfan's argument that Target's construction is somehow inconsistent with broadcast messages (Dyfan Op. Br. at 11) is not only incorrect but it ignores its inventors' own description of the invention. And, here, where the Dyfan inventors clearly identified what their invention was, Dyfan's ignorance of such disclosure is impermissible.

§II.C; *Honeywell*, 452 F.3d at 1318-1319; *Akamai*, 629 F.3d at 1325- 1328; *Biogen*, 318 F.3d at 1140.

Target's construction, which is again the only construction proposed by either party and the only construction supported by the intrinsic record and extrinsic evidence, should likewise be adopted as it is the plain and ordinary meaning of the claimed "an address portion" in the context of the Patents-in-Suit and at the time of the invention. Target Op. Br. at 23-24.

> 3.   "shopping mall" ('899 cls. 2, 7, 12, 30; '292 cls. 4, 13, 26, 29) (Term 2)

As reflected in the parties' Opening Briefs, the crux of this dispute is whether a Target store is a shopping mall. Dyfan proposes to leave this question unanswered through its proposed plain and ordinary meaning construction, which is contrary to claim construction principles. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). While Target agrees that the term "shopping mall" has a plain and ordinary meaning, it seeks to resolve the parties' apparent claim construction dispute by seeking confirmation that a shopping mall is a building containing two or more distinct and independent retail stores. Although Dyfan argues that this is not the plain and ordinary meaning, it curiously proposes no other understanding and does not explain which aspect of the proposed construction is the subject of disagreement.

Rather than address the crux of the dispute, Dyfan focuses on the superficial argument that nesting Target's construction in the claim creates confusion. Dyfan Op. Br. at 8. To the extent there is confusion, that is easily remedied by construing the broader phrase "the building includes a shopping mall" as "the building contains two or more distinct and independent retail

stores." In other words, while Target focused on the term "shopping mall" because that is the term in dispute, the grammatical issue identified by Dyfan is easily remedied.[8]

Accordingly, the Court should resolve the parties' claim construction dispute and adopt Target's proposed construction.

4.      "building including a plurality of facilities therein" ('292 cls. 1, 15, 28) (Term 1)

As previewed by Target in its Opening Brief, the parties' dispute of Term 1 arises simply because Dyfan has attempted to stretch the meaning of this phrase to encompass an individual Target store that includes internal departments (*e.g.*, clothing, houseware, jewelry, electronics). Target Op. Br. at 26-27. Dyfan fully acknowledges and embraces that this is its intent and, as also previewed by Target, points to dependent claims 13 and 16's recitation of a "retail space" and "different locations in the retail space" (and other similar dependent claim limitations) as compelling this broader construction. Dyfan Op. Br. at 6-7; Target Op. Br. at 26-27. In doing so, Dyfan alleges that Target's construction somehow "excludes *embodiments*" without pointing to any evidence that any such alleged "embodiments" were *disclosed* in the '584 Provisional or the '197 Application. Dyfan Op. Br. at 6-7 *citing Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-1277 (Fed. Cir. 2008) (stating "[w]e normally do not interpret claim terms in a way that excludes *embodiments disclosed in the specification*.") (emphasis added).

As detailed by Target in its Opening Brief, Dyfan cannot point to any such disclosure because none exists. Indeed, the term "facility" is not used in the '584 Provisional, and its usage in the specification of the '197 Application is consistent with a "facility" meaning "a distinct

---

[8] The same is true for claim 30 of the '899 Patent for which the phrase "the building includes a retail space in a shopping mall" as "the building contains a retail space among two or more distinct and independent retail stores."

venue or store built, installed, or established to serve a particular purpose, brand or company." *See* Target Op. Br. at 26 *citing* Ex. B at [0034] (p. 7) ("The logical attributes may be *types of venues* (e.g. sports *facilities*, theatres, parks, etc.), categories of retail stores or service venues (e.g. shoe stores, drug stores, clothing stores, hobby stores, sports clubs, etc.), *facilities* associated with a specific brand (e.g. all *facilities* associated with a given brand or company).") (emphasis added).  And, consistent with this meaning, the only "building" in which either priority document disclosed any embodiments of the invention achieving an outcome or result related to *internal* locations is an "airport" or "shopping mall," *i.e.,* buildings which respectively contain two or more distinct venues or stores, each built, installed, or established to serve a particular purpose, brand or company.  *See* Target Op. Br. at 26-27 *citing* Ex. A at pp. 29-30; Ex. B at [0040] (pp. 24-25) (same).

    In cases like this one, where Dyfan contends the claims are entitled to an earlier priority date, the prosecution history (and drafting of claims more than 7 years after such date) cannot be used to broaden claim scope beyond the disclosure at the time of the invention.  *Phillips*, 415 F.3d at 1312; *PC Connector,* 406 F.3d at 1363; *see also Microsoft*, 789 F.3d at 1300.  Dyfan's attempt to have its cake and eat it too, *i.e.*, rely on an earlier priority date to attempt to avoid prior art while drafting claims to attempt to cover something divorced from its disclosed invention, should be rejected[9]. Rather, Target's construction should be adopted as it is the only construction proposed by either party, and the only construction that (i) flows from the inventors'

---

[9] As mentioned above, outside of the "address portion," recited among a laundry list of alternative limitations over 7.5 columns long in a single dependent claim (claim 4) in the '292 Patent (and which should be construed as proposed in § III.C.2 above), the claims of the '292 Patent do not require adding a location-specific header onto, or in lieu of, the existing header of messages, and routing messages to devices based on information in the location header.  *See* Target Op. Br. at 23-25.

disclosure at the time of the invention (the '584 Provisional), (ii) is consistent with the disclosure of the '197 Application (filed one year later, in March 2012), and (iii) is consistent with the established meaning of "facility."  Target Op. Br. at 26-27 *citing* Ex. E at 416.

5.   <u>"output, via the at least one mobile device" / "causing to be output, via the at least one mobile device" / "cause to be output, via the at least one mobile device" ('899 cls. 1, 7, 9, 11; '292 cls. 1, 15, 28) (Term 5)</u>

As outlined in its Opening Brief, Target's constructions of these related phrases ("delivering from the at least one mobile device" / "causing the delivery from the at least one mobile device") flow from the claim language and are consistent with the disclosure at the time of the invention.  Target Op. Br. at 28.  There is no dispute that each of the claims-at-issue recites both "*output*, via the at least one mobile device", and "*display* . . . via a display of the at least one mobile device" functions of "code."  *Id.*; *see also id.* at 15-20.  Although it did not expressly make this argument in its Opening Brief, during its deposition of Dr. Goldberg, Dyfan posited that this differing claim language would actually be interpreted as having the same scope, a position that Dr. Goldberg flatly rejected from the perspective of a POSITA.  Goldberg Depo Tr. at 132:14-135:10; *see also, e.*g., *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996) (different claim terms presumably have different meanings).

In addition to its argument premised on a fundamental misunderstanding of the law (*see* §II.C above), Dyfan also incorrectly argues that substituting Target's construction into the claims would cause confusion between, on the one hand, the "computer code" (executing on the at least one mobile device) "receiv[ing] . . . the response message" "from the at least one server," and, on the other hand, the "delivering . . . the visual information" "from the at least one mobile device":

> said computer code, when executed [by the at least one mobile device], further configured to:
>
> > receive, from the at least one server . . . the response message including the particular location-relevant information, and

in response to the receipt, from the at least one server . . . , of the response message . . . cause . . . the one or more mobile device actions including [causing the delivery from the at least one mobile device] the visual information based on the particular location-relevant information.

As illustrated above, Dyfan's alleged confusion is simply not present in the claims.

Therefore, Target's construction, which is the only construction proposed by either party, and the only construction supported by the surrounding claim language and the disclosure at the time of the invention, should be adopted.

Date:  November 22, 2019

/s/ Gilbert A. Greene

Gilbert A. Greene
**DUANE MORRIS LLP**
Las Cimas IV
900 S. Capital of Texas Highway, Suite 300
Austin, TX 78746
Tel.: 512-277-2246
Fax: 512-597-0703
Email: BGreene@duanemorris.com

Matthew S. Yungwirth (admitted *pro hac vice*)
**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 2000
Atlanta, GA  30309-3929
Telephone:  404-253-6900
Email:  msyungwirth@duanemorris.com

Christopher J. Tyson (admitted *pro hac vice*)
**DUANE MORRIS LLP**
505 9th Street N.W., Suite 1000
Washington, DC 20004-2166
Tel:  202.776.5213
Email: cjtyson@duanemorris.com

**Daniel M. Lechleiter**
Faegre Baker Daniels LLP
300 North Meridian Street
Suite 2700
Indianapolis, IN 46204-1750
(317) 237-1070
Fax: (317) 237-1000
Email: daniel.lechleiter@faegrebd.com

**Lauren M.W. Steinhaeuser**
(admitted *pro hac vice*)
Faegre Baker Daniels LLP
90 S. Seventh St., Suite 2200
Minneapolis, MN 55402
Tel: 630-766-6879
Fax: 612-766-1600
Email: lauren.steinhaeuser@faegrebd.com

*Counsel for Target Corporation*

## CERTIFICATE OF SERVICE

I certify that on November 22, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Gilbert A. Greene*