# Exhibit J



Deposition of:

# Dr. Benjamin Goldberg

*November 12, 2019*

In the Matter of:

# Dyfan LLC Vs. Target Corpopration

Veritext Legal Solutions

800.808.4958 | calendar-de@veritext.com |

Page 1

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                    WACO DIVISION
         Case No. 6:19-cv-00179-ADA

3

         - - - - - - - - - - - - - - - - - - -x
4

         DYFAN, LLC,
5

                                   Plaintiff,
6

                 -against-
7

         TARGET CORPORATION,
8

                                   Defendant.
9

         - - - - - - - - - - - - - - - - - - -x
10

                           1540 Broadway
11                         New York, New York
12                         November 12, 2019
                           9:42 a.m.
13

14

15           DEPOSITION of BENJAMIN GOLDBERG, an
16      Expert witness in the above-entitled
17      action, held at the above time and place,
18      taken before Arthur Hecht, a Shorthand
19      Reporter and Notary Public of the State of
20      New York, pursuant to the Federal Rules of
21      Civil Procedure, and stipulations between
22      Counsel.

23

24                    *       *       *

25

Page 2

1  A P P E A R A N C E S :
2
   DEVLIN LAW FIRM
3  Attorneys for Plaintiff
   1526 Gilpin Avenue
4  Wilmington, Delaware 19806
   BY:  DEREK DAHLGREN, ESQ.
5
6
   DUANE MORRIS, L.L.P.
7  Attorneys for Defendant
   505 9th Street, Suite 1000
8  Washington, DC 10004
   BY:  CHRISTOPHER J. TYSON, ESQ.
9
10
            *    *    *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1       S T I P U L A T I O N S
2
3     IT IS HEREBY STIPULATED AND AGREED, by
4  and among counsel for the respective
5  parties hereto, that the filing, sealing
6  and certification of the within deposition
7  shall be and the same are hereby waived;
8     IT IS FURTHER STIPULATED AND AGREED
9  that all objections, except as to form of
10 the question, shall be reserved to the
11 time of the trial;
12    IT IS FURTHER STIPULATED AND AGREED
13 that the within deposition may be signed
14 before any Notary Public with the same
15 force and effect as if signed and sworn to
16 before the Court.
17
18            *    *    *
19
20
21
22
23
24
25

Page 3

1            I N D E X
2
3
   WITNESS                      PAGE
4
   BENJAMIN GOLDBERG
5
6
   Examination by:
7
   MR. DAHLGREN              5
8  MR. TYSON              225
   MR. DAHLGREN           242
9
10
11        E X H I B I T S
12
   GOLDBERG     DESCRIPTION      PAGE
13 Exhibit 1   U.S. patent number    11
               997399
14
   Exhibit 2   patent number 10194292   11
15
   Exhibit 3   declaration of Dr.     12
16             Benjamin Goldberg
17 Exhibit 4   provisional patent     32
               disclosure entitled
18             system and method for
               efficient information
19             distribution and data
               collection in location
20             aware connection
               networks
21
   Exhibit 5   numbered list of       69
22             disputed claim terms
23 Exhibit 6   system, method and    200
               computer program product
24             for location and/or
               relevancy based triggers
25             for mobile devices

Page 5

1     B E N J A M I N   G O L D B E R G, called
2  as a witness, having been first duly
3  sworn, was examined and testified as
4  follows:
5
6  EXAMINATION BY
7  MR. DAHLGREN:
8     Q.   Good morning, Dr. Goldberg.
9     A.   Good morning, Mr. Dahlgren.
10    Q.   Just for the record and
11 everything, can you please state your name
12 and address?
13    A.   Benjamin Goldberg, 200 Mercer
14 Street, apartment 2F, New York, New York
15 10012.
16    Q.   And are you represented here by
17 counsel today?
18    A.   Yes.
19    Q.   You understand you're being
20 deposed in response to a declaration that
21 was submitted in the present case,
22 correct?
23    A.   Yes.
24    Q.   Have you ever been deposed
25 before?

Page 6

1    A.   Yes.
2    Q.   Approximately how many times?
3    A.   At least 50, maybe closer to 60.
4    Q.   Okay.  So I'm going to go over
5  the ground rules in a little bit, but
6  you're probably going to be familiar with
7  most of those.  With these prior
8  depositions, however, did any of them
9  involve you expressing opinions on whether
10 claims were mean plus function?
11   A.   I believe so, yes.
12   Q.   Do you recall which cases those
13 were?
14   A.   There was a case where I was
15 retained on behalf of a company called
16 Agis, A-G-I-S, where I testified with
17 regards to means plus function.
18   Q.   That's a District Court case?
19   A.   Yes, in Florida.
20   Q.   Okay.
21   A.   That's all that comes to mind.
22 There may have been -- I may have
23 submitted declarations regarding means
24 plus function, I don't recall testifying
25 about them --

Page 7

1    Q.   Okay.
2    A.   -- in deposition.
3    Q.   Do you recall any cases where
4  you submitted declarations opining about
5  whether terms should be considered as mean
6  plus function terms?
7    A.   Well, there was a recent case
8  where I believe my declaration talked
9  about identifying structure for a means
10 plus function case.  In that case -- I'm
11 sorry, let me restate that answer.
12        There was a case in which I
13 believe my declaration addressed
14 identifying structure for means plus
15 function claims.
16   Q.   Okay.
17   A.   And that case is the Sisvel v
18 Spotify case, that may be on my CV.
19   Q.   Okay.  I will just put a note to
20 check the spelling of Sisvel, and we'll
21 get that later.
22   A.   It's S-I-S-V-E-L.
23   Q.   Thank you very much.
24        And was that a District Court
25 case or a PTAB proceeding?

Page 8

1    A.   I believe it was a PTAB
2  proceeding.
3    Q.   Okay.
4    A.   And IPR, to be specific.
5    Q.   Okay.  So just again, you've
6  probably heard this 50 or 60 times, like
7  you've said, but just a few ground rules.
8  It's important that you give complete and
9  truthful answers, do you understand?
10   A.   Yes.
11   Q.   And it's also important that you
12 give verbal responses for the court
13 reporter as opposed to nodding your head
14 and things like that, can you do that
15 today, please?
16   A.   Yes.
17   Q.   And again, occasionally, I may
18 accidently interrupt you, if I do, please
19 let me know, it's important that we don't
20 speak over each other, just so that we
21 have a clean transcript, is that fair?
22   A.   Yes.
23   Q.   If you don't understand a
24 question that I ask, please ask me to
25 clarify, and if you don't, I'll just

Page 9

1  assume that you understand what I was
2  asking, is that fair?
3    A.   Yes.
4    Q.   Okay.  And your attorney may
5  object to some of my questions, but unless
6  you're instructed not to answer, you still
7  have to answer, so do you understand that?
8    A.   I do.
9    Q.   Okay.  Is there any reason today
10 that you can't give complete and truthful
11 testimony?
12   A.   No.
13   Q.   Okay.  So what did you do to
14 prepare for today's deposition?
15   A.   I reviewed documents and I met
16 with counsel.
17   Q.   Who did you meet with?
18   A.   Mr. Tyson.
19   Q.   And when was that?
20   A.   Yesterday.
21   Q.   And approximately how long?
22   A.   Four and a half hours.
23   Q.   Do you recall what documents you
24 reviewed?
25   A.   I -- I think I do remember, yes.

3 (Pages 6 - 9)

Page 10

1    Q.   Can you identify those
2  documents?
3    A.   I read the provisional
4  application in this case, I read the 197
5  application, I read the claims of the 899
6  and the 292 patents, they share the
7  specifics with the 197 application.  I
8  reviewed some trial -- of my trial
9  testimony in that A-G-I-S case, and of
10  course I reviewed my declaration.
11    Q.   And was that the only meeting
12  or -- only meeting that you had to prepare
13  for today's deposition?
14    A.   Yes.
15    Q.   Did you have any phone calls
16  prior to that?
17    A.   Not in preparation for this
18  case -- for this deposition.
19    Q.   Okay.  So aside from reviewing
20  the trial testimony in the Agis case, you
21  didn't review any other materials that are
22  beyond those listed in your declaration
23  that was submitted in this case, is that
24  correct?
25    A.   To the best of my recollection,

Page 11

1  that's correct.
2    MR. DAHLGREN:  And just to make
3  it easier, I'll go ahead and get that
4  out and mark it for you and also just
5  the patents as well.
6    THE WITNESS:  Great.
7    MR. DAHLGREN:  So starting with
8  the patents, this will be marked
9  Goldberg Exhibit 1.  It's a U.S.
10  patent number 997399.
11    [Whereupon, at this time, the
12  reporter marked as Goldberg Exhibit 1
13  the above-mentioned U.S. patent number
14  997399 for identification.]
15    MR. DAHLGREN:  And for Goldberg
16  Exhibit 2 is a second patent, it's
17  patent number 10194292.
18    [Whereupon, at this time, the
19  reporter marked as Goldberg Exhibit 2
20  the above-mentioned patent number
21  10194292 for identification.]
22    MR. DAHLGREN:  And finally, we
23  have what is Exhibit I, declaration of
24  Dr. Benjamin Goldberg with regard to
25  certain claim constructions that was

Page 12

1  submitted in the Dyfan Target case in
2  the Western District of Texas, mark
3  that as Goldberg Exhibit 3.
4    [Whereupon, at this time, the
5  reporter marked as Goldberg Exhibit 3
6  the above-mentioned declaration of Dr.
7  Benjamin Goldberg for identification.]
8    Q.   And so, Dr. Goldberg, if you
9  wouldn't mind if you could look at your
10  declaration that's Exhibit 3, I believe on
11  page three, there's a list of materials
12  reviewed.  Just let me know when you're
13  there.
14    A.   Yes.
15    Q.   And I just wanted to confirm
16  again that during your preparation, the
17  only additional material that you reviewed
18  was, I believe you said, trial testimony
19  in that Agis case?
20    A.   To the best of my recollection,
21  that's true, yes.
22    Q.   Okay.  How long did you work on
23  preparing your declaration, to the best of
24  your recollection?
25    A.   In terms of number of days or

Page 13

1  what period of time?
2    Q.   Number of hours, approximately,
3  if you can recall --
4    A.   Yes --
5    Q.   -- you put in.
6    A.   -- around 12 to 15 hours,
7  somewhere around there.
8    Q.   And when were you first
9  contacted about potentially participating
10  in this case?
11    A.   I'd say mid-August of this year.
12    Q.   So I just want to take a look at
13  your CV and go over some of your work
14  experience.
15    What's your present position
16  right now?
17    A.   I'm a tenured associate
18  professor of computer science at NYU.
19    Q.   And --
20    A.   I'm also the director of the
21  master's program at NYU in computer
22  science.
23    Q.   And how long have you been a
24  tenured associate professor there?
25    A.   In that position, I've been for

Page 14

1 about 25 years, and then before that, I
2 was an assistant professor.
3     Q.   Okay.  What did you do before
4 you were an assistant professor at NYU?
5     A.   I was a graduate student.
6     Q.   And that was at Yale?
7     A.   Yes.
8     Q.   And so there was no, like,
9 positions in the private sector in between
10 your studies at Yale and being professor
11 at NYU?
12     A.   Correct.  I had summer jobs as a
13 student, but my full-time employment has
14 been in academics.
15     Q.   Okay.  And what would you say is
16 the primary focus of your work at NYU in
17 terms of research?
18     A.   Research --
19         MR. TYSON:  Objection to form.
20     A.   Research focus primarily has
21 been in programming languages, compilers,
22 it's called program verification, ensuring
23 programs run correctly, and memory
24 management.
25     Q.   And so looking at your recent

Page 15

1 journal papers, the last journal paper
2 that you authored was in November or at
3 least was published in November 2005, is
4 that correct?
5     A.   Yes, for my journal papers,
6 that's correct.
7     Q.   Okay.  And in terms of books or
8 chapters in books, it looks like there was
9 a book that was published in 1996, is that
10 correct?
11     A.   Yes, a chapter of a book.
12     Q.   A chapter, okay.
13         And the publications and
14 proceedings of refereed symposia, it looks
15 like the last one was in September of
16 2010, is that correct?
17     A.   That's correct.
18     Q.   I didn't see, and perhaps I
19 missed it, do you have any patents --
20     A.   No.
21     Q.   -- yourself?
22     A.   No.
23     Q.   Have you applied for any
24 patents?
25     A.   I have not.

Page 16

1     Q.   Is there a -- if you don't mind
2 me asking, is there a particular reason or
3 is it the research and work that you're
4 doing didn't lend itself to that?
5         MR. TYSON:  Objection to the
6     form.
7     A.   I've always been inclined to
8 just publish the work and not bother to
9 patent it.  It wasn't clear there would be
10 any true financial value for the fairly
11 theoretical work that I'm doing.
12     Q.   Okay, okay.  Now, looking at
13 your CV, are there any references to work
14 on location-based networks?
15         MR. TYSON:  I object to form.
16     A.   No, I don't believe so.
17     Q.   What experience do you have
18 working with location-based networks?
19         MR. TYSON:  I object to the
20     form.
21         MR. DAHLGREN:  I'm sorry, what
22 was the objection, to the form?
23         MR. TYSON:  It was a form
24     objection, I'll speak up.
25         MR. DAHLGREN:  I'm sorry, I just

Page 17

1 couldn't hear.
2         MR. TYSON:  Yup.
3     A.   In the course of my teaching, I
4 certainly teach about network protocols
5 and routing, but other than the teaching
6 about networks, I haven't done any -- any
7 actual work in location-based networks.
8     Q.   And how do location-based
9 networks differ from other type of
10 networks that you've worked with?
11         MR. TYSON:  I object to the
12     form.
13     A.   Well -- so I teach -- when I
14 lecture about networks, I lecture about
15 the TCP/IP protocol for the most part, and
16 the various layers in the network stack,
17 and certainly there's a location component
18 to that to leave MAC addresses and IP
19 addresses, but the focus certainly is not
20 on location-based networks.
21     Q.   So it would be fair to say that
22 you've never created data communication
23 like Paradigm based on physical attributes
24 such as location as a basis for message
25 routing, is that accurate?

5 (Pages 14 - 17)

1          MR. TYSON:  I object to the
2     form.
3     A.   Yes.
4     Q.   So this might be for part of my
5     own education, but I just want to go over
6     kind of the technology that is at issue or
7     involved in the patents.
8          And first, you're familiar with
9     cellular networks, correct?
10    A.   Yes.
11    Q.   Do you consider that a term of
12    art?
13    A.   Cellular network?  Yes, it's a
14    term of art.
15    Q.   And how would you describe that
16    in lay terms, if you don't mind?
17    A.   These are the protocols
18    supporting wireless communication for cell
19    phones, typically based on wireless
20    standards such as 3G or LTE.
21    Q.   And 5G, is the new one coming
22    out that I hear all about?
23    A.   Correct.
24    Q.   Okay.  And when you say
25    protocols, again, just for my benefit,

1     what do you mean by that?
2     A.   These are the rules governing
3     the format of messages sent between the
4     mobile device and the network, rules
5     governing the -- which messages need to be
6     sent, which information needs to be sent
7     in order to support operation of cell
8     phones.
9     Q.   Okay.  Would protocols also
10    include the manner in which the messages
11    are transmitted, and excuse me if I'm not
12    being technically accurate, but there's
13    like a handshake protocol, correct?
14    A.   Yeah, and so as I mentioned,
15    governs not only the format of messages
16    sent, but the types of messages that have
17    to be exchanged between the mobile device
18    and the network, and that includes certain
19    handshaking protocols, handshaking rules
20    that require a series of messages back and
21    forth to provide both the mobile device
22    and the network with sufficient
23    information in order to be able to
24    communicate.
25    Q.   Okay.  And are you familiar with

1     how that is achieved with a stationary
2     wireless network, I think you said the
3     manner in how the messages are transferred
4     in the network?
5          MR. TYSON:  I object to the
6     form.
7     A.   So there are thousands of rules
8     in different handshaking processes that go
9     on, I'm more familiar with some, less
10    familiar with others.
11    Q.   Okay.
12    A.   But I've certainly -- I've read
13    lots of code in that space.
14    Q.   Okay.  Does Bluetooth have a
15    specific protocol?
16    A.   Yes.
17    Q.   Are you familiar with that one?
18    A.   Less than with the other
19    wireless protocols, 3G, 4G, things like
20    that.  I'd have -- I have reviewed a fair
21    amount of Bluetooth documentation, but
22    it's been a long time, so I'd have to
23    refresh my memory.
24    Q.   Okay.  Would you refer to
25    protocol itself as a term of art?

1     A.   Certainly.
2     Q.   And I think you mentioned that
3     there are thousands of different protocols
4     that are out there in existence?
5     A.   Well, that --
6     Q.   Or are being utilized.
7     A.   There are thousands of rules
8     that the cell phone and the base station
9     have to follow in order to support all the
10    operations that cell phones can perform.
11    Q.   If you wouldn't mind, for the
12    protocols that you are familiar with, I
13    guess we can do, like, 3G, could you
14    describe in a high level how a message is
15    transmitted?
16         MR. TYSON:  Objection.
17    Foundation.  Form.
18    A.   That's tough at a high level,
19    it's so complicated, but the idea is
20    that -- you're talking about transmitting
21    from a cell phone to somewhere else, to
22    some destination --
23    Q.   Yes.
24    A.   -- on the internet?
25    Q.   We can do that, yes, that's

6 (Pages 18 - 21)

Page 22

1  correct.  Let's do that.
2      A.    So essentially, the IP packet, a
3  packet that the internet knows about is
4  packaged inside of a message that conforms
5  to the 3G protocol, and it might be the
6  case that if a packet is long enough, it's
7  broken up into smaller pieces to fit
8  inside the packets that the cell -- the
9  cellular protocol knows about.
10         And then based on an agreement
11  between the cell phone and the base
12  station, that packet gets processed, gets
13  coded so that it can be transmitted
14  reliably over the air, and that includes
15  adding redundant information, anything
16  that would make the packet less likely to
17  be corrupted by noise over the air.
18         And ultimately, the packets are
19  transmitted from the cell phone to the
20  base station, where they are reassembled
21  into the entire data that encapsulates the
22  IP packet, and then the IP packet is
23  extracted and sent on to the internet.
24      Q.    And you mentioned an agreement
25  between the cell phone and the base

Page 23

1  station, what did you mean by that?
2      A.    So based on the signal quality
3  and the distance of the phone from the
4  tower, there are different forms of
5  encoding that can be chosen that have
6  different levels of redundancy, and the
7  base station -- the bottom line is the
8  base station tells the cell phone how to
9  encode the data so it can be transmitted
10  reliably to the base station.
11      Q.    Okay, okay.  So when these
12  messages are sent, there's prior
13  communications between, like, the base
14  station and the cell phone before the
15  packet's even sent?
16      A.    Very much so.  When the -- when
17  the cell phone first enters the cell,
18  which is the region serviced by a given
19  tower, there's a whole handshaking process
20  where the mobile device identifies itself,
21  and the network says, okay, I recognize you,
22  here's what you should do to transmit back
23  to me.
24      Q.    Okay.
25      A.    And it's a fairly complicated

Page 24

1  process.
2      Q.    Okay.  And for communication
3  from the base station to the cell phone,
4  is it the same process or is it different?
5      A.    Similar process, where the base
6  station essentially broadcasts to all the
7  cell phones in its cell here's how I'm
8  going to communicate with you.
9      Q.    Okay.
10      A.    And then based on that, each
11  cell phone knows what to listen for.
12      Q.    And when you say the cell phone
13  knows what to listen for, are they
14  listening for the actual message being
15  transmitted or is there some initial
16  contact where the base station informs the
17  cell phone that I'm sending something your
18  way?
19      MR. TYSON:  I object to the
20  form.
21      A.    So after the cell phone knows
22  how to communicate with the base station,
23  the base station then says here are
24  additional details about how I'm going to
25  communicate with you and when, and so the

Page 25

1  mobile device, the cell phone, knows when
2  to listen and how to listen for
3  transmissions from the base station.
4      Q.    Okay.  Is the process similar
5  with stationary wireless networks?
6      MR. TYSON:  I object to the
7  form.
8      Q.    In terms of -- excuse me, is the
9  process of communication between, I'm
10  going to use nodes for lack of a better
11  word, and a stationary wireless network
12  similar to that of a cellular network?
13      A.    So when I think of stationary
14  wireless networks, I think of Bluetooth,
15  WiMAX or Wi-Fi, and the protocols do share
16  some similarity, but because they don't
17  have to handle mobility, in other words,
18  the devices aren't moving, there's no
19  handoff from one tower to the next.
20         It's -- it's somewhat simpler,
21  the communication, for the stationary
22  wireless networks.  When a device such as
23  a laptop or even a cell phone on a Wi-Fi
24  or Bluetooth network gets turned on, it
25  has to announce itself, and then there's a

7 (Pages 22 - 25)

Page 26

1  handshaking process to set up the
2  communication parameters between the base
3  station, is really the right term, and the
4  device.
5      Q.   Okay.  And so again, talking
6  about the handshaking process, does the
7  handshaking process occur with every
8  subsequent communication between the base
9  station and the cell phone?
10      MR. TYSON:  I object to the
11  form.
12      A.   I'd have to look at the
13  individual -- individual protocol
14  standards to answer that for sure.
15      My recollection is no, once some
16  initial handshake goes on, the data can go
17  ahead and be transmitted back and forth.
18      Q.   Okay.  When that data's
19  transmitted, is there first any message or
20  information sent to the receiving cell
21  phone that a message is on the way or that
22  a message has been sent?
23      A.   That I don't recall.  There's an
24  acknowledgment process where the -- the
25  recipient has to send back a message

Page 27

1  saying, hey, I received what you sent me.
2  Beyond that, I just don't recall.
3      Q.   And again, just so I understand,
4  the protocols that govern these types of
5  communications, there are a variety of
6  them and they have certain differences, is
7  that fair?
8      A.   Certainly.
9      Q.   Okay.  Are you familiar with low
10  bandwidth sensor networks?
11      A.   I'm somewhat familiar with
12  sensor networks.  I'm not -- I don't
13  particularly recall hearing about low
14  bandwidth sensor networks.
15      Q.   Okay.  Would you consider sensor
16  networks to be a term of art?
17      A.   Yes.
18      Q.   And also going back to
19  stationary wireless networks, would you
20  consider that to be a term of art as well?
21      A.   Yes.
22      Q.   And then under that genus, you
23  had mentioned Bluetooth, WiMAX and Wi-Fi,
24  correct?
25      A.   Yes.

Page 28

1      Q.   And you would consider all those
2  to be terms of art?
3      A.   Yes.
4      Q.   And so a person working in the
5  field of, like, networks would have some
6  understanding of these various terms of
7  art that we just discussed, is that fair?
8      A.   Yes.
9      Q.   And within networks, there are
10  also things called subnetworks, is that
11  correct?
12      A.   Yes.
13      Q.   And how would you describe that?
14      MR. TYSON:  I object to the
15  form.
16      Q.   How would you describe
17  subnetwork?
18      A.   The context in which I've heard
19  it is where you have a large network such
20  as the internet, that is in fact a
21  collection of smaller networks, and
22  typically a subnetwork, or a subnet, is a
23  portion of the larger network that have --
24  sorry, that has devices on it with similar
25  network addresses.

Page 29

1      So a subnet is often a
2  collection of computers and other devices
3  that have the same initial digits in their
4  IP addresses, or that are all connected to
5  the same router.
6      Q.   Okay.  Would you consider
7  subnetworks to be a term of art as well in
8  this field?
9      A.   Yes.  It's not necessarily a
10  precise term denoting a single
11  configuration, but it is a term of art.
12      Q.   And when I say this field, just
13  to make things easier so we're all on the
14  same page, I mean in your declaration, you
15  discussed the qualifications of a person
16  of ordinary skill in the art?
17      A.   Yes.
18      Q.   Software development, I'm
19  looking at paragraph 16 of Exhibit 3 which
20  is your declaration, and so I'm just
21  trying to make sure that when I refer to,
22  like, in this area, you know, term of art
23  that we're referring to something that's
24  tied to the definition of the POSITA and
25  kind of the field of invention with these

8 (Pages 26 - 29)

Page 30

1    patents that we're dealing with.  Am I
2    making sense?  Was that clear?
3        A.   Yes.  When you said this field,
4    I understood it to be the field, the
5    technologies that I've identified in
6    paragraph 16.
7        Q.   Okay, okay, excellent, thank
8    you.  You had mentioned WiMAX, could you
9    please tell me briefly what that refers
10   to?
11       A.   That's another stationary
12   wireless network protocol that really
13   hasn't caught on, Bluetooth became much
14   more popular.  It was just another
15   competing protocol.
16       Q.   Okay.  But that's still
17   considered -- excuse me, WiMAX would still
18   be considered a term of art, though it's
19   not as prevalent as some of the other
20   stationary wireless network protocols?
21       A.   Correct.
22       Q.   And I believe you said that you
23   weren't entirely familiar at this moment
24   with the protocol for Bluetooth, do you
25   happen to recall how messages are

Page 31

1    transmitted using the WiMAX protocol?
2            MR. TYSON:  I object to the
3    form.
4        A.   I don't.  I think what I
5    testified, Mr. Dahlgren, was that it's
6    been a long time since I looked at the
7    Bluetooth standard, and I just don't
8    recall.
9        Q.   Yes, and that's fair, I wasn't
10   trying to mischaracterize your testimony.
11           Prior to your involvement in
12   this case, had you heard of the term
13   dedicated short-range communications?
14       A.   I don't recall.  I may have, I'm
15   just not sure.
16       Q.   And since your involvement in
17   this case, do you have an understanding as
18   to what dedicated short-range
19   communications refers to?
20       A.   Are you referring to something
21   in the patent?  I'm not sure what context.
22       Q.   Yes, so let's --
23       A.   In my declaration?
24       Q.   Let's see where I can point you
25   to that most easily.  Bear with me one

Page 32

1    second, I'll see if I can find a reference
2    to it.
3            Well --
4        A.   Can you --
5        Q.   Give me one second, it's
6    referred to in the provisional
7    application, I believe.
8        A.   Which I don't think you've
9    marked yet.
10       Q.   Correct, correct, and I'll just
11   confirm where it is, and if it's right,
12   I'm going to pull it out, get you a copy.
13           MR. DAHLGREN:  Can you mark this
14   as Goldberg Exhibit 4.
15           [Whereupon, at this time, the
16   reporter marked as Goldberg Exhibit 4
17   the above-mentioned provisional patent
18   disclosure entitled system and method
19   for efficient information distribution
20   and data collection in location aware
21   connection networks for
22   identification.]
23       Q.   And so I'm looking at for
24   Exhibit 4 the provisional patent
25   disclosure entitled system and method for

Page 33

1    efficient information distribution and
2    data collection in location aware
3    connection networks.  There is kind of a
4    case kind of caption heading above that
5    that has a page number, do you see that at
6    the very top?
7        A.   Yes.
8        Q.   And if you look at page six of
9    35, you'll see at the very bottom of the
10   page, there's a reference to dedicated
11   short -- it says rage communication, but I
12   believe that is a typo.  And if you want
13   to look at the following page, there's a
14   little bit more discussion in the first
15   few paragraphs of the abbreviation, DSRC.
16       A.   And what was your question?
17       Q.   Well, first I'd asked if you
18   were familiar with dedicated short-range
19   communications prior to your involvement
20   in this case, and then I believe after I
21   asked that since your involvement in this
22   case, have you developed an understanding
23   as to what that refers to?
24       A.   So in this context, I was not
25   familiar with the term.

9 (Pages 30 - 33)

Page 34

1    Q.   If at any time you need to take
2    a break, please just let me know.
3    A.   Sure.
4    Q.   And I'll try to stop as soon as
5    we can.
6    A.   So prior to this case, I was not
7    familiar with the DSRC, dedicated
8    short-range communications referred to in
9    Exhibit 4.
10   Q.   And if you look at, it's page
11   seven of 35 of Exhibit 4, the provisional
12   application, the beginning of the third
13   paragraph, that's the third sentence, it
14   says however, to make use of this spectrum
15   in a mobile environment required
16   development of new communications
17   protocols.
18   A.   I see that, yes.
19   Q.   And then you see the sentences
20   following that where it discusses some
21   IEEE standard?
22   A.   IEEE 802.11 standard is what we
23   think of as Wi-Fi.
24   Q.   And so the following sentence
25   says that it was modified to allow what is

Page 35

1    known as association-less protocol
2    identified as IEEE 802.11p, do you see
3    that?
4    A.   Yeah, I believe the word is
5    association-less.
6    Q.   Association-less, excuse me if I
7    misspoke, thank you.
8        Do you know what modifications
9    were made?
10   A.   I do not, other -- beyond what's
11   explained in this paragraph.
12   Q.   Okay.  And further down in the
13   same paragraph, the sentence beginning
14   because a system is radio based, all
15   terminals can hear all messages
16   transmitted within radio range?
17   A.   I see that.
18   Q.   Do you understand hearing a
19   message to be different than receiving it?
20   I was just curious about the use of the
21   different terms.
22   A.   Yes.  Receiving a message means
23   receiving the data sent over the air that
24   is intended for that device.  Hearing, as
25   it's being used here, means being able to

Page 36

1    see data that may or may not be intended
2    for a particular device, so if I'm a
3    mobile phone, I can see all the bits
4    flying around, even those being sent to
5    other devices, but I know I should only
6    listen to and receive the data that's
7    intended for me.
8    Q.   Okay.  And is there -- in the
9    various protocols that you're aware of for
10   communications, is there an indication
11   that's sent to a cell phone that this
12   message is actually intended for you?
13       MR. TYSON:  I object to the
14   form.
15   A.   Yes.  And let me just remark,
16   depending on the protocol, it may be based
17   on timing, in that the base station has
18   said data sent during this particular
19   timeframe is meant for mobile device A,
20   data sent during this timeframe is meant
21   for mobile device B, so it -- at the
22   wireless level, it can be based on timing,
23   not just on saying specifically or
24   explicitly this data's for you.
25   Q.   Okay.  So if I understand

Page 37

1    correctly, there's different ways that a
2    base station may notify a cell phone that
3    this message is for you?
4    A.   Yes.
5    Q.   Okay.  Are you familiar with
6    vehicle infrastructure integration, it's
7    also discussed in the provisional
8    application, I believe it's page seven of
9    35 of Exhibit 4 in the very first
10   paragraph?
11   A.   I was not familiar with it prior
12   to reading this provisional, my knowledge
13   of it is based on the provisional.
14   Q.   Okay.  So are you familiar with
15   the DSRC/WAVE, W-A-V-E, concept?
16   A.   Not beyond what's described in
17   this document.
18   Q.   And so it's fair to say that
19   you're not familiar with the type of
20   communication protocol that DSRC/WAVE
21   utilized?
22       MR. TYSON:  I object to the
23   form.
24   A.   That's correct, beyond what was
25   described in this document.

10 (Pages 34 - 37)

1    Q.   And given that your familiarity
2  with vehicle infrastructure integration
3  and DSRC/WAVE is based on the information
4  in Exhibit 4, provisional application, is
5  it fair to say that you couldn't opine on
6  whether those are terms of art?
7        MR. TYSON:  I object to the
8  form.
9    A.   I guess independent of what is
10  disclosed here, I would not have known
11  those to be terms of art.  The fact that
12  they are -- it refers to the DSRC as a
13  particular mode of communication, it
14  appears to be a term of art for people
15  working in that area, but I wouldn't have
16  known it independently of this provision.
17    Q.   Okay.  At the bottom of page
18  seven of 35 of Exhibit 4, there's a
19  reference to a suite of standards known as
20  IEEE 1609 wires access in vehicular
21  environments wave.
22    A.   I see that.
23    Q.   And the provisional states that
24  this suite address is security net,
25  networking and messaging, as well as

1  channel management, do you see that?
2    A.   I do.
3    Q.   What is meant by channel
4  management?
5        MR. TYSON:  I object to the
6  form.
7    Q.   To the best of your
8  understanding.
9    A.   I'd have to -- to look at the
10  standard.  In general, it means choosing
11  the mode of communication that works given
12  the channel, the quality of the channel,
13  which is how much interference there is
14  from other sources over the air.  And also
15  who gets to transmit on what channel.
16        So a channel is typically some
17  range of frequencies, and different mobile
18  devices could be assigned different
19  channels to transmit on, and so the base
20  station has to assign channels depending
21  on the protocol, assign channels to
22  different mobile devices.
23    Q.   Okay.  And the reference to
24  networking and messaging that is addressed
25  by this standard, is that similar to the

1  network communications protocols that
2  we've been discussing at a high level?
3        MR. TYSON:  I object to the
4  form.
5    A.   Again, I can't answer for sure
6  not looking at this IEEE standard, but
7  that's what I would expect, that defines
8  how the initial association between a
9  mobile device and a base station and the
10  definition of what a message actually is,
11  a packet, a message, and how to route
12  them.
13    Q.   Okay.  And the IEEE standards
14  that are identified here, those are --
15  strike that.
16        The IEEE standards referenced in
17  the provisional application of Exhibit 4,
18  those are standards that would be well
19  known to a person skilled in the art, is
20  that fair to say?
21        MR. TYSON:  I object to the
22  form.
23    A.   Well, I think it would have been
24  known to a person of skill in the art who
25  happened to be working in wireless access

1  for vehicles.
2        So, you know, generally I've
3  talked about in my declaration how -- what
4  background a person of skill in the art
5  would have, and so a person of skill in
6  the art would certainly be able to read
7  the IEEE standard and to understand it, be
8  able to implement it, but they wouldn't
9  necessarily, coming out of -- out of
10  college and working for a few years, they
11  wouldn't necessarily have seen this
12  particular standard, but they can
13  certainly read and understand it.
14    Q.   Okay.  Are you familiar with the
15  term data format and encoding schemes?
16    A.   Sure.
17    Q.   Is that a single term,
18  generally, or is that two separate terms?
19    A.   It's two related terms.
20    Q.   And could you just describe, and
21  briefly, just what those two terms mean?
22    A.   Yes.  Data format means how we
23  actually organize the data that we want to
24  transmit so that the recipient of the
25  message would understand it, so how

Page 42

1  many -- how many bits you can send in one
2  packet and what, you know, each field of a
3  message means, those are all data formats.
4         Encoding schemes are -- I
5  mentioned that a message goes through a
6  sort of processing in order to add
7  redundancy for reliable transmission over
8  the air, and so encoding schemes are ways
9  of manipulating the bits, adding
10  redundancy, so that the transmission is
11  sufficiently reliable to be received at
12  the other end.
13     Q.   Okay.  Going back to protocols,
14  I just want to make sure I understand how
15  these work.  Is there coding that is done
16  that establishes the protocol?
17         I can rephrase the question if
18  it wasn't clear.
19     A.   Let me try to answer --
20     Q.   Sure.
21     A.   I'll try to answer.  That is the
22  standards define the information that has
23  to be sent between the base station and a
24  wireless device in order for the
25  communication -- for subsequent

Page 43

1  communications to happen.
2         So as I said, there are
3  thousands of rules and processes that have
4  to be followed, and there is typically
5  software code running on the base station
6  and the mobile device that dictates -- I'm
7  sorry, the software on those devices that
8  obey the standard and perform the
9  operations dictated by the standard.
10     Q.   So then is it fair to say that
11  if you have a cellular device and base
12  station that are using a particular
13  protocol, that the base station and
14  cellular device would have some software
15  program framing allowing them to implement
16  a protocol?
17         MR. TYSON:  I object to the
18  form.
19     A.   I would describe it as the code
20  would implement the protocols.
21     Q.   And the code would be code
22  residing on -- at the base station and on
23  the cellular device?
24     A.   Yes.
25     Q.   So when a device is used --

Page 44

1  strike that.
2         When a cellular device is used
3  with a particular protocol, that would
4  inform a person skilled in the art that
5  that device has some software component or
6  components that are used for purposes of
7  following and implementing the protocol?
8         MR. TYSON:  I object to the
9  form.
10     A.   I agree with that.
11     Q.   Okay.  And if a device, for
12  example, was using the Bluetooth protocol,
13  a person skilled in the art could look to
14  that protocol and understand -- strike
15  that.
16         If a device is using Bluetooth
17  protocol, for example, would a person
18  skilled in the art have a sense as to what
19  software was residing on the device so
20  that it could implement that protocol?
21     A.   Yes, for the actual Bluetooth
22  protocol, one of skill may have -- might
23  have to look at the standard, but would
24  understand what the code on the devices
25  would have to do to support the protocol.

Page 45

1     Q.   And that would hold true with
2  pretty much every type of communication
3  protocol for networks, is that fair?
4         MR. TYSON:  I object to the
5  form.
6     A.   Every standardized communication
7  protocol, yes, one of skill could read the
8  standard and understand that there is code
9  implementing that standard on the devices.
10     Q.   Okay.  And the code that would
11  be implemented on the devices for using a
12  particular protocol -- strike that, strike
13  that, I'll get back to that.
14         So we talked about communication
15  protocols, are you familiar with the term
16  transfer protocol?
17     A.   I am.  There are various
18  transfer protocols that are used for
19  transferring files, for example, large
20  blocks of data.  FTP, which stands for the
21  file transfer protocol, comes to mind.
22     Q.   Okay.  So that is somewhat
23  different than the communication protocols
24  that we've been discussing?
25     A.   It's built on top of the

12 (Pages 42 - 45)

Page 46

1 communication protocol.
2 Q. Okay. And would you consider
3 transfer protocols to be a term of art?
4 A. In the context that I was just
5 discussing, yes.
6 Q. And the security protocols, are
7 those also protocols that, if I
8 mischaracterize what you said before,
9 please correct me, that are kind of on top
10 of the communication protocol?
11 A. Yes, typically they define how
12 data is encrypted before being sent via
13 the communication protocols we've been
14 discussing.
15 Q. Okay.
16 A. As a general term.
17 Q. Understand. And have you heard
18 of the term back haul network?
19 A. Say that again?
20 Q. Back haul network?
21 A. H-A-U-L?
22 Q. Correct.
23 A. It didn't ring a bell. If it's
24 in the patents provisionals of my
25 declaration, I'd be happy to take a look,

Page 47

1 but sitting here, I don't recall that
2 term.
3 Q. Okay. And I believe there is a
4 reference in the provisional to a
5 broadband back haul infrastructure, are
6 you familiar with that?
7 A. Certainly --
8 MR. TYSON: Lack of foundation.
9 A. Certainly broadband, but it
10 didn't ring a bell. I'd be happy to -- if
11 you want to direct me to the provisional,
12 I'll be happy to take a look.
13 Q. Yes, and at the next break, I'll
14 be happy to find -- actually, I think I
15 found at least one reference, again we're
16 on page seven of 35 of Exhibit 4, the
17 provisional, it's the second paragraph,
18 and it says the roadside unit, RSU, is
19 connected via a back haul link to a
20 service node through the backbone network
21 to a service delivery node.
22 It's not the exact -- I think I
23 referred to a back haul network, but is a
24 back haul link something that you're
25 familiar with?

Page 48

1 A. Sitting here, it's not familiar
2 to me.
3 Q. Okay. You mentioned TCP/IP, I
4 believe?
5 A. Yes.
6 Q. And that is a -- would you
7 consider that -- sorry, strike that.
8 Would you consider TCP/IP to be
9 a type of transfer protocol?
10 A. It's actually refers to the set
11 of protocols that govern communications
12 over the internet, so it includes a
13 transfer protocol.
14 Q. Okay.
15 A. But it's not -- it's not -- not
16 only that.
17 Q. Understand, okay. And just
18 again going through some of the
19 terminology that's used in the
20 provisional, there's references to proxy
21 servers, are you familiar with that term?
22 A. Yes.
23 Q. And is it correct to say that
24 those are not actual hard, like, physical
25 servers, but are, like, software-based

Page 49

1 servers, or am I getting that wrong?
2 MR. TYSON: Objection to
3 foundation.
4 A. I think you're getting that
5 wrong. A proxy server is a server that
6 acts on behalf of a different server in
7 order to increase network transmission
8 speeds, things like that.
9 Q. Okay. And proxy server would be
10 considered a term of art, is that fair?
11 A. Certainly.
12 Q. Are there different types of
13 proxy servers?
14 A. Yes, depending on what function
15 the proxy server's carrying out.
16 Q. So on page 28 of 35 of Exhibit
17 4, in figure three, it says system
18 architecture, there's a reference to
19 location proxy server, and there's three
20 of them, actually.
21 A. Three shown, although they
22 represent N of them.
23 Q. Correct, correct. Do you have
24 an understanding of what is meant by
25 location proxy server?

13 (Pages 46 - 49)

1    A.   These are servers that are used
2  for storing and transmitting data to sets
3  of devices that are in a particular
4  geographical area.
5    Q.   Okay.  And had you heard of the
6  term location proxy server prior to your
7  involvement in this case?
8    A.   I don't recall hearing that
9  term, but certainly I'm aware of proxy
10  servers that were used to serve particular
11  regions, geographical regions.
12    Q.   And again, some more probably
13  basic terms that your first-year students
14  would probably be familiar with, but bear
15  with me if you don't mind, the term
16  content provider.
17    A.   Certainly.
18    Q.   How would you define that,
19  briefly, if it's possible?
20    A.   It's typically a server or a set
21  of servers in which content is placed for
22  distribution to devices that ask for that
23  content.
24    Q.   And is data provider different
25  than content provider or essentially

1  synonymous terms?
2    A.   Well --
3    MR. TYSON:  Objection.
4  Foundation.
5    A.   Content often is used
6  colloquially to mean the material that
7  people want to see or read themselves,
8  like web pages, and data could be
9  anything, but from a systems point of
10  view, whether content or data is meant to
11  be viewed by a user or not doesn't really
12  make a difference, so I have no problem
13  using those synonymously.
14    Q.   Okay.  And again, figure three
15  on page 28 of 35 of Exhibit 4 also refers
16  to data content aggregator, are you
17  familiar with that term?
18    A.   Yes.
19    Q.   And could you briefly describe
20  what that means?
21    A.   In this -- in this case, in the
22  context of this provisional application,
23  it means a server, a set of servers that
24  are used to receive data from multiple
25  devices and to store and perhaps aggregate

1  that data.
2    Q.   And again, sorry for the basic
3  terminology that we're reviewing right
4  now, but network input/output units, what
5  do those refer to?
6    A.   These -- in the context of this
7  provisional I don't recall where it
8  appears, it's just devices that are able
9  to transmit data, whether it's over the
10  air or over a wire and outside of the
11  context of provisional, does the term
12  network input/output unit have any
13  different meaning to you?
14    A.   No, I/O, input/output, one would
15  understand that a network input/output
16  network would understand something that
17  transmits data over a network.
18    Q.   And would it be fair to say that
19  would be a term of art?
20    A.   I hadn't seen it before this
21  provisional, but I think one of skill
22  would understand those three words
23  together to be what I -- what I described
24  it.
25    Q.   Okay.  And user interface, is it

1  fair to say that that is the, I didn't
2  want to say means, but that allows a user
3  to interact with a device?
4    A.   Yes, it defines the mechanism by
5  which data is displayed to the user and
6  the mechanism by which the user provides
7  input to the computer or system.
8    Q.   And are there different types of
9  user interfaces that are known currently?
10    A.   Of course.
11    Q.   And so a person skilled in the
12  art, if they needed a user interface,
13  there would be potentially some type of
14  software module that would address that
15  particular need that they could just --
16  excuse me, plug and play --
17    MR. TYSON:  Objection.
18    Q.   -- something along those lines?
19    MR. TYSON:  I object to the
20  form.
21    Q.   I can try and maybe ask it a
22  little more clearly.
23    But if a person skilled in the
24  art needed to implement a user interface
25  on a device, would there be known options

14 (Pages 50 - 53)

Page 54

1 available to that person from which they
2 could select from?
3     A.   If a user knew exactly what they
4 wanted to display -- I'm sorry, not --
5 when you say user, a developer.
6     Q.   Yes, correct.
7     A.   A developer of a system or
8 device knew exactly what information they
9 wanted to display to the user and in what
10 form, and what information they wanted to
11 receive back from the user and in what
12 form, they could either select existing
13 off-the-shelf software, user interface
14 software that performed those functions or
15 they could build it themselves using
16 frameworks provided by the devices such as
17 mobile phones for building user
18 interfaces.
19         MR. TYSON:  Off the record.
20         [Discussion held off the
21 record.]
22     Q.   Just one point just to kind of
23 make sure I'm clear for the record,
24 earlier you referred to the 899 patent and
25 the 292 patent, do you recall that?

Page 55

1     A.   Yes.
2     Q.   And you see Exhibit 1, Goldberg
3 Exhibit 1 before you, is it all right if I
4 refer to that as the 899 patent?
5     A.   Yes.
6     Q.   And that's the patent you were
7 referring to earlier?
8     A.   Correct.
9     Q.   And likewise with Exhibit 2, if
10 I refer to that as the 292 patent going
11 forward?
12     A.   Yes.
13     Q.   Thank you.  Are you familiar
14 with the term application?
15     A.   Certainly.
16     Q.   What is an application in the
17 context of computer science?
18     A.   It's a computer program intended
19 to provide some service to a user, and
20 when I say computer, of course I mean any
21 computing device such as a mobile phone or
22 a tablet.
23     Q.   So is an application an example
24 of a software program?
25     A.   Yes.

Page 56

1     Q.   So then -- strike that.
2         If one had, like, a module of
3 software code that could perform some
4 functions, is that equivalent to an
5 application?
6         MR. TYSON:  I object to the
7 form.
8     A.   It depends what that software
9 code did.  So an application is something
10 that provides information to a user.  So
11 there's lots of software running on your
12 computer that you never see, such as the
13 operating system.
14     Q.   Yup.
15     A.   So that would not be considered
16 an application.  An application is
17 something that performs a specific
18 function to provide a service to the user.
19     Q.   Okay.  And as with user
20 interfaces, are there off-the-shelf
21 applications that a person skilled in the
22 art would be aware of that they could use
23 depending on their needs in developing
24 some type of network system?
25     A.   Certainly.

Page 57

1     Q.   Can you think of any examples of
2 applications that might be useful in the
3 context of a network?
4         MR. TYSON:  I object to the
5 form.
6     A.   Well, there are -- certainly
7 there are web browsers, for example, that
8 allow users to retrieve documents, when
9 servers interact with web servers.  There
10 are file transfer applications, I
11 mentioned FTP applications, that are used
12 for transferring files.
13         I mean, there are numerous apps
14 that you can buy from the app store that
15 cause communication between a mobile
16 device and a server, so the answer is yes,
17 there's lots of off-the-shelf applications
18 you can buy to operate in the context of a
19 network.
20     Q.   And when you refer to web
21 browsers, that would include those that
22 are configured for mobile devices versus
23 PCs?
24     A.   Certainly.
25     Q.   So Chrome on my Android phone,

15 (Pages 54 - 57)

Page 58

1  would that be an example of an
2  application?
3      A.   Yes.
4      Q.   So is it fair to say application
5  is a term of art?
6      A.   Yes.
7      Q.   And I think we already covered
8  this, but if I recall correctly, you said
9  that a software program encompasses more
10  than what an application encompasses, the
11  latter being limited to providing
12  information to a user, is that fair?
13      MR. TYSON:  Objection to the
14   form.
15      A.   Yes, applications are an example
16  of software programs where they interact
17  with the user, and as I mentioned, there
18  are lots of software programs that are not
19  applications because they manage resources
20  on a device without the user being aware
21  of them.
22      Q.   And I think we may have referred
23  to this, but mobile devices can have a
24  user interface, correct?
25      A.   Mobile devices do have a user

Page 59

1  interface.
2      Q.   Wouldn't be that effective if
3  they didn't, probably.
4      A.   It would be ineffective.
5      Q.   Yeah.  Are you familiar with the
6  term user interface signal?
7      MR. TYSON:  Objection.
8   Foundation.
9      A.   I can understand it, but it
10  sounds like something -- sounds more
11  legalese than technical.
12      Q.   And I'll make a note that
13  there's a reference somewhere in Exhibit
14  4, and I will find that during a break and
15  point you to it and see if that provides
16  any more clarification.
17      Would you consider display to be
18  a term of art in the computer science
19  field?
20      A.   Yes, both the noun and the verb.
21      Q.   With respect to the noun, how
22  would you define display in this field?
23      A.   It's a hardware component that
24  allows data to be displayed to a user.
25      Q.   Does the noun version of display

Page 60

1  have any software elements in addition to
2  the hardware component?
3      A.   Well, there is certainly
4  software associated with a display that
5  actually causes the display of data on the
6  hardware display.
7      Q.   And is it accurate that --
8  strike that.
9      Is the software that can be
10  associated with a display similar to user
11  interface software in that there are a
12  variety of different software programs
13  available off the shelf that a person
14  skilled in the art could select if they
15  were trying to develop a display?
16      MR. TYSON:  I object to the
17   form.
18      A.   So the software that is
19  associated with the hardware display is
20  often called a driver, this is computer
21  code that knows about the particular
22  hardware and is able to interact with the
23  hardware.  That driver then can be used by
24  either off-the-shelf user interface
25  software or custom user interface software

Page 61

1  to cause the display of a particular
2  format that the user can see and interact
3  with.
4      Q.   I just want to make sure I
5  understand that correctly, but is it fair
6  to say then that a display would have
7  associated software that would come along
8  with it in the form of a driver that a
9  person skilled in the art could then
10  implement with a desired user interface?
11      MR. TYSON:  I object to the
12   form.
13      A.   Let me just state, you had it
14  almost exactly right.
15      Q.   Okay, please correct it for me.
16      A.   Yes, associated with a display
17  is driver software that a developer can
18  then use to either build a custom user
19  interface or can find off-the-shelf user
20  interface code to effect a user interface.
21      Q.   And again, the driver software
22  that is associated with the display, what
23  was the, again, the functionality that it
24  provides?
25      A.   That's the -- the low level

16 (Pages 58 - 61)

Page 62

1  functionality of telling the display which
2  pixels of the display to turn on and off,
3  the pixels being the little -- the dots on
4  the screen.
5      Q.   Okay.
6      A.   And what color they should be.
7      Q.   So the driver would be involved
8  any time something is displayed on the
9  display?
10     A.   Certainly.
11     Q.   Okay.
12     A.   And then from that
13  functionality, you build the user
14  interface.
15     Q.   I think we kind of touched on
16  this to a certain extent, but there are
17  known technologies, such as user
18  interfaces, databases, networks that are
19  off the shelf -- excuse me, available off
20  the shelf to use as components of a
21  communications network, is that fair?
22         MR. TYSON:  Objection to form.
23     A.   That was a long one, would you
24  mind reading that back.
25         [The requested portion of the

Page 63

1      record was read.]
2      A.   Yes.
3      Q.   And just to be clear, when I'm
4  talking about available off-the-shelf
5  technologies for use in communications
6  network and asking if they are available,
7  would you still agree that they were
8  available as of 2011?
9          MR. TYSON:  I object to the
10  form.
11     Q.   Around the filing date of the
12  provisional.
13         MR. TYSON:  I object to the
14  form.
15     A.   Yes.
16     Q.   And because of that, a person
17  skilled in the art would be aware of
18  various user interfaces that might be
19  implemented as part of a communications
20  network, correct?
21         MR. TYSON:  I object to the
22  form.
23     A.   Yes, they would be aware of
24  certain off-the-shelf software that could
25  be used if the user -- if the developer

Page 64

1  knew what they wanted to display or
2  communicate.
3      Q.   And likewise a person skilled in
4  the art would have known about various
5  types of databases that could be utilized
6  in a communications network as well that
7  were available off the shelf?
8      A.   Yeah, if -- if the user or the
9  developer knew what data needed to be
10  stored, they could choose an Oracle or a
11  Microsoft database to store that data.
12     Q.   Okay.  And with respect to the
13  communication protocols that we discussed,
14  a person skilled in the art would have
15  known, depending on the protocol, what
16  components of software would need to be
17  installed on the, in the context of a the
18  cellular network, a base station and a
19  cell phone, is that fair?
20         MR. TYSON:  I object to the
21  form.
22     A.   Yes, the -- so for example, if
23  it was 3G that was available, certainly in
24  2011, the user would know that once the
25  communication chips were selected, what

Page 65

1  software packages would need to be
2  installed in order to support the 3G
3  protocol.
4      Q.   And the same would be true with
5  respect to the Bluetooth protocol,
6  correct?
7          MR. TYSON:  I object to the
8  form.
9      A.   Yes.
10     Q.   Now, the messages that are sent
11  in these communication networks, I believe
12  we discussed that they're dictated, at
13  least in part, by the particular protocol
14  that's being used, is that right?
15     A.   Some of them, yes.  The hand --
16  so-called handshaking messages are
17  dictated by the standard.
18     Q.   And would a person skilled in
19  the art have understood that there were a
20  variety of known message types that could
21  be utilized in a network?
22     A.   The standards define the
23  different types of messages that can be
24  sent, not necessarily the content, but the
25  types of the messages.

17 (Pages 62 - 65)

1  Q.   And the messages themselves,
2  they contain information, correct?
3       MR. TYSON:  I object to the
4  form.
5  A.   Yes.
6  Q.   For lack of a better word.
7  A.   That's a perfectly good word.
8  Q.   And some of the messages, too,
9  they have a software component, would you
10 say, to them?
11 A.   No, they -- they're just data,
12 they're bits.
13 Q.   Bits.  Would you consider
14 messages in the context of a
15 communications network to be a term of
16 art?
17 A.   Yes, it's a very general term of
18 art, but it is a term of art.
19 Q.   So I want to go back to the
20 discussion of protocols, and I know that
21 you said that there are thousands of rules
22 and many protocols, and that it's complex,
23 but in terms of what you can recall, are
24 you aware of any protocols that involve
25 sending a notification to -- strike that.

1       Just to take a step back for
2  terminology, when I refer to a
3  communications network, if I refer to,
4  like, a receiving node, is it all right to
5  use that as a generic term, it could be a
6  cell phone or some other -- like a laptop
7  or a desktop --
8  A.   Yes.
9  Q.   -- is that fair?
10 A.   Yes, I understand that.
11 Q.   So are you aware of any
12 communication protocols that would --
13 strike that.
14      Are you aware of any
15 communication protocols where the
16 receiving node is provided an advanced
17 notification that it will be receiving a
18 message?
19 A.   Sitting here, I don't recall,
20 I'd have to look at the standards for the
21 various communication protocols.
22 Q.   Okay.  And I know you mentioned
23 thousands of rules, I wasn't clear -- it
24 wasn't clear to me if you also were saying
25 there's thousands of communication

1  protocols, if you had to just ballpark and
2  just in a rough sense, like how many
3  different communications protocols do you
4  think there are in existence?
5  A.   So if you're defining
6  communication protocol as a single -- a
7  single collection of standards that all
8  work together to implement one network
9  system, so for example LTE or 3G, so I
10 would consider each of those a protocol
11 that are -- that provide thousands of
12 rules that the devices must follow in
13 order to implement that protocol.
14      And so if the protocol is that
15 at the level of LTE or 3G or 2G, you know,
16 I don't know how many are out there, but
17 I'm aware of 20 or 30 of them.
18 Q.   Okay.
19 A.   And each one is supported by
20 hundreds or thousands of rules.
21 Q.   Okay.  So I would like to walk
22 through some of the claims in the patent
23 suit, Exhibit 1 and Exhibit 2.  And first
24 I'd like to go to claim one of the 899
25 patent.  And I want to focus on a specific

1  term that's in dispute, and I believe it's
2  term number six in the numbering scheme
3  that the parties have used, and I can get
4  you the document that will have that for
5  you, just one second.
6       MR. DAHLGREN:  I believe we are
7  on Goldberg 5.
8       [Whereupon, at this time, the
9  reporter marked as Goldberg Exhibit 5
10 the above-mentioned numbered list of
11 disputed claim terms for
12 identification.]
13 Q.   And Dr. Goldberg, have you seen
14 Goldberg Exhibit 5 before?
15 A.   Not that I can recall, no.
16 Q.   If you want to take a moment
17 just to review it, my understanding is
18 it's like a numbering convention for the
19 disputed claim terms, and I was just going
20 to use this numbering to try to make
21 things a little more clear on the record.
22 A.   Okay, that's fine.
23 Q.   So the first term I would like
24 to discuss is number six.
25 A.   Yes.

18 (Pages 66 - 69)

Page 70

1    Q.   And if you look at Goldberg
2  Exhibit 1, it's the 899 patent, starting
3  with claim one that's in column 29 of
4  Exhibit 1, the 899 patent.
5    A.   Yes.
6    Q.   And whenever you're there, just
7  let me know.
8        Around line 48 in column 29 of
9  Exhibit 1, the 899 patent, it says an
10 application configured for execution.
11   A.   I see that.
12   Q.   And later around line 51 says
13 the application, when executed, configured
14 to cause the at least one mobile device to
15 display of an option via display of the at
16 least one mobile device, and is it your
17 understanding that that corresponds to
18 term six as it pertains to claim one of
19 the 899 patent?  And again, you can
20 reference Goldberg Exhibit 5.
21   A.   Yes, that -- that does appear to
22 correspond to term number six.
23   Q.   So I just wanted to walk through
24 the claim and kind of see what is in here
25 and try to unpack it a little bit.

Page 71

1        With respect to term six,
2  there's a reference to a mobile device,
3  correct?
4    A.   Yes.
5    Q.   And you would agree that a
6  mobile device is structure, is that fair?
7    A.   Yeah, it's something that is
8  identifiable to somebody reading this
9  claim.
10   Q.   Okay.  And the display of the at
11 least one mobile device, you would agree
12 that's another identifiable component of
13 the structure, is that correct?
14   A.   I think that's fair.  I would
15 know what is meant by display of the at
16 least one mobile device, yes.
17   Q.   By reference of -- excuse me,
18 where it says a display, you'd understand
19 that to be the noun versus the verb
20 display that we were discussing earlier?
21   A.   Yes, the verb comes at the
22 beginning of that, that element.
23   Q.   Correct, both forms are in
24 there.
25   A.   Yes.

Page 72

1    Q.   I see.  Referring to the a
2  display, I believe you said earlier that
3  there was some driver software that was
4  associated with the displays that would --
5  is that correct?
6    A.   Yes.
7    Q.   And so the reference to a
8  display here in claim one of 899 patent
9  would necessarily inform a person skilled
10 in the art that there was some driver
11 software associated with it, is that fair?
12   A.   Yes.
13   Q.   And above, it's around line 50,
14 do you see a reference to at least one
15 broadcast short-range -- 50, 51, sorry, at
16 least one broadcast short-range
17 communications unit?
18   A.   Yes.
19   Q.   And do you understand that to
20 also connote structure?
21   A.   Yes, it's a device, it's able to
22 communicate via broadcasting in typically
23 short range, a short-range protocol.
24   Q.   And I believe we discussed
25 earlier that there are a variety of

Page 73

1  different software applications that are
2  available, and that one could select an
3  application that would be used to
4  facilitate the display of information on
5  the noun display of the device?
6        MR. TYSON:  I object to the
7  form.
8    Q.   And I think user interfaces were
9  one example of the applications that you
10 mentioned.
11   A.   So if I as a developer knew what
12 I wanted to display on a mobile device, I
13 could select software that I could
14 configure to display what I wanted to
15 display on the mobile device.
16   Q.   Okay.  And if you look on --
17 well, if you generally read through claim
18 one, you agree there are also references
19 to at least one server as well, correct?
20   A.   Well, starting at line 14 at
21 column 30, I see that.
22   Q.   Okay.  And if you look at line
23 35 of column 30, you see a reference to
24 said application, do you see that?
25   A.   I do.

19 (Pages 70 - 73)

Page 74

1   Q.   And do you understand that to
2   refer to the application that is part of
3   disputed claim term six?
4   A.   Yes, specifically the
5   application first mentioned at column 20,
6   line 48.
7   Q.   And if you also go back to
8   column 29, it is the, let's see, beginning
9   around line 58, and this is Exhibit 1, 899
10  patent, in that paragraph, you see a
11  reference to broadcast short-range
12  communications unit and via the Bluetooth
13  wireless communications protocol, do you
14  see that?
15  A.   I do.
16  Q.   And so would you agree that a
17  person skilled in the art would understand
18  that the application being referred to in
19  disputed claim term six is compatible with
20  the Bluetooth wireless communications
21  protocol?
22       MR. TYSON:  I object to the
23  form.  If there's a question, we need
24  it repeated.
25       MR. DAHLGREN:  If you wouldn't

Page 75

1   mind, if it's possible to read my
2   question back, and if it was poorly
3   worded, I will take another shot at
4   it.
5       [The requested portion of the
6   record was read.]
7       MR. TYSON:  I object to the
8   form.
9   A.   I would agree that the claimed
10  application is able to receive an
11  indication of a receipt of one or more
12  messages that appear to have been sent via
13  the Bluetooth communications protocol.
14  Q.   So a person of ordinary skill in
15  the art would understand that the mobile
16  device and the application by virtue of
17  using the Bluetooth wireless
18  communications protocol would have some
19  software on it that allowed it to do so as
20  we discussed earlier?
21       MR. TYSON:  I object to the
22  form.
23  A.   The claim says the application
24  is configured to receive an indication of
25  a receipt of the message.  The

Page 76

1   application, as we have discussed, one of
2   skill would understand to be software.
3   Q.   Understand.
4   A.   I'm --
5   Q.   Let me try and ask the question,
6   maybe -- or try to ask a slightly
7   different question.
8       The reference to the Bluetooth
9   wireless communications protocol in claim
10  one would inform one of skill in the art
11  that the mobile device had software on it
12  that allowed it to be compliant with the
13  Bluetooth wireless communications
14  protocol?
15  A.   Let me just note, Mr. Dahlgren,
16  that starting on page 33 is where I
17  address this question.  I'm just going to
18  review it to --
19  Q.   Sure, sure.
20  A.   -- to refresh my recollection.
21       The best I can tell is that this
22  claim requires that a message was received
23  via the Bluetooth wireless communication
24  protocol, and that the application is
25  running on the mobile device is configured

Page 77

1   to receive an indication of that receipt,
2   and so it doesn't say anything about the
3   receiving of an indication being part of
4   the Bluetooth protocol.
5   Q.   Sure, sure.  If you look at the
6   claim element above where it says an
7   application and it starts with
8   rebroadcast, and it's line 35, column 29,
9   Exhibit 1, the 899 patent, and it states
10  rebroadcast without solicitation and via
11  the Bluetooth wireless communications
12  protocol, the one or more messages
13  including the address portion and the
14  identifier including the at least three
15  fields and the at least one value for the
16  unsolicited broadcasting thereof for
17  intended receipt by any of the plurality
18  of mobile devices in the communication
19  range of the at least one broadcast
20  short-range communications unit, do you
21  see that?
22  A.   I do.
23  Q.   Does that clarify that the
24  mobile devices are capable of receiving
25  Bluetooth messages -- excuse me, messages

1  via the Bluetooth wireless communications
2  protocol?
3      A.   I think it's fair as claimed
4  that the -- to say that the system
5  includes these broadcast short-range
6  communications unit that send messages via
7  the Bluetooth protocol to the mobile
8  device, and since the claim also says that
9  the application received an indication of
10  a receipt of the one or more messages, I
11  think it's -- it's fair to say that the
12  messages could be received by a mobile
13  device via the Bluetooth protocol, so the
14  message itself --
15      Q.   Correct?
16      A.   -- could be received by mobile
17  device via the Bluetooth protocol.
18      Q.   And in that case, the mobile
19  device would have some software component
20  that allowed it to participate in the
21  Bluetooth communications protocol, is that
22  fair?
23          MR. TYSON:  I object to the
24      form.
25      A.   I think that's fair.

1      Q.   And going back to column 30 of
2  the 899 patent on Exhibit 1, around line
3  35, this is the said application when
4  executed, further configured to cause at
5  least one mobile device to receive from
6  the at least one server and via another
7  wireless communications protocol the
8  response message, do you see that?
9      A.   Yes.
10      Q.   And we had talked earlier about
11  how the reference to said application was
12  referring to the application in disputed
13  claim term six, is that right?
14          MR. TYSON:  I object to the
15      form.
16      A.   That's correct.
17      Q.   And so because the application
18  is configured to cause the at least one
19  mobile device to receive a message via
20  another wireless communications protocol,
21  a person skilled in the art would
22  understand that there would be some
23  software component involved with the
24  application that allowed it to participate
25  in that particular wireless communication

1  protocol, is that fair?
2          MR. TYSON:  I object to the
3      form.
4      A.   Yes.  The application could
5  cause the mobile device to receive a
6  response message via another wireless
7  communications protocol, then I think it's
8  fair to say that the mobile device is able
9  to communicate using that wireless
10  communications protocol.  Is that what
11  your question was?
12      Q.   Yes, and I guess maybe even
13  taking a step further, because it said
14  that application, when executed,
15  configured to cause at least one mobile to
16  receive, I paraphrase, the message, that
17  the application itself would have some
18  software component that allowed it to
19  participate in that particular wireless
20  communications protocol?
21      A.   Well, not necessarily.  It just
22  needs to cause the mobile device to be
23  able to, so the mobile device would need
24  to have software on it that enabled it to
25  receive a message via that communications

1  protocol.
2      Q.   Okay.  Okay.  But you would
3  agree that the reference to the various
4  communication protocols would mean that a
5  person skilled in the art, knowing which
6  protocols are being referred to, would
7  understand that there's particular
8  software components that would be on the
9  mobile devices that allowed them to
10  participate in that protocol?
11          MR. TYSON:  I object to the
12      form.
13      Q.   And let me break that down.
14      A.   Okay.
15      Q.   Earlier we discussed that with
16  respect to these communications protocols,
17  that there is a software component that
18  would reside on the, let's say, mobile
19  device that would be receiving a message
20  so that they could participate in the
21  protocol.
22      A.   Yes, if the mobile device
23  supports a particular communication
24  protocol, there is software on that mobile
25  device that supports the receiving of a

Page 82

1  message using that protocol.
2      Q.   And if a person skilled in the
3  art knew which protocol was being
4  implemented, they would be able to
5  ascertain what software component was
6  needed for the mobile device, is that
7  fair?
8          MR. TYSON:  I object to the
9  form.
10     A.   It's fair to say that given that
11  the mobile device supports a particular
12  communications protocol, one of skill
13  would know what software is running on
14  that mobile device to support that
15  communications protocol.
16     Q.   Okay.  Earlier we talked about
17  applications being, you know, a term of
18  art referring to web browsers, file
19  transfer applications, Chrome, as an
20  example -- strike that, strike that
21  question, please.
22         There's also a reference to, and
23  again, this is in column 30 -- strike
24  that.
25         Going back to column 29, and

Page 83

1  looking at -- it's line 61, the
2  application receives an indication of a
3  receipt of one or more messages, to
4  paraphrase that limitation, do you see
5  that?
6      A.   I see that passage, yes.
7      Q.   And earlier we talked about
8  messages, and messages are a term of art,
9  correct?
10     A.   Yes.
11     Q.   And messages can have specific
12  formats depending on the protocols that
13  are being used, correct?
14     A.   Yes.
15     Q.   And if a person skilled in the
16  art knew of the particular protocol being
17  used would -- strike that.
18         A person skilled in the art,
19  knowing the protocol, would then
20  understand the makeup of the message that
21  was being sent pursuant to that protocol,
22  is that fair?
23         MR. TYSON:  I object to the
24  form.
25     A.   Depending on the protocol used

Page 84

1  and the type of message, one of skill
2  would understand the format of the
3  message, but of course wouldn't know what
4  the content is.
5      Q.   Would you consider the format of
6  a message to be structure in the context
7  of the claim?
8      A.   For a given communications
9  protocol, the format of a message is one
10  aspect of structure, in other words, how
11  one communicates.  Again, it doesn't say
12  anything about the content of the message.
13     Q.   Understand, yeah, understand.
14         So just to recap, some of the
15  structural elements that we identified in
16  claim one, we have mobile device, a
17  display of a mobile device, the broadcast
18  short-range communications unit, reference
19  to a server, there was reference to
20  various communication protocols, and
21  finally, we just discussed the message,
22  and the message pursuant to protocol
23  having a format.
24     A.   So -- so the particular format
25  of a message for a particular protocol is

Page 85

1  one aspect of -- of structure, yes.
2      Q.   Okay.  And the other elements
3  that I mentioned, mobile device, display,
4  you would agree that those are structural
5  aspects as well?
6      A.   Yes, I believe so.
7      Q.   And also when we refer to the
8  communications protocol itself, that
9  provides information on the structural
10  aspects?
11         MR. TYSON:  I object to the
12  form.
13     A.   Well, certainly Bluetooth does
14  provide structure about certain -- certain
15  aspects of the claim, and given the term
16  communications protocol, one of skill
17  would know what the range of choices are
18  for communication protocols, they could
19  fill that in with their knowledge.
20     Q.   Okay.  There are -- and I think
21  we talked about this, you said 20 or 30
22  protocols that you're familiar with.
23     A.   Yes, but only a handful are
24  widely used.
25     Q.   Understand, okay.  I think it's

22 (Pages 82 - 85)

1 going to be largely the same, but for
2 disputed claim term six, I believe --
3 yeah, claims one, seven, nine and 11 of
4 the 899 patent, which is Exhibit 1, were
5 identified, if you wouldn't mind, I'd just
6 like to turn to claims seven, nine and 11,
7 and just have you confirm that the same
8 aspects that we discussed with respect to
9 claim one are present, though I'll note
10 that seven and nine refer to computer code
11 as opposed to application, so setting that
12 difference aside, if the other aspects are
13 present.
14      MR. TYSON:  I object to the
15 form.
16      A.   Do you want to -- just to make
17 sure we're on the same page, do you want
18 to list what aspects you're talking about?
19      Q.   Sure.  So with claim seven, it's
20 on column 31 of the 899 patent, which is
21 Exhibit 1, we have at the very bottom of
22 31 computer code configured for execution
23 by at least one of the plurality of mobile
24 devices in the communication range of the
25 at least one broadcast short-range

1 communications unit.  The computer code
2 when executed configured to cause display
3 of an option via a display of the at least
4 one mobile device.
5      So there we have mobile device,
6 we have broadcast short-range
7 communications unit and we have a display
8 of a mobile device, correct?
9      A.   Yes.
10     Q.   And if you look at, again, it's
11 column 31, but it's line 53, talking about
12 broadcast via a short-range first wireless
13 communications protocol, and messages, and
14 I'm paraphrasing here, but intended for,
15 received by any of the plurality of mobile
16 devices.  So you see that there's a
17 reference to this short-range first
18 wireless communications protocol?
19     A.   I see that.
20     Q.   And if you look at column 32,
21 it's line, I'd say, around 42, said
22 computer code, when executed, further
23 configured to receive from the at least
24 one server and via the second wireless
25 communications protocol the response

1 message, do you see that?
2      A.   I do.
3      Q.   And so there we have the server
4 and we have a second communications
5 protocol, a wireless communications
6 protocol.
7      A.   Yes.
8      Q.   And we also have the message as
9 well.
10     A.   I see that.
11     Q.   And you'd agree that those are
12 all structural aspects, connote structural
13 aspects with respect to the claim, is that
14 fair?
15     A.   When you say all, talk about
16 just the -- what you just mentioned, the
17 computer code -- well, and then you said
18 the second communication -- second
19 wireless communication protocol?
20     Q.   Yes, the two protocols, I was
21 kind of referring to everything all
22 together in the context of the claim that
23 it provides aspects of structure to the
24 claim.  Like the protocols would dictate
25 that the mobile devices have certain

1 software so they can participate with the
2 protocol, is that correct?
3      A.   That's correct.
4      Q.   The protocol would dictate that
5 the message has a particular format?
6      A.   Yes, again, format, not content,
7 that's correct.
8      Q.   And there is the other computer
9 code, the mobile device, the other
10 display, reference to the server that's in
11 communication with the mobile device, the
12 computer card.
13     A.   So a server's a machine,
14 computer code, of course, can be used to
15 do anything, but I don't think we -- we
16 talked about computer code, because it
17 didn't appear in the claim one.
18     Q.   Correct, correct.
19     A.   Right.
20     Q.   And that's why I said that I
21 believe it's seven and nine refer to
22 computer code --
23     A.   Okay.
24     Q.   -- versus application, so
25 setting that difference aside, the other

1  structural aspects of claim one that we
2  discussed --
3      A.   Okay.
4      Q.   -- are generally present in
5  claim seven?
6      A.   The other ones, yes.
7      Q.   I just would like to confirm the
8  same with respect to claim nine, and I'm
9  happy to walk through it or if you just
10  want to review and say that you agree that
11  the same structural aspects are present,
12  that's fine as well, whichever's easier
13  for you.
14      A.   Well, so claim nine has
15  reference to a short-range first wireless
16  communications protocol, and so knowing
17  that there's a communications protocol
18  being used, you would know that there's
19  software on the phone.
20          And you would further know that
21  messages happen to have a certain format.
22      Q.   Yes, and also if you look at
23  column 34 where it says said computer
24  code, it refers to a second wireless
25  communications protocol, so that would be

1  another example?
2      A.   And that would dictate a
3  particular message format as well.
4      Q.   And so that would apply in this
5  case to the response message that is
6  around line 46 of column 34 of the 899
7  patent, right?
8      A.   Yes, again, that would dictate
9  the formats, but not content.
10      Q.   Understand.  And again, there's
11  a reference to server that's in
12  communication with the mobile devices?
13      A.   Yes.
14      Q.   And we have the mobile device
15  and we also have the display of the mobile
16  device is also present in the claim?
17      A.   Correct.
18      Q.   And there's also the broadcast
19  short-range communications unit that's
20  referenced in claim nine as well as claims
21  one and seven?
22      A.   Yes.
23      Q.   And those, again, all connote
24  some degree of structure for the claim, is
25  that fair?

1      A.   So the -- yeah, connotes certain
2  aspects of structure, I agree with that.
3      Q.   And actually, if I could just
4  turn your attention to -- it's column 34,
5  line -- around 38, it talks about -- I'll
6  read this, the full quotation beginning at
7  35, after the particular location-relevant
8  information is located based on the at
9  least one value caused to be sent to the
10  at least one mobile device and via the
11  internet protocol a response message.
12      A.   Okay.
13      Q.   So the fact that the mobile
14  device can receive a response message via
15  the internet protocol, would that
16  similarly inform a person skilled in the
17  art that there's some software component
18  on the mobile device that allows it to
19  receive such a message?
20      A.   Well, it says it specifically at
21  line 44 of column 34 starting line 44 that
22  the computer code, which is configured for
23  execution by a mobile device, is further
24  configured to receive the response message
25  via -- I'm sorry, take that back, that

1  doesn't mention in that protocol.
2      Q.   Yes, it just appeared to me that
3  there were three protocols, at least being
4  referenced in claim nine, and the only
5  point being that as we discussed, the
6  protocols -- a person skilled in the art
7  would understand that by using a protocol,
8  there's a software component associated
9  with the receiving device?
10      A.   Yeah, I would -- what I would
11  say is the claim element starting at
12  column 34, line 43 -- I'm sorry, line 44,
13  indicates that there is software for
14  receiving messages via wireless
15  communications protocol on the mobile
16  device.
17      Q.   And that would connote some
18  degree of structure, correct?
19      A.   Yes, to some degree.
20      Q.   And I think now we can turn to
21  claim 11, and this one does refer to
22  application like claim one.  It's
23  beginning on the bottom -- yeah, towards
24  the bottom of column 35 of the 899 patent.
25      A.   Can you ask the question again?

24 (Pages 90 - 93)

Page 94

1    Q.   Sure, I just would like you to
2  review claim 11, and again, I just want to
3  go over the same kind of structural
4  components that we discussed with respect
5  to claims one, seven and nine.  We have
6  broadcast short-range communications unit?
7    A.   Yes.
8    Q.   We have first wireless
9  communications protocol?
10    A.   Yes.
11    Q.   Messages according to that
12  protocol that are intended for receipt by
13  mobile devices, is that correct?
14        I'm sorry, I was looking at the
15  limitation on column 35, beginning at line
16  54.
17    A.   Yes, so -- yes, so it claims
18  broadcasting by a first wireless
19  communication protocol, one or more
20  messages, they're intended to be received
21  by mobile devices.
22    Q.   And so that would indicate that,
23  one, the messages have a particular format
24  according to that first wireless
25  communications protocol, correct?

Page 95

1    A.   I would agree with that.
2    Q.   And two, it would indicate that
3  the mobile devices have some software
4  component that allows them to participate
5  in that first wireless communications
6  protocol?
7    A.   I think that's fair, yes.
8    Q.   And also we have an application,
9  this is at line 65 of column 35 of the 899
10  patent, and again similar to claim one, an
11  application configured to be executed by
12  at least one of the plurality of mobile
13  devices, the application, when executed,
14  configured to cause display of an option
15  via a display of the at least one mobile
16  device.
17    A.   I see that.
18    Q.   And so again, we have the mobile
19  device and we have the display of the
20  mobile device, so there are structural
21  components in the claim?
22    A.   So a mobile device and its
23  hardware display, yes, is a -- is an
24  aspect of structure.
25    Q.   And the hardware display would

Page 96

1  have -- it was, I think you said, and I
2  don't want to get it wrong, some driver
3  software associated with it?
4    A.   Yes.
5    Q.   So there would be some
6  additional -- strike that.
7        A person skilled in the art
8  would understand that by virtue of
9  referencing a hardware display, that it
10  would also include a software component,
11  specifically the driver for the display?
12    A.   Yes.
13    Q.   And I think we said that that
14  driver essentially allows, like, the image
15  to be depicted on the display, like which
16  pixels light up and things like that,
17  correct?
18    A.   Correct.  You know, the
19  developer would have to determine what
20  needs to be displayed, but then the driver
21  code could be used to affect whatever
22  image the developer chooses.
23    Q.   And are there -- strike that.
24        We also have a reference to a
25  server in claim 11?

Page 97

1    A.   Yes.
2    Q.   And we have reference to
3  internet protocol as well, it's around 24
4  of column 36, it calls out the mobile
5  device application actions, around 29.
6    A.   Okay.  Is there a question?
7    Q.   Sorry, and mobile device
8  application, you'd agree, is referring to
9  the application referred to on line 65 of
10  column 35 of the 899 patent?
11    A.   Yes, that's the way I read it.
12    Q.   Okay.  And also again on column
13  36, said application when executed further
14  configured to receive from the at least
15  one server and via the second wireless
16  communication protocol the response
17  message, so we have another communications
18  protocol and a message that a person who
19  is skilled in the art would be formatted
20  according to that protocol, correct?
21    A.   Yes.
22    Q.   And a person with skill in the
23  art would also understand that the mobile
24  device would have to be -- would have a
25  software component that would allow it to

25 (Pages 94 - 97)

1 participate in that second wireless
2 communications protocol, right?
3    A.   Yes.
4    Q.   So you would agree that claim 11
5 has essentially the same structural
6 components that we discussed with respect
7 to claims one, seven and nine with the
8 exception of the difference between
9 application and computer code, is that
10 fair?
11    A.   Yes, these -- the claims that we
12 reviewed do have the elements that we've
13 discussed that provide some structure.
14    Q.   And you would agree that the --
15 taking claim 11, for example, that the
16 later reference to said application or
17 mobile device application, that that would
18 inform what was being referred to as the
19 an application on line 65 of column 35?
20    MR. TYSON:  I object to the
21 form.
22    A.   Well, I would say those
23 references to said application and mobile
24 device application refers to the an
25 application introduced on line 65 of

1 column 35.
2    Q.   Okay.  And so to the extent that
3 the later references in the claim include
4 additional structural components, like
5 compliant with a different communications
6 protocol, that that would inform the
7 application that is part of disputed claim
8 six, is that fair?
9    MR. TYSON:  I object to the
10 form.
11    A.   It would describe some aspects,
12 some additional aspects of the application
13 mentioned in disputed claim six, of course
14 only some of the aspects.
15    Q.   Understood, but it would give a
16 person skilled in the art some information
17 about the structure and meaning of the
18 application, fair?
19    MR. TYSON:  I object to the
20 form.
21    A.   It would give some additional
22 information, I agree with that.
23    MR. DAHLGREN:  Now there is a
24 disputed -- well, I don't know what
25 time it is, if this is a good time for

1 a lunch break or not.  I could -- I
2 was going to go into seven, disputed
3 seven, which is just 292, but we can
4 do that after we get a bite to eat or
5 now, just power through if you want,
6 till one o'clock.
7    MR. TYSON:  I think we can do a
8 short --
9    THE WITNESS:  I'm okay either
10 way.
11    MR. TYSON:  Let's just go off
12 the record and we'll figure it out.
13    [Discussion held off the
14 record.]
15    Q.   So Dr. Goldberg, if you could
16 turn to Exhibit 2, that's the 292 patent,
17 and we're going to be discussing disputed
18 claim term seven, and if we look at
19 Goldberg Exhibit 5, claims one, 15 and 28
20 were identified, so we'll be looking at
21 those claims, and again, just identifying
22 some of the structural aspects that are
23 present in the claim.
24    A.   Okay.
25    Q.   So beginning with claim one, and

1 I guess let's just walk through it
2 beginning on column 30 of the 292 patent,
3 the actual disputed term seven is in
4 column 31, but we'll get to that, but I
5 just want to walk through what's present
6 in the claim.
7    You have a broadcast short-range
8 communications unit, do you see that,
9 around lines, like, 43?
10    A.   I do.
11    Q.   Okay.  We also have a first
12 wireless communications protocol, and
13 broadcast messages intended for receipt by
14 a plurality of mobile devices, do you see
15 that?
16    A.   I do, in column 30 around lines
17 46 to 51.
18    Q.   And like we discussed before,
19 the communications protocol would require
20 some software on the mobile device and it
21 would also inform the format of the
22 message, correct?
23    A.   Yes.
24    Q.   And we have a second broadcast
25 short-range communications unit as well

Page 102

1    around line 58, column 30.
2        A.   Yes.
3        Q.   And we have mobile devices, and
4    then going now, looking at around line
5    seven of column 31, this is, what I
6    believe is identified as disputed claim
7    term seven, but it's a -- it says code
8    configured to be executed by at least one
9    of the plurality of mobile devices, the
10   code, when executed configured to cause
11   display via display of the at least one
12   mobile device of an option for causing
13   first visual information and second visual
14   information to be output via the at least
15   one mobile device.
16       A.   I see that.
17       Q.   And so there we have mobile
18   devices having code, and the display of
19   the mobile device, correct?
20       A.   Yes.
21       Q.   And we know that the code of the
22   mobile devices is informed by the
23   communications protocols that are --
24   reside in the claim, correct?
25           MR. TYSON:  I object to the

Page 103

1    form.
2        A.   Well, I think as we discussed
3    before, that given a communications
4    protocol, one of skill would know that
5    there is code on the mobile device to
6    support that protocol.
7        Q.   Okay.  Okay.  And then just
8    again kind of walking through the claim,
9    we also have a server that is in
10   communication with the at least one mobile
11   device, and if you look at column 31
12   around line 47, eight, it says via the
13   internet?
14       A.   Yes, I see that.
15       Q.   And if -- if the server's in
16   communication with the mobile device via
17   the internet, would you understand that to
18   mean, like, via the internet protocol?
19       A.   Well, it seems to be physically
20   the internet, but that would require the
21   use of the internet protocol.
22       Q.   Okay.  And I guess if you look
23   at lines 50, 51, I think it clarifies that
24   received from at least one mobile device
25   and internet protocol over the internet at

Page 104

1    least in part at least one message.
2        A.   Yes.
3        Q.   So I think that clarifies that
4    it's using, in part, the internet
5    protocol.
6        A.   Yeah, the server is, yes.
7        Q.   And because the mobile device is
8    receiving the message from the server
9    that's using the internet protocol, would
10   the mobile device also have to be
11   configured with some type of software to
12   allow it to participate in that protocol?
13       A.   Yes, the mobile device would
14   need to have software on it.
15       Q.   So the internet protocol would
16   inform the structure of the server as well
17   as the mobile device, is that fair?
18       A.   Some aspects of the structure of
19   the mobile device and the server, yes.
20       Q.   I want to make sure I didn't
21   miss any other protocols, but you would
22   agree that there is at least substantial
23   similarity between the structural aspects
24   that are recited in claim one of the 292
25   patent as compared to those that we

Page 105

1    discussed with respect to the 899 patent
2    disputed claim six, is that fair?
3        A.   That's fair.  You're talking
4    about the communication protocols, the
5    broadcast communication units, things like
6    that.
7        Q.   Yes, mobile device, display,
8    server.
9        A.   Those aspects are similar with
10   the 899.
11       Q.   And then in the messages that
12   are being transferred pursuant to
13   particular protocols which would have
14   particular formats as a result?
15       A.   Correct.
16       Q.   Okay, so I think that covers
17   claim one.  The next one is claim 15, and
18   again, I think unlike the 899 patent where
19   there was a difference between application
20   and computer code, I believe that the
21   other claims, 15 and 28 are -- do not have
22   those differences.  So claim 15's at the
23   bottom of column 39 of the 292 patent,
24   which is Exhibit 2.
25       A.   Yes, I see it.

27 (Pages 102 - 105)

Page 106

1    Q.   And here again, broadcast short-
2    range communications unit, broadcast
3    messages sent via or broadcast via first
4    wireless communications protocol with
5    mobile devices.
6         We have second broadcast
7    short-range communications unit that also
8    sends or broadcasts via the first wireless
9    communications protocol, and we have again
10   the code configured to be executed, code
11   when you get to actual disputed claim term
12   seven, it's in column 40, around line 29,
13   the code when executed configured to cause
14   display via a display of the at least one
15   mobile device.  So those are other
16   structural components that we discussed,
17   correct?
18   A.   So I would say my answer for
19   these particular elements for claim 15
20   would be the same as for claim one, and
21   the same as I said about the claim one is
22   899.
23   Q.   Yes, so provides certain
24   structural aspects of the claim, is
25   that --

Page 107

1    A.   Yes.
2    Q.   -- a fair characterization?
3    A.   Generally speaking, certain
4    aspects of format and the mechanism for
5    communicating information without
6    informing the actual content of the
7    information.
8    Q.   Yes, I understand.  There's also
9    reference to the server, internet protocol
10   and, you know, messages according to
11   different protocols, so we can kind of
12   keep reviewing it in more detail, but if
13   you'll agree that claim 15 is essentially
14   the same as claim one in terms of the
15   specific structural components that we've
16   discussed, we can jump to claim 28 and try
17   to move this along.
18   A.   So as I said, for claim 15, the
19   same elements that connote some structure
20   that we discussed for claim one apply to
21   claim 15.
22   Q.   Okay.  Now turn to claim 28, it
23   begins on column 43 of the 292 patent,
24   Exhibit 2.
25   A.   I see it.

Page 108

1    Q.   If you want to just review it
2    quickly and confirm whether or not it has
3    the same structural components that we
4    discussed with respect to claims one and
5    15, that's fine, or I can walk through it
6    again, whichever is easier for you.
7    A.   Just give me a minute --
8    Q.   Sure.
9    A.   -- to read this.
10   Q.   Sure, take your time.
11   A.   Mr. Dahlgren, I'll say that my
12   opinions about the following claim terms
13   for claim 28 are the same as those I've
14   expressed for claims one and 15 of the 292
15   patent as well as, for example, claim one
16   of the 899 patent.
17   Q.   Okay.
18   A.   Broadcast short-range
19   communications unit, first wireless
20   communications protocol, second broadcast
21   short-range communications unit, display
22   of the at least one mobile device,
23   internet protocol, second wireless
24   communications protocol and the server,
25   period.

Page 109

1    Q.   And the messages according to
2    the protocols, correct?
3    A.   Yes, the messages, the format
4    would be defined by the protocol.
5         MR. DAHLGREN:  I think we can
6    take a break for lunch quick.  Thank
7    you for just letting me power through
8    that.
9         THE WITNESS:  Sure.
10        [A recess was taken.]
11   Q.   Dr. Goldberg, I would like you
12   to, if you have, I think it was Exhibit 5,
13   was the numbered disputed claim terms,
14   Goldberg Exhibit 5.
15   A.   Yes.
16   Q.   I'd like to discuss eight and
17   nine.  So starting with eight,
18   application, so it's the same, beginning
19   with an application, but it refers to, and
20   if you take Exhibit 1, the 899 patent,
21   column 29, and you look down, it's the
22   application configured language around
23   lines 48 and 49, and then it is also an
24   indication of a receipt which is 58
25   through, like, 64, and you can just take a

28 (Pages 106 - 109)

Page 110

1   look at that.
2     A.  So it's column 29 starting at
3   what line?
4     Q.  The limitation is -- starts at
5   48, an application configured for
6   execution by at least one of the plurality
7   of mobile devices, and then it's ellipsed,
8   and it drops down to the application when
9   executed causes at least one mobile device
10   to, and then it goes down to what I said
11   was line 58, receive indication of a
12   receipt along with the rest of the
13   language that's in that claim limitation.
14     A.  Yes, okay.
15     Q.  And so this is going to be very
16   similar to what, you know, we did before,
17   but just again talking about what in the
18   claim provides some aspects of structure,
19   and I think it will be largely duplicative
20   of what we did when we talked about
21   disputed claims of six and seven as we go
22   through this, and so hopefully we can
23   marshal on fairly quickly.
24     But again, just, you know,
25   looking at claim one, we have the same

Page 111

1   kind of structural aspects reflected by
2   the short-range communications unit, the
3   communications protocol, the mobile device
4   display, the Bluetooth wireless
5   communications protocol, which is
6   specifically called out in claim one, the
7   server, internet protocol and it says
8   another wireless communications protocol.
9     So point being we have the same
10   kind of structural elements that are
11   present in the claim that we discussed
12   earlier --
13     A.  Right.
14     Q.  -- is that fair to say?
15     A.  Yeah, so my opinion that I
16   expressed earlier with regard to 899 claim
17   one still stands, but now we're looking at
18   a different claim element that you
19   directed me to, right?
20     Q.  Yes.
21     A.  Starting at line --
22     Q.  We are --
23     A.  -- 58.
24     Q.  -- and the reason we discussed
25   before the other aspects of the claim is

Page 112

1   because some of those inform the
2   application, some inform the mobile
3   device, even the display, and so those
4   would still have some bearing on how a
5   person skilled in the art looking at the
6   claim as a whole would view the particular
7   claim limitations.
8     So for example, if we're talking
9   about the application, an application
10   configured for execution by at least one
11   of the plurality of mobile devices, so
12   that's around line 48 of column 29.
13     A.  I see that.
14     Q.  And then, you know, we jumped
15   over to column 30, around line 35 where it
16   referred to application again and provides
17   some additional information, and then
18   there was the interaction between the
19   server sending messages to the mobile
20   devices that we discussed, that's
21   reflected earlier in column 30.
22     And so the point being that all
23   these different structural aspects of the
24   claim that we discussed, that they would
25   still inform how a person would interpret

Page 113

1   an application -- or excuse me, disputed
2   claim eight, that's the point that I was
3   trying to make, is that the point that you
4   would agree or would disagree?
5     MR. TYSON:  I object to the
6   form.
7     A.  To the extent that disputed
8   claim eight recites the elements that we
9   already discussed, then my opinion on
10   those elements apply to disputed claim
11   eight.
12     Q.  Okay.
13     A.  But it's just those elements.
14     Q.  Okay, understand.  And, you
15   know, disputed claim eight, it does refer
16   to the application configured, and then
17   goes on to recite the received indication
18   of receipt, that limitation in lines 58
19   through 60 -- is it 64 --
20     A.  I see that.
21     Q.  -- in column 29, so the point
22   being is that elsewhere where it talks
23   about the application or it talks about
24   short-range communication unit or
25   different communication protocols and

Page 114

1   messages, that those can also inform how a
2   person skilled in the art will understand
3   the application that's recited at line,
4   like, 48 of column 29, do you follow me?
5      A.   Yes, so as I discussed, it might
6   inform about certain aspects of the
7   limitation.
8      Q.   Yes, okay, and I think that's --
9   and that's fair.  And the point I wanted
10  to make here is again we're dealing with
11  the same other structural components that
12  we discussed previously, and that those
13  are still present, and you would agree
14  they may have some bearing on disputed
15  claim eight, is that fair?
16      MR. TYSON:  I object to the
17  form.
18      A.   Yes, some bearing.
19      Q.   Looking at this now, do you see
20  anything that would connote any other
21  structural limitation to the claim that I
22  might have missed?  And you can take a
23  minute to review the claim, and we'll
24  probably go on to the next one.
25      A.   Not that I can think of.

Page 115

1      Q.   Okay.  So just to kind of
2   summarize it, you agree with respect to
3   our earlier discussion with the other
4   disputed claim terms like six and seven,
5   that with respect to claim one of the 899
6   patent, those same structural features are
7   present and may have bearing with respect
8   to disputed claim eight?
9      MR. TYSON:  I object to the
10  form.
11      A.   Yes, they inform some aspect of
12  claim eight.
13      Q.   Okay.
14      A.   I'm sorry, of claim term eight.
15      Q.   Claim term eight, yes, correct,
16  okay.  So I'm going to kind of do the same
17  thing with claim seven of the 899 patent,
18  it's Exhibit 1, claim seven is on column
19  31, begins around line 44.
20      A.   I see it.
21      Q.   And you would agree that the
22  same structural components that we
23  identified in our earlier discussion of
24  claim seven are still present and have
25  some bearing on how disputed claim term

Page 116

1   eight might be understood by a person
2   skilled in the art?
3      MR. TYSON:  I object to the
4   form.
5      A.   Yes, to the extent that those
6   elements such as the Bluetooth or wireless
7   communications protocol, et cetera, that
8   we've already discussed appear in disputed
9   claim eight, those terms would have some
10  bearing on disputed claim eight.
11      Q.   And going back to, actually,
12  claim one in the Bluetooth wireless
13  communications protocol, are you aware
14  whether the Bluetooth wireless
15  communications protocol would involve
16  sending some indication that a message had
17  been sent to a mobile device --
18      MR. TYSON:  I object to the
19  form.
20      Q.   -- as part of the protocol?
21      A.   Sitting here, I don't recall,
22  I'd have to look at the standard.
23      Q.   Okay.  And are you aware of any
24  wireless communication protocols that
25  would have a -- strike that.

Page 117

1      Are you aware of any wireless
2   communication protocols that would, in
3   connection with sending a message to a
4   mobile device, also include an indication
5   that the message was sent?
6      MR. TYSON:  I object to the
7   form.
8      A.   Sitting here, I don't recall, I
9   would have to look at the standards.
10      Q.   Okay.  Okay.  And you didn't
11  review the various wireless communication
12  protocols, Bluetooth protocols in
13  preparing your declaration, is that fair?
14      A.   Yes, that's fair.
15      Q.   Again, with claim seven, you
16  would agree, the same structural
17  components that we discussed earlier are
18  present, and I apologize if I asked this
19  question already, and that they would have
20  bearing again on how disputed claim eight
21  would be understood by a person skilled in
22  the art?
23      MR. TYSON:  I object to the
24  form.
25      A.   Yeah, you did ask before, and

30 (Pages 114 - 117)

Page 118

1  I'll just repeat my answer, and that is to
2  the extent that those terms that we
3  discussed, communications protocol,
4  broadcast communication unit, appear in
5  disputed claim eight then they have
6  bearing on how one would understand claim
7  eight.
8      Q.    So that raises --
9      A.    I apologize again, I meant claim
10  term eight.
11     Q.    Yes.  And you understand that
12  claim term -- disputed claim term eight
13  which is in claim seven, computer code
14  configured for execution, was going to
15  ellipse it to receive an indication of
16  received, you understand that that's
17  disputed claim term eight for claim seven,
18  right?
19     A.    That's what it appears to be,
20  right.
21     Q.    And so you would agree that
22  other references to the computer code
23  would inform the meaning of that term,
24  correct?
25         MR. TYSON:  I object to the

Page 119

1      form.
2      Q.    Even if they were not present in
3  the language of disputed claim term eight?
4         MR. TYSON:  Objection.
5      A.    Well, I understand that each
6  claim limitation should be read in the
7  context of the entire claim, and so -- and
8  so yes, there will be other portions of
9  the claim that inform one's understanding
10  of certain claim limitation.
11     Q.    And for example, one of those
12  portions looking at claim seven of the 899
13  patent, again disputed claim eight refers
14  to the computer code configured for
15  execution, but if you look at, for
16  example, it's around line 43 of column 32,
17  it refers to said computer code when
18  executed further configured to and then
19  forms some different things, is that
20  correct?
21     A.    I see that, yes.
22     Q.    And so you'd agree that to the
23  extent that it refers to various wireless
24  communication protocols, messages,
25  interactions with the server, that it

Page 120

1  would inform the meaning of what the
2  computer code configured for execution in
3  disputed claim eight means, is that fair?
4      A.    Fair, yes.
5      Q.    And so now again, the same, I
6  guess, questions with respect to claim
7  nine of the 899 patent, it's Exhibit 1,
8  it's on column 33.
9      A.    Yes.
10     Q.    You would agree that the same
11  structural elements that we discussed
12  previously are still present in claim
13  nine, is that fair?
14     A.    Yes, the same ones that we
15  discussed.
16     Q.    And that the structural
17  elements -- strike that.
18         And you would agree that the
19  structural elements that we discussed with
20  respect to claim nine would have some
21  bearing on how a person of ordinary skill
22  in the art would understand the disputed
23  claim term eight, is that fair?
24         MR. TYSON:  I object to the
25     form.

Page 121

1      A.    Yes.  As I said, to the extent
2  that those terms appear in claim eight or
3  are used to inform about the claimed
4  computer code elsewhere in the claim.
5      Q.    But even with respect to aspects
6  that inform mobile device or the broadcast
7  short-range communication unit and various
8  protocols, you would agree that those
9  would still have some bearing on how a
10  person skilled in the art would understand
11  disputed claim term eight?
12     A.    Yes.
13     Q.    Okay.  And now claim 11 of the
14  899 patent, Exhibit 1.  Again, you agree
15  that the same structural elements that we
16  discussed previously with respect to claim
17  11 of the 899 patent are present and that
18  they would have a bearing on disputed
19  claim term eight, is that fair?
20     A.    Yes.
21     Q.    So I believe we covered one,
22  seven, nine, 11.  So now if you wouldn't
23  mind, if you'd look at Exhibit 2, the 292
24  patent, and I'll make sure I get these
25  terms right, but I believe it's claims

31 (Pages 118 - 121)

Page 122

1  one, 15 and 28.
2       And I'm sorry, just quickly, in
3  claim nine of 899 patent, it refers to a
4  short-range wireless communication
5  protocol, do you have any understanding as
6  to how the, I guess, the short-range
7  modifier might change the protocol from
8  other wireless communication protocols?
9       A.   Well, there are certain
10  protocols that are normally considered to
11  be short-range, in other words, covering a
12  small, fairly small wireless distance, and
13  Bluetooth would be one of those.
14       Q.   Okay.  So would a person of
15  skill in the art understand that a
16  reference to a short-range wireless
17  communication protocol could include
18  Bluetooth?
19       A.   I think so.
20       Q.   Okay.  So looking at Exhibit 2,
21  the 292 patent, start at claim one.  You
22  would agree that, and again, this is
23  similar to what I was asking before, I'm
24  trying to just expedite this, that the
25  same structural elements that we discussed

Page 123

1  earlier with respect to claim one of the
2  292 patent are still present and would
3  have some bearing on the way a person of
4  ordinary skill in the art would understand
5  disputed claim term eight?
6       And please take your time to
7  review anything that you need to.  And if
8  it's easier, I can walk you through it.
9       A.   No, my testimony would be the
10  same, those two claim terms that we
11  discussed as having -- as connoting some
12  structure would have a bearing on a person
13  of skill's understanding of disputed claim
14  term eight.
15       Q.   Okay.
16       A.   In claim one of the 292 patent.
17       Q.   Okay.  And also -- and so the
18  same question with respect to claim 15 of
19  the 292 patent.  With respect to the claim
20  15, we discussed a number of different
21  elements that would connote structure that
22  are present in the claim, and you would
23  agree that those structural elements would
24  have some bearing on how a person skilled
25  in the art would understand disputed

Page 124

1  term eight as is recited in claim 15 of
2  the 292 patent?
3       A.   I think my answer for claim 15
4  would be the same as for claim one and the
5  other claim.  The other claims that we
6  discussed of the 899 patent.
7       Q.   Okay.
8       A.   They would have some bearing on
9  one's understanding of the disputed claim
10  term eight.
11       Q.   The same question with respect
12  to claim 28 of the 292 patent, and that
13  begins on column 43, we're on Exhibit 2,
14  and you would agree that the same
15  structural elements that we discussed with
16  respect to claim 28 of the 292 patent
17  would have some bearing on how a person of
18  ordinary skill in the art would understand
19  disputed claim term eight -- strike that.
20       You would agree that the
21  structural elements we discussed
22  previously with respect to claim 28 of the
23  292 patent would have some bearing on how
24  a person of ordinary skill in the art
25  would understand disputed claim term

Page 125

1  eight?
2       A.   Yes, the particular claim terms
3  that we discussed as having some structure
4  would have some bearing on claim term
5  eight in the context of claim 28 of the
6  292 patent.
7       Q.   And are you aware of any
8  communication protocols that provide,
9  along with a message that is being sent to
10  a mobile device, some type of notification
11  or indication that the message has been
12  sent and received by that mobile device?
13       MR. TYSON:  I object to the
14  form.
15       A.   So as I discussed previously,
16  most communication protocols provide a
17  mechanism for -- in which the recipient of
18  a message sends an acknowledgment to the
19  sender letting them know that a message
20  was received.  I don't think this applies
21  here, but that's -- that's what I recall
22  almost every communications protocol I can
23  think of.
24       Q.   Okay.  But can you say that
25  those protocols that you can think of in

Page 126

1   which you noted that there was the
2   confirmation of receipt, do you recall
3   whether there was any type of indication
4   of receipt that was provided along with
5   the message?
6           MR. TYSON:  I object to the
7   form.
8       A.   Provided to the recipient?
9       Q.   Correct.
10      A.   I don't recall, I'd have to look
11  at the standards.
12      Q.   So it's possible that both would
13  be done in a particular protocol
14  whereas -- that is there would be a
15  confirmation, but also indication that a
16  message had been sent along with a message
17  to the recipient, that an indication or a
18  notification that a message was sent was
19  sent along with the message itself to the
20  recipient?
21          MR. TYSON:  I object to the
22  form.
23      A.   I'd have to look in the
24  standards.  There's no disclosure that I
25  found in the patents or the applications,

Page 127

1   so I'd have to go look at the standards.
2       Q.   But if the standards had that
3   functionality and the person with skill in
4   the art was knowledgeable about the
5   standards was able to understand that that
6   functionality flows from the use of the
7   standard, is that fair?
8           MR. TYSON:  I object to the
9   form.
10      A.   I think it's fair to say that if
11  the standard says that an indication of a
12  receipt is sent along with the data,
13  then -- then one of skill familiar with
14  that standard would know what that -- what
15  that is.
16      Q.   Okay.  And at this time, you're
17  just not familiar with the standard to
18  know if that's the case?
19      A.   Right, I would have to review
20  the standards to refresh my recollection.
21      Q.   Okay.  Now I'd like to discuss
22  disputed claim term nine, and that also
23  involves claims one, 15 and 28 of the 292
24  patent which is marked as Exhibit 2.  And
25  you'll note that -- if you look at it,

Page 128

1   that it is similar to disputed claim term
2   eight, except that it's referring to
3   indication received from a second
4   broadcast short-range communications unit,
5   I just wanted to point that out if that --
6   if that helps you.
7           But with respect to claims one,
8   15 and 28, the structural elements that
9   we've discussed today that are present in
10  these claims, you would agree that they
11  would have some bearing on how a person of
12  skill in the art would understand disputed
13  claim term nine, is that fair?
14      A.   Disputed claim term nine refers
15  to mobile devices, refers to broadcast
16  short-range communications unit and first
17  wireless protocol, and those we've
18  discussed one of skill would understand
19  some structure of, so at least those would
20  have some bearing on one's understanding
21  of disputed claim term nine.
22      Q.   And again, as we discussed
23  before, because the claims also recite
24  interactions between the server and the
25  mobile devices that have the code

Page 129

1   configured to be executed upon them and
2   the various protocols that are used for
3   communication with the mobile devices,
4   that the other structural elements that we
5   discussed, while maybe not recited
6   expressly in disputed claim term nine,
7   would nonetheless have some bearing on how
8   a person skilled in the art would
9   understand disputed claim term nine?
10      A.   I mean --
11          MR. TYSON:  I object to the
12  form.
13      A.   I agree with that.
14      Q.   Again, I was asking these
15  questions with respect to one, 15 and 28
16  kind of collectively in order to try to
17  expedite things.
18      A.   Yeah.
19      Q.   Would you agree that the same
20  applies to the three claims?
21      A.   I do.
22      Q.   So now I'd like to discuss
23  disputed claim terms it's going to be ten
24  and 11.  We'll start with ten.  Ten is
25  just claim one of the 899 patent, it's

1  Exhibit 1.  And if you look at, it's
2  column 29, it refers to said application
3  when executed, and that language can be
4  found in column 30 around line 35, and
5  then it's ellipsed, and it then refers to
6  what starts at, it looks like, line 41 of
7  column 30 in response to the receipt, do
8  you see that?
9      A.   I do.
10     Q.   And again, you'd agree that the
11  same structural components that we've
12  discussed earlier with respect to claim
13  one would have some bearing on how a
14  person of ordinary skill in the art would
15  understand disputed claim term ten, is
16  that fair?
17     A.   Yes, my prior testimony about
18  the -- the elements that we've been
19  discussing would have some bearing on the
20  understanding of disputed claim term ten.
21     Q.   So now disputed claim term 11
22  covers claims seven, nine and 11 of the
23  899 patent and also claim one of the 292
24  patent, so if we stick with the 899
25  patent, Exhibit 1, and looking at claim

1  seven, so what we have in claim seven,
2  it's around lines 43, column 32, and it's
3  said computer when executed further
4  configured to, and again, similar to claim
5  one it's ellipsed and it goes down to in
6  response -- yeah, response to the receipt,
7  so that's beginning around line 47 of
8  column 32, do you see that?
9      A.   I do.
10     Q.   So that disputed claim term 11
11  in claim seven of 899 patent, you would
12  agree that the structural elements that
13  we've discussed previously that are
14  present in claim seven would have some
15  bearing on how an ordinary person skilled
16  in the art would understand disputed claim
17  term 11, correct?
18     A.   Yes, some bearing, yes.
19     Q.   Some of the claims refer to
20  mobile action including causing to be
21  output via the at least one mobile device,
22  the visual information, that's -- I could
23  point you to column 32, again we're still
24  in claim seven, the 899 patent, and I
25  guess particularly it's line, like, 55, or

1  54, 55, causing to be output visual
2  information, it's via the at least one
3  mobile device.
4      Do you understand causing visual
5  information to be output via mobile device
6  to be similar to causing to display via
7  mobile device visual information?
8      A.   Well, I'm having trouble with
9  your question because when we're talking
10  about, for example, claim one of the 899,
11  it's causing to display via the display of
12  the mobile device, right?  So that's not
13  exactly what you said.
14     Q.   Correct.  The language is
15  slightly different in claim seven, and I
16  guess the point I was getting at is that
17  do you read those as being essentially the
18  same but just not using the same language?
19     MR. TYSON:  I object to the
20  form.
21     Q.   Excuse me, having the same --
22  essentially the same meaning even though
23  they use different terms to describe it.
24     A.   And which two terms are you
25  talking about?

1      Q.   I'm causing -- excuse me, I'm
2  referring to causing to be output via the
3  at least one mobile device the visual
4  information.
5      A.   Okay.  And what's the other one?
6      Q.   The other one -- well, actually
7  in respect to disputed claim ten, claim
8  one does use that same language, but the
9  question would be --
10     A.   So --
11     Q.   -- that I would pose to you is
12  whether causing to output via a mobile
13  device visual information means that the
14  mobile device is displaying visual
15  information?
16     A.   I don't -- I don't think it's
17  necessarily so, and this is part of my
18  opinion about that one of skill
19  couldn't -- wouldn't understand what the
20  scope of that term is.
21     So if you look at column 32,
22  lines four and five, cause display of an
23  option via a display of the at least one
24  mobile device, so here they use the words
25  cause display via a display, and yet at

34 (Pages 130 - 133)

Page 134

1 line -- line 54 of the same column,
2 causing to be output via at least one
3 mobile device, and so to me, there's a --
4 the language is different as it is here,
5 then one can't assume that they mean the
6 same thing.
7          And so I understand cause
8 display via a display is to display
9 whatever on the mobile device's screen or
10 their display, whereas cause output via
11 the device of visual information seems to
12 be broader.
13         That apparently, this is
14 claiming that the computer code can
15 cause -- as long as the visual information
16 is output somewhere on the -- and somehow
17 the mobile device is used, then that might
18 satisfy this claim element, so it's tough
19 to tell what exactly is meant here because
20 there's no corresponding disclosure in
21 the -- in the provisional or the
22 applications or patent specifications.
23     Q.   So if I understand correctly,
24 you're saying causing to be output via
25 mobile device some visual information that

Page 135

1 is essentially broader than displaying
2 some visual information on the mobile
3 device's display?
4     A.   I think one of skill reading
5 that would realize that this may be --
6 this may be broader, that as long as
7 you're causing the information to be
8 output and you're using the mobile device
9 to do so in some way, then maybe that
10 reads on this claim.  It's hard to know.
11     Q.   Okay.  So going back, we were
12 starting on, excuse me if I'm wrong, we
13 did disputed claim term ten, correct, and
14 we did 11?
15     A.   Yes.
16     Q.   We did the 899 patent claim
17 seven, nine and 11 for disputed claim
18 terms 11, is that right?
19     A.   I believe so.
20     Q.   You would agree that -- I mean,
21 as we -- actually, take that back.
22         Yes, I think we did ten and we
23 started on 11 with claim seven, disputed
24 claim term 11 is present in claims seven,
25 nine and 11 of the 899 patent.  Claim

Page 136

1 seven and nine refer to computer code,
2 claim 11 refers to application, I believe?
3     A.   Yes, that's correct.
4     Q.   So aside from those differences,
5 you would agree that the structural
6 elements that we have discussed with
7 respect to claims seven, nine and 11 of
8 the 899 patent would inform a person of
9 ordinary skill in the art's understanding
10 of disputed claim term 11?  And if you
11 need me to point to where those are
12 present in any of the other claims, please
13 let me know.
14     A.   No, I think my testimony about
15 claim seven, about what -- what one of
16 skill would and would not understand with
17 regard to disputed claim term 11 applies
18 to claim nine of the 889 patent as well.
19     Q.   Okay.  And also claim 11?
20     A.   Yes, my opinions I've just
21 expressed about claims seven and nine with
22 respect to claim term 11 also apply to
23 claim 11 of the 899 patent.
24     Q.   So for 11, disputed claim term
25 11, it's also present in claim one of the

Page 137

1 292 patent, and claim one again of 292
2 patent begins on column 30 of Plaintiff's
3 Exhibit 2.
4         The language of disputed claim
5 term 11, I believe, is on column 32 with
6 the exception of, I think, the said code
7 when executed further configured to, not
8 preamble, but the, kind of, opening, and
9 then it's ellipsed to line four of column
10 32, do you see that?
11     A.   I do.
12     Q.   Okay.  And so again, the
13 structural elements that we've identified
14 in claim one of the 292 patent, you would
15 agree that those structural components
16 would inform a person of ordinary skill in
17 the art's understanding of disputed claim
18 term 11, is that fair?
19     A.   Yes, that's fair.  And let me
20 just repeat my -- the caveat, that the
21 cause to be output limitation, because it
22 doesn't say on which display or how the
23 visual information is output, I don't
24 think is informed by the structural
25 element discussed which is the display of

35 (Pages 134 - 137)

Page 138

1  a mobile device.
2      Q.   Okay.  So in that case for that
3  particular part of disputed claim term 11,
4  it's your position that the display of the
5  mobile device may not have bearing on the
6  output via the at least one mobile device,
7  is that fair?
8      A.   Yes, in fact, one can't tell if
9  it has bearing or not.
10     Q.   Okay.  Now, you would agree,
11 however, that the code that is referenced
12 in claim one of the 292 patent that is
13 further configured to achieve disputed
14 claim term 11, that that code is the same
15 code that is referred to on line seven of
16 column 31 that also is configured to cause
17 display via display of the at least one
18 mobile device of an option for causing, et
19 cetera, do you see that?
20         MR. TYSON:  I object to the
21     form.
22     A.   I do, I see the line, the cause
23 display via a display limitation starting
24 at line ten.
25     Q.   And so the code that is being

Page 139

1  referred to as being configured to cause a
2  display, that's the same code that is
3  further configured to achieve disputed
4  claim term 11, correct?
5          MR. TYSON:  I object to the
6      form.
7      A.   I agree that the said code at
8  line 64, which is further configured to
9  contain certain features recited in the
10 subsequent limitations, is the same code
11 as found on line eight of column 31.
12     Q.   And so with that understanding,
13 you would agree that the reference to
14 configured to cause display via display of
15 at least one mobile device, that would
16 still inform a person of ordinary skill in
17 the art regarding how the code should be
18 interpreted, and that is the same code
19 that is involved in disputed claim term
20 11, right?
21         MR. TYSON:  I object to the
22     form.
23     A.   What I would say, the same code
24 as identified as causing to the display
25 via a display of the mobile device an

Page 140

1  option is the same code, in other words, a
2  part of the same code base, as the code
3  that is claimed to cause to be output via
4  at least one mobile device, either the
5  first or second visual information in
6  column 32.  It's the same set of code, but
7  I think that's all you can say.
8      Q.   Yes, and my point is only that
9  because that earlier discussion of display
10 does have some bearing on scope of the
11 code and the meaning of the code, that a
12 person skilled in the art would understand
13 that it would have some bearing on the
14 interpretation of disputed claim term 11.
15         MR. TYSON:  I object to the
16     form.
17     Q.   For example, they would
18 understand that the code is configured to
19 achieve both of the claim elements, is
20 that fair?
21         MR. TYSON:  I object to the
22     form.
23     A.   Yeah, I think what's fair to say
24 is that the code, which has many features,
25 as claimed, has the feature of being able

Page 141

1  to cause display on the mobile device's
2  display as an option, and has a separate
3  feature that -- causing the output of
4  visual information by the mobile device,
5  so it's informing one of skill that this
6  code contains a bunch of different things,
7  two of which are -- including displaying
8  an option on the mobile device's display
9  and outputting information via the mobile
10 device.  I think that's all you can say
11 that one of skill would understand from
12 reading this claim in disputed claim term
13 11.
14     Q.   Okay.  So for disputed claim
15 term 12, it is found in claims 15 and 28
16 of the 292 patent, and claim 15 begins at
17 the bottom of column 39 of 292 patent
18 that's Exhibit 2.
19     A.   I see it.
20     Q.   And disputed claim term 12 is
21 actually on column 41, and I believe it is
22 around lines 40 -- it begins around line
23 46.
24         And similar with what we
25 discussed with respect to claim one and

36 (Pages 138 - 141)

Page 142

1  disputed claim term 11, you would agree
2  that the structural elements that we've
3  identified previously in claims 15 and 28
4  of the 292 patent would have some bearing
5  of how a person of ordinary skill in the
6  art would have understood disputed claim
7  term 12, is that fair?
8      A.   I think that's fair, except with
9  the same caveat, that one of skill would
10  not understand what causing that be output
11  by a mobile device means in the same way
12  that the same issue arose for claim term
13  11.
14      Q.   Okay.  And as we discussed with
15  claim one in 292 patent and claim 11,
16  while some of the structural elements may
17  have bearing on how certain parts of the
18  code would have been understood, it's your
19  opinion that at least the display or the
20  mobile device may not be directly relevant
21  to the output limitation, did I capture
22  that right?
23      A.   Yes, different language is used
24  within the same claim, and so there's no
25  reason to think that it means exactly the

Page 143

1  same thing.
2      Q.   Are you aware that the same
3  meaning for a particular claim element can
4  be achieved using different language,
5  though, correct?
6          MR. TYSON:  I object to the
7      form.
8      A.   That's correct, and I would look
9  at the patent specification for clarity.
10     Q.   Okay.
11     A.   And I did that and found none
12  here.
13     Q.   And you understand that where
14  there is not sufficient structure to
15  achieve a claim function recited in a
16  claim, that that may implicate means plus
17  function?
18         MR. TYSON:  I object to the
19     form.
20     A.   I'm not a lawyer, but generally
21  that's consistent with my understanding as
22  a layperson.
23     Q.   Okay.  And you also understand
24  that where there is sufficient structure
25  that is present in a claim, that would

Page 144

1  mean that the claim term's not subject to
2  means plus function, correct?
3          MR. TYSON:  I object to the
4      form.  It calls for a legal
5      conclusion.
6      A.   My understanding of means plus
7  function claims is stated in paragraph 23
8  on page six of my declaration and where I
9  state, for example, the presumption that a
10  claim is not means plus function can be
11  rebutted by showing that the claim element
12  recites a function without reciting
13  sufficient structure for performing that
14  function.
15     Q.   I'd like you to -- you wouldn't
16  mind pointing me to that paragraph.
17     A.   Sure, page six, paragraph 23 of
18  my declaration.  What I read was the last
19  sentence of that.
20     Q.   And so the corollary -- strike
21  that.
22         So looking at that statement but
23  from the other direction, you would agree
24  that for a claim term to not fall under
25  the -- strike that.  I'm trying to figure

Page 145

1  out how to say this the right way.
2          So you would agree that for a
3  term to not be -- sorry, strike that
4  again.
5          So a patent -- you would agree
6  that a patent need only disclose
7  sufficient structure for a person
8  ordinarily skilled in the art to provide a
9  software program for the specified
10  function for a term to not fall under
11  means plus function?
12         MR. TYSON:  I object to the form
13     and it calls for a legal conclusion.
14     A.   Only -- if you could just -- I
15  need to hear the question again.
16     Q.   Yes, I'll try to ask it again.
17         So in paragraph 23 of your
18  declaration, you state your understanding
19  about how the presumption against means
20  plus function can be rebutted where the
21  claim element recites the function but
22  does not recite sufficient structure for
23  performing that function, is that fair?
24     A.   Yes.
25     Q.   And you would agree that where a

37 (Pages 142 - 145)

Page 146

1  claim element discloses sufficient
2  structure for a person of ordinary skill
3  in the art to provide an operative
4  software program for the specified
5  function that it would not fall under the
6  means plus function exception, is that
7  fair?
8       MR. TYSON:  I object to the
9  form.
10      A.   Well, I'm not a lawyer.  My
11  understanding that -- is that the claim
12  element would need to recite the structure
13  required to perform that function, and
14  that the test is not that -- that --
15  whether one's knowledge, one of skill's
16  knowledge would be enough to go off and
17  figure out how to perform that function,
18  but my understanding is the claim element
19  would have to disclose how to perform that
20  function to one of skill in the art --
21      Q.   Okay.
22      A.   -- rather than relying on one of
23  skill in the art figuring it out based on
24  their knowledge.
25      Q.   And I was characterizing that

Page 147

1  wrong.  If there was sufficient structure
2  such that a person of ordinary skill in
3  the art could identify an operative
4  software program, for example, and off-
5  the-shelf software interface, then the
6  claim would not be means plus function,
7  correct, you would have sufficient
8  structure?
9       MR. TYSON:  I object to the
10  form.
11      A.   So based on my understanding as
12  provided to me by Counsel in this matter,
13  it's not enough for me to be able to
14  identify an off-the-shelf software for
15  performing that function, but rather the
16  claim itself has to recite how -- how one
17  goes about performing the function,
18  whether software or not.
19      Q.   Okay, and I'm not here to argue
20  the law with you, so I think that we
21  can -- we can move along and get back to
22  more of the substance of the declaration.
23      So before I distracted myself
24  with our legal discussion, I believe that
25  we had addressed -- get through all of

Page 148

1  disputed claim term 12.
2       So we had discussed, I think,
3  claim 15, disputed claim term 12 is also
4  present in claim 28, and if you want to
5  take a minute to look at that claim,
6  that's fine.  It's -- the language of
7  disputed claim term 12 is found on the
8  bottom of column 44.
9       A.   What line number?
10      Q.   Starting at 56 and then again
11  it's ellipsed to after the receipt.
12      A.   At 65?
13      Q.   What is it?  I apologize, I had
14  jumped to 13, but 12, 28 -- I'm sorry, I'm
15  trying to find --
16      A.   I'm assuming it's starting at
17  column 44 line 65.
18      Q.   Maybe I'm reading this too long,
19  but it looks like said code when executed
20  configured to and then it's ellipsed, in
21  response to receipt, and here it says --
22  it may be that there's just a typo in that
23  the slight difference in 15 and 28 wasn't
24  captured in brackets, because the rest of
25  the -- the rest of the language looks

Page 149

1  correct, so I think you're right.
2       So going with -- so going with
3  that, again, as we discussed, claim 28,
4  like claim 15 of the 292 patent we
5  identified various structural components
6  that are present in the claim, and you
7  would agree that those structural
8  components would have a bearing on how a
9  person of ordinary skill in the art would
10  understand disputed claim term 12, is that
11  fair?  Again with the caveat about the
12  output versus display.
13      A.   I think that's correct.  Claim
14  term 12 refers to the second wireless
15  communications protocol, the internet
16  protocol, the internet, and so at least
17  some of the structural elements that we
18  discussed earlier would have some bearing
19  on one's understanding of disputed claim
20  term 12 in the context of claim 28 of the
21  292 patent.
22      Q.   Yes.  And again, the said code
23  is the same code that is referenced in the
24  bottom of column 43, and I think I made
25  the point earlier that that code is

38 (Pages 146 - 149)

1  configured to cause display, so even the
2  display has some bearing on how the code
3  as a whole might be understood?
4      MR. TYSON:  I object to the
5  form.
6      A.  I agree with that, even though
7  it may not bear on the output limitation
8  referenced in disputed claim term 12.
9      Q.  Okay.  Moving along, I would
10  like to move on to disputed claim term 13,
11  and this is found in claim one of the 292
12  patent, and if you want to look at
13  Goldberg Exhibit 5, and it's on page five
14  is where disputed claim term 13 is.
15      A.  Sure.
16      Q.  If you want to take a look at
17  that, and then I can direct you to where
18  it's present in the claim, in claim one.
19      A.  Okay.  Just bear with me one
20  minute.
21      Q.  Sure, sure.
22      A.  Okay, I'm ready for you to
23  direct me.
24      Q.  Sure.  So disputed claim term
25  13, it begins column 31, line 64, and

1  that's the said code when executed further
2  configured to, and then it's ellipsed, and
3  it picks up at, I think it's around line
4  11 of column 32 of the 292 patent, it's
5  Exhibit 2, where it says after the
6  receipt.
7      And again, we discussed in
8  connection with claim one a variety of
9  structural components, and you would agree
10  that a person of ordinary skill in the
11  art, or a POSITA, would understand that
12  those have some bearing on disputed claim
13  term 13 would have been understood?
14      A.  Okay, so they would have some
15  bearing, at least a subset of them,
16  because the disputed claim term 13 recites
17  the second wireless communications
18  protocol, but again, this disputed claim
19  13 has the issue of the output via at
20  least one mobile device for which I don't
21  think there is a structure.
22      Q.  So that's going back to the
23  display --
24      A.  Yes.
25      Q.  -- versus output distinction

1  that you're drawing and I understand, and
2  again, you would still agree, though, that
3  the code being referred to in disputed
4  claim 13 is the same code that is referred
5  to on line seven of column 31 where the
6  code is configured to cause display via
7  display of the mobile device --
8      MR. TYSON:  I object to the
9  form.
10      Q.  -- so that the structural
11  components would still have some bearing
12  on how code as a whole would be
13  understood, is that fair?
14      MR. TYSON:  I object to the
15  form.
16      A.  Yes, that's fair.  As I
17  testified before, the code, which is a
18  bunch of software instructions, as claimed
19  here would have -- would be configurable
20  to cause display by the display of the
21  mobile device, in the case of an option,
22  and in addition to a number of other
23  features would be able to cause the output
24  via the -- via the mobile device of visual
25  information.

1      Q.  Okay.  And you had mentioned the
2  second wireless protocol, you would agree
3  that the code also is used on mobile
4  devices in connection with the first
5  wireless communications protocol, and
6  that's around line 20 of column 31, so
7  just like display, the various protocols
8  still have some bearing on the overall
9  scope of code, correct?
10      MR. TYSON:  I object to the
11  form.
12      A.  Yes.
13      Q.  And we talked about response
14  message that's present in disputed claim
15  13, and as that is pursuant to a
16  particular wireless communications
17  protocol, the message would have some
18  particular format, correct?
19      A.  As we've discussed, a message
20  sent via a particular wireless
21  communications protocol would have a
22  particular format dictated by that
23  protocol.
24      Q.  And we discussed earlier that
25  the format of the message would connote

39 (Pages 150 - 153)

Page 154

1    some degree of structure, fair?
2        A.   Some degree --
3            MR. TYSON:  Form.
4        A.   It would tell you where the
5    different types of data would need to be
6    put within the message, but it wouldn't
7    tell you what the data itself is.
8        Q.   Understand.  If you look at the
9    claim, it does refer to certain types of
10   information that are included in some of
11   the messages, is that fair?
12       A.   Are you talking about claim one
13   of the 292?
14       Q.   Yes.  And just looking at the
15   disputed claim term 13, it references
16   response message including first location
17   relevant information and the second
18   location relevant information, and so
19   there's at least some description of the
20   content and the protocol would give you
21   some information on the format, is that
22   fair?
23       A.   I think it's fair.  There's
24   some -- some indication of the type of
25   content, and then the format would be

Page 155

1    dictated by the wireless communication
2    protocol.
3        Q.   Okay.  Fourteen is found --
4    excuse me, disputed claim term 14 is found
5    in claim 15 of the 292 patent, and you can
6    feel free to disagree with me, but I would
7    say that there's, you know, some
8    similarities between 13, disputed claim 13
9    and disputed claim 14, and I believe that
10   the relevant disputed claim term language
11   is found in column 41, line 47 is said
12   code when executed configured to and then
13   it jumps down to what I believe is line
14   64.
15       A.   I see it.
16       Q.   And so again, it's the same
17   questions I've been asking before.  We've
18   discussed a variety of structural
19   components that are present in claim 15 of
20   the 292 patent, the wireless communication
21   protocols, server, the mobile devices, the
22   message, the software that comes along
23   with using the various protocols, and so
24   you would agree that those structural
25   elements would have some bearing on how a

Page 156

1    person who is skilled in the art would
2    have understood disputed claim term 14
3    that's present in claim 15 of the 292
4    patent?
5        A.   Yes, I would say some bearing,
6    and with the same caveat about the output
7    as we've discussed.
8        Q.   Now we're on 15, and this is
9    claim 28 of the 292 patent, Exhibit 2.
10   And that begins, it's at column 43, around
11   line 30, and the actual disputed claim 15,
12   there's the one line column 44 at line 56,
13   a code when executed further configured to
14   and it's ellipsed, and then it drops down
15   to, make sure I get this right, I think it
16   goes to column 45, line four.
17           And again, the same questions as
18   before with respect to these claims.
19   We've identified a number of structural
20   components that are present in claim 28 of
21   the 292 patent, and you would agree that
22   those structural components that we've
23   identified that have some bearing on how a
24   person of ordinary skill in the art would
25   have understood disputed claim term 15,

Page 157

1    correct?
2        A.   Since disputed claim term 15
3    recites wireless communications protocol
4    mobile device, then those terms would
5    have -- would inform one of skill as to
6    some aspects of the meaning of disputed
7    claim term 15.  We still have the caveat,
8    of course, about the output --
9        Q.   Correct.
10       A.   -- appearing in that claim term.
11       Q.   And I understand your position
12   on that, and again, you would agree that
13   the code that's being referred to in
14   disputed claim term 15 is also the code
15   that is first recited at the bottom of
16   column 43 at line 65?
17       A.   Yes.
18           MR. TYSON:  Objection to the
19   form.
20       Q.   And so you would agree that,
21   again, that these structural components,
22   while some of them may not be recited
23   expressly in disputed claim term 15, that
24   nonetheless, they could have -- strike
25   that.

40 (Pages 154 - 157)

1      You would agree that the
2  structural components that we identified
3  in claim 28 of the 292 patent, even though
4  they're not necessarily expressly recited
5  in disputed claim term 15, would have some
6  bearing on how that disputed claim term
7  would have been understood by a person of
8  skill in the art?
9      MR. TYSON:  I object to the
10     form.
11     A.   I agree it could have some, some
12  bearing, yes.
13     Q.   Now we're moving into kind of a
14  second category I want to call a second
15  category of the claim, these are all where
16  the system is configured claims, and this
17  is 16 -- disputed claim term 16 through
18  30.  So I'd like to try to march through
19  these, if we can.
20     And so starting with 16 is
21  claims one, seven and nine of the 899
22  patent.  So if you could turn to claim one
23  of the 899 patent, I believe that you will
24  find disputed claim term 16 to be in that
25  last wherein claim limitation at the

1  bottom of column 30, I think it's Exhibit
2  1 to the 899 patent.
3      And you see that it's wherein
4  the mobile device application visual
5  information includes an image and the
6  system is configured such that after the
7  indication of the user input is received,
8  and after an initial instance of the
9  output of the mobile device application
10  visual information including the image is
11  caused, subsequent instances of the output
12  of the mobile device application visual
13  information including different images are
14  capable of being caused as a user moves
15  among a plurality of the facilities of the
16  building without requiring additional
17  subsequent user input.
18     Do you see that?
19     A.   I do.  Give me a moment, I'd
20  like to reread it.
21     Q.   Please, please.
22     A.   Okay.
23     Q.   Now, if you look at the --
24  you're familiar with the preamble of the
25  claim, do you know what that means?

1      A.   Yes.
2      Q.   So the preamble of claim one is
3  a system comprising, has a building, it
4  has broadcast short-range communication
5  unit, fixed location, it generates
6  messages including the various things, has
7  an application that's configured, you
8  know, to do things, a server, application
9  configured to do more stuff, so you
10  understand the system encompasses all of
11  those elements of the claim, correct?
12     A.   That's my reading of it.
13     Q.   And so you understand that the
14  use of system is not adding any additional
15  element to the claim, it's merely
16  specifying that the system is configured
17  to do these additional things, does that
18  make sense?
19     A.   Could you read that back?  I'm
20  sorry.
21     [The requested portion of the
22     record was read.]
23     A.   It didn't quite make sense.
24     Q.   Are you familiar with wherein
25  clauses?

1      A.   Sure.
2      Q.   And again, you're not here to
3  speak to the law, but just what's your
4  understanding of a wherein clause, as best
5  you know?
6      A.   Providing additional description
7  or limitation of something that's already
8  been described.
9      Q.   Okay.  And so if you look at the
10  disputed claim term 16, it's part of a
11  wherein clause, you see that, right?
12     A.   Yes.
13     Q.   And the system has already been
14  described --
15     A.   Yes.
16     Q.   -- correct?
17     And so it is merely specifying
18  that the system is configured to do
19  certain things, and it's not seeking to
20  add an additional means outside of the
21  elements that already reside in the
22  system?
23     A.   I understand it's not adding an
24  additional component to the system.
25     Q.   Correct.  And you understand

41 (Pages 158 - 161)

Page 162

1    that a means plus function is a drafting
2    tool where people running patent claims
3    can add an additional component but
4    describe it functionally, is that fair?
5        MR. TYSON:  I object to the
6    form.  It calls for a legal
7    conclusion.
8        A.   As a layperson, to me, I guess
9    that sounds reasonable.
10       Q.   Okay.  And so here, we're not
11   adding an additional component with the
12   wherein clause when it refers to the
13   system, is that correct?
14       MR. TYSON:  I object to the
15   form.  It calls for speculation.
16       A.   My understanding is that you are
17   describing some aspect of the system that
18   you've already introduced.
19       Q.   Okay.  Okay.  And if you look at
20   some of the language about what the system
21   is configured to do, it appears that there
22   are components of the system that are
23   performing like functions already, is that
24   fair?
25       MR. TYSON:  I object to the

Page 163

1    form.
2        A.   I'm not -- I'm not sure I
3    follow.
4        Q.   So what we have is the system is
5    configured such that after indication of
6    the user the input is received, do you see
7    that on lines 51 to 52 in column 30?  Do
8    you see --
9        A.   Yes.
10       Q.   -- indication user input is
11   received?
12       And if you look across at line
13   55 of column 29, above it says there's the
14   application configured for execution by at
15   least one of the plurality of mobile
16   devices, and when executed, configured to
17   cause the at least one mobile device to,
18   and then it says at line 55, receive an
19   indication of a user input in connection
20   with the option displayed.
21       A.   With the option displayed, yes.
22       Q.   So here going back to disputed
23   claim 16, you have after indication of
24   user input is received --
25       A.   After the indication of the user

Page 164

1    input is received.
2        Q.   Yes, and you see before column
3    29, it says received an indication, and
4    then later in column 30, it refers to the
5    indication?
6        A.   Yes, I see that.
7        Q.   And you're familiar with patent
8    drafting, that the first time something is
9    introduced, it's like an or a, and then
10   later it's the or said?
11       A.   Yes.
12       Q.   Okay.  So going back to the
13   question I was asking before, if you look
14   at disputed claim term 16 and what the
15   system is configured to do, much of
16   those -- strike that.
17       Going back to my earlier
18   question, if you look at disputed claim 16
19   and what the system is configured to do in
20   that wherein clause, much of that is --
21   appears to be done by kind of
22   subcomponents of the system, is that fair?
23       A.   Generally speaking, I would say
24   yes, but it talks -- where the wherein
25   clause talks about the system being

Page 165

1    configured to do something, it could refer
2    to one of the already mentioned components
3    of that system doing it.
4        Q.   That was -- you made that point
5    much more succinctly than I was able to
6    do.
7        And so again, looking at this,
8    the wherein clause recites that the system
9    was configured to achieve the limitation
10   of disputed claim term 16, it's not adding
11   any new or separate structural element to
12   the claim, is that fair?
13       A.   It's not adding any new
14   component, but rather describing what the
15   system already introduced can also do or
16   perhaps constraining what the system can
17   do.
18       Q.   Okay.  And as we discussed, that
19   system is all of the components that were
20   recited in claim one, essentially,
21   correct?
22       A.   Yes.
23       Q.   Okay.  And so here as system is
24   defined as all these various components in
25   claim one of the 899 patent, you would

42 (Pages 162 - 165)

Page 166

1  agree that the use of system in disputed
2  claim term 16 isn't a generic nonce word
3  that is being used to add additional
4  structure that is defined functionally, is
5  that fair?
6      A.   I'm going to take a minute just
7  to look at my declaration --
8      Q.   Yes, please.
9      A.   -- see what I've testified to
10  about that.
11      Is there a question pending?
12      MR. DAHLGREN:  I'll refer to our
13  court reporter.
14      [The requested portion of the
15  record was read.]
16      A.   What I would say is that I agree
17  that the use of system within the wherein
18  clause doesn't add a new component, but
19  what I would say is that by using system
20  to perform some feature, support some
21  claim feature, you can't tell or it didn't
22  specify which component is performing or
23  supporting that feature.
24      Q.   But the system is the sum of all
25  the components that are recited therein?

Page 167

1      A.   I agree.
2      Q.   And so by stating that the
3  system is performing some functionality,
4  it's not any additional component that is
5  doing it, it's already part and parcel in
6  the scope of the claim in terms of the
7  component?
8      A.   I agree with that, but -- and
9  system comprises hardware and software --
10      Q.   Correct?
11      A.   -- as we've seen, so by claiming
12  a system does something didn't indicate
13  whether it's the software doing it or the
14  hardware doing it.
15      MR. DAHLGREN:  Off the record.
16      [A recess was taken.]
17      Q.   So Dr. Goldberg, we discussed
18  claim one and how the system, the language
19  disputed in claim term 16 is in a wherein
20  clause and that it's not reciting any
21  additional structural component in terms
22  of functional language, since it's already
23  defined to encompass the entire claim, and
24  you agree with that point, right?
25      A.   Well --

Page 168

1      MR. TYSON:  I object to the
2  form.
3      A.   What I agreed with was that it's
4  not adding a new component beyond what was
5  already set forth in the claim.
6      Q.   Okay.  And when you say
7  component, it's not adding a new
8  structural component, of course?
9      A.   Yeah, the building, you have the
10  broadcast communication units, you have
11  the code, you have the mobile devices, you
12  have the server, so it's not adding any --
13  to any of those.
14      Q.   Okay.  Okay.  You say in
15  paragraph 127 --
16      A.   Of my declaration?
17      Q.   Of your declaration, Goldberg
18  Exhibit 3, it's on page 55, that you've
19  been informed to understand that system
20  has been explicitly recognized by courts
21  as a nonce word, do you see that?
22      A.   I see it, yeah.
23      Q.   Do you know if any of those
24  court decisions were evaluating system
25  when it was used in a wherein clause?

Page 169

1      A.   No, that's not something I would
2  be aware of.
3      Q.   Okay.  So you don't know the
4  context in which the courts determined
5  that system was a nonce word?
6      A.   That's correct, I've set forth
7  here what I understand from Counsel.
8      Q.   Okay.  Did that information that
9  they relayed to you that system has been
10  recognized as a nonce word, did that have
11  a significant effect on your decision on
12  how you interpreted these system claims
13  that are in dispute?
14      A.   To be clear, I was only asked to
15  opine on certain limitation, and whether
16  or not there was sufficient structure
17  within the claim to support that
18  limitation, or within the specification,
19  and so this, whether system was a nonce
20  word or not, did not play a role in my
21  consideration.
22      Q.   Okay.  So I'd like to look at
23  claim seven of the 899 patent, this is
24  also relevant to disputed claim 16.  And
25  if you look at column 32, line 62 through

43 (Pages 166 - 169)

1  through line 64, and you see again that
2  it's a -- the system is being referenced
3  in a wherein clause, do you see that?
4      A.   I do.
5      Q.   And like claim one, you
6  understand that system refers to all the
7  components that are recited in the claim,
8  correct?
9      A.   That's the way I read that.
10     Q.   And you'd agree that the
11 reference to system in the wherein clause
12 is not introducing a new structural
13 component, correct?
14     A.   I agree it's not introducing a
15 new component such as the building or the
16 broadcast units or the mobile device or
17 the computer code.  I understand it's
18 referring to the elements that are already
19 laid out in the claim.
20     Q.   Okay.  And just so I understand,
21 it's your position that even though system
22 is not attempting to add an additional
23 structural component that's defined solely
24 by functional language, that it still
25 falls under the means plus function

1  exception, is that right?
2          MR. TYSON:  I object to the
3  form.
4      A.   Can you --
5      Q.   Sure.
6      A.   -- refer me to my declaration
7  where I said that?
8      Q.   Yes.  So you start discussing
9  the system claim limitations on page 54 of
10 your declaration, Exhibit 3.
11     A.   Okay.
12     Q.   And what I don't see discussed
13 here is whether there is any relevance to
14 your analysis if the recitation of system
15 in these disputed limitations is not
16 adding an additional structural component
17 even if defined by the functional
18 language, is that more clear or did I
19 even --
20     A.   No.
21     Q.   -- further muddy the waters?
22         So again, in your discussion of
23 the system claim limitations on certain
24 patents, I did not see anywhere that you
25 stated that the use of system in the

1  wherein clauses was adding some new claim
2  element that relied solely on functional
3  language, and again, I want to say new
4  claim element in addition to what was
5  already recited in the claim in terms of
6  the structural components?
7      A.   I don't recall making such an
8  assertion.
9      Q.   Okay.
10     A.   My -- I will say as a general
11 statement that my declaration speaks for
12 itself, and if I don't remember something
13 that's in my declaration, I still stand by
14 it of course.
15     Q.   Understand, understand.  And you
16 did review your declaration yesterday,
17 though.
18     A.   I did.
19     Q.   So you're somewhat familiar with
20 it?
21     A.   Yes, certainly.
22     Q.   And if at any point in time you
23 want to refer to it for a moment, please
24 just let me know, and we'll give you the
25 time.

1      A.   Sure.
2      Q.   So again, I guess the same
3  point, and this may be duplicative of what
4  I already asked you, but you'd agree that
5  the system in the wherein clause in claim
6  seven of the 899 patent that's disputed
7  claim term 16, that that's not a new
8  structural element, correct?
9          MR. TYSON:  I object to the
10 form.
11     A.   As I said, I read that as
12 describing some aspect of the system as
13 already described in the previous
14 limitations appearing in that claim.
15     Q.   Okay.
16     A.   It's not a new component of the
17 system.
18     Q.   So now if you can turn to claim
19 nine of the 899 patent.  Claim nine begins
20 on column 33 of the 899 patent which is
21 Exhibit 1.
22     A.   Yes.
23     Q.   The disputed system claim term
24 16 is found in column 34, beginning around
25 line 58, it says wherein the system is

Page 174

1    configured.
2        A.   I see it.
3        Q.   And so it's the same questions I
4    asked you with respect to claims one and
5    seven, you would agree that the recitation
6    of system in the written clause in
7    disputed claim 16 is not adding an
8    additional structural component to the
9    claim, correct?
10       A.   I'll just clarify, it's disputed
11   claim term 16 you're referring to.
12       Q.   I'm sorry, if I left out term,
13   please -- thank you for correcting me.
14       A.   More than understandable.  So to
15   answer the question I think you're trying
16   to ask here to in claim nine, the system
17   that appears within the wherein clause, I
18   don't read it as adding a new component,
19   but rather describing some behavior by the
20   system as already described in the
21   previous claim elements.
22       Q.   Okay.  So now I'd like to turn
23   to claim 11, and this is disputed claim
24   17.
25       A.   Term 17.

Page 175

1        Q.   Thank you.  I would like to turn
2    to claim 11 of the 899 patent and disputed
3    claim term 17, and you can find disputed
4    claim term 17 in column 36 of the 899
5    patent, it's Exhibit 1, and again, it's
6    present in a wherein clause wherein the
7    system is configured.
8        A.   I see that at line 45 of column
9    36.
10       Q.   Yes.  And it says the system is
11   further configured.
12       A.   I see that.
13       Q.   And so again, looking at this
14   claim, it's your understanding that the
15   reference to system in the wherein clause
16   of claim 11 is not adding an additional
17   structural component to the claim that's
18   not already present, is that fair?
19       A.   It is not adding a new component
20   to the -- to the claim, I agree.
21       Q.   Okay.  Now if we can turn back
22   to claim one of the 899 patent, and we
23   will be discussing disputed claim term 18,
24   so I think unless there's a correction to
25   the claims here that I'm missing, I think

Page 176

1    in Exhibit 5 for disputed claim term 18, I
2    don't think further is part of it, there
3    might be a typo there, I just wanted to
4    point that out.  It says the system is
5    configured such that the option of -- I'm
6    sorry, I was looking at claim seven, so
7    that probably accounts for the
8    discrepancy.  Sorry.
9        Turn to claim one, wherein the
10   system is further configured.
11       A.   That's it, column 30, line 60.
12       Q.   That's where the confusion is.
13   And again, as with the other questions
14   that I've asked regarding these disputed
15   system limitations, you would agree that
16   the recitation of system in disputed claim
17   18 is not adding an additional structural
18   component to claim one of the 899 patent,
19   correct?
20       A.   So I agree that the reference to
21   the system within the wherein clause is
22   not adding a new component to the system.
23   I'll note as I said in my declaration that
24   disputed claim term 18 doesn't say what
25   component within the system is configured

Page 177

1    to perform the limitation specified in
2    disputed claim 18, but I agree that these
3    system referred to this disputed claim 18
4    refers to the components already described
5    previously in claim one.
6        Q.   Okay.  I'm trying to think of
7    probably a bad analogy or something like
8    that, but if you had a claim that recited
9    an automobile with computer engine,
10   various features, wherein said automobile
11   was capable of using cruise control, would
12   you say that that would be indefinite
13   because the automobile, there's a computer
14   or some type of specially programmed
15   module to monitor and control speed -- I'm
16   trying to think of an example to kind of
17   make this more clear.  I don't know.  Is
18   that a bad example, analogy?
19       MR. TYSON:  I object to the
20   form.
21       MR. DAHLGREN:  Is it a form
22   objection?
23       MR. TYSON:  It calls for
24   speculation.
25       A.   Well, I think the analogy does

45 (Pages 174 - 177)

1  hold in the sense that it doesn't -- this
2  automobile consisting of a bunch of things
3  doesn't say how the automobile responds to
4  the cruise control, so if it's just an
5  automobile responding to cruise control,
6  for example, then that doesn't tell me how
7  to go about making the automobile respond
8  to cruise control, and that's similar to
9  the analogy that -- to what my opinions
10 are in my declaration.
11     Q.   So here we have, you know, the
12 system has building, broadcast short-range
13 communication units, server, mobile
14 devices, various protocols are involved,
15 servers, messages, there's an application
16 or code, you know, depending on the
17 particular claim that we're talking about,
18 so there are a number of components that
19 are present in the system, right?
20     A.   I agree with that.
21     Q.   And if I understand correctly,
22 your contention is that because system
23 isn't parsed to specify one of the
24 subcomponents that is responsible for
25 performing the alleged function, that

1  that's what makes it indefinite -- or
2  falls under means plus function, the
3  exception, and is therefore indefinite
4  because you can't tie the function to an
5  aspect of the claim, is that fair?
6          MR. TYSON:  Objection.
7     A.   Well, let me just note that I
8  have not been asked to opine whether these
9  claims are indefinite or not.  Counsel's
10 informed me that's a legal conclusion.
11 All I've been asked to do is for a number
12 of limitations, I've been asked to
13 determine whether there is sufficient
14 structure within the claim for one of
15 skill to understand how to implement the
16 functional elements that I've been asked
17 about, and if not, whether there is
18 sufficient structure within the disclosure
19 of the specification and the provisional
20 application --
21     Q.   Okay.
22     A.   -- to determine structure.  So
23 I've been provided the functional --
24 statements of function and asked is that
25 supported by sufficient structure so that

1  one of skill would know how to do it.
2     Q.   Okay.  If -- and so if I
3  understand correctly, so you're not
4  opining on the ultimate question of
5  indefiniteness, I understand that, instead
6  you are opining on whether the disputed
7  limitation has sufficient structure in it
8  to perform the function, and if not,
9  whether there is sufficient structure
10 linked to that functionality that's
11 disclosed in provision or the application
12 for patents, applications for the patents
13 in suit, is that fair?
14     A.   Yes, that -- that's consistent
15 with what I was asked to do.
16     Q.   Okay.
17     A.   Let me just remark that I think
18 it's -- I'm sure I set forth in my
19 declaration what exactly I was asked to
20 do.
21     Q.   Understand.  Understand.
22     A.   Okay.
23     Q.   We did disputed claim term 18,
24 which is in one, now if you look at
25 disputed claim term 19 that is present in

1  claims seven and nine of the 899 patent,
2  that's Exhibit 1.  In claim seven of the
3  899 patent, you can find the disputed
4  claim term language at the bottom of
5  column 32, I believe.
6     A.   Yes, starting at line 65.
7     Q.   Yes, so seven is configured, I
8  think nine is -- well, nine is also
9  configured.  I don't see --
10    A.   I don't see further.
11    Q.   Further configured -- that may
12 be a typo.  Setting aside the use of
13 further in disputed claim term 19, you
14 would agree that disputed claim term 19 in
15 claim seven is also present within the
16 wherein clause, correct?
17    A.   Yes.
18    Q.   And so again, as previously, you
19 would agree that the use of system in the
20 wherein clause is not adding any
21 additional structural component to the
22 claim that's already present?
23    A.   As I've testified, use of the
24 system refers to the system as already
25 introduced as a collection of components

46 (Pages 178 - 181)

Page 182

1   laid out in claim seven.
2       Q.   And turning to claim nine, the
3   same question, and again, this is disputed
4   claim term 19 language at the bottom of
5   column 34, but again, you would agree that
6   because the system recited in the wherein
7   clause does not add any additional
8   structural components to the claim that
9   are not already present, correct?
10      A.   So as I've testified in my
11  previous answer, in fact, the system
12  referred to at the bottom of column 34,
13  line 59 is the system of claim nine
14  introduced at line 47 of column 33
15  consisting of a collection of components
16  already set forth in the claim nine.
17      Q.   Okay.  Now, if we look at
18  disputed claim 20, we have a wherein
19  clause, this time -- I'm trying to find
20  where it is here -- it refers to the
21  application, and this is claim 11 of the
22  899 patent, and you can see the disputed
23  language of claim term 20 towards the
24  bottom of column 36.
25      A.   Give me a moment to look at

Page 183

1   that --
2       Q.   Sure.
3       A.   -- disputed claim 20.  Can you
4   repeat where in claim 11 I could see that?
5       Q.   In claim 11, I believe that you
6   will find it around line 53 of column 36.
7   Further wherein, the application when
8   executed is configured to permit a
9   determination as to whether the one or
10  more mobile device application actions
11  including causing to be output to visual
12  information is triggered.
13      A.   Okay, I see it, thank you.
14      Q.   And that was not grouped in the
15  system claims in your declaration, and
16  just so you know, you address it beginning
17  on page 49, it appears.
18      A.   Yes, that's true.
19      Q.   So I wanted to make that
20  clarification, not to steer you wrong.
21          Now, you would agree that the
22  application in disputed claim term 20 is
23  the same application that is recited on
24  line 65 of column 35 that's also in claim
25  11 of the 899 patent?

Page 184

1       A.   I agree.
2       Q.   And it's also the same
3   application that's referred to in
4   column -- excuse me, column 36, line 32?
5       A.   I agree.
6       Q.   And so you'd agree that the use
7   of the wherein clause referring to the
8   application is not adding an additional
9   component to claim 11 of the 899 patent,
10  right?
11      A.   I agree, it's specifying
12  additional function of the said
13  application.
14      Q.   Turning to disputed claim 21,
15  disputed claim term 21 found in claims
16  seven and nine of the 899 patent.  So
17  beginning with claim seven --
18      A.   Give me a moment --
19      Q.   Sure.
20      A.   -- to read disputed claim term
21  21.
22      Q.   Yes, disputed claim term 21, and
23  I think it will just inform your reading
24  of claim seven if you note that in column
25  32, line 58 there is a break where it's

Page 185

1   wherein, and so each of the following
2   limitations is part of that wherein
3   clause.
4       A.   Yes.
5       Q.   Do you see what I'm talking
6   about?
7       A.   I do.
8       Q.   And so with that understanding,
9   as we discussed with the other claims, you
10  would agree that the recitation of the
11  system configured such that different
12  brand-specific visual information is
13  caused to be output, that is not adding an
14  additional structural component to the
15  claim that is not already present,
16  correct?
17      A.   I agree that the reference of
18  the system here is referring to, in total,
19  all the components of the system already
20  laid out in claim seven, and this provides
21  an additional function of that system.
22      Q.   Okay.  And if we look at claim
23  nine, again you'll see that the wherein
24  clause is kind of set off on line 58 of
25  column 34, and the disputed claim term 21

47 (Pages 182 - 185)

Page 186

1  language is found in column 35 lines 12
2  through 15?
3      A.   Yes, that's correct.
4      Q.   And the same as with the other
5  system terms that we discussed, that are
6  part of wherein clauses, you would agree
7  that disputed claim term 21 in claim nine
8  of the 899 patent does not add any
9  additional structural components to the
10  claim that are not already present?
11      A.   I agree that it adds no
12  components, but just specifies an
13  additional function of the system.
14      Q.   So now it's disputed claim term
15  22, and it's claims four and 14 of the 899
16  patent, and we'll also have to turn to the
17  292 patent.  So if you look at column 31
18  of the 899 patent, it's Exhibit 1,
19  beginning around line five, it says a
20  system of claim one, wherein the system is
21  configured such that the output of the
22  mobile device application, visual
23  information is conditionally caused based
24  on whether a mobile device-specific
25  threshold has been met.

Page 187

1      A.   Okay, I see that.
2      Q.   And you would agree that as we
3  discussed with the other claims that this
4  depending claim with the wherein clause,
5  claim four of the 899 patent is not adding
6  any additional structural components that
7  are not already present in claim one?
8      A.   Similar to my previous answers,
9  I viewed claim four, the wherein clause,
10  as describing an additional function of
11  the system whose components are already
12  laid out in claim one.
13      Q.   If you can turn to claim 14, and
14  that should be at the top of column 37 of
15  899 patent and it's essentially the same,
16  and so I just ask whether you agree that
17  the wherein clause and the use of system
18  in claim 14 does not add any additional
19  structural components that were not
20  already present in claim 11, correct?
21      A.   Similar to claim four, claim 14
22  does not add any components to the system
23  of claim 11, but rather recites an
24  additional function of that system.
25      Q.   Turning to the 292 patent,

Page 188

1  Exhibit 2, disputed claim term 22 appears
2  in claims five and 18.  I direct your
3  attention to claim five to begin, and
4  that's at the bottom of column 38.
5      A.   I see it.
6      Q.   And again, this is essentially
7  the same question as I've asked with
8  respect to the other claims, but you would
9  agree that the use of system in the
10  wherein clause of claim five of the 292
11  patent does not add any additional
12  structural components that were not
13  already present in claim one of the 292
14  patent, correct?
15      A.   Similar to my previous answers,
16  my reading claim five does not add any
17  components to the system of claim one
18  other than what was already specified in
19  claim one, but adds an additional
20  function.
21      Q.   And turning to claim 18, with
22  respect to claim 15 -- strike that.
23          You would agree that claim 18
24  and its recitation of system in the
25  wherein clause does not add any structural

Page 189

1  components that were not already present
2  in claim 15, correct?
3      A.   Similar to my previous answer,
4  claim 18 does not add any component to
5  claim -- to the system of claim 15 that
6  was not already specified in claim 15, but
7  rather recites an additional function of
8  that system.
9      Q.   So now moving on to disputed
10  claim 23, and we can stick with the 292
11  patent and do that first, claims eight and
12  21 of the 292 patent, it's Exhibit 2,
13  involve disputed claim term 23.  And
14  conveniently, we're still in column 42.
15          If you look down to claim 21,
16  that's disputed claim term 23, and again,
17  it's a wherein depending claim -- excuse
18  me, it's a depending claim of claim 15
19  wherein the system is configured to
20  achieve the limitation that's recited in
21  the claim.
22      A.   I've lost -- so I think I've
23  lost where we are, because --
24      Q.   Sure.
25      A.   For claim term 23, disputed

48 (Pages 186 - 189)

1  claim term 23, in the 292 patent, it's
2  claims eight and 21.
3      Q.   Correct, and I was going to 21
4  first, since we were already on that same
5  column, but did you move to --
6      A.   Twenty-one is not in column 40.
7      Q.   I thought I said 42, I apologize
8  if I misspoke.
9      A.   So now I'm with you on claim 21
10  of the 292 patent.
11      Q.   Okay.
12      A.   Reciting the --
13      Q.   System claim of claim -- the
14  system of claim 15 wherein the system is
15  configured.
16      A.   Right, and it includes the
17  language of disputing claim term 23.
18      Q.   Correct.
19      A.   Okay.
20      Q.   And my question, and again,
21  similar to what I've been asking
22  previously, you would agree that claim 21
23  and the language of disputed claim term 23
24  do not add any additional structural
25  components that are not already recited in

1  claim 15, correct?
2      A.   Claim 21 adds no component to
3  the system of claim 15, but rather recites
4  additional function of claim -- of the
5  system of claim 15.
6      Q.   And turning to the claim eight
7  of the 292 patent, which is in column 39.
8      A.   I see it.
9      Q.   I'll just ask the same question,
10  you would agree that the disputed claim
11  term 23 language that is found in claim
12  eight of 292 patent does not add any
13  additional structural components that are
14  not already present in claim one?
15      A.   Claim eight does not add any
16  components to the system of claim one
17  beyond what was already recited in claim
18  one, but it does recite an additional
19  function of that system.
20      Q.   Okay.  Now we can jump over to
21  the 899 patent in claim 18, this is also
22  implicating disputed claim term 23, and
23  you can find it on column 37 of the 899
24  patent, it's Exhibit 1.
25      A.   I see it.

1      Q.   And again, the same question,
2  you would agree that the disputed claim
3  term language in disputed claim term 23
4  does not add any structural components
5  beyond what is already recited in claim 11
6  of the 899 patent, correct?
7      A.   Well, to be precise, you're
8  asking about claim 18, right?
9      Q.   I'm saying in that claim 18,
10  and -- correct.  So disputed claim 23
11  corresponds to claim 18 of the 899 patent.
12      A.   I'm sorry, disputed claim term
13  23 --
14      Q.   Correct.
15      A.   -- I agree that it corresponds
16  to claim 18 of the 899 patent.
17      Q.   And you would agree that claim
18  18 does not add any additional structural
19  components beyond what is recited in claim
20  11, correct?
21      A.   Claim 18 does not add any
22  components to the system of claim 11, but
23  rather specifies an additional function of
24  that system.
25      Q.   Okay.  I think we're in luck,

1  disputed claim 24 is found in claim 19 of
2  the 899 patent, so just moving down ever
3  so slightly, the same question, would you
4  agree that claim 19 does not add any
5  additional structural components beyond
6  what is recited in claim 11?
7      A.   Claim 19 does not add any
8  components to the system of claim 11, but
9  rather specifies an additional function of
10  that system.
11      Q.   And we're going to jump to
12  disputed claim term 26, just because it's
13  found in claim 23 of the 899 patent.
14      A.   Okay.
15      Q.   And that's at line 55 of column
16  37 of Exhibit 1.  And the same question,
17  you would agree that claim 23 does not add
18  any structural components beyond what is
19  recited in claim 11, correct?
20      A.   Claim 23 does not add any
21  component to the system of claim 11, but
22  rather specifies an additional function of
23  that system.
24      Q.   Okay.  If you could turn to the
25  292 patent.

49 (Pages 190 - 193)

Page 194

1      A.   Yeah.
2      Q.   And we're going to go to
3  disputed claim term 25, and that's present
4  in claims one, 15 and 28.  And if you look
5  at column 32 of the 292 patent beginning
6  around lines 23 going to 34, there is a
7  wherein clause --
8      A.   Could you repeat the column and
9  line number?
10      Q.   Sure.  It's column 32 and it's
11  lines 23 through 34.
12      A.   Okay.
13      Q.   And there's a wherein clause, or
14  wherein limitation referring to the system
15  is configured to achieve what is recited
16  in disputed claim term 25, and the
17  question again, similar to everything I've
18  asked you about these, is that you would
19  agree that the wherein clause here and the
20  reference to the system is not adding an
21  additional structural component beyond
22  what is already recited in claim one of
23  the 292 patent, correct?
24      A.   I agree that the system referred
25  to in this wherein clause is the system

Page 195

1  whose components are already set forth
2  in -- in claim one, but rather recites an
3  additional function of the system.
4      Q.   Okay.  With respect to claim 15,
5  if you look at column 42, lines seven to
6  19, similar wherein clause, and so I just
7  ask the same question, whether you would
8  agree that the wherein clause in reference
9  to the system is not adding any additional
10  structural components to claim 15, but
11  merely further specifying functionality, I
12  think is what you've been saying?
13      A.   Well, what I've been saying is
14  that this wherein clause, the system
15  recited in the wherein clause in column 42
16  starting on line seven is referring to the
17  system whose components are already listed
18  previously in that claim, and that the
19  wherein clause just specifies an
20  additional function of that system.
21      Q.   Okay.  Now turning to claim 28,
22  one more with respect to disputed claim
23  term 25, and this is at the bottom of
24  column 45 and I think bridging over into
25  top of column 46.

Page 196

1      A.   I see it.
2      Q.   And the same question, you would
3  agree that the reference to the system in
4  the wherein clause in claim 28 of the 292
5  patent is not adding any additional
6  structural elements to the claim, correct?
7      A.   The system recited in the
8  wherein clause, the bottom of column 45,
9  is not adding a new component to the
10  system as set forth in -- within claim 28,
11  but rather reciting additional function of
12  that system.
13      Q.   So now if you turn to claim 25
14  of the 292 patent, this is disputed claim
15  term 27, and you can find it, it's lines
16  13 through 16 of column 43.
17      A.   I see it.
18      Q.   And again, the same type of
19  question I've been asking previously, you
20  would agree that claim 25 reciting wherein
21  the system is configured to do what is set
22  forth in disputed claim term 27 that is
23  not adding any structural components that
24  are not already present in claim 15, fair?
25      A.   Claim 25 does not add any new

Page 197

1  component to the system of claim 15, but
2  rather recites an additional function of
3  that system.
4      Q.   And now if you can turn to claim
5  11, it's column 39, we're still in the 292
6  patent, this disputed claim term 27,
7  again, the same question, you'd agree that
8  the recitation of the disputed claim term
9  of 27 found in claim 11 does not add any
10  additional structural components beyond
11  what is already present in claim one of
12  the 292 patent, correct?
13      A.   Claim 11 does not add any
14  component to the system of claim one, but
15  rather recites an additional function of
16  that system.
17      Q.   So if we turn to claim 12 of the
18  292 patent, we're jumping forward
19  slightly, this is disputing claim term 29.
20      A.   Okay.
21      Q.   And again, it's the same
22  question, you would agree that claim 12
23  which contains disputed claim term 29 does
24  not add any structural components beyond
25  what is already set forth in claim one, is

50 (Pages 194 - 197)

Page 198

1  that correct?
2     A.   The claim 12 of the 292 does not
3  add any new components to the system of
4  claim one, but rather recites an
5  additional function of that system.
6     Q.   So turning back to the 899
7  patent, disputed claim term 28 is present
8  in claim 25 of the 899 patent, and that
9  can be found on column 37, and again, it's
10 Exhibit 1 of the 899 patent.
11    A.   I see it.
12    Q.   You would agree that claim 25
13 and its recitation of disputed claim term
14 28 does not add any structural components
15 beyond what is already disclosed in claim
16 11, correct?
17    A.   Claim 25 of the 899 patent does
18 not add component to the system of claim
19 11, but rather recites an additional
20 function of that system.
21    Q.   And finally, turning to claim 28
22 of the 899 patent, and this is on column
23 38.
24    A.   I see it.
25    Q.   And this pertains to disputed

Page 199

1  claim term 30.  I would ask the same
2  question, you would agree that claim 28
3  and its recitation of disputed claim term
4  30 does not add any additional structure
5  beyond what is already recited in claim 11
6  of the 899 patent, correct?
7     A.   Claim 28 does not add any
8  component to the system of claim 11,
9  rather it recites an additional function
10 of that system.
11    Q.   Just some more, I guess, general
12 questions.
13       You understand that the claims
14 define the scope of protection -- or
15 excuse me, define the scope of the
16 invention protected by a patent, right?
17    A.   As a layperson, that sounds
18 right to me.
19    Q.   And you're familiar with patent
20 specification disclosing multiple
21 embodiments, is that correct?
22    A.   Yes.
23    Q.   There were a few statements in
24 your declaration where I believe you said
25 that the patents had said certain things

Page 200

1  were not part of the invention, and I'm
2  just trying to find -- find that, and I
3  just want to ask you a few questions about
4  that.
5        Going to, for example, it's page
6  19, paragraph 43, you talk about
7  specification of the 197 application --
8  sorry, did I give you a copy of the 197?
9  Let me do that, I'm sorry.  It will be
10 helpful so that you have it in front of
11 you.
12       [Whereupon, at this time, the
13    reporter marked as Goldberg Exhibit 6
14    the above-mentioned system, method and
15    computer program product for location
16    and/or relevancy based triggers for
17    mobile devices for identification.]
18    Q.   In paragraph 43, you state that
19 the 197 application emphasizes that the
20 environment for implementing the system as
21 well as the environment for carrying out,
22 implementing the following are not part of
23 the invention, and I just wanted to kind
24 of go through a couple of these citations
25 that you included and just kind of try to

Page 201

1  parse that a little bit.
2        You cite to paragraph 27, it's
3  on page five of the 197 application which
4  is Exhibit 6 that was just handed to you.
5     A.   I see it.
6     Q.   And figure two illustrates an
7  exemplary system 200, in accordance with
8  one embodiment.  As an option, the system
9  may be implemented in the context of any
10 of the devices of the network architecture
11 100 of figure one, and then it says of
12 course system 200 may be implemented in
13 any desired environment.
14    A.   Yes.
15    Q.   And when you state that the
16 environment for carrying out or
17 implementing are not part of the
18 invention, you would agree, though, that
19 if it was implemented in the context of
20 the network architecture 100 of figure
21 one, I mean, that would be part of the
22 invention, correct?
23    A.   I'm not sure I understand
24 your -- your question.  What I'm saying is
25 that the caveat or disclaimer that you

51 (Pages 198 - 201)

1  find throughout the 197 patent says, well,
2  here's one way to do it, but essentially
3  any way you do it, any way you carry out
4  this function is -- would be covered.
5        And so the disclaimer in
6  paragraph 27 specifically says, well, you
7  can implement system 200 in any
8  environment, not necessarily described in
9  this -- in this specification, and it
10 would still be covered.
11       And so the actual implementation
12 set forth in the 197 application is not
13 what defines the invention, and it appears
14 to be the function that was claimed is the
15 invention, not the structure provided in
16 the embodiment in the specification.
17    Q.   So it's your opinion that where
18 a patentee states that there may be other
19 ways of implementing the invention beyond
20 what is disclosed expressly in the various
21 embodiments, that they're somehow stating
22 that it's not part of their invention?  I
23 just don't see how that follows.
24       MR. TYSON:  I object to the
25 form.

1    Q.   Let me strike that.
2        So you said -- the patent is
3  saying here's one way to do it, but you
4  can do it any way you want, is that kind
5  of a fair characterization of what you
6  were saying before?
7    A.   I think that's -- that's fair.
8  We claim some function, and any way you
9  carry out that function is fine, it's
10 covered.
11   Q.   But if the system 200 was
12 implemented in the context of the devices
13 of the network architecture 100 of figure
14 one, you would not dispute that that's
15 part of -- that would be part of the
16 invention, correct?
17   A.   I would not dispute that the
18 actual -- any actual embodiment that's
19 described in the 197 would be covered
20 under the claims, I'm not saying that the
21 -- that the system 200 is not -- is
22 outside of the claims, what I'm saying is
23 that the structure of system 200 does not
24 seem to -- to describe the scope of that
25 claim at all because of the disclaimer.

1    Q.   So you would say that the
2  statement that the system 200 may be
3  implemented in any desired environment is
4  a disclaimer?  And I'm not asking for like
5  a legal opinion, but you believe that that
6  is somehow an admission that it's not part
7  of the invention?
8        MR. TYSON:  Objection to the
9  form.
10   A.   That it doesn't describe the
11 scope of the invention.
12   Q.   If you look at paragraph 49 on
13 page ten of the 197 application, it talks
14 about figure four and a method for
15 providing a relevancy-based trigger for
16 mobile device in accordance with another
17 embodiment, and you understand that the
18 reference to embodiment in the patent
19 specification refers to embodiments of the
20 invention, correct?
21   A.   Yes.
22   Q.   So what paragraph 49's saying in
23 the first sentence is that this
24 illustrates a method that's in accordance
25 with the embodiment of the invention, are

1  you with me?
2        MR. TYSON:  I object.
3    A.   Yes, I think that's right.
4    Q.   And then it says as an option,
5  the method may be implemented in the
6  context of the architecture environment of
7  the previous figures and/or any subsequent
8  figures, do you see that?
9    A.   I do.
10   Q.   And so that's saying that this
11 aspect of the invention, according to this
12 embodiment, that you can implement it in
13 different architectures and environments
14 that are disclosed in the 197 application,
15 correct?
16   A.   Yup, yes.
17   Q.   And you would agree that up
18 until that point that that's referring to
19 the use of this relevancy-based trigger in
20 these environments as one of the
21 inventions of the patent suit -- or excuse
22 me, of the 197 application, is that fair?
23   A.   Well, it's an example of the
24 implementation of method 400 described in
25 the patent is an example of what the

52 (Pages 202 - 205)

Page 206

1   patentee believes is the invention.
2      Q.   And it's your opinion that the
3   fact that the patentee attempted to
4   include some broad hedging language that
5   the method could be carried out in any
6   desired environment, that that somehow
7   means the environment is no longer part of
8   the invention period?
9      A.   That the environment in which
10  the method is carried out does not set
11  forth the scope of the invention, I think
12  is the way I view it.  It's not that the
13  environment disclosed is not an example of
14  the invention, but rather it does not set
15  forth the meets and bounds of the
16  invention.
17     Q.   Because it's essentially
18  unbounded, is that your opinion?
19     A.   The language says you can do it
20  any way you want.
21     Q.   It says you can do it one way,
22  as an option, you can do it another way,
23  or really you can do it any way, is that
24  fair?
25     A.   Yeah, that's a fair

Page 207

1   characterization.
2      Q.   And so you would agree that at
3   least in the first two instances where
4   it's specified in detail and not just some
5   do it any way you want, that that would be
6   still within the scope of the invention?
7      A.   Within the scope --
8        MR. TYSON:  I object to the
9   form.
10       THE WITNESS:  Sorry.
11     A.   Within the scope, I agree with
12  that, but it does not set forth the scope,
13  it doesn't provide structure.
14     Q.   Well, the claims define the
15  actual scope, right, and that's a legal
16  question, we don't need to -- I'll strike
17  that.
18     A.   Okay.
19     Q.   That's fine, I'm not asking for
20  a legal opinion.  It might be best for the
21  lawyers to figure that out in briefing.
22       And I'm sorry, I want to get off
23  the law stuff quickly, but I want to make
24  sure I got your understanding of this
25  correctly.  You understand that the words

Page 208

1   in the claims are not required to be
2   recited verbatim in the specification, is
3   that your understanding?
4      A.   Yes.
5      Q.   At a lay, non-attorney level?
6      A.   Yes, it is.
7      Q.   Have you ever been informed that
8   functions such as storing, receiving and
9   processing can be supported by a general
10  purpose computer?
11     A.   I don't know if --
12     Q.   Without any need to have a
13  specialized or specially programmed
14  computer.
15     A.   I don't know if I formed that or
16  not.  You're just talking about the
17  generic operations of storing,
18  receiving --
19     Q.   Storing, receiving or
20  processing, that those can be adequately
21  supported by the disclosure of a general
22  purpose computer?
23     A.   From a legal point of view, I
24  don't recall.
25     Q.   Okay.  And this was more just

Page 209

1   when you were being informed of the legal
2   standards, so I was just curious.
3      A.   I don't recall.
4      Q.   Okay.  In looking at the
5   materials listed in your declaration, and
6   you said that the only other thing you had
7   looked at aside from that was some Agis
8   trial transcript, I didn't see reference
9   to the prosecution histories of the 899
10  patent or the 292 patent, were those not
11  part of the materials that you reviewed in
12  forming your opinions?
13     A.   I don't -- that's correct, I
14  don't recall reviewing those.
15     Q.   Okay.  You don't recall or you
16  didn't or --
17     A.   I certainly didn't review them
18  in preparation for this deposition.
19     Q.   Okay.
20     A.   And to the best of my knowledge,
21  this list is complete.
22     Q.   Okay.
23     A.   So I don't -- I don't believe I
24  reviewed the file histories for the 899
25  and 292.

53 (Pages 206 - 209)

Page 210

1    Q.   Okay.  You would agree that
2  there's standard modules of software code
3  that are well known and can be identified
4  by name as connoting sufficient structure
5  in a claim?
6        MR. TYSON:  I object to the
7  form.
8    A.   I mean, I'd have to -- I guess
9  I'd have to see the context, but if they
10 were identified by name in a claim, I
11 suspect that would provide some -- some
12 structure, but I'd have to look at the
13 actual example.
14   Q.   And I don't know if, like for
15 example, a Bluetooth communication
16 protocol would be considered like a
17 standard module software code identified
18 by name, that might be a bad example.
19   A.   I'd have to see the context, but
20 as we've discussed, you know, reciting the
21 Bluetooth communications protocol does
22 inform one of skill about certain features
23 of the Bluetooth --
24   Q.   Okay.
25   A.   -- system.

Page 211

1    Q.   And are there classes of
2  software subroutines that are well known
3  to perform various functions that a person
4  skilled in the art could utilize if they
5  were developing a network?
6    A.   Yes, so one of skill would know
7  about various resources for getting
8  software for network communications.
9    Q.   And are there common graphic
10 libraries with corresponding APIs that a
11 person with skill in the art can use to
12 generate images on display?
13       MR. TYSON:  I object to the
14 form.
15   A.   If a developer knew what they
16 wanted -- what images they wanted to
17 generate on the screen, then there are
18 common libraries that can be used to do
19 that.
20   Q.   And they would have a
21 corresponding application program
22 interface that could be used in connection
23 with that?
24   A.   Yes, most graphics libraries or
25 user interface libraries provide APIs that

Page 212

1  can be used by a developer.
2    Q.   Okay.  You had mentioned this
3  Agis matter, do you recall opining on the
4  term CPU software?
5    A.   I don't recall, I didn't notice
6  that in my review of my testimony in that
7  case.
8    Q.   We talked, I think, a little bit
9  before, and correct me if I'm wrong, we're
10 talking about applications and programs,
11 and I believe applications were a subset
12 of programs, is that correct?
13   A.   Yes.
14   Q.   Are you aware that courts have
15 found that the term program is
16 sufficiently specific so that it does not
17 fall under means plus function?
18   A.   I'm not -- I'm not aware one way
19 or the other, I don't know the case law
20 regarding that.
21   Q.   Okay.  Do you recall doing work
22 for a party, I believe it's called
23 Typemock?
24   A.   Yes.
25   Q.   Do you recall opining on a

Page 213

1  computational apparatus?
2    A.   I don't have any specific
3  recollection.
4    Q.   And would you agree that there's
5  standard modules of software that a person
6  that's skilled in the art would know to
7  use to generate a display?
8        MR. TYSON:  I object to the
9  form.
10   A.   Yes.  Again, if the developer
11 knows what he wants to display, then there
12 are software modules he can use to
13 generate the display of the content that
14 he wants to display.
15   Q.   And would you agree that also
16 applies to outputting a message that's
17 based on information that's received?
18       MR. TYSON:  I object to the
19 form.
20   A.   Well, if the developer knows
21 exactly how they want to take information
22 that's been received and generate a
23 message from that, then the developer
24 would know how to do that using a software
25 library.

54 (Pages 210 - 213)

Page 214

1     Q.   Do you recall opining that a
2  symbol generator is a standard module
3  software code that was well known in the
4  art, and that the term symbol generator
5  would have been sufficient to identify
6  these modules of software code to one with
7  skill?
8     A.   So I recall opining that a user
9  -- one of skill using the term single
10 generator, we're talking about displaying
11 symbols on the screen, that the user could
12 figure out how to generate symbols, a
13 symbol generator, but using a software
14 library.
15    Q.   What it says, and probably I
16 didn't get copies of this, furthermore,
17 one of ordinary skill in the art would
18 have understood that a symbol generator as
19 a standard module software code that was
20 well known in the art and that the term
21 symbol generator would have been
22 sufficient to identify these modules of
23 program code to one of ordinary skill in
24 the art, so I don't think that you were
25 saying that one would then have been able

Page 215

1  to create the program code, I think you
2  said it was already available?
3        MR. TYSON:  Objection.
4  Foundation.
5     A.   Right, what I said was that --
6  well, you read it, but upon reading the
7  term symbol generator, the user would then
8  know, oh, I can go get this piece of
9  software that displays symbols on the
10 screen, which is what the claim symbol
11 generator does.
12    Q.   Did you consider whether any of
13 the claim terms that are recited on your
14 declaration, whether any of those were
15 well known to art and refer to standard
16 modules of software code?
17    A.   Well, I did for some of the
18 terms that we talked about, such --
19 related to the various communications
20 protocols.  In the Agis case which you're
21 reading from, I was asked by Counsel to
22 opine on whether a person upon -- a person
23 of skill upon reading the various claim
24 elements would be able to identify
25 software that accomplished the functions

Page 216

1  listed in the claim, and that was from
2  Counsel in the Agis case.
3     Q.   Okay.
4     A.   In this matter, as I set forth
5  in my declaration, I was asked to
6  determine if the patent specification of
7  the claims themselves disclosed the
8  structure for performing the functions in
9  the claims, and so it was a different
10 exercise, but certainly for some of the
11 claim terms that we've discussed,
12 including internet protocol, Bluetooth
13 protocol, you know, I knew immediately
14 that that corresponded to certain
15 libraries of software that one could have,
16 that one could get.
17    Q.   You can't include that
18 information in your declaration, however,
19 correct?
20    A.   Well, I was not asked to opine
21 on the limitations regarding Bluetooth or
22 internet protocol.
23    Q.   Even as they were contained in
24 some of the disputed claim terms?
25    A.   Well, my declaration speaks for

Page 217

1  itself, and that is I was asked to
2  determine whether there was structure in
3  the claims or in the specifications for
4  the claim terms as a whole that I listed
5  in my declaration.
6     Q.   Do you think that it was a
7  mistake not to examine some of the
8  communication protocols and how messages
9  were transmitted to see if it provided
10 support for the functionality recited in
11 the claims, and to the extent that
12 specification was recited in the
13 provisional or in the 197 application?
14       MR. TYSON:  I object to the
15 form.  Mischaracterizing testimony.
16    A.   I was asked to review the claims
17 and the specification for certain
18 limitations, and asked to opine on whether
19 there was sufficient structure disclosed
20 in the claims and the specification to
21 support the claim functionality that I
22 asked to opine about.
23       Certainly I would have
24 considered citations within the
25 specifications of the claims to specific

55 (Pages 214 - 217)

Page 218

1    protocols, for example, I would have
2    considered those in forming my opinions.
3         As you'll read in my
4    declaration, the bases for my opinions was
5    not due to ignoring any communications
6    protocols.
7    Q.   I'm just curious, you know, for
8    example, when the Bluetooth communication
9    protocol was explicitly spelled out in the
10   claim that you didn't, I guess, review
11   parts of that in the process of forming
12   your opinion regarding whether there was
13   sufficient structure in the claim for
14   performing the function.
15   A.   I think you'll see in my
16   declaration that my opinions were not
17   based on what the Bluetooth protocol did
18   or did not provide, but rather what was
19   disclosed in the patent.
20   Q.   Okay.  And which also -- I mean,
21   the patent did disclose Bluetooth
22   communication protocol, right?
23   A.   Right, you see that my opinions
24   are not related to that aspect.
25   Q.   Okay.  And at this time, since

Page 219

1    you haven't recently reviewed the
2    Bluetooth communication protocol, you
3    can't opine on whether or not it actually
4    would provide any support for the claims
5    having sufficient structure, is that fair?
6    A.   No, I don't think that's fair.
7    Q.   So without knowing the Bluetooth
8    communication protocol and, for example,
9    the procedures and rules and details for
10   exchanging messages, you can still --
11   maybe it's best if I give an example.
12        So for example, it was disputed
13   claim term eight, I'm looking at the 899
14   patent, claim one, it's lines 58 through
15   64, and it was an application configured
16   for execution by a plurality of mobile
17   devices.  The application when executed
18   configured to and then for disputed claims
19   were made received indication of a receipt
20   without solicitation from the at least one
21   broadcast short-range communications unit
22   and via the Bluetooth wireless
23   communications protocol of one or more
24   messages including the address portion and
25   the identifier including at least three

Page 220

1    fields and at least one value.
2         And if I recall, you took issue
3    with the receiving and indication of
4    receipt as not being supported, and based
5    on our discussion of today, it seems that
6    the Bluetooth wireless communications
7    protocol could potentially have that be
8    part of the way messages are handled in a
9    network?
10        MR. TYSON:  Objection to the
11   form.
12   A.   So my understanding is that
13   there's not sufficient structure to simply
14   refer to the Bluetooth wireless
15   communications protocol and assume that
16   the one of skill reading the claim would
17   need to dig through every aspect of the
18   Bluetooth wireless communications protocol
19   to figure out if there's any way to
20   receive an indication of a receipt, even
21   though it's not disclosed in the patent
22   specification, and so I did not dig into
23   the Bluetooth wireless communications
24   protocol trying to search for every
25   possible way that an indication of a

Page 221

1    receipt could be received, but rather
2    understood that that should be disclosed
3    in the patent specification.
4    Q.   And so it's not your opinion
5    that the hypothetical person of ordinary
6    skill in the art would have known the
7    Bluetooth standard, it's your opinion that
8    they would not have dived through it to
9    see if the particular functionality
10   recited in the disputed claim made was
11   part of the Bluetooth wireless
12   communications protocol, which we, I
13   think, agreed required that both the
14   sending node and receiving node have some
15   type of software so that they can abide by
16   that protocol?
17        MR. TYSON:  I object to the
18   form.
19   A.   My understanding is that the
20   patentee is required to disclose such -- a
21   claimed element like this without
22   requiring one of skill to be able to
23   construct the structure for this element
24   based on one of skill's knowledge, in this
25   case, one of skill's knowledge of the

56 (Pages 218 - 221)

Page 222

1 wireless communications protocol.
2 Q. You agreed earlier that
3 Bluetooth wireless communication protocol
4 is a term of art, correct?
5 A. Yes.
6 Q. Okay. Okay. I understand your
7 position, I don't necessarily agree, but I
8 don't know if there's value in belaboring
9 the point.
10 A. Right.
11 Q. But it did occur to me that
12 there were certain disclosures in terms of
13 standards and communication protocols and
14 the like in the provisional that you did
15 not discuss any detail to see if they may
16 provide support for the claim limitations,
17 is that fair that you did not go through
18 that exercise?
19 A. You know what? I certainly did
20 for the provisional, and for the
21 specification of the 197, I went through
22 the exercise of determining what exactly
23 was identified as structure and how it
24 correlated to the claims.
25 Q. But I guess my point is that you

Page 223

1 did not go further when it talks about,
2 for example, modifying IEEE 802-11 to
3 be -- to allow what is known as a
4 association-less protocol --
5 A. Association-less?
6 Q. I keep saying that, association-
7 less protocol, correct. There was also
8 the IEEE 1609 wireless access in vehicular
9 environments wave, and I didn't see much
10 of -- any discussion of that.
11 A. Correct.
12 Q. You know, with some of the
13 claims reciting very specific
14 communication protocols, you know, such as
15 Bluetooth. You did not go through the
16 exercise of diving into those various
17 standards or protocols to see if reference
18 to them was enough to provide support for
19 the claim limitations, is that correct?
20 A. I -- I think the way to say it
21 is I did not dive into those protocols
22 searching for support for a particular
23 function claimed in the 899 or the 292
24 patent.
25 Q. Okay.

Page 224

1 A. And I'll note the provisional
2 only mentions Bluetooth in passing.
3 Q. I guess that begs the question,
4 it's still mentioned, though, right?
5 A. It does appear once.
6 Q. And it does appear in some of
7 the -- certain claims as well, correct?
8 A. Of these later patents?
9 Q. Yes.
10 A. Certainly.
11 MR. DAHLGREN: Yes. I think I
12 just need a minute or two to see if I
13 have anything left, I think I may have
14 covered it all.
15 [A recess was taken.]
16 MR. DAHLGREN: Unless your
17 Counsel has any questions for you, I
18 don't have any further questions at
19 this time, and thank you very much,
20 Dr. Goldberg, I appreciate your
21 participation today.
22 THE WITNESS: Thank you.
23 MR. TYSON: I've just got a
24 couple, couple of questions.
25 MR. DAHLGREN: Then I may

Page 225

1 have --
2 MR. TYSON: You might have some
3 after.
4 EXAMINATION BY
5 MR. TYSON:
6 Q. Dr. Goldberg, we're talking
7 about the 292 patent, could you open that
8 up? I think that's deposition Exhibit 2.
9 Just look at claim one, for example.
10 A. Okay.
11 Q. Claim one, as part of the claim,
12 Counsel had asked you a number of
13 questions related to code, and column 31,
14 we see there at about line seven, code
15 configured to be executed by at least one
16 of the plurality of mobile devices, do you
17 see that?
18 A. I do.
19 Q. And I've tried to write this
20 down, but I may have gotten it wrong, but
21 I believe that earlier you testified that
22 code in a general sense is a term that
23 might mean a set of software instructions,
24 is that consistent with your testimony?
25 A. Yes.

Page 226

1    Q.   And so the code could be a set
2  of many different software instructions,
3  is that fair?
4         MR. DAHLGREN: Objection.
5  Leading.
6    A.   It could be any collection of
7  software instructions in any sequence.
8    Q.   And just looking at 292 patent
9  claim one, and I think you've given
10  testimony in your declaration, there's a
11  number of functions that this recited code
12  is performing.  For example, there's at
13  column 31, line about 11 to 14, there's
14  this cause display of an option function
15  at the next -- let's say at column 31,
16  line 18 to 22, there's a receive and
17  indication of a receipt of the one or more
18  first broadcast messages function.
19         Then for example at column 32,
20  line four, let's say line four to 11, and
21  really specifically where it says caused
22  to be outputted around line eight, there's
23  a another function of code, cause to be
24  output, the first visual information based
25  on the first location relevant

Page 227

1  information, so these are just three
2  examples, there's other functions that are
3  recited in this code, would you agree with
4  that?
5    A.   Yes.
6         MR. DAHLGREN: Objection to
7  form.  Leading.
8    Q.   Is it your belief that literally
9  the identical software instruction in this
10  set of code would have to be what's
11  performing each of the recited functions,
12  is that your testimony?
13         MR. DAHLGREN: Objection.  Form.
14    Q.   Let me ask it a different way.
15         Could a different software
16  instruction in this code set perform each
17  of those functions?
18    A.   Each of these functions could be
19  performed by a different set of
20  instructions within the same code.
21    Q.   Okay.  Again, so looking now at
22  the 899 patent in claim one, and this is
23  at column 29, 899 is Exhibit 1 of your
24  deposition, so we have the 899 patent.  At
25  column 29 at about line 48, there's the

Page 228

1  recitation of an application, do you see
2  that?
3    A.   Yes.
4    Q.   Are you familiar with whether an
5  application could mean -- really would
6  generally mean one or more applications?
7         MR. DAHLGREN: Objection to
8  form.  Foundation.
9    A.   As claimed --
10    Q.   As claimed here.
11    A.   In patent -- in patent law?  My
12  understanding is that an application could
13  refer to one or more.
14    Q.   One or more applications?
15    A.   Yes.
16    Q.   So again, looking at here, there
17  are some of these recited functions that
18  you provided testimony on, others that you
19  did not, but here again at column 29, line
20  53 to 54, we have a display of an option
21  via the display of at least one mobile
22  device, then again at column 29, about
23  line 50, let's go down to about 58 to 64,
24  you've got this receive and indication of
25  a receipt of the one or more messages.

Page 229

1         Then just going across again,
2  you have application in saying said
3  application, but it's referring again to,
4  let's say at column 30, line 37 to 40,
5  there's receive the response message, and
6  then even after that, we have a limitation
7  that you talked about column, 30 --
8  starting at about line 41 and then going
9  down to line 49, there there is this in
10  response to the receipt, you have control
11  including causing to be output the mobile
12  device application visual information.
13         So I'm paraphrasing some of
14  these, but I'm generally referring to
15  different functions that are recited for
16  the application here, and is it your
17  testimony that literally the same
18  application would have to perform every
19  single one of the functions claims?
20         MR. DAHLGREN: Objection.  Form.
21  Leading.
22    A.   Well, my understanding is that
23  when a claim recites a or an something, it
24  means one or more, and so looking at an
25  application, if that means one or more

58 (Pages 226 - 229)

Page 230

1  applications, then it would seem to me as
2  a layperson that the one or more
3  applications would need to support the
4  functions that you mentioned. So it
5  wouldn't necessarily have to be exactly
6  the same program, but rather it could be
7  one of the applications of the an
8  application claimed.
9      Q.  I actually want to go to your
10  declaration. Counsel had asked you a
11  number of questions about the provisional
12  application and about a lot of discussion
13  in background which is the provisional
14  application, so your declaration is
15  Exhibit 3 of the deposition, and then I
16  think the provisional itself is Exhibit 4.
17      A.  Yes.
18      Q.  So just turning to page nine of
19  your declaration.
20      A.  Okay.
21      Q.  So just looking at paragraph 31,
22  and I'm just going to read it, you say at
23  Dyfan's contended time of the invention,
24  parenthesis, March 2011, the 584
25  provisional identified various problems

Page 231

1  with acknowledged prior art systems, and
2  then I see it looks like these are
3  indented paragraphs, are these excerpts
4  from the 584 provisional that you provided
5  here?
6      A.  Yes.
7      Q.  And some of those acknowledged
8  prior art systems that you did say
9  identified various problems, I'm looking
10  at the first excerpt 584 provisional at
11  page 18 is the internet protocol which is
12  identified there?
13      A.  Correct.
14      Q.  And then in the second
15  paragraph, you talk about -- the excerpt
16  from the provisional at page 16 is in the
17  various addressed network systems
18  described above, and it has parenthesis
19  cellular, WiMAX, et cetera, do you see
20  them?
21      A.  Yes.
22      Q.  So internet protocol, cellular
23  protocols, WiMAX protocols, those were all
24  acknowledged prior art systems that it's
25  your testimony here that the 584

Page 232

1  provisional is identifying problems with,
2  is that consistent with your testimony?
3      A.  Yes.
4      Q.  And then the third paragraph, I
5  think this is referring again to page 16,
6  and why don't we turn to page 16 of the
7  provisional itself. And I think actually,
8  let's turn to page 14, so 14 and 15,
9  Counsel asked you a number of questions
10  about this dedicated short-range
11  communications, DSRC, and then a number of
12  these protocols, the 16 -- the different
13  IEEE 1609 protocols on page 15, this
14  vehicle infrastructure integration on page
15  seven and then the paragraph below that
16  page 15 refers to -- it's the second
17  paragraph on page 15 of the provisional
18  application refers to a roadside unit --
19      A.  Yes.
20      Q.  -- do you see that? And that
21  has a parenthesis of RSU?
22      A.  Yes.
23      Q.  And then on page 16, there's a
24  number of other prior protocols that are
25  listed here, including those IEEE 1609.2,

Page 233

1  then there's a number of transfer
2  protocols listed in the second paragraph
3  on page 16, and your quote here from page
4  16 is -- it looks like that's the last
5  paragraph on page 16.
6      A.  That's correct.
7      Q.  And it's referring to a number
8  of problems with -- it looks like -- the
9  last sentence is referring to broadcasting
10  to all terminals in the vicinity of an RSU
11  requesting that they send data about that
12  location, so there's some testimony that
13  you're excerpting here that that DSRC
14  system that had these radio -- what do
15  they call it, roadside units, RSCs (sic),
16  that were -- identified problems with
17  those acknowledged prior art systems,
18  correct?
19      A.  Correct.
20      Q.  And then I think you cite to a
21  paragraph at page 18 of the provisional,
22  this is again still on page nine of your
23  declaration, it looks like this is the
24  last paragraph of what is called the
25  background of the invention, do you see

59 (Pages 230 - 233)

Page 234

1   that?
2       A.   I do.
3       Q.   And I'm just going to read it,
4   it says it is obvious that today's systems
5   do not provide a convenient method of
6   directly sending data messages to a
7   certain physical location, and do not
8   support the efficient collection of
9   certain data messages from specified
10  physical locations, do you see that?
11      A.   I do.
12      Q.   So these paragraphs and other
13  paragraphs that I've identified in here,
14  you're referring to those, and you put
15  them under the caveat, the 584 provisional
16  identified various problems with
17  acknowledged prior art systems, is that
18  correct?
19      A.   Yes.
20      Q.   Just looking at the next two
21  paragraphs in your declaration, so
22  paragraphs 32 and 33 of your declaration,
23  you now get into what's called the summary
24  of the invention section, and you say the
25  summary of the invention section of the

Page 235

1   584 provisional identifies the solution to
2   set the invention apart from these prior
3   art systems and solve these problems, do
4   you see that?
5       A.   I do.
6       Q.   And it looks like you cite to a
7   number of different paragraphs and you're
8   just quoting those paragraphs at page 18,
9   is that correct?
10      A.   Yes.
11      Q.   Like the first quote, it says
12  the present invention addresses the
13  challenges mentioned above, do you see
14  that?
15      A.   I do.
16      Q.   And then you -- I think you
17  really actually are just quoting a number
18  of these paragraphs on page 18.
19      A.   Correct, in fact it's just one,
20  consecutive paragraph, one big block.
21      Q.   Let's go to paragraph 33,
22  actually, of your declaration.  And you
23  say the detailed description of presently
24  preferred embodiments of the invention
25  section of the 584 provisional summarizes

Page 236

1   the invention solution, and it looks like
2   you have a quote there, can you just read
3   that quote on page ten of your declaration
4   from the 584 provisional at page 21
5   starting with the invention?  Can you read
6   it out loud?
7       A.   In fact, I will read it right
8   from the -- from the provisional on page
9   21.  The invention described herein
10  provides a means and function for
11  delivering messages to certain physical
12  locations and for collecting data from
13  certain locations, period.
14          The approach uses a location
15  header in the communication process that a
16  location-aware proxy server can understand
17  to route messages to and from mobile
18  terminals via a variety of wireless and
19  wireline communication networks, period.
20      Q.   And -- I mean, you as
21  interpreting this as a person with
22  ordinary skill in the art, you
23  characterize this as a paragraph, I mean,
24  it uses the word invention as summarizing
25  the invention solution as disclosed in the

Page 237

1   provisional, is that fair?
2           MR. DAHLGREN:  Objection to
3       form.  Leading.
4       A.   Yes, I say it right there that
5   this is how the provisional summarizes the
6   invention disclosed in the provisional,
7   which is using a location header in the
8   communication process, so a very specific
9   way of performing location-aware routing.
10      Q.   And -- would you -- is it fair
11  to say that the invention was purporting
12  to modify the format of messages that were
13  exchanged via existing wireless
14  communication protocols?
15          MR. DAHLGREN:  Objection to
16      form.  Leading.
17      A.   Yes, as disclosed in the prior
18  art section of the provisional, of the
19  existing protocols had drawbacks that
20  prevented them from performing this
21  location-aware communications, and the
22  provisional, the invention of the
23  provisional sought to solve those problems
24  through the use of a location header.
25      Q.   And the location header, that

60 (Pages 234 - 237)

Page 238

1   would be something that would be inserted
2   as a header that would be modifying the
3   format of these messages, is that correct?
4       MR. DAHLGREN:  Objection to the
5       form.  Leading.
6       A.   That is what was disclosed in
7   the provisional, yes.
8       Q.   Is it fair to say that the
9   invention was also modifying these
10  protocols, so not only using this location
11  header, but also routing messages based on
12  the location header, is that fair that it
13  was modifying these existing protocols
14  using this location header and routing
15  that location header?
16      MR. DAHLGREN:  Objection to the
17      form.  Leading.
18      A.   So it was modifying the protocol
19  to insert a location header into the
20  message and then modifying the routing of
21  messages based on the location header.
22      Q.   And that was the invention that
23  is specifically called out by 584
24  provision?
25      A.   Yes, one of skill reading the

Page 239

1   provision would understand that was the
2   invention.
3       Q.   And I think Counsel had asked
4   you a number of questions on these, but
5   just to confirm, the provisional is
6   referring to cellular standards like 3G,
7   so 3G would be an example of an existing
8   wireless communication protocol?
9       A.   Certainly.
10      Q.   And WiMAX would be an example of
11  an existing wireless communication
12  protocol?
13      A.   Yes.
14      Q.   And Wi-Fi would be an example of
15  an existing wireless communication
16  protocol?
17      A.   Correct.
18      Q.   And Bluetooth would be an
19  example of an existing wireless
20  communication protocol?
21      A.   That's correct.
22      Q.   Do you believe that you have
23  specialized skill and training in software
24  development -- actually, let's go to your
25  declaration.

Page 240

1       You refer to your definition of
2   a person of ordinary skill in the art, and
3   I think Counsel actually pointed you to
4   this earlier, looking at, I think -- you
5   have a section on page four of your
6   declaration starting with paragraph 14, it
7   says person of ordinary skill in the art,
8   and that's section 6B, I believe?
9       A.   Yes.
10      Q.   And you have -- the paragraph 14
11  includes your understanding from
12  Defendant's Counsel, paragraph 15 says
13  something, I've been advised that a person
14  of ordinary skill is a hypothetical
15  person, and then in paragraph 16, you
16  render your opinion with respect to a
17  person of ordinary skill in the art, is
18  that a fair summary of this --
19      A.   Yes.
20      Q.   -- these paragraphs?
21      A.   Yes.
22      Q.   And so you first say that a
23  person with ordinary skill in the art
24  would have had a bachelor of science
25  degree in computer science or similar

Page 241

1   technical field together with two years of
2   educational practicum or work experience
3   in the field of software development,
4   parenthesis, including programming for
5   client server systems, databases and
6   networks or related areas, do you see
7   that?
8       A.   I do.
9       Q.   And would you say sitting here
10  today, you have specialized skill and
11  training in software development that
12  would assist the court, in this case the
13  judge in the Western District of Texas,
14  that would assist the court in resolving
15  the issues to which you've provided
16  testimony in your declaration?
17      A.   I do.
18      MR. DAHLGREN:  Objection to the
19      form.  Leading.
20      Q.   And also based on your
21  definition, would you -- sitting here
22  today, do you believe you have specialized
23  skill and training in data communication
24  networks including those involving mobile
25  devices that would assist the court in

61 (Pages 238 - 241)

Page 242

1  resolving the issues for which you've
2  provided testimony in your declaration on
3  in this case?
4      MR. DAHLGREN:  Objection to the
5  form.  Leading.
6      A.   Yes.
7      Q.   And you would have had that
8  specialized skill and training prior to
9  the priority date of these patents which
10 is March 2011?
11     MR. DAHLGREN:  Objection.
12     A.   Yes.
13     MR. TYSON:  Okay, I have no
14 further questions.
15     MR. DAHLGREN:  I think I might
16 just have a few.
17 CONTINUED EXAMINATION BY
18 MR. DAHLGREN:
19     Q.   So your Counsel asked you a
20 variety of questions about some of the
21 drawbacks in the existing systems at the
22 time that the provisional was filed,
23 correct?
24     A.   Yes.
25     Q.   And it's your opinion or you

Page 243

1  cite a statement where they say that they
2  have found a way to overcome those
3  challenges, correct?
4      A.   Which one are you referring to?
5  Where -- I assume you're referring to page
6  ten of my declaration where the
7  provisional sets forth a summary of the
8  invention and detailed description?
9      Q.   I was looking at the provisional
10 application, Exhibit 4, the page ten of
11 35, it's under summary invention, the
12 present invention addresses the challenges
13 mentioned above.
14     A.   I see that.
15     Q.   Now, you would agree that the
16 invention did not -- or provisional did
17 not purport to create a new type of
18 network that did not use any existing or
19 conventional technology whatsoever,
20 correct?
21     A.   Could you read back the
22 question?
23     MR. DAHLGREN:  Do you mind
24 reading it back, please.
25     [The requested portion of the

Page 244

1  record was read.]
2      A.   I would characterize it as the
3  invention of the provisional application
4  built upon or adapted conventional network
5  protocols in order to perform location-
6  aware routing.  It actually modified what
7  was -- what is already there, to perform
8  location-aware routing.
9      Q.   So if you look at the
10 provisional application, it's page 20 of
11 35, looking at the court header, the last
12 full paragraph says the current invention
13 may support a wide variety of mobile
14 communication networks including Wi-Fi
15 hotspots, there's a IEEE standard in
16 parenthesis there, WiMAX, another
17 standard, ad hoc networks and based on
18 what appears to be other standards,
19 derivatives such as DSRC cellular
20 networks, 2G, CMA, GSM, 2.5G, et cetera,
21 do you see that?
22     A.   I do.
23     Q.   Okay.  And are those the type of
24 communication networks that we were
25 talking about that have protocols?

Page 245

1      A.   These have protocols, yes.
2      Q.   Did you review any of these
3  protocols when you were evaluating the
4  disputed claim terms in your declaration?
5      A.   I've -- not as part of the
6  preparation of my declaration, I reviewed
7  a number of these protocols already.  I
8  also note that it says the current
9  invention may support them, it doesn't say
10 the other way around, that these
11 technologies may support the invention.
12 Right?
13     What they're saying, you can
14 build -- you can still build these network
15 protocols on top of the invention, so that
16 even though the invention requires a
17 location header, you can still implement
18 these -- these protocols on top of the
19 invention.
20     Q.   And implementing those protocols
21 on top of the invention would entail
22 utilizing the various rules, things you
23 mentioned in terms of how messages are
24 transmitted, for example?
25     A.   Sure, in addition to, of course,

62 (Pages 242 - 245)

Page 246

1  the location header disclosed in the
2  provisional.
3      Q.   Going to the 899 patent, there
4  was some question about an application in
5  claim one, it's referred to in, it looks
6  like it's line 48 of column 29 of 899
7  patent, it says an application, and
8  Counsel asked you if that could refer to
9  one or more?
10     A.   Yes.
11     Q.   Does the fact that at line 35 in
12  column 30 it then refers to said
13  application when executed, does that
14  inform you as to whether the an
15  application was singular or allowed for
16  more than one?
17     A.   I mean, you're asking a question
18  about drafting of patent claims, and as a
19  layperson, as I testified, my
20  understanding of the claim says an
21  application, it can be understood to mean
22  one or more, so I would assume that the
23  said application would refer to said one
24  or more applications, but that's my
25  understanding as a layperson of patent

Page 247

1  drafting.
2      Q.   And if you look at column 30,
3  lines 25 through 34, it says after
4  particular location-relevant information
5  is located based on the at least one value
6  cause to be sent from the at least one
7  server to the at least one mobile device
8  and via the internet protocol, response
9  message including the particular
10  location-relevant information for use in
11  controlling the one or more mobile device
12  application actions of the application
13  including causing to be output via the at
14  least one mobile device, the mobile device
15  application visual information, does
16  that -- is your understanding of the
17  reference to mobile device application
18  there, is that a singular or plural?
19     A.   No, I think the one or more
20  application -- if an application means one
21  or more applications, then where you see
22  the application refers to the one or more.
23  Again, you're asking me as a layperson
24  about patent drafting language.
25     Q.   It doesn't say said first

Page 248

1  application and said second application
2  anywhere in claim one of the 899 patent,
3  does it?
4      A.   No.
5          MR. DAHLGREN:  Okay.  That's
6  everything, I thank you again, I
7  appreciate it.
8
9          [TIME NOTED: 5:36 p.m.]
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 249

1          C E R T I F I C A T I O N
2
3      I, ARTHUR HECHT, a Notary Public for
4  and within the State of New York, do
5  hereby certify that the foregoing witness,
6  BENJAMIN GOLDBERG, was duly sworn on the
7  date indicated, and that the foregoing is
8  a true and accurate transcription of my
9  stenographic notes.
10     I further certify that I am not
11  employed by nor related to any party to
12  this action.
13
14
15
16          _____
17           ARTHUR HECHT
18
19
20
21
22
23
24
25

Page 250

1  Christopher Tyson, Esq. - Duane Morris LLP

2  cjtyson@duanemorris.com

3         November 15, 2019

4  RE:  Dyfan LLC v. Target Corporation

5  11/12/2019, Dr. Benjamin Goldberg (#3665610)

6     The above-referenced transcript is available for

7  review.

8     Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12    The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  <Email address for Errata Return>

16

17   Return completed errata within 30 days from

18  receipt of testimony.

19   If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22         Yours,

23         Veritext Legal Solutions

24

25

Page 251

1  Dyfan LLC v. Target Corporation

2  Dr. Benjamin Goldberg (#3665610)

3      E R R A T A   S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____  _____

24  Dr. Benjamin Goldberg          Date

25

Page 252

1  Dyfan LLC v. Target Corporation

2  Dr. Benjamin Goldberg (#3665610)

3         ACKNOWLEDGEMENT OF DEPONENT

4     I, Dr. Benjamin Goldberg, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____  _____

12  Dr. Benjamin Goldberg          Date

13  *If notary is required

14      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  _____ DAY OF _____, 20___.

16

17

18  _____

19  NOTARY PUBLIC

20

21

22

23

24

25

64 (Pages 250 - 252)

[00179 - 25]                                    Page 1

| **0** |
| --- |

**00179**   1:2

| **1** |
| --- |

**1**   3:13 11:9,12
 55:2,3 68:23 70:2
 70:4,9 74:9 77:9
 79:2 86:4,21
 109:20 115:18
 120:7 121:14
 130:1,25 159:2
 173:21 175:5
 181:2 186:18
 191:24 193:16
 198:10 227:23
**100**   201:11,20
 203:13
**1000**   2:7
**10004**   2:8
**10012**   5:15
**10194292**   3:14
 11:17,21
**11**   3:13,14 86:3,6
 93:21 94:2 96:25
 98:4,15 121:13,17
 121:22 129:24
 130:21,22 131:10
 131:17 135:14,17
 135:18,23,24,25
 136:2,7,10,17,19
 136:22,23,24,25
 137:5,18 138:3,14
 139:4,20 140:14
 141:13 142:1,13
 142:15 151:4
 174:23 175:2,16
 182:21 183:4,5,25
 184:9 187:20,23
 192:5,20,22 193:6
 193:8,19,21 197:5
 197:9,13 198:16

198:19 199:5,8
 226:13,20
**11/12/2019**   250:5
**12**   1:12 3:15 13:6
 141:15,20 142:7
 148:1,3,7,14
 149:10,14,20
 150:8 186:1
 197:17,22 198:2
**127**   168:15
**13**   148:14 150:10
 150:14,25 151:13
 151:16,19 152:4
 153:15 154:15
 155:8,8 196:16
**14**   73:20 155:4,9
 156:2 186:15
 187:13,18,21
 226:13 232:8,8
 240:6,10
**15**   13:6 100:19
 105:17,21 106:19
 107:13,18,21
 108:5,14 122:1
 123:18,20 124:1,3
 127:23 128:8
 129:15 141:15,16
 142:3 148:3,23
 149:4 155:5,19
 156:3,8,11,25
 157:2,7,14,23
 158:5 186:2
 188:22 189:2,5,6
 189:18 190:14
 191:1,3,5 194:4
 195:4,10 196:24
 197:1 232:8,13,16
 232:17 240:12
 250:3
**15's**   105:22

**1526**   2:3
**1540**   1:10
**16**   29:19 30:6
 158:17,17,20,24
 161:10 163:23
 164:14,18 165:10
 166:2 167:19
 169:24 173:7,24
 174:7,11 196:16
 231:16 232:5,6,12
 232:23 233:3,4,5
 240:15
**1609**   38:20 223:8
 232:13
**1609.2**   232:25
**17**   174:24,25 175:3
 175:4
**18**   175:23 176:1,17
 176:24 177:2,3
 180:23 188:2,21
 188:23 189:4
 191:21 192:8,9,11
 192:16,18,21
 226:16 231:11
 233:21 235:8,18
**19**   180:25 181:13
 181:14 182:4
 193:1,4,7 195:6
 200:6
**197**   10:4,7 200:7,8
 200:19 201:3
 202:1,12 203:19
 204:13 205:14,22
 217:13 222:21
**19806**   2:4
**1996**   15:9

| **2** |
| --- |

**2**   3:14 11:16,19
 55:9 68:23 100:16
 105:24 107:24
 121:23 122:20

124:13 127:24
 137:3 141:18
 151:5 156:9 188:1
 189:12 225:8
**2.5g**   244:20
**20**   68:17 74:5
 85:21 153:6
 182:18,23 183:3
 183:22 244:10
 252:15
**200**   3:23 5:13
 201:7,12 202:7
 203:11,21,23
 204:2
**2005**   15:3
**2010**   15:16
**2011**   63:8 64:24
 230:24 242:10
**2019**   1:12 250:3
**21**   184:14,15,21,22
 185:25 186:7
 189:12,15 190:2,3
 190:9,22 191:2
 236:4,9
**22**   186:15 188:1
 226:16
**225**   3:8
**23**   144:7,17 145:17
 189:10,13,16,25
 190:1,17,23
 191:11,22 192:3
 192:10,13 193:13
 193:17,20 194:6
 194:11
**24**   97:3 193:1
**242**   3:8
**25**   14:1 194:3,16
 195:23 196:13,20
 196:25 198:8,12
 198:17 247:3

**26** 193:12
**27** 196:15,22 197:6
197:9 201:2 202:6
**28** 49:16 51:15
100:19 105:21
107:16,22 108:13
122:1 124:12,16
124:22 125:5
127:23 128:8
129:15 141:15
142:3 148:4,14,23
149:3,20 156:9,20
158:3 194:4
195:21 196:4,10
198:7,14,21 199:2
199:7
**29** 70:3,8 74:8
77:8 82:25 97:5
106:12 109:21
110:2 112:12
113:21 114:4
130:2 163:13
164:3 197:19,23
227:23,25 228:19
228:22 246:6
**292** 10:6 54:25
55:10 100:3,16
101:2 104:24
105:23 107:23
108:14 121:23
122:21 123:2,16
123:19 124:2,12
124:16,23 125:6
127:23 130:23
137:1,1,14 138:12
141:16,17 142:4
142:15 149:4,21
150:11 151:4
154:13 155:5,20
156:3,9,21 158:3
186:17 187:25

188:10,13 189:10
189:12 190:1,10
191:7,12 193:25
194:5,23 196:4,14
197:5,12,18 198:2
209:10,25 223:23
225:7 226:8
**2f** 5:14
**2g** 68:15 244:20

**3**

**3** 3:15 12:3,5,10
29:19 168:18
171:10 230:15
**30** 68:17 73:21,23
79:1 82:23 85:21
101:2,16 102:1
112:15,21 130:4,7
137:2 156:11
158:18 159:1
163:7 164:4
176:11 199:1,4
229:4,7 246:12
247:2 250:17
**31** 86:20,22 87:11
101:4 102:5
103:11 115:19
138:16 139:11
150:25 152:5
153:6 186:17
225:13 226:13,15
230:21
**32** 3:17 87:20
119:16 131:2,8,23
133:21 137:5,10
140:6 151:4
169:25 181:5
184:4,25 194:5,10
226:19 234:22
**33** 76:16 120:8
173:20 182:14
234:22 235:21

**34** 90:23 91:6 92:4
92:21 93:12
173:24 182:5,12
185:25 194:6,11
247:3
**35** 33:9 34:11 37:9
38:18 47:16 49:16
51:15 73:23 77:8
79:3 92:7 93:24
94:15 95:9 97:10
98:19 99:1 112:15
130:4 183:24
186:1 243:11
244:11 246:11
**36** 97:4,13 175:4,9
182:24 183:6
184:4
**3665610** 250:5
251:2 252:2
**37** 187:14 191:23
193:16 198:9
229:4
**38** 92:5 188:4
198:23
**39** 105:23 141:17
191:7 197:5
**3g** 18:20 20:19
21:13 22:5 64:23
65:2 68:9,15
239:6,7

**4**

**4** 3:17 32:14,16,24
34:9,11 37:9 38:4
38:18 40:17 47:16
49:17 51:15 59:14
230:16 243:10
**40** 106:12 141:22
190:6 229:4
**400** 205:24
**41** 130:6 141:21
155:11 229:8

**42** 87:21 189:14
190:7 195:5,15
**43** 93:12 101:9
107:23 119:16
124:13 131:2
149:24 156:10
157:16 196:16
200:6,18
**44** 92:21,21 93:12
115:19 148:8,17
156:12
**45** 156:16 175:8
195:24 196:8
**46** 91:6 101:17
141:23 195:25
**47** 103:12 131:7
155:11 182:14
**4775** 249:16
**48** 70:8 74:6
109:23 110:5
112:12 114:4
227:25 246:6
**49** 109:23 183:17
204:12 229:9
**49's** 204:22
**4g** 20:19

**5**

**5** 3:7,21 69:7,9,14
70:20 100:19
109:12,14 150:13
176:1
**50** 6:3 8:6 72:13
72:15 103:23
228:23
**505** 2:7
**51** 70:12 72:15
101:17 103:23
163:7
**52** 163:7
**53** 87:11 183:6
228:20

**[54 - additional]** Page 3

**54**  94:16 132:1
134:1 171:9
228:20
**55**  131:25 132:1
163:13,18 168:18
193:15
**56**  148:10 156:12
**58**  74:9 102:1
109:24 110:11
111:23 113:18
173:25 184:25
185:24 219:14
228:23
**584**  230:24 231:4
231:10,25 234:15
235:1,25 236:4
238:23
**59**  182:13
**5:36**  248:9
**5g**  18:21

**6**

**6**  3:23 200:13
201:4
**60**  6:3 8:6 113:19
176:11
**61**  83:1
**62**  169:25
**64**  109:25 113:19
139:8 150:25
155:14 170:1
219:15 228:23
**65**  95:9 97:9 98:19
98:25 148:12,17
157:16 181:6
183:24
**69**  3:21
**6:19**  1:2
**6b**  240:8

**8**

**802-11**  223:2
**802.11**  34:22
**802.11p**  35:2
**889**  136:18
**899**  10:5 54:24
55:4 68:24 70:2,4
70:9,19 72:8 74:9
77:9 79:2 86:4,20
91:6 93:24 95:9
97:10 105:1,10,18
106:22 108:16
109:20 111:16
115:5,17 119:12
120:7 121:14,17
122:3 124:6
129:25 130:23,24
131:11,24 132:10
135:16,25 136:8
136:23 158:21,23
159:2 165:25
169:23 173:6,19
173:20 175:2,4,22
176:18 181:1,3
182:22 183:25
184:9,16 186:8,15
186:18 187:5,15
191:21,23 192:6
192:11,16 193:2
193:13 198:6,8,10
198:17,22 199:6
209:9,24 219:13
223:23 227:22,23
227:24 246:3,6
248:2

**9**

**997399**  3:13 11:10
11:14
**9:42**  1:12

**9th**  2:7

**a**

**a.m.**  1:12
**abbreviation**
33:15
**abide**  221:15
**able**  19:23 35:25
41:6,8 52:8 60:22
72:21 75:10 80:8
80:23 82:4 127:5
140:25 147:13
152:23 165:5
214:25 215:24
221:22
**academics**  14:14
**access**  38:20 40:25
223:8
**accidently**  8:18
**accomplished**
215:25
**accounts**  176:7
**accuracy**  250:9
**accurate**  17:25
19:12 60:7 249:8
**achieve**  138:13
139:3 140:19
143:15 165:9
189:20 194:15
**achieved**  20:1
143:4
**acknowledged**
231:1,7,24 233:17
234:17
**acknowledgement**
252:3
**acknowledgment**
26:24 125:18
250:12
**action**  1:17 131:20
249:12

**actions**  97:5
183:10 247:12
**acts**  49:6
**actual**  17:7 24:14
44:21 48:24 101:3
106:11 107:6
156:11 202:11
203:18,18 207:15
210:13
**ad**  244:17
**ada**  1:2
**adapted**  244:4
**add**  42:6 161:20
162:3 166:3,18
170:22 182:7
186:8 187:18,22
188:11,16,25
189:4 190:24
191:12,15 192:4
192:18,21 193:4,7
193:17,20 196:25
197:9,13,24 198:3
198:14,18 199:4,7
**adding**  22:15 42:9
160:14 161:23
162:11 165:10,13
168:4,7,12 171:16
172:1 174:7,18
175:16,19 176:17
176:22 181:20
184:8 185:13
187:5 194:20
195:9 196:5,9,23
**addition**  60:1
152:22 172:4
245:25
**additional**  12:17
24:24 96:6 99:4
99:12,21 112:17
159:16 160:14,17
161:6,20,24 162:3

162:11 166:3
167:4,21 170:22
171:16 174:8
175:16 176:17
181:21 182:7
184:8,12 185:14
185:21 186:9,13
187:6,10,18,24
188:11,19 189:7
190:24 191:4,13
191:18 192:18,23
193:5,9,22 194:21
195:3,9,20 196:5
196:11 197:2,10
197:15 198:5,19
199:4,9
**additions** 252:6
**address** 5:12
38:24 53:14 76:17
77:13 183:16
219:24 250:15
**addressed** 7:13
39:24 147:25
231:17
**addresses** 17:18
17:19 28:25 29:4
235:12 243:12
**adds** 186:11
188:19 191:2
**adequately** 208:20
**admission** 204:6
**advanced** 67:16
**advised** 240:13
**affect** 96:21
**aggregate** 51:25
**aggregator** 51:16
**agis** 6:16 10:20
12:19 209:7 212:3
215:20 216:2
**agree** 44:10 63:7
71:5,11 73:18

74:16 75:9 81:3
85:4 88:11 90:10
92:2 95:1 97:8
98:4,14 99:22
104:22 107:13
113:4 114:13
115:2,21 117:16
118:21 119:22
120:10,18 121:8
121:14 122:22
123:23 124:14,20
128:10 129:13,19
130:10 131:12
135:20 136:5
137:15 138:10
139:7,13 142:1
144:23 145:2,5,25
149:7 150:6 151:9
152:2 153:2
155:24 156:21
157:12,20 158:1
158:11 166:1,16
167:1,8,24 170:10
170:14 173:4
174:5 175:20
176:15,20 177:2
178:20 181:14,19
182:5 183:21
184:1,5,6,11
185:10,17 186:6
186:11 187:2,16
188:9,23 190:22
191:10 192:2,15
192:17 193:4,17
194:19,24 195:8
196:3,20 197:7,22
198:12 199:2
201:18 205:17
207:2,11 210:1
213:4,15 222:7
227:3 243:15

**agreed** 4:3,8,12
168:3 221:13
222:2
**agreement** 22:10
22:24
**ahead** 11:3 26:17
**air** 22:14,17 35:23
39:14 42:8 52:10
**alleged** 178:25
**allotted** 250:20
**allow** 34:25 57:8
97:25 104:12
223:3
**allowed** 75:19
76:12 78:20 79:24
80:18 81:9 246:15
**allowing** 43:15
**allows** 53:2 59:24
92:18 95:4 96:14
**amount** 20:21
**analogy** 177:7,18
177:25 178:9
**analysis** 171:14
**android** 57:25
**announce** 25:25
**answer** 7:11 9:6,7
26:14 40:5 42:19
42:21 57:16
106:18 118:1
124:3 174:15
182:11 189:3
**answers** 8:9 187:8
188:15
**apart** 235:2
**apartment** 5:14
**apis** 211:10,25
**apologize** 117:18
118:9 148:13
190:7
**app** 57:14

**apparatus** 213:1
**apparently** 134:13
**appear** 70:21
75:12 89:17 116:8
118:4 121:2 224:5
224:6
**appeared** 93:2
**appearing** 157:10
173:14
**appears** 38:14
52:8 118:19
162:21 164:21
174:17 183:17
188:1 202:13
244:18
**appended** 252:7
**applicable** 250:8
**application** 10:4,5
10:7 32:7 34:12
37:8 38:4 40:17
51:22 55:14,16,23
56:5,9,16,16 58:2
58:4,10 70:10,13
73:3,24 74:2,5,18
75:10,16,23 76:1
76:24 77:7 78:9
79:3,11,12,17,24
80:4,14,17 83:2
86:11 89:24 93:22
95:8,11,13 97:5,8
97:9,13 98:9,16,17
98:19,23,24,25
99:7,12,18 105:19
109:18,19,22
110:5,8 112:2,9,9
112:16 113:1,16
113:23 114:3
130:2 136:2 159:4
159:9,12 160:7,8
163:14 178:15
179:20 180:11

182:21 183:7,10
183:22,23 184:3,8
184:13 186:22
200:7,19 201:3
202:12 204:13
205:14,22 211:21
217:13 219:15,17
228:1,5,12 229:2,3
229:12,16,18,25
230:8,12,14
232:18 243:10
244:3,10 246:4,7
246:13,15,21,23
247:12,12,15,17
247:20,20,22
248:1,1
**applications**  56:21
57:2,10,11,17
58:15,19 73:1,9
82:17,19 126:25
134:22 180:12
212:10,11 228:6
228:14 230:1,3,7
246:24 247:21
**applied**  15:23
**applies**  125:20
129:20 136:17
213:16
**apply**  91:4 107:20
113:10 136:22
**appreciate**  224:20
248:7
**approach**  236:14
**approximately**  6:2
9:21 13:2
**apps**  57:13
**architecture**  49:18
201:10,20 203:13
205:6
**architectures**
205:13

**area**  29:22 38:15
50:4
**areas**  241:6
**argue**  147:19
**arose**  142:12
**art**  18:12,14 20:25
27:16,20 28:2,7
29:7,11,16,22
30:18 38:6,11,14
40:19,24 41:4,6
44:4,13,18 46:3
49:10 52:19 53:12
53:24 56:22 58:5
59:18 60:14 61:9
63:17 64:4,14
65:19 66:16,18,18
72:10 74:17 75:15
76:10 79:21 81:5
82:3,18 83:8,16,18
92:17 93:6 96:7
97:19,23 99:16
112:5 114:2 116:2
117:22 120:22
121:10 122:15
123:4,25 124:18
124:24 127:4
128:12 129:8
130:14 131:16
139:17 140:12
142:6 145:8 146:3
146:20,23 147:3
149:9 151:11
156:1,24 158:8
211:4,11 213:6
214:4,17,20,24
215:15 221:6
222:4 231:1,8,24
233:17 234:17
235:3 236:22
237:18 240:2,7,17
240:23

**art's**  136:9 137:17
**arthur**  1:18 249:3
249:17
**ascertain**  82:5
**aside**  10:19 86:12
89:25 136:4
181:12 209:7
**asked**  33:17,21
117:18 169:14
173:4 174:4
176:14 179:8,11
179:12,16,24
180:15,19 188:7
194:18 215:21
216:5,20 217:1,16
217:18,22 225:12
230:10 232:9
239:3 242:19
246:8
**asking**  9:2 16:2
63:6 122:23
129:14 155:17
164:13 190:21
192:8 196:19
204:4 207:19
246:17 247:23
**aspect**  84:10 85:1
95:24 115:11
162:17 173:12
179:5 205:11
218:24 220:17
**aspects**  85:5,10,15
86:8,12,18 88:12
88:13,23 90:1,11
92:2 99:11,12,14
100:22 104:18,23
105:9 106:24
107:4 110:18
111:1,25 112:23
114:6 121:5 157:6

**assertion**  172:8
**assign**  39:20,21
**assigned**  39:18
**assist**  241:12,14,25
**assistant**  14:2,4
**associate**  13:17,24
**associated**  60:4,10
60:19 61:7,16,22
72:4,11 93:8 96:3
**association**  35:1,5
35:6 40:8 223:4,5
223:6
**assume**  9:1 134:5
220:15 243:5
246:22
**assuming**  148:16
**attached**  250:11
**attempted**  206:3
**attempting**  170:22
**attention**  92:4
188:3
**attorney**  9:4 208:5
250:13
**attorneys**  2:3,7
**attributes**  17:23
**august**  13:11
**authored**  15:2
**automobile**  177:9
177:10,13 178:2,3
178:5,7
**available**  54:1
60:13 62:19 63:4
63:6,8 64:7,23
73:2 215:2 250:6
**avenue**  2:3
**aware**  3:20 32:20
33:2 36:9 50:9
56:22 58:20 63:17
63:23 66:24 67:11
67:14 68:17
116:13,23 117:1

125:7 143:2 169:2
212:14,18 236:16
237:9,21 244:6,8

**b**

**b** 3:10 5:1,1 36:21
**bachelor** 240:24
**back** 19:20 23:22
26:17,25 27:18
42:13 45:13 46:18
46:20 47:5,19,23
47:24 54:11 62:24
66:19 67:1 74:7
75:2 79:1 82:25
92:25 116:11
135:11,21 147:21
151:22 160:19
163:22 164:12,17
175:21 198:6
243:21,24
**backbone** 47:20
**background** 41:4
230:13 233:25
**bad** 177:7,18
210:18
**ballpark** 68:1
**bandwidth** 27:10
27:14
**base** 21:8 22:11,20
22:25 23:7,8,10,13
24:3,5,16,22,23
25:3 26:2,8 36:17
37:2 39:19 40:9
42:23 43:5,11,13
43:22 64:18 140:2
**based** 3:24 16:14
16:18 17:7,8,20,23
18:19 22:10 23:2
24:10 35:14 36:16
36:22 37:13 38:3
48:25 92:8 146:23
147:11 186:23

200:16 204:15
205:19 213:17
218:17 220:4
221:24 226:24
238:11,21 241:20
244:17 247:5
**bases** 218:4
**basic** 50:13 52:2
**basis** 17:24
**bear** 31:25 50:14
150:7,19
**bearing** 112:4
114:14,18 115:7
115:25 116:10
117:20 118:6
120:21 121:9,18
123:3,12,24 124:8
124:17,23 125:4
128:11,20 129:7
130:13,19 131:15
131:18 138:5,9
140:10,13 142:4
142:17 149:8,18
150:2 151:12,15
152:11 153:8
155:25 156:5,23
158:6,12
**beginning** 34:12
35:13 71:22 74:8
92:6 93:23 94:15
100:25 101:2
109:18 131:7
173:24 183:16
184:17 186:19
194:5
**begins** 107:23
115:19 124:13
137:2 141:16,22
150:25 156:10
173:19

**begs** 224:3
**behalf** 6:15 49:6
**behavior** 174:19
**belaboring** 222:8
**belief** 227:8
**believe** 6:11 7:8,13
8:1 12:10,18
16:16 30:22 32:7
33:12,20 35:4
37:8 47:3 48:4
65:11 69:1,6 72:2
72:24 85:6 86:2
89:21 102:6
105:20 121:21,25
135:19 136:2
137:5 141:21
147:24 155:9,13
158:23 181:5
183:5 199:24
204:5 209:23
212:11,22 225:21
239:22 240:8
241:22
**believes** 206:1
**bell** 46:23 47:10
**benefit** 18:25
**benjamin** 1:15 3:4
3:16 5:13 11:24
12:7 249:6 250:5
251:2,24 252:2,4
252:12
**best** 10:25 12:20
12:23 39:7 76:21
161:4 207:20
209:20 219:11
**better** 25:10 66:6
**beyond** 10:22 27:2
35:10 37:16,24
168:4 191:17
192:5,19 193:5,18
194:21 197:10,24

198:15 199:5
202:19
**big** 235:20
**bit** 6:5 33:14 70:25
201:1 212:8
**bite** 100:4
**bits** 36:3 42:1,9
66:12,13
**block** 235:20
**blocks** 45:20
**bluetooth** 20:14
20:21 25:14,24
27:23 30:13,24
31:7 44:12,16,21
65:5 74:12,20
75:13,17 76:8,13
76:23 77:4,11,25
78:1,7,13,17,21
85:13 111:4 116:6
116:12,14 117:12
122:13,18 210:15
210:21,23 216:12
216:21 218:8,17
218:21 219:2,7,22
220:6,14,18,23
221:7,11 222:3
223:15 224:2
239:18
**book** 15:9,11
**books** 15:7,8
**bother** 16:8
**bottom** 23:7 33:9
38:17 86:21 93:23
93:24 105:23
141:17 148:8
149:24 157:15
159:1 181:4 182:4
182:12,24 188:4
195:23 196:8
**bounds** 206:15

**brackets**  148:24
**brand**  185:12
**break**  34:2 47:13
  59:14 81:13 100:1
  109:6 184:25
**bridging**  195:24
**briefing**  207:21
**briefly**  30:9 41:21
  50:19 51:19
**broad**  206:4
**broadband**  47:5,9
**broadcast**  72:15
  72:16 74:11 77:19
  78:5 84:17 86:25
  87:6,12 91:18
  94:6 101:7,13,24
  105:5 106:1,2,3,6
  108:18,20 118:4
  121:6 128:4,15
  160:4 168:10
  170:16 178:12
  219:21 226:18
**broadcasting**
  72:22 77:16 94:18
  233:9
**broadcasts**  24:6
  106:8
**broader**  134:12
  135:1,6
**broadway**  1:10
**broken**  22:7
**browsers**  57:7,21
  82:18
**build**  54:15 61:18
  62:13 245:14,14
**building**  54:17
  159:16 160:3
  168:9 170:15
  178:12
**built**  45:25 244:4

**bunch**  141:6
  152:18 178:2
**buy**  57:14,18

**c**

**c**  2:1 249:1,1
**call**  158:14 233:15
**called**  5:1 6:15
  14:22 28:10 60:20
  65:16 111:6
  212:22 233:24
  234:23 238:23
**calls**  10:15 97:4
  144:4 145:13
  162:6,15 177:23
**capable**  77:24
  159:14 177:11
**caption**  33:4
**capture**  142:21
**captured**  148:24
**card**  89:12
**carried**  206:5,10
**carry**  202:3 203:9
**carrying**  49:15
  200:21 201:16
**case**  1:2 5:21 6:14
  6:18 7:7,10,10,12
  7:17,18,25 10:4,9
  10:18,20,23 12:1
  12:19 13:10 22:6
  31:12,17 33:4,20
  33:22 34:6 50:7
  51:21 78:18 91:5
  127:18 138:2
  152:21 212:7,19
  215:20 216:2
  221:25 241:12
  242:3
**cases**  6:12 7:3
**category**  158:14
  158:15

**caught**  30:13
**cause**  57:15 61:1
  70:14 79:4,18
  80:5,15,22 87:2
  95:14 102:10
  106:13 133:22,25
  134:7,10,15
  137:21 138:16,22
  139:1,14 140:3
  141:1 150:1 152:6
  152:20,23 163:17
  226:14,23 247:6
**caused**  92:9
  159:11,14 185:13
  186:23 226:21
**causes**  60:5 110:9
**causing**  102:12
  131:20 132:1,4,6
  132:11 133:1,2,12
  134:2,24 135:7
  138:18 139:24
  141:3 142:10
  183:11 229:11
  247:13
**caveat**  137:20
  142:9 149:11
  156:6 157:7
  201:25 234:15
**cell**  18:18 19:7
  21:8,10,21 22:8,11
  22:19,25 23:8,14
  23:17,17 24:3,7,7
  24:11,12,17,21
  25:1,23 26:9,20
  36:11 37:2 64:19
  67:6
**cellular**  18:9,13
  22:9 25:12 43:11
  43:14,23 44:2
  64:18 231:19,22
  239:6 244:19

**certain**  11:25
  19:18 27:6 62:16
  63:24 85:14,14
  88:25 90:21 92:1
  106:23 107:3
  114:6 119:10
  122:9 139:9
  142:17 154:9
  161:19 169:15
  171:23 199:25
  210:22 216:14
  217:17 222:12
  224:7 234:7,9
  236:11,13
**certainly**  17:4,17
  17:19 20:12 21:1
  27:8 41:6,13 47:7
  47:9 49:11 50:9
  50:17 55:15 56:25
  57:6,24 60:3
  62:10 64:23 85:13
  172:21 209:17
  216:10 217:23
  222:19 224:10
  239:9
**certification**  4:6
**certify**  249:5,10
**cetera**  116:7
  138:19 231:19
  244:20
**challenges**  235:13
  243:3,12
**change**  122:7
  251:4,7,10,13,16
  251:19
**changes**  250:10
  252:6
**channel**  39:1,3,12
  39:12,15,16
**channels**  39:19,20
  39:21

**chapter** 15:11,12
**chapters** 15:8
**characterization**
    107:2 203:5 207:1
**characterize**
    236:23 244:2
**characterizing**
    146:25
**check** 7:20
**chips** 64:25
**choices** 85:17
**choose** 64:10
**chooses** 96:22
**choosing** 39:10
**chosen** 23:5
**christopher** 2:8
    250:1
**chrome** 57:25
    82:19
**citations** 200:24
    217:24
**cite** 201:2 233:20
    235:6 243:1
**civil** 1:21
**cjtyson** 250:2
**claim** 3:22 11:25
    68:24 69:11,19
    70:3,18,24 71:9
    72:8 73:17 74:3
    74:19 75:23 76:9
    76:22 77:6 78:8
    79:13 84:7,16
    85:15 86:2,9,19
    88:13,22,24 89:17
    90:1,5,8,14 91:16
    91:20,24 93:4,11
    93:21,22 94:2
    95:10,21 96:25
    98:4,15 99:3,7,13
    100:18,23,25
    101:6 102:6,24

103:8 104:24
105:2,17,17,22
106:11,19,20,21
106:24 107:13,14
107:16,18,20,21
107:22 108:12,13
108:15 109:13
110:13,18,25
111:6,11,16,18,25
112:6,7,24 113:2,8
113:10,15 114:15
114:21,23 115:4,5
115:8,12,14,15,17
115:18,24,25
116:9,10,12
117:15,20 118:5,6
118:9,12,12,13,17
118:17 119:3,6,7,9
119:10,12,13
120:3,6,12,20,23
121:2,4,11,13,16
121:19 122:3,21
123:1,5,10,13,16
123:18,19,22,25
124:1,3,4,5,9,12
124:16,19,22,25
125:2,4,5 127:22
128:1,13,14,21
129:6,9,23,25
130:12,15,20,21
130:23,25 131:1,4
131:10,11,14,16
131:24 132:10,15
133:7,7 134:18
135:10,13,16,17
135:23,24,25
136:2,10,15,17,18
136:19,22,23,24
136:25 137:1,4,14
137:17 138:3,12
138:14 139:4,19

140:14,19 141:12
141:12,14,16,20
141:25 142:1,6,12
142:15,15,24
143:3,15,16,25
144:1,10,11,24
145:21 146:1,11
146:18 147:6,16
148:1,3,3,4,5,7
149:3,4,6,10,13,19
149:20 150:8,10
150:11,14,18,18
150:24 151:8,12
151:16,18 152:4
153:14 154:9,12
154:15 155:4,5,8,9
155:10,19 156:2,3
156:9,11,20,25
157:2,7,10,14,23
158:3,5,6,15,17,22
158:24,25 159:25
160:2,11,15
161:10 163:23
164:14,18 165:10
165:12,20,25
166:2,21 167:6,18
167:19,23,24
169:17,23,24
170:5,7,19 171:9
171:23 172:1,4,5
173:5,7,14,18,19
173:23 174:7,9,11
174:16,21,23,23
175:2,3,4,14,16,17
175:20,22,23
176:1,6,9,16,18,24
177:2,3,5,8 178:17
179:5,14 180:23
180:25 181:2,4,13
181:14,15,22
182:1,2,4,8,13,16

182:18,21,23
183:3,4,5,22,24
184:9,14,15,17,20
184:22,24 185:15
185:20,22,25
186:7,7,10,14,20
187:4,5,7,9,12,13
187:18,20,21,21
187:23 188:1,3,10
188:13,16,17,19
188:21,22,23
189:2,4,5,5,6,10
189:13,15,16,17
189:18,18,21,25
190:1,9,13,13,14
190:17,22,23
191:1,2,3,4,5,6,10
191:11,14,15,16
191:17,21,22
192:2,3,5,8,9,10
192:11,12,16,17
192:19,21,22
193:1,1,4,6,7,8,12
193:13,17,19,20
193:21 194:3,16
194:22 195:2,4,10
195:18,21,22
196:4,6,10,13,14
196:20,22,24,25
197:1,4,6,8,9,11
197:13,14,17,19
197:22,23,25
198:2,4,7,8,12,13
198:15,17,18,21
199:1,2,3,5,7,8
203:8,25 210:5,10
215:10,13,23
216:1,11,24 217:4
217:21 218:10,13
219:13,14 220:16
221:10 222:16

[claim - column]                                                    Page 9

223:19 225:9,11
225:11 226:9
227:22 229:23
245:4 246:5,20
248:2
**claimed**  75:9 78:3
121:3 140:3,25
152:18 202:14
221:21 223:23
228:9,10 230:8
**claiming**  134:14
167:11
**claims**  6:10 7:15
10:5 68:22 86:3,6
91:20 94:5,17
98:7,11 100:19,21
105:21 108:4,14
110:21 121:25
124:5 127:23
128:7,10,23
129:20 130:22
131:19 135:24
136:7,12,21
141:15 142:3
144:7 156:18
158:16,21 162:2
169:12 174:4
175:25 179:9
181:1 183:15
184:15 185:9
186:15 187:3
188:2,8 189:11
190:2 194:4
199:13 203:20,22
207:14 208:1
216:7,9 217:3,11
217:16,20,25
219:4,18 222:24
223:13 224:7
229:19 246:18

**clarification**  59:16
183:20
**clarifies**  103:23
104:3
**clarify**  8:25 77:23
174:10
**clarity**  143:9
**classes**  211:1
**clause**  161:4,11
162:12 164:20,25
165:8 166:18
167:20 168:25
170:3,11 173:5
174:6,17 175:6,15
176:21 181:16,20
182:7,19 184:7
185:3,24 187:4,9
187:17 188:10,25
194:7,13,19,25
195:6,8,14,15,19
196:4,8
**clauses**  160:25
172:1 186:6
**clean**  8:21
**clear**  16:9 30:2
42:18 54:23 63:3
67:23,24 69:21
169:14 171:18
177:17
**clearly**  53:22
**client**  241:5
**closer**  6:3
**cma**  244:20
**code**  20:13 43:5,19
43:21,21 44:24
45:8,10 56:3,9
60:21 61:20 86:10
86:22 87:1,22
88:17 89:9,14,16
89:22 90:24 92:22
96:21 98:9 102:7

102:10,18,21
103:5 105:20
106:10,10,13
118:13,22 119:14
119:17 120:2
121:4 128:25
134:14 136:1
137:6 138:11,14
138:15,25 139:2,7
139:10,17,18,23
140:1,2,2,6,11,11
140:18,24 141:6
142:18 148:19
149:22,23,25
150:2 151:1 152:3
152:4,6,12,17
153:3,9 155:12
156:13 157:13,14
168:11 170:17
178:16 210:2,17
214:3,6,19,23
215:1,16 225:13
225:14,22 226:1
226:11,23 227:3
227:10,16,20
**coded**  22:13
**coding**  42:15
**collecting**  236:12
**collection**  3:19
28:21 29:2 32:20
33:2 68:7 181:25
182:15 226:6
234:8
**collectively**  129:16
**college**  41:10
**colloquially**  51:6
**color**  62:6
**column**  70:3,8
73:21,23 74:5,8
77:8 79:1 82:23
82:25 86:20 87:11

87:20 90:23 91:6
92:4,21 93:12,24
94:15 95:9 97:4
97:10,12 98:19
99:1 101:2,4,16
102:1,5 103:11
105:23 106:12
107:23 109:21
110:2 112:12,15
112:21 113:21
114:4 115:18
119:16 120:8
124:13 130:2,4,7
131:2,8,23 133:21
134:1 137:2,5,9
138:16 139:11
140:6 141:17,21
148:8,17 149:24
150:25 151:4
152:5 153:6
155:11 156:10,12
156:16 157:16
159:1 163:7,13
164:2,4 169:25
173:20,24 175:4,8
176:11 181:5
182:5,12,14,24
183:6,24 184:4,4
184:24 185:25
186:1,17 187:14
188:4 189:14
190:5,6 191:7,23
193:15 194:5,8,10
195:5,15,24,25
196:8,16 197:5
198:9,22 225:13
226:13,15,19
227:23,25 228:19
228:22 229:4,7
246:6,12 247:2

come  61:7
comes  6:21 45:21
71:21 155:22
coming  18:21 41:9
common  211:9,18
communicate
19:24 24:8,22,25
64:2 72:22 80:9
communicates
84:11
communicating
107:5
communication
17:22 18:18 24:2
25:9,21 26:2,8
33:11 37:20 38:13
39:11 42:25 45:2
45:6,14,23 46:1,10
46:13 57:15 64:13
64:25 65:11 67:12
67:15,21,25 68:6
76:23 77:18 79:25
81:4,23 84:20
85:18 86:24 88:18
88:19 89:11 91:12
94:19 97:16
103:10,16 105:4,5
113:24,25 116:24
117:2,11 118:4
119:24 121:7
122:4,8,17 125:8
125:16 129:3
155:1,20 160:4
168:10 178:13
210:15 217:8
218:8,22 219:2,8
222:3,13 223:14
236:15,19 237:8
237:14 239:8,11
239:15,20 241:23
244:14,24

communications
23:13 27:5 31:13
31:19 33:19 34:8
34:16 36:10 40:1
43:1 48:11 62:21
63:5,19 64:6
66:15 67:3 68:3
72:17 74:12,13,20
75:13,18 76:9,13
77:11,20 78:1,6,21
79:7,20 80:7,10,20
80:25 81:16 82:12
82:15 84:8,18
85:8,16 87:1,7,13
87:18,25 88:4,5
90:16,17,25 91:19
93:15 94:6,9,25
95:5 97:17 98:2
99:5 101:8,12,19
101:25 102:23
103:3 106:2,4,7,9
108:19,20,21,24
111:2,3,5,8 116:7
116:13,15 118:3
125:22 128:4,16
149:15 151:17
153:5,16,21 157:3
210:21 211:8
215:19 218:5
219:21,23 220:6
220:15,18,23
221:12 222:1
232:11 237:21
company  6:15
compared  104:25
compatible  74:19
competing  30:15
compilers  14:21
complete  8:8 9:10
209:21 252:8

completed  250:17
complex  66:22
compliant  76:12
99:5
complicated  21:19
23:25
component  17:17
44:5 59:23 60:2
66:9 71:12 78:19
79:23 80:18 81:17
82:5 92:17 93:8
95:4 96:10 97:25
161:24 162:3,11
165:14 166:18,22
167:4,7,21 168:4,7
168:8 170:13,15
170:23 171:16
173:16 174:8,18
175:17,19 176:18
176:22,25 181:21
184:9 185:14
189:4 191:2
193:21 194:21
196:9 197:1,14
198:18 199:8
components  44:6
62:20 64:16 81:8
94:4 95:21 98:6
99:4 106:16
107:15 108:3
114:11 115:22
117:17 130:11
137:15 149:5,8
151:9 152:11
155:19 156:20,22
157:21 158:2
162:22 165:2,19
165:24 166:25
170:7 172:6 177:4
178:18 181:25
182:8,15 185:19

186:9,12 187:6,11
187:19,22 188:12
188:17 189:1
190:25 191:13,16
192:4,19,22 193:5
193:8,18 195:1,10
195:17 196:23
197:10,24 198:3
198:14
comprises  167:9
comprising  160:3
computational
213:1
computer  3:23
13:18,21 53:7
55:17,18,20 56:12
59:18 60:20 86:10
86:22 87:1,22
88:17 89:8,12,14
89:16,22 90:23
92:22 98:9 105:20
118:13,22 119:14
119:17 120:2
121:4 131:3
134:14 136:1
170:17 177:9,13
200:15 208:10,14
208:22 240:25
computers  29:2
computing  55:21
concept  37:15
conclusion  144:5
145:13 162:7
179:10
conditionally
186:23
configurable
152:19
configuration
29:11

**configure**  73:14
**configured**  57:22
  70:10,13 75:24
  76:25 79:4,18
  80:15 86:22 87:2
  87:23 92:22,24
  95:11,14 97:14
  102:8,10 104:11
  106:10,13 109:22
  110:5 112:10
  113:16 118:14
  119:14,18 120:2
  129:1 131:4 137:7
  138:13,16 139:1,3
  139:8,14 140:18
  148:20 150:1
  151:2 152:6
  155:12 156:13
  158:16 159:6
  160:7,9,16 161:18
  162:21 163:5,14
  163:16 164:15,19
  165:1,9 174:1
  175:7,11 176:5,10
  176:25 181:7,9,11
  183:8 185:11
  186:21 189:19
  190:15 194:15
  196:21 219:15,18
  225:15
**confirm**  12:15
  32:11 86:7 90:7
  108:2 239:5
**confirmation**
  126:2,15
**conforms**  22:4
**confusion**  176:12
**connected**  29:4
  47:19
**connection**  3:20
  32:21 33:3 117:3

151:8 153:4
  163:19 211:22
**connote**  72:20
  88:12 91:23 93:17
  107:19 114:20
  123:21 153:25
**connotes**  92:1
**connoting**  123:11
  210:4
**consecutive**
  235:20
**consider**  18:11
  27:15,20 28:1
  29:6 46:2 48:7,8
  59:17 66:13 68:10
  84:5 215:12
**consideration**
  169:21
**considered**  7:5
  30:17,18 49:10
  56:15 122:10
  210:16 217:24
  218:2
**consistent**  143:21
  180:14 225:24
  232:2
**consisting**  178:2
  182:15
**constraining**
  165:16
**construct**  221:23
**constructions**
  11:25
**contact**  24:16
**contacted**  13:9
**contain**  66:2 139:9
**contained**  216:23
**contains**  141:6
  197:23
**contended**  230:23

**content**  50:16,21
  50:23,25 51:5,10
  51:16 65:24 84:4
  84:12 89:6 91:9
  107:6 154:20,25
  213:13
**contention**  178:22
**context**  28:18
  31:21 33:24 46:4
  51:22 52:6,11
  55:17 57:3,18
  64:17 66:14 84:6
  88:22 119:7 125:5
  149:20 169:4
  201:9,19 203:12
  205:6 210:9,19
**continued**  242:17
**control**  177:11,15
  178:4,5,8 229:10
**controlling**  247:11
**convenient**  234:5
**conveniently**
  189:14
**convention**  69:18
**conventional**
  243:19 244:4
**copies**  214:16
  250:14
**copy**  32:12 200:8
**corollary**  144:20
**corpopration**
  250:4 251:1 252:1
**corporation**  1:7
**correct**  5:22 10:24
  11:1 14:12 15:4,6
  15:10,16,17 18:9
  18:23 19:13 22:1
  27:24 28:11 30:21
  32:10,10 37:24
  46:9,22 48:23
  49:23,23 54:6

55:8 58:24 61:15
  63:20 65:6 66:2
  71:3,13,23 72:5
  73:19 78:15 79:16
  83:9,13 87:8 89:2
  89:3,7,18,18 91:17
  93:18 94:13,25
  96:17,18 97:20
  101:22 102:19,24
  105:15 106:17
  109:2 115:15
  118:24 119:20
  126:9 131:17
  132:14 135:13
  136:3 139:4 143:5
  143:8 144:2 147:7
  149:1,13 153:9,18
  157:1,9 160:11
  161:16,25 162:13
  165:21 167:10
  169:6 170:8,13
  173:8 174:9
  176:19 181:16
  182:9 185:16
  186:3 187:20
  188:14 189:2
  190:3,18 191:1
  192:6,10,14,20
  193:19 194:23
  196:6 197:12
  198:1,16 199:6,21
  201:22 203:16
  204:20 205:15
  209:13 212:9,12
  216:19 222:4
  223:7,11,19 224:7
  231:13 233:6,18
  233:19 234:18
  235:9,19 238:3
  239:17,21 242:23
  243:3,20 252:8

correcting 174:13
correction 175:24
corrections 252:6
correctly 14:23
37:1 58:8 61:5
134:23 178:21
180:3 207:25
correlated 222:24
correspond 70:22
corresponded
216:14
corresponding
134:20 211:10,21
corresponds 70:17
192:11,15
corrupted 22:17
counsel 1:22 4:4
5:17 9:16 147:12
169:7 215:21
216:2 224:17
225:12 230:10
232:9 239:3 240:3
240:12 242:19
246:8 250:14
counsel's 179:9
couple 200:24
224:24,24
course 10:10 17:3
53:10 55:20 84:3
89:14 99:13 157:8
168:8 172:14
201:12 245:25
court 1:1 4:16
6:18 7:24 8:12
166:13 168:24
241:12,14,25
244:11
courts 168:20
169:4 212:14
covered 58:7
121:21 202:4,10

203:10,19 224:14
covering 122:11
covers 105:16
130:22
cpu 212:4
create 215:1
243:17
created 17:22
cruise 177:11
178:4,5,8
curious 35:20
209:2 218:7
current 244:12
245:8
currently 53:9
custom 60:25
61:18
cv 1:2 7:18 13:13
16:13

**d**

d 3:1 5:1
dahlgren 2:4 3:7,8
5:7,9 11:2,7,15,22
16:21,25 31:5
32:13 69:6 74:25
76:15 99:23
108:11 109:5
166:12 167:15
177:21 224:11,16
224:25 226:4
227:6,13 228:7
229:20 237:2,15
238:4,16 241:18
242:4,11,15,18
243:23 248:5
data 3:19 17:22
22:21 23:9 26:16
32:20 33:2 35:23
36:1,6,18,20 41:15
41:22,23 42:3
45:20 46:12 50:2

50:24 51:8,10,16
51:24 52:1,9,17
53:5 59:24 60:5
64:9,11 66:11
127:12 154:5,7
233:11 234:6,9
236:12 241:23
data's 26:18 36:24
database 64:11
databases 62:18
64:5 241:5
date 63:11 242:9
249:7 251:24
252:12
day 252:15
days 12:25 250:17
dc 2:8
dealing 30:1
114:10
decision 169:11
decisions 168:24
declaration 3:15
5:20 7:8,13 10:10
10:22 11:23 12:6
12:10,23 29:14,20
31:23 41:3 46:25
117:13 144:8,18
145:18 147:22
166:7 168:16,17
171:6,10 172:11
172:13,16 176:23
178:10 180:19
183:15 199:24
209:5 215:14
216:5,18,25 217:5
218:4,16 226:10
230:10,14,19
233:23 234:21,22
235:22 236:3
239:25 240:6
241:16 242:2

243:6 245:4,6
declarations 6:23
7:4
declare 252:4
dedicated 31:13
31:18 33:10,18
34:7 232:10
deemed 252:6
defendant 1:8 2:7
defendant's
240:12
define 42:22 46:11
50:18 59:22 65:22
199:14,15 207:14
defined 109:4
165:24 166:4
167:23 170:23
171:17
defines 40:7 53:4
202:13
defining 68:5
definition 29:24
40:10 240:1
241:21
degree 91:24
93:18,19 154:1,2
240:25
delaware 2:4
delivering 236:11
delivery 47:21
denoting 29:10
depending 36:16
39:20 49:14 56:23
64:15 83:12,25
178:16 187:4
189:17,18
depends 56:8
depicted 96:15
deponent 250:13
252:3

deposed 5:20,24
deposing 250:13
deposition 1:15
  4:6,13 7:2 9:14
  10:13,18 209:18
  225:8 227:24
  230:15
depositions 6:8
derek 2:4
derivatives 244:19
describe 18:15
  21:14 28:13,16
  41:20 43:19 51:19
  99:11 132:23
  162:4 203:24
  204:10
described 37:16
  37:25 52:23 161:8
  161:14 173:13
  174:20 177:4
  202:8 203:19
  205:24 231:18
  236:9
describing 162:17
  165:14 173:12
  174:19 187:10
description 3:12
  154:19 161:6
  235:23 243:8
desired 61:10
  201:13 204:3
  206:6
desktop 67:7
destination 21:22
detail 107:12
  207:4 222:15
detailed 235:23
  243:8
details 24:24
  219:9

determination
  183:9
determine 96:19
  179:13,22 216:6
  217:2
determined 169:4
determining
  222:22
develop 60:15
developed 33:22
developer 54:5,7
  61:17 63:25 64:9
  73:11 96:19,22
  211:15 212:11
  213:10,20,23
developing 56:23
  211:5
development
  29:18 34:16
  239:24 241:3,11
device 19:4,17,21
  23:20 25:1,22
  26:4 35:24 36:2
  36:19,21 40:9
  42:24 43:6,11,14
  43:23,25 44:2,5,11
  44:16,19 53:3,25
  54:8 55:21 57:16
  58:20 70:14,16
  71:2,6,11,16 72:21
  73:5,12,15 75:16
  76:11,25 78:8,13
  78:17,19 79:5,19
  80:5,8,22,23 81:19
  81:22,25 82:6,11
  82:14 84:16,17
  85:3 87:4,5,8 89:9
  89:11 91:14,16
  92:10,14,18,23
  93:9,16 95:16,19
  95:20,22 97:5,7,24

98:17,24 101:20
  102:12,15,19
  103:5,11,16,24
  104:7,10,13,17,19
  105:7 106:15
  108:22 110:9
  111:3 112:3
  116:17 117:4
  121:6 125:10,12
  131:21 132:3,5,7
  132:12 133:3,13
  133:14,24 134:3
  134:11,17,25
  135:8 138:1,5,6,18
  139:15,25 140:4
  141:4,10 142:11
  142:20 151:20
  152:7,21,24 157:4
  159:4,9,12 163:17
  170:16 183:10
  186:22,24 204:16
  228:22 229:12
  247:7,11,14,14,17
device's 134:9
  135:3 141:1,8
devices 3:25 25:18
  28:24 29:2 36:5
  39:18,22 43:7
  44:24 45:9,11
  50:3,22 51:25
  52:8 54:16 57:22
  58:23,25 68:12
  77:18,24 81:9
  86:24 87:16 88:25
  91:12 94:13,21
  95:3,13 101:14
  102:3,9,18,22
  106:5 110:7
  112:11,20 128:15
  128:25 129:3
  153:4 155:21

163:16 168:11
  178:14 200:17
  201:10 203:12
  219:17 225:16
  241:25
devlin 2:2
dictate 88:24 89:4
  91:2,8
dictated 43:9
  65:12,17 153:22
  155:1
dictates 43:6
differ 17:9
difference 51:12
  86:12 89:25 98:8
  105:19 148:23
differences 27:6
  105:22 136:4
different 20:8 21:3
  23:4,6 24:4 35:19
  35:21 37:1 39:17
  39:18,22 45:23
  49:6,12 50:24
  52:13 53:8 60:12
  65:23 68:3 73:1
  76:7 99:5 107:11
  111:18 112:23
  113:25 119:19
  123:20 132:15,23
  134:4 141:6
  142:23 143:4
  154:5 159:13
  185:11 205:13
  216:9 226:2
  227:14,15,19
  229:15 232:12
  235:7
dig 220:17,22
digits 29:3
direct 47:11
  150:17,23 188:2

directed   111:19
direction   144:23
directly   142:20
  234:6
director   13:20
disagree   113:4
  155:6
disclaimer   201:25
  202:5 203:25
  204:4
disclose   145:6
  146:19 218:21
  221:20
disclosed   38:10
  180:11 198:15
  202:20 205:14
  206:13 216:7
  217:19 218:19
  220:21 221:2
  236:25 237:6,17
  238:6 246:1
discloses   146:1
disclosing   199:20
disclosure   3:17
  32:18,25 126:24
  134:20 179:18
  208:21
disclosures   222:12
discrepancy   176:8
discuss   69:24
  109:16 127:21
  129:22 222:15
discussed   28:7
  29:15 37:7 64:13
  65:12 72:24 75:20
  76:1 81:15 84:21
  86:8 90:2 93:5
  94:4 98:6,13
  101:18 103:2
  105:1 106:16
  107:16,20 108:4

111:11,24 112:20
112:24 113:9
114:5,12 116:8
117:17 118:3
120:11,15,19
121:16 122:25
123:11,20 124:6
124:15,21 125:3
125:15 128:9,18
128:22 129:5
130:12 131:13
136:6 137:25
141:25 142:14
148:2 149:3,18
151:7 153:19,24
155:18 156:7
165:18 167:17
171:12 185:9
186:5 187:3
210:20 216:11
discusses   34:20
discussing   40:2
  45:24 46:5,14
  71:20 100:17
  130:19 171:8
  175:23
discussion   33:14
  54:20 66:20
  100:13 115:3,23
  140:9 147:24
  171:22 220:5
  223:10 230:12
display   54:4,9
  59:17,22,25 60:4,5
  60:6,10,15,19 61:1
  61:6,16,22 62:1,2
  62:9 64:1 70:15
  70:15 71:10,15,18
  71:20 72:2,8 73:4
  73:5,12,14,15
  84:17 85:3 87:2,3

87:7 89:10 91:15
95:14,15,19,23,25
96:9,11,15 102:11
102:11,18 105:7
106:14,14 108:21
111:4 112:3 132:6
132:11,11 133:22
133:23,25,25
134:8,8,8,10 135:3
137:22,25 138:4
138:17,17,23,23
139:2,14,14,24,25
140:9 141:1,2,8
142:19 149:12
150:1,2 151:23
152:6,7,20,20
153:7 211:12
213:7,11,13,14
226:14 228:20,21
displayed   53:5
  59:24 62:8 96:20
  163:20,21
displaying   133:14
  135:1 141:7
  214:10
displays   72:4
  215:9
dispute   69:1
  169:13 203:14,17
disputed   3:22
  69:11,19 74:3,19
  79:12 86:2 99:7
  99:13,24 100:2,17
  101:3 102:6 105:2
  106:11 109:13
  110:21 113:1,7,10
  113:15 114:14
  115:4,8,25 116:8
  116:10 117:20
  118:5,12,17 119:3
  119:13 120:3,22

121:11,18 123:5
123:13,25 124:9
124:19,25 127:22
128:1,12,14,21
129:6,9,23 130:15
130:20,21 131:10
131:16 133:7
135:13,17,23
136:10,17,24
137:4,17 138:3,13
139:3,19 140:14
141:12,14,20
142:1,6 148:1,3,7
149:10,19 150:8
150:10,14,24
151:12,16,18
152:3 153:14
154:15 155:4,8,9
155:10 156:2,11
156:25 157:2,6,14
157:23 158:5,6,17
158:24 161:10
163:22 164:14,18
165:10 166:1
167:19 169:24
171:15 173:6,23
174:7,10,23 175:2
175:3,23 176:1,14
176:16,24 177:2,3
180:6,23,25 181:3
181:13,14 182:3
182:18,22 183:3
183:22 184:14,15
184:20,22 185:25
186:7,14 188:1
189:9,13,16,25
190:23 191:10,22
192:2,3,10,12
193:1,12 194:3,16
195:22 196:14,22
197:6,8,23 198:7

198:13,25 199:3
216:24 219:12,18
221:10 245:4
**disputing** 190:17
197:19
**distance** 23:3
122:12
**distinction** 151:25
**distracted** 147:23
**distribution** 3:19
32:19 33:1 50:22
**district** 1:1,1 6:18
7:24 12:2 241:13
**dive** 223:21
**dived** 221:8
**diving** 223:16
**division** 1:2
**document** 37:17
37:25 69:4
**documentation**
20:21
**documents** 9:15
9:23 10:2 57:8
**doing** 16:4,11
165:3 167:5,13,14
212:21
**dots** 62:3
**dr** 3:15 5:8 11:24
12:6,8 69:13
100:15 109:11
167:17 224:20
225:6 250:5 251:2
251:24 252:2,4,12
**drafting** 162:1
164:8 246:18
247:1,24
**drawbacks** 237:19
242:21
**drawing** 152:1
**driver** 60:20,23
61:8,17,21 62:7

72:3,10 96:2,11,14
96:20
**drops** 110:8
156:14
**dsrc** 33:15 34:7
37:15,20 38:3,12
232:11 233:13
244:19
**duane** 2:6 250:1
**duanemorris.com**
250:2
**due** 218:5
**duly** 5:2 249:6
**duplicative** 110:19
173:3
**dyfan** 1:4 12:1
250:4 251:1 252:1
**dyfan's** 230:23

**e**

**e** 2:1,1 3:1,10 5:1,1
7:22 37:15 249:1
251:3,3,3
**earlier** 54:24 55:7
71:20 72:2,25
75:20 79:10 81:15
82:16 83:7 111:12
111:16 112:21
115:3,23 117:17
123:1 130:12
140:9 149:18,25
153:24 164:17
222:2 225:21
240:4
**easier** 11:3 29:13
90:12 108:6 123:8
**easily** 31:25
**eat** 100:4
**education** 18:5
**educational** 241:2
**effect** 4:15 61:20
169:11

**effective** 59:2
**efficient** 3:18
32:19 33:1 234:8
**eight** 103:12
109:16,17 113:2,8
113:11,15 114:15
115:8,12,14,15
116:1,9,10 117:20
118:5,7,10,12,17
119:3,13 120:3,23
121:2,11,19 123:5
123:14 124:1,10
124:19 125:1,5
128:2 139:11
189:11 190:2
191:6,12,15
219:13 226:22
**either** 54:12 60:24
61:18 100:9 140:4
**element** 71:22
77:6 93:11 111:18
134:18 137:25
143:3 144:11
145:21 146:1,12
146:18 160:15
165:11 172:2,4
173:8 221:21,23
**elements** 60:1
84:15 85:2 98:12
106:19 107:19
111:10 113:8,10
113:13 116:6
120:11,17,19
121:15 122:25
123:21,23 124:15
124:21 128:8
129:4 130:18
131:12 136:6
137:13 140:19
142:2,16 149:17
155:25 160:11

161:21 170:18
174:21 179:16
196:6 215:24
**ellipse** 118:15
**ellipsed** 110:7
130:5 131:5 137:9
148:11,20 151:2
156:14
**email** 250:15
**embodiment**
201:8 202:16
203:18 204:17,18
204:25 205:12
**embodiments**
199:21 202:21
204:19 235:24
**emphasizes**
200:19
**employed** 249:11
**employment** 14:13
**enabled** 80:24
**encapsulates**
22:21
**encode** 23:9
**encoding** 23:5
41:15 42:4,8
**encompass** 167:23
**encompasses** 58:9
58:10 160:10
**encrypted** 46:12
**engine** 177:9
**ensuring** 14:22
**entail** 245:21
**enters** 23:17
**entire** 22:21 119:7
167:23
**entirely** 30:23
**entitled** 1:16 3:17
32:18,25
**environment**
34:15 200:20,21

201:13,16 202:8
204:3 205:6 206:6
206:7,9,13
**environments**
38:21 205:13,20
223:9
**equivalent** 56:4
**errata** 250:11,13
250:15,17
**esq** 2:4,8 250:1
**essentially** 22:2
24:6 50:25 96:14
98:5 107:13
132:17,22 135:1
165:20 187:15
188:6 202:2
206:17
**establishes** 42:16
**et** 116:7 138:18
231:19 244:20
**evaluating** 168:24
245:3
**exact** 47:22
**exactly** 54:3,8
61:14 132:13
134:19 142:25
180:19 213:21
222:22 230:5
**examination** 3:6
5:6 225:4 242:17
**examine** 217:7
**examined** 5:3
**example** 44:12,17
45:19 55:23 57:7
58:1,15 64:22
68:9 73:9 82:20
91:1 98:15 108:15
112:8 119:11,16
132:10 140:17
144:9 147:4
177:16,18 178:6

200:5 205:23,25
206:13 210:13,15
210:18 218:1,8
219:8,11,12 223:2
225:9 226:12,19
239:7,10,14,19
245:24
**examples** 57:1
227:2
**excellent** 30:7
**exception** 98:8
137:6 146:6 171:1
179:3
**excerpt** 231:10,15
**excerpting** 233:13
**excerpts** 231:3
**exchanged** 19:17
237:13
**exchanging**
219:10
**excuse** 19:11 25:8
30:17 35:6 53:16
62:19 71:17 77:25
113:1 132:21
133:1 135:12
155:4 184:4
189:17 199:15
205:21
**executed** 70:13
79:4 80:14 87:2
87:22 95:11,13
97:13 102:8,10
106:10,13 110:9
119:18 129:1
130:3 131:3 137:7
148:19 151:1
155:12 156:13
163:16 183:8
219:17 225:15
246:13

**execution** 70:10
86:22 92:23 110:6
112:10 118:14
119:15 120:2
163:14 219:16
**exemplary** 201:7
**exercise** 216:10
222:18,22 223:16
**exhibit** 3:13,14,15
3:17,21,23 11:9,12
11:16,19,23 12:3,5
12:10 29:19 32:14
32:16,24 34:9,11
37:9 38:4,18
40:17 47:16 49:16
51:15 55:2,3,9
59:13 68:23,23
69:9,14 70:2,4,9
70:20 74:9 77:9
79:2 86:4,21
100:16,19 105:24
107:24 109:12,14
109:20 115:18
120:7 121:14,23
122:20 124:13
127:24 130:1,25
137:3 141:18
150:13 151:5
156:9 159:1
168:18 171:10
173:21 175:5
176:1 181:2
186:18 188:1
189:12 191:24
193:16 198:10
200:13 201:4
225:8 227:23
230:15,16 243:10
**existence** 21:4
68:4

**existing** 54:12
237:13,19 238:13
239:7,11,15,19
242:21 243:18
**expect** 40:7
**expedite** 122:24
129:17
**experience** 13:14
16:17 241:2
**expert** 1:16
**explained** 35:11
**explicitly** 36:24
168:20 218:9
**expressed** 108:14
111:16 136:21
**expressing** 6:9
**expressly** 129:6
157:23 158:4
202:20
**extent** 62:16 99:2
113:7 116:5 118:2
119:23 121:1
217:11
**extracted** 22:23

**f**

**f** 249:1
**facilitate** 73:4
**facilities** 159:15
**fact** 28:20 38:11
92:13 138:8
182:11 206:3
235:19 236:7
246:11
**fails** 250:19
**fair** 8:21 9:2 17:21
20:20 27:7 28:7
31:9 37:18 38:5
40:20 43:10 45:3
49:10 52:18 53:1
58:4,12 61:5
62:21 64:19 67:9

71:6,14 72:11
78:3,11,22,25 80:1
80:8 82:7,10
83:22 88:14 91:25
95:7 98:10 99:8
99:18 104:17
105:2,3 107:2
111:14 114:9,15
117:13,14 120:3,4
120:13,23 121:19
127:7,10 128:13
130:16 137:18,19
138:7 140:20,23
142:7,8 145:23
146:7 149:11
152:13,16 154:1
154:11,22,23
162:4,24 164:22
165:12 166:5
175:18 179:5
180:13 196:24
203:5,7 205:22
206:24,25 219:5,6
222:17 226:3
237:1,10 238:8,12
240:18
**fairly** 16:10 23:25
110:23 122:12
**fall** 144:24 145:10
146:5 212:17
**falls** 170:25 179:2
**familiar** 6:6 18:8
19:25 20:9,10,17
21:12 27:9,11
30:23 33:18,25
34:7 37:5,11,14,19
41:14 45:15 47:6
47:25 48:1,21
50:14 51:17 55:13
59:5 85:22 127:13
127:17 159:24

160:24 164:7
172:19 199:19
228:4
**familiarity** 38:1
**feature** 140:25
141:3 166:20,21
166:23
**features** 115:6
139:9 140:24
152:23 177:10
210:22
**federal** 1:20
**feel** 155:6
**fi** 25:15,23 27:23
34:23 239:14
244:14
**field** 28:5 29:8,12
29:25 30:3,4 42:2
59:19,22 241:1,3
**fields** 77:15 220:1
**figure** 49:17 51:14
100:12 144:25
146:17 201:6,11
201:20 203:13
204:14 207:21
214:12 220:19
**figures** 205:7,8
**figuring** 146:23
**file** 45:21 57:10
82:18 209:24
**filed** 242:22
**files** 45:19 57:12
**filing** 4:5 63:11
**fill** 85:19
**finally** 11:22 84:21
198:21
**financial** 16:10
**find** 32:1 47:14
59:14 61:19
148:15 158:24
175:3 181:3

182:19 183:6
191:23 196:15
200:2,2 202:1
**fine** 69:22 90:12
108:5 148:6 203:9
207:19
**firm** 2:2
**first** 5:2 13:8 18:8
23:17 26:19 33:14
33:17 37:9 50:13
68:23 69:23 74:5
87:12,17 90:15
94:8,18,24 95:5
101:11 102:13
106:3,8 108:19
128:16 140:5
153:4 154:16
157:15 164:8
189:11 190:4
204:23 207:3
226:18,24,25
231:10 235:11
240:22 247:25
**fit** 22:7
**five** 133:22 150:13
186:19 188:2,3,10
188:16 201:3
**fixed** 160:5
**florida** 6:19
**flows** 127:6
**flying** 36:4
**focus** 14:16,20
17:19 68:25
**follow** 21:9 68:12
114:4 163:3
**followed** 43:4
**following** 33:13
34:20,24 44:7
108:12 185:1
200:22

**follows** 5:4 202:23
**force** 4:15
**foregoing** 249:5,7
252:5
**form** 4:9 14:19
16:6,15,20,22,23
17:12 18:2 20:6
21:17 24:20 25:7
26:11 28:15 31:3
36:14 37:23 38:8
39:6 40:4,22
43:18 44:9 45:5
53:20 54:10,12
56:7 57:5 58:14
60:17 61:8,12
62:22 63:10,14,22
64:21 65:8 66:4
73:7 74:23 75:8
75:22 78:24 79:15
80:3 81:12 82:9
83:24 85:12 86:15
98:21 99:10,20
103:1 113:6
114:17 115:10
116:4,19 117:7,24
119:1 120:25
125:14 126:7,22
127:9 129:12
132:20 138:21
139:6,22 140:16
140:22 143:7,19
144:4 145:12
146:9 147:10
150:5 152:9,15
153:11 154:3
157:19 158:10
162:6,15 163:1
168:2 171:3
173:10 177:20,21
202:25 204:9
207:9 210:7

211:14 213:9,19
217:15 220:11
221:18 227:7,13
228:8 229:20
237:3,16 238:5,17
241:19 242:5
**format**  19:3,15
41:15,22 61:2
84:2,5,9,23,24
89:5,6 90:21 91:3
94:23 101:21
107:4 109:3
153:18,22,25
154:21,25 237:12
238:3
**formats**  42:3
83:12 91:9 105:14
**formatted**  97:19
**formed**  208:15
**forming**  209:12
218:2,11
**forms**  23:4 71:23
119:19
**forth**  19:21 26:17
168:5 169:6
180:18 182:16
195:1 196:10,22
197:25 202:12
206:11,15 207:12
216:4 243:7
**forward**  55:11
197:18
**found**  47:15
126:25 130:4
139:11 141:15
143:11 148:7
150:11 155:3,4,11
173:24 184:15
186:1 191:11
193:1,13 197:9
198:9 212:15

243:2
**foundation**  21:17
47:8 49:3 51:4
59:8 215:4 228:8
**four**  9:22 133:22
137:9 156:16
186:15 187:5,9,21
204:14 226:20,20
240:5
**fourteen**  155:3
**frameworks**  54:16
**framing**  43:15
**free**  155:6
**frequencies**  39:17
**front**  200:10
**ftp**  45:20 57:11
**full**  14:13 92:6
244:12
**function**  6:10,17
6:24 7:6,10,15
49:14 56:18
143:15,17 144:2,7
144:10,12,14
145:10,11,20,21
145:23 146:5,6,13
146:17,20 147:6
147:15,17 162:1
170:25 178:25
179:2,4,24 180:8
184:12 185:21
186:13 187:10,24
188:20 189:7
191:4,19 192:23
193:9,22 195:3,20
196:11 197:2,15
198:5,20 199:9
202:4,14 203:8,9
212:17 218:14
223:23 226:14,18
226:23 236:10

**functional**  167:22
170:24 171:17
172:2 179:16,23
**functionality**
61:23 62:1,13
127:3,6 167:3
180:10 195:11
217:10,21 221:9
**functionally**  162:4
166:4
**functions**  54:14
56:4 162:23 208:8
211:3 215:25
216:8 226:11
227:2,11,17,18
228:17 229:15,19
230:4
**further**  4:8,12
35:12 79:4 80:13
87:22 90:20 92:23
97:13 119:18
131:3 137:7
138:13 139:3,8
151:1 156:13
171:21 175:11
176:2,10 181:10
181:11,13 183:7
195:11 223:1
224:18 242:14
249:10
**furthermore**
214:16

---

## g

**g**  5:1,1 6:16 10:9
**general**  39:10
46:16 66:17
172:10 199:11
208:9,21 225:22
**generally**  41:2,18
73:17 90:4 107:3
143:20 164:23

228:6 229:14
**generate**  211:12
211:17 213:7,13
213:22 214:12
**generates**  160:5
**generator**  214:2,4
214:10,13,18,21
215:7,11
**generic**  67:5 166:2
208:17
**genus**  27:22
**geographical**  50:4
50:11
**getting**  49:1,4
132:16 211:7
**gilpin**  2:3
**give**  8:8,12 9:10
32:5 99:15,21
108:7 154:20
159:19 172:24
182:25 184:18
200:8 219:11
**given**  23:18 38:1
39:11 82:10 84:8
85:15 103:3 226:9
252:9
**go**  6:4 11:3 13:13
18:5 20:8 26:16
66:19 68:24 74:7
94:3 100:2,11
110:21 114:24
127:1 146:16
178:7 194:2
200:24 215:8
222:17 223:1,15
228:23 230:9
235:21 239:24
**goes**  26:16 42:5
110:10 113:17
131:5 147:17
156:16

**going**   6:4,6 24:8
    24:24 25:10 27:18
    32:12 42:13 48:18
    55:10 69:19 76:17
    79:1 82:25 86:1
    100:2,17 102:4
    110:15 115:16
    116:11 118:14
    129:23 135:11
    149:2,2 151:22
    163:22 164:12,17
    166:6 190:3
    193:11 194:2,6
    200:5 229:1,8
    230:22 234:3
    246:3
**goldberg**   1:15 3:4
    3:12,16 5:8,13
    11:9,12,15,19,24
    12:3,5,7,8 32:14
    32:16 55:2 69:7,9
    69:13,14 70:1,20
    100:15,19 109:11
    109:14 150:13
    167:17 168:17
    200:13 224:20
    225:6 249:6 250:5
    251:2,24 252:2,4
    252:12
**good**   5:8,9 66:7
    99:25
**gotten**   225:20
**govern**   27:4 48:11
**governing**   19:2,5
**governs**   19:15
**graduate**   14:5
**graphic**   211:9
**graphics**   211:24
**great**   11:6
**ground**   6:5 8:7

**grouped**   183:14
**gsm**   244:20
**guess**   21:13 38:9
    80:12 101:1
    103:22 120:6
    122:6 131:25
    132:16 162:8
    173:2 199:11
    210:8 218:10
    222:25 224:3

**h**

**h**   3:10 46:21 251:3
**half**   9:22
**hand**   65:15
**handed**   201:4
**handful**   85:23
**handle**   25:17
**handled**   220:8
**handoff**   25:19
**handshake**   19:13
    26:16
**handshaking**
    19:19,19 20:8
    23:19 26:1,6,7
    65:16
**happen**   30:25 43:1
    90:21
**happened**   40:25
**happy**   46:25 47:10
    47:12,14 90:9
**hard**   48:24 135:10
**hardware**   59:23
    60:2,6,19,22,23
    95:23,25 96:9
    167:9,14
**haul**   46:18,20 47:5
    47:19,23,24
**head**   8:13
**header**   236:15
    237:7,24,25 238:2
    238:11,12,14,15

238:19,21 244:11
    245:17 246:1
**heading**   33:4
**hear**   17:1 18:22
    35:15 145:15
**heard**   8:6 28:18
    31:12 46:17 50:5
**hearing**   27:13
    35:18,24 50:8
**hecht**   1:18 249:3
    249:17
**hedging**   206:4
**held**   1:17 54:20
    100:13
**helpful**   200:10
**helps**   128:6
**hereto**   4:5 252:7
**hey**   27:1
**high**   21:14,18 40:2
**histories**   209:9,24
**hoc**   244:17
**hold**   45:1 178:1
**hopefully**   110:22
**hotspots**   244:15
**hours**   9:22 13:2,6
**hundreds**   68:20
**hypothetical**
    221:5 240:14

**i**

**idea**   21:19
**identical**   227:9
**identifiable**   71:8
    71:12
**identification**
    11:14,21 12:7
    32:22 69:12
    200:17
**identified**   30:5
    35:2 40:14 84:15
    86:5 100:20 102:6
    115:23 137:13

139:24 142:3
    149:5 156:19,23
    158:2 210:3,10,17
    222:23 230:25
    231:9,12 233:16
    234:13,16
**identifier**   77:14
    219:25
**identifies**   23:20
    235:1
**identify**   10:1
    147:3,14 214:5,22
    215:24
**identifying**   7:9,14
    100:21 232:1
**ieee**   34:21,22 35:2
    38:20 40:6,13,16
    41:7 223:2,8
    232:13,25 244:15
**ignoring**   218:5
**illustrates**   201:6
    204:24
**image**   96:14,22
    159:5,10
**images**   159:13
    211:12,16
**immediately**
    216:13
**implement**   41:8
    43:15,20 44:20
    53:24 61:10 68:8
    68:13 179:15
    202:7 205:12
    245:17
**implementation**
    202:11 205:24
**implemented**
    45:11 63:19 82:4
    201:9,12,19
    203:12 204:3
    205:5

**implementing**
44:7 45:9 200:20
200:22 201:17
202:19 245:20
**implicate** 143:16
**implicating**
191:22
**important** 8:8,11
8:19
**inclined** 16:7
**include** 19:10
57:21 96:10 99:3
117:4 122:17
206:4 216:17
**included** 154:10
200:25
**includes** 19:18
22:14 48:12 78:5
159:5 190:16
240:11
**including** 77:13,14
131:20 141:7
154:16 159:10,13
160:6 183:11
216:12 219:24,25
229:11 232:25
241:4,24 244:14
247:9,13
**increase** 49:7
**indefinite** 177:12
179:1,3,9
**indefiniteness**
180:5
**indented** 231:3
**independent** 38:9
**independently**
38:16
**indicate** 94:22
95:2 167:12
**indicated** 249:7

**indicates** 93:13
**indication** 36:10
75:11,24 77:1,3
78:9 83:2 109:24
110:11 113:17
116:16 117:4
118:15 125:11
126:3,15,17
127:11 128:3
154:24 159:7
163:5,10,19,23,25
164:3,5 219:19
220:3,20,25
226:17 228:24
**individual** 26:13
26:13
**ineffective** 59:4
**inform** 44:4 72:9
76:10 92:16 98:18
99:6 101:21
104:16 112:1,2,25
114:1,6 115:11
118:23 119:9
120:1 121:3,6
136:8 137:16
139:16 157:5
184:23 210:22
246:14
**information** 3:18
19:6,23 22:15
26:20 32:19 33:1
38:3 42:22 54:8
54:10 56:10 58:12
66:2 73:4 85:9
92:8 99:16,22
102:13,14 107:5,7
112:17 131:22
132:2,5,7 133:4,13
133:15 134:11,15
134:25 135:2,7
137:23 140:5

141:4,9 152:25
154:10,17,18,21
159:5,10,13 169:8
183:12 185:12
186:23 213:17,21
216:18 226:24
227:1 229:12
247:4,10,15
**informed** 102:22
137:24 168:19
179:10 208:7
209:1
**informing** 107:6
141:5
**informs** 24:16
**infrastructure**
37:6 38:2 47:5
232:14
**initial** 24:15 26:16
29:3 40:8 159:8
**input** 52:4,12,14
52:15 53:7 159:7
159:17 163:6,10
163:19,24 164:1
**insert** 238:19
**inserted** 238:1
**inside** 22:4,8
**installed** 64:17
65:2
**instance** 159:8
**instances** 159:11
207:3
**instructed** 9:6
**instruction** 227:9
227:16
**instructions**
152:18 225:23
226:2,7 227:20
**integration** 37:6
38:2 232:14

**intended** 35:24
36:1,7,12 55:18
77:17 87:14 94:12
94:20 101:13
**interact** 53:3 57:9
58:16 60:22 61:2
**interaction** 112:18
**interactions**
119:25 128:24
**interface** 52:25
53:12,24 54:13
58:24 59:1,6
60:11,24,25 61:10
61:19,20,20 62:14
147:5 211:22,25
**interfaces** 53:9
54:18 56:20 62:18
63:18 73:8
**interference** 39:13
**internet** 21:24
22:3,23 28:20
48:12 92:11,15
97:3 103:13,17,18
103:20,21,25,25
104:4,9,15 107:9
108:23 111:7
149:15,16 216:12
216:22 231:11,22
247:8
**interpret** 112:25
**interpretation**
140:14
**interpreted**
139:18 169:12
**interpreting**
236:21
**interrupt** 8:18
**introduced** 98:25
162:18 164:9
165:15 181:25
182:14

**introducing**
170:12,14
**invention** 29:25
199:16 200:1,23
201:18,22 202:13
202:15,19,22
203:16 204:7,11
204:20,25 205:11
206:1,8,11,14,16
207:6 230:23
233:25 234:24,25
235:2,12,24 236:1
236:5,9,24,25
237:6,11,22 238:9
238:22 239:2
243:8,11,12,16
244:3,12 245:9,11
245:15,16,19,21
**inventions** 205:21
**involve** 6:9 66:24
116:15 189:13
**involved** 18:7 62:7
79:23 139:19
178:14
**involvement** 31:11
31:16 33:19,21
50:7
**involves** 127:23
**involving** 241:24
**ip** 17:15,18 22:2
22:22,22 29:4
48:3,8
**ipr** 8:4
**issue** 18:6 142:12
151:19 220:2
**issues** 241:15
242:1

**j**

**j** 2:8 5:1
**jobs** 14:12

**journal** 15:1,1,5
**judge** 241:13
**jump** 107:16
191:20 193:11
**jumped** 112:14
148:14
**jumping** 197:18
**jumps** 155:13

**k**

**keep** 107:12 223:6
**kind** 18:6 29:25
33:3,4 46:9 54:22
62:15 70:24 88:21
94:3 103:8 107:11
111:1,10 115:1,16
129:16 137:8
158:13 164:21
177:16 185:24
200:23,25 203:4
**knew** 54:3,8 64:1
64:9 73:11 82:3
83:16 211:15
216:13
**know** 8:19 12:12
29:22 34:2 35:8
36:5 41:2 42:2
64:24 66:20 67:22
68:15,16 70:7
71:15 82:13,17
84:3 85:17 90:18
90:20 96:18 99:24
102:21 103:4
107:10 110:16,24
112:14 113:15
125:19 127:14,18
135:10 136:13
155:7 159:25
160:8 161:5
168:23 169:3
172:24 177:17
178:11,16 180:1

183:16 208:11,15
210:14,20 211:6
212:19 213:6,24
215:8 216:13
218:7 222:8,19
223:12,14
**knowing** 81:5
83:19 90:16 219:7
**knowledge** 37:12
85:19 146:15,16
146:24 209:20
221:24,25
**knowledgeable**
127:4
**known** 35:1 38:10
38:16,19 40:19,24
53:9,25 62:17
64:4,15 65:20
210:3 211:2 214:3
214:20 215:15
221:6 223:3
**knows** 22:3,9
24:11,13,21 25:1
60:21 213:11,20

**l**

**l** 4:1 5:1 7:22
46:21
**l.l.p.** 2:6
**lack** 25:10 47:8
66:6
**laid** 170:19 182:1
185:20 187:12
**language** 109:22
110:13 119:3
130:3 132:14,18
133:8 134:4 137:4
142:23 143:4
148:6,25 155:10
162:20 167:18,22
170:24 171:18
172:3 181:4 182:4

182:23 186:1
190:17,23 191:11
192:3 206:4,19
247:24
**languages** 14:21
**laptop** 25:23 67:6
**large** 28:19 45:19
**largely** 86:1
110:19
**larger** 28:23
**law** 2:2 147:20
161:3 207:23
212:19 228:11
**lawyer** 143:20
146:10
**lawyers** 207:21
**lay** 18:16 208:5
**layers** 17:16
**layperson** 143:22
162:8 199:17
230:2 246:19,25
247:23
**leading** 226:5
227:7 229:21
237:3,16 238:5,17
241:19 242:5
**leave** 17:18
**lecture** 17:14,14
**left** 174:12 224:13
**legal** 144:4 145:13
147:24 162:6
179:10 204:5
207:15,20 208:23
209:1 250:23
**legalese** 59:11
**lend** 16:4
**letting** 109:7
125:19
**level** 21:14,18
36:22 40:2 61:25
68:15 208:5

levels   23:6
libraries   211:10
  211:18,24,25
  216:15
library   213:25
  214:14
light   96:16
likewise   55:9 64:3
limitation   83:4
  94:15 110:4,13
  113:18 114:7,21
  119:6,10 137:21
  138:23 142:21
  150:7 158:25
  161:7 165:9
  169:15,18 177:1
  180:7 189:20
  194:14 229:6
limitations   112:7
  139:10 171:9,15
  171:23 173:14
  176:15 179:12
  185:2 216:21
  217:18 222:16
  223:19
limited   58:11
line   23:7 70:8,12
  72:13 73:20,22
  74:6,9 77:8 79:2
  83:1 87:11,21
  91:6 92:5,21,21
  93:12,12 94:15
  95:9 97:9 98:19
  98:25 102:1,4
  103:12 106:12
  110:3,11 111:21
  112:12,15 114:3
  115:19 119:16
  130:4,6 131:7,25
  134:1,1 137:9
  138:15,22,24

139:8,11 141:22
148:9,17 150:25
151:3 152:5 153:6
155:11,13 156:11
156:12,12,16
157:16 163:12,18
169:25 170:1
173:25 175:8
176:11 181:6
182:13,14 183:6
183:24 184:4,25
185:24 186:19
193:15 194:9
195:16 225:14
226:13,16,20,20
226:22 227:25
228:19,23 229:4,8
229:9 246:6,11
251:4,7,10,13,16
251:19
lines   53:18 101:9
101:16 103:23
109:23 113:18
131:2 133:22
141:22 163:7
186:1 194:6,11
195:5 196:15
219:14 247:3
link   47:19,24
linked   180:10
list   3:21 12:11
69:10 86:18
209:21
listed   10:22
195:17 209:5
216:1 217:4
232:25 233:2
listen   24:11,13
25:2,2 36:6
listening   24:14

literally   227:8
229:17
little   6:5 33:14
53:22 62:3 69:21
70:25 201:1 212:8
llc   1:4 250:4 251:1
252:1
llp   250:1
located   92:8 247:5
location   3:19,24
16:14,18 17:7,8,17
17:20,24 32:20
33:2 49:19,25
50:6 92:7 154:16
154:18 160:5
200:15 226:25
233:12 234:7
236:14,16 237:7,9
237:21,24,25
238:10,12,14,15
238:19,21 244:5,8
245:17 246:1
247:4,10
locations   234:10
236:12,13
long   9:21 12:22
13:23 20:22 22:6
31:6 62:23 134:15
135:6 148:18
longer   206:7
look   12:9 13:12
26:12 33:8,13
34:10 39:9 44:13
44:23 46:25 47:12
67:20 70:1 73:16
73:22 77:5 87:10
87:20 90:22
100:18 103:11,22
109:21 110:1
116:22 117:9
119:15 121:23

126:10,23 127:1
127:25 130:1
133:21 143:8
148:5 150:12,16
154:8 159:23
161:9 162:19
163:12 164:13,18
166:7 169:22,25
180:24 182:17,25
185:22 186:17
189:15 194:4
195:5 204:12
210:12 225:9
244:9 247:2
looked   31:6 209:7
looking   14:25
16:12 29:19 32:23
40:6 83:1 94:14
100:20 102:4
110:25 111:17
112:5 114:19
119:12 122:20
130:25 144:22
154:14 165:7
175:13 176:6
209:4 219:13
226:8 227:21
228:16 229:24
230:21 231:9
234:20 240:4
243:9 244:11
looks   15:8,14
130:6 148:19,25
231:2 233:4,8,23
235:6 236:1 246:5
lost   189:22,23
lot   230:12
lots   20:13 56:11
57:17 58:18
loud   236:6

low   27:9,13 61:25
lte   18:20 68:9,15
luck   192:25
lunch   100:1 109:6

**m**

m   5:1
mac   17:18
machine   89:13
makeup   83:20
making   30:2 172:7
   178:7
manage   58:19
management
   14:24 39:1,4
manipulating   42:9
manner   19:10
   20:3
march   158:18
   230:24 242:10
mark   11:4 12:2
   32:13
marked   11:8,12
   11:19 12:5 32:9
   32:16 69:9 127:24
   200:13
marshal   110:23
master's   13:21
material   12:17
   51:6
materials   10:21
   12:11 209:5,11
matter   147:12
   212:3 216:4
mean   6:10 7:5
   19:1 23:1 29:14
   41:21 51:6 55:20
   57:13 81:4 103:18
   129:10 134:5
   135:20 144:1
   201:21 210:8
   218:20 225:23

228:5,6 236:20,23
246:17,21
meaning   52:13
   99:17 118:23
   120:1 132:22
   140:11 143:3
   157:6
means   6:17,23 7:9
   7:14 35:22,25
   39:10 41:22 42:3
   51:20,23 53:2
   120:3 133:13
   142:11,25 143:16
   144:2,6,10 145:11
   145:19 146:6
   147:6 159:25
   161:20 162:1
   170:25 179:2
   206:7 212:17
   229:24,25 236:10
   247:20
meant   36:19,20
   39:3 49:24 51:10
   71:15 118:9
   134:19
mechanism   53:4,6
   107:4 125:17
meet   9:17
meeting   10:11,12
meets   206:15
memory   14:23
   20:23
mention   93:1
mentioned   11:13
   11:20 12:6 19:14
   21:2 22:24 27:23
   30:8 32:17 42:5
   48:3 57:11 58:17
   67:22 69:10 73:10
   74:5 85:3 88:16
   99:13 153:1 165:2

200:14 212:2
224:4 230:4
235:13 243:13
245:23
mentions   224:2
mercer   5:13
merely   160:15
   161:17 195:11
message   17:24
   21:14 22:4 24:14
   26:19,21,22,25
   35:19,22 36:12
   37:3 40:10,11
   41:25 42:3,5
   65:20 67:18 75:25
   76:22 78:14 79:8
   79:19 80:6,16,25
   81:19 82:1 83:20
   84:1,3,6,9,12,21
   84:22,25 88:1,8
   89:5 91:3,5 92:11
   92:14,19,24 97:17
   97:18 101:22
   104:1,8 116:16
   117:3,5 125:9,11
   125:18,19 126:5
   126:16,16,18,19
   153:14,17,19,25
   154:6,16 155:22
   213:16,23 229:5
   238:20 247:9
messages   19:3,5
   19:10,15,16,20
   20:3 23:12 30:25
   35:15 65:10,16,23
   65:25 66:1,8,14
   75:12 77:12,25,25
   78:6,10,12 83:3,8
   83:8,11 87:13
   90:21 93:14 94:11
   94:20,23 101:13

105:11 106:3
107:10 109:1,3
112:19 114:1
119:24 154:11
160:6 178:15
217:8 219:10,24
220:8 226:18
228:25 234:6,9
236:11,17 237:12
238:3,11,21
245:23
messaging   38:25
   39:24
met   9:15 186:25
method   3:18,23
   32:18,25 200:14
   204:14,24 205:5
   205:24 206:5,10
   234:5
microsoft   64:11
mid   13:11
mind   6:21 12:9
   16:1 18:16 21:11
   45:21 50:15 62:24
   75:1 86:5 121:23
   144:16 243:23
minute   108:7
   114:23 148:5
   150:20 166:6
   224:12
mischaracterize
   31:10 46:8
mischaracterizing
   217:15
missed   15:19
   114:22
missing   175:25
misspoke   35:7
   190:8
mistake   217:7

**mobile** 3:25 19:4
19:17,21 23:20
25:1 34:15 36:3
36:19,21 39:17,22
40:9 43:6 54:17
55:21 57:15,22
58:23,25 70:14,16
71:2,6,11,16 73:12
73:15 75:15 76:11
76:25 77:18,24
78:7,12,16,18 79:5
79:19 80:5,8,15,22
80:23 81:9,18,22
81:24 82:6,11,14
84:16,17 85:3
86:23 87:4,5,8,15
88:25 89:9,11
91:12,14,15 92:10
92:13,18,23 93:15
94:13,21 95:3,12
95:15,18,20,22
97:4,7,23 98:17,23
101:14,20 102:3,9
102:12,15,17,19
102:22 103:5,10
103:16,24 104:7
104:10,13,17,19
105:7 106:5,15
108:22 110:7,9
111:3 112:2,11,19
116:17 117:4
121:6 125:10,12
128:15,25 129:3
131:20,21 132:3,5
132:7,12 133:3,12
133:14,24 134:3,9
134:17,25 135:2,8
138:1,5,6,18
139:15,25 140:4
141:1,4,8,9 142:11
142:20 151:20

152:7,21,24 153:3
155:21 157:4
159:4,9,12 163:15
163:17 168:11
170:16 178:13
183:10 186:22,24
200:17 204:16
219:16 225:16
228:21 229:11
236:17 241:24
244:13 247:7,11
247:14,14,17
**mobility** 25:17
**mode** 38:13 39:11
**modifications** 35:8
**modified** 34:25
244:6
**modifier** 122:7
**modify** 237:12
**modifying** 223:2
238:2,9,13,18,20
**module** 53:14 56:2
177:15 210:17
214:2,19
**modules** 210:2
213:5,12 214:6,22
215:16
**moment** 30:23
69:16 159:19
172:23 182:25
184:18
**monitor** 177:15
**morning** 5:8,9
**morris** 2:6 250:1
**move** 107:17
147:21 150:10
190:5
**moves** 159:14
**moving** 25:18
150:9 158:13
189:9 193:2

**muddy** 171:21
**multiple** 51:24
199:20

**n**

**n** 2:1 3:1 4:1 5:1,1
49:22 249:1
**name** 5:11 210:4
210:10,18
**necessarily** 29:9
41:9,11 65:24
72:9 80:21 133:17
158:4 202:8 222:7
230:5
**necessary** 252:6
**need** 19:5 34:1
53:15 64:16 65:1
74:23 80:23
104:14 123:7
136:11 145:6,15
146:12 154:5
207:16 208:12
220:17 224:12
230:3
**needed** 53:12,24
64:9 82:6
**needs** 19:6 56:23
80:22 96:20
**net** 38:24
**network** 17:4,16
18:13 19:4,18,22
20:2,4 23:21
25:11,12,24 28:19
28:23,25 30:12,20
40:1 46:18,20
47:20,23 49:7
52:4,12,15,16,17
56:24 57:3,19
62:21 63:6,20
64:6,18 65:21
66:15 67:3 68:8
201:10,20 203:13

211:5,8 220:9
231:17 243:18
244:4 245:14
**networking** 38:25
39:24
**networks** 3:20
16:14,18 17:6,7,9
17:10,14,20 18:9
25:5,14,22 27:10
27:12,14,16,19
28:5,9,21 32:21
33:3 45:3 62:18
65:11 236:19
241:6,24 244:14
244:17,20,24
**never** 17:22 56:12
**new** 1:11,11,20
5:14,14 18:21
34:16 165:11,13
166:18 168:4,7
170:12,15 172:1,3
173:7,16 174:18
175:19 176:22
196:9,25 198:3
243:17 249:4
**nine** 86:3,6,10
89:21 90:8,14
91:20 93:4 94:5
98:7 109:17 120:7
120:13,20 121:22
122:3 127:22
128:13,14,21
129:6,9 130:22
135:17,25 136:1,7
136:18,21 158:21
173:19,19 174:16
181:1,8,8 182:2,13
182:16 184:16
185:23 186:7
230:18 233:22

nodding 8:13
node 47:20,21
67:4,16 221:14,14
nodes 25:10
noise 22:17
non 208:5
nonce 166:2
168:21 169:5,10
169:19
normally 122:10
notary 1:19 4:14
249:3 252:13,19
note 7:19 59:12
76:15 86:9 127:25
176:23 179:7
184:24 224:1
245:8 250:10
noted 126:1 248:9
252:7
notes 249:9
notice 212:5
notification 66:25
67:17 125:10
126:18
notify 37:2
noun 59:20,21,25
71:19 73:5
november 1:12
15:2,3 250:3
number 3:13,14
11:10,13,17,20
12:25 13:2 33:5
69:2,24 70:22
123:20 148:9
152:22 156:19
178:18 179:11
194:9 225:12
226:11 230:11
232:9,11,24 233:1
233:7 235:7,17
239:4 245:7

numbered 3:21
69:10 109:13
numbering 69:2
69:18,20
numerous 57:13
nyu 13:18,21 14:4
14:11,16

**o**

o 4:1 5:1 52:14
249:1
o'clock 100:6
obey 43:8
object 9:5 16:15
16:19 17:11 18:1
20:5 24:19 25:6
26:10 28:14 31:2
36:13 37:22 38:7
39:5 40:3,21
43:17 44:8 45:4
53:19 56:6 57:4
60:16 61:11 63:9
63:13,21 64:20
65:7 66:3 73:6
74:22 75:7,21
78:23 79:14 80:2
81:11 82:8 83:23
85:11 86:14 98:20
99:9,19 102:25
113:5 114:16
115:9 116:3,18
117:6,23 118:25
120:24 125:13
126:6,21 127:8
129:11 132:19
138:20 139:5,21
140:15,21 143:6
143:18 144:3
145:12 146:8
147:9 150:4 152:8
152:14 153:10
158:9 162:5,14,25

168:1 171:2 173:9
177:19 202:24
205:2 207:8 210:6
211:13 213:8,18
217:14 221:17
objection 14:19
16:5,22,24 21:16
49:2 51:3 53:17
58:13 59:7 62:22
119:4 157:18
177:22 179:6
204:8 215:3
220:10 226:4
227:6,13 228:7
229:20 237:2,15
238:4,16 241:18
242:4,11
objections 4:9
obvious 234:4
occasionally 8:17
occur 26:7 222:11
oh 215:8
okay 6:4,20 7:1,16
7:19 8:3,5 9:4,9
9:13 10:19 12:22
14:3,15 15:7,12
16:12,12 18:24
19:9,25 20:11,14
20:24 23:11,11,21
23:24 24:2,9 25:4
26:5,18 27:9,15
29:6 30:7,7,16
35:12 36:8,25
37:5,14 38:17
39:23 40:13 41:14
42:13 44:11 45:10
45:22 46:2,15
47:3 48:3,14,17
49:9 50:5 51:14
52:25 56:19 61:15
62:5,11 64:12

67:22 68:18,21
69:22 71:10 73:16
73:22 81:2,2,14
82:16 85:2,20,25
89:23 90:3 92:12
97:6,12 99:2
100:9,24 101:11
103:7,7,22 105:16
107:22 108:17
110:14 113:12,14
114:8 115:1,13,16
116:23 117:10,10
121:13 122:14,20
123:15,17 124:7
125:24 127:16,21
133:5 135:11
136:19 137:12
138:2,10 141:14
142:14 143:10,23
146:21 147:19
150:9,19,22
151:14 153:1
155:3 159:22
161:9 162:10,19
162:19 164:12
165:18,23 168:6
168:14,14 169:3,8
169:22 170:20
171:11 172:9
173:15 174:22
175:21 177:6
179:21 180:2,16
180:22 182:17
183:13 185:22
187:1 190:11,19
191:20 192:25
193:14,24 194:12
195:4,21 197:20
207:18 208:25
209:4,15,19,22
210:1,24 212:2,21

216:3 218:20,25
222:6,6 223:25
225:10 227:21
230:20 242:13
244:23 248:5
**once** 26:15 64:24
224:5
**one's** 119:9 124:9
128:20 146:15
149:19
**ones** 90:6 120:14
**open** 225:7
**opening** 137:8
**operate** 57:18
**operating** 56:13
**operation** 19:7
**operations** 21:10
43:9 208:17
**operative** 146:3
147:3
**opine** 38:5 169:15
179:8 215:22
216:20 217:18,22
219:3
**opining** 7:4 180:4
180:6 212:3,25
214:1,8
**opinion** 111:15
113:9 133:18
142:19 202:17
204:5 206:2,18
207:20 218:12
221:4,7 240:16
242:25
**opinions** 6:9
108:12 136:20
178:9 209:12
218:2,4,16,23
**opposed** 8:13
86:11

**option** 70:15 87:3
95:14 102:12
133:23 138:18
140:1 141:2,8
152:21 163:20,21
176:5 201:8 205:4
206:22 226:14
228:20
**options** 53:25
**oracle** 64:10
**order** 19:7,23 21:9
42:6,24 49:7 65:2
68:13 129:16
244:5
**ordinarily** 145:8
**ordinary** 29:16
75:14 120:21
123:4 124:18,24
130:14 131:15
136:9 137:16
139:16 142:5
146:2 147:2 149:9
151:10 156:24
214:17,23 221:5
236:22 240:2,7,14
240:17,23
**organize** 41:23
**output** 52:4,12,14
52:15 102:14
131:21 132:1,5
133:2,12 134:2,10
134:16,24 135:8
137:21,23 138:6
140:3 141:3
142:10,21 149:12
150:7 151:19,25
152:23 156:6
157:8 159:9,11
183:11 185:13
186:21 226:24
229:11 247:13

**outputted** 226:22
**outputting** 141:9
213:16
**outside** 52:10
161:20 203:22
**overall** 153:8
**overcome** 243:2

**p**

**p** 2:1,1 4:1
**p.m.** 248:9
**packaged** 22:4
**packages** 65:1
**packet** 22:2,3,6,12
22:16,22,22 40:11
42:2
**packet's** 23:15
**packets** 22:8,18
**page** 3:3,12 12:11
29:14 33:5,8,10,13
34:10 37:8 38:17
47:16 49:16 51:15
76:16 86:17 144:8
144:17 150:13
168:18 171:9
183:17 200:5
201:3 204:13
230:18 231:11,16
232:5,6,8,13,14,16
232:17,23 233:3,3
233:5,21,22 235:8
235:18 236:3,4,8
240:5 243:5,10
244:10 251:4,7,10
251:13,16,19
**pages** 51:8
**paper** 15:1
**papers** 15:1,5
**paradigm** 17:23
**paragraph** 29:19
30:6 34:13 35:11
35:13 37:10 47:17

74:10 144:7,16,17
145:17 168:15
200:6,18 201:2
202:6 204:12,22
230:21 231:15
232:4,15,17 233:2
233:5,21,24
235:20,21 236:23
240:6,10,12,15
244:12
**paragraphs** 33:15
231:3 234:12,13
234:21,22 235:7,8
235:18 240:20
**parameters** 26:2
**paraphrase** 80:16
83:4
**paraphrasing**
87:14 229:13
**parcel** 167:5
**parenthesis**
230:24 231:18
232:21 241:4
244:16
**parse** 201:1
**parsed** 178:23
**part** 17:15 18:4
63:19 65:13 74:2
77:3 99:7 104:1,4
116:20 133:17
138:3 140:2
161:10 167:5
176:2 185:2 186:6
200:1,22 201:17
201:21 202:22
203:15,15 204:6
206:7 209:11
220:8 221:11
225:11 245:5
**participate** 78:20
79:24 80:19 81:10

81:20 89:1 95:4
98:1 104:12
**participating** 13:9
**participation**
224:21
**particular** 16:2
36:2,18 38:13
41:12 43:12 44:3
45:12 50:3,10
53:15 60:21 61:1
65:13 79:25 80:19
81:7,23 82:11
83:16 84:24,25
89:5 91:3 92:7
94:23 105:13,14
106:19 112:6
125:2 126:13
138:3 143:3
153:16,18,20,22
178:17 221:9
223:22 247:4,9
**particularly** 27:13
131:25
**parties** 4:5 69:3
**parts** 142:17
218:11
**party** 212:22
249:11
**passage** 83:6
**passing** 224:2
**patent** 3:13,14,17
11:10,13,16,17,20
16:9 31:21 32:17
32:24 54:24,25
55:4,6,10 68:22,25
70:2,4,9,19 72:8
74:10 77:9 79:2
86:4,20 91:7
93:24 95:10 97:10
100:16 101:2
104:25 105:1,18

105:23 107:23
108:15,16 109:20
115:6,17 119:13
120:7 121:14,17
121:24 122:3,21
123:2,16,19 124:2
124:6,12,16,23
125:6 127:24
129:25 130:23,24
130:25 131:11,24
134:22 135:16,25
136:8,18,23 137:1
137:2,14 138:12
141:16,17 142:4
142:15 143:9
145:5,6 149:4,21
150:12 151:4
155:5,20 156:4,9
156:21 158:3,22
158:23 159:2
162:2 164:7
165:25 169:23
173:6,19,20 175:2
175:5,22 176:18
181:1,3 182:22
183:25 184:9,16
186:8,16,17,18
187:5,15,25
188:11,14 189:11
189:12 190:1,10
191:7,12,21,24
192:6,11,16 193:2
193:13,25 194:5
194:23 196:5,14
197:6,12,18 198:7
198:8,10,17,22
199:6,16,19 202:1
203:2 204:18
205:21,25 209:10
209:10 216:6
218:19,21 219:14

220:21 221:3
223:24 225:7
226:8 227:22,24
228:11,11 246:3,7
246:18,25 247:24
248:2
**patentee** 202:18
206:1,3 221:20
**patents** 10:6 11:5
11:8 15:19,24
18:7 30:1 46:24
126:25 171:24
180:12,12 199:25
224:8 242:9
**pcs** 57:23
**pending** 166:11
**people** 38:14 51:7
162:2
**perfectly** 66:7
**perform** 21:10
43:8 56:3 146:13
146:17,19 166:20
177:1 180:8 211:3
227:16 229:18
244:5,7
**performed** 54:14
227:19
**performing**
144:13 145:23
147:15,17 162:23
166:22 167:3
178:25 216:8
218:14 226:12
227:11 237:9,20
**performs** 56:17
**period** 13:1
108:25 206:8
236:13,19
**permit** 183:8
**person** 28:4 29:15
40:19,24 41:4,5

44:4,13,17 53:11
53:23 54:1 56:21
60:13 61:9 63:16
64:3,14 65:18
72:9 74:17 75:14
79:21 81:5 82:2
83:15,18 92:16
93:6 96:7 97:18
97:22 99:16 112:5
112:25 114:2
116:1 117:21
120:21 121:10
122:14 123:3,12
123:24 124:17,24
127:3 128:11
129:8 130:14
131:15 136:8
137:16 139:16
140:12 142:5
145:7 146:2 147:2
149:9 151:10
156:1,24 158:7
211:3,11 213:5
215:22,22 221:5
236:21 240:2,7,13
240:15,17,23
**pertains** 70:18
198:25
**phone** 10:15 21:8
21:21 22:11,19,25
23:3,8,14,17 24:3
24:11,12,17,21
25:1,23 26:9,21
36:3,11 37:2
55:21 57:25 64:19
67:6 90:19
**phones** 18:19 19:8
21:10 24:7 54:17
**physical** 17:23
48:24 234:7,10
236:11

physically 103:19
picks 151:3
piece 215:8
pieces 22:7
pixels 62:2,3 96:16
place 1:17
placed 50:21
plaintiff 1:5 2:3
plaintiff's 137:2
play 53:16 169:20
please 5:11 8:15
  8:18,24 30:9 34:2
  46:9 61:15 82:21
  123:6 136:12
  159:21,21 166:8
  172:23 174:13
  243:24
plug 53:16
plural 247:18
plurality 77:17
  86:23 87:15 95:12
  101:14 102:9
  110:6 112:11
  159:15 163:15
  219:16 225:16
plus 6:10,17,24
  7:6,10,14 143:16
  144:2,6,10 145:11
  145:20 146:6
  147:6 162:1
  170:25 179:2
  212:17
point 31:24 51:9
  54:22 59:15 93:5
  111:9 112:22
  113:2,3,21 114:9
  128:5 131:23
  132:16 136:11
  140:8 149:25
  165:4 167:24
  172:22 173:3

176:4 205:18
  208:23 222:9,25
pointed 240:3
pointing 144:16
poorly 75:2
popular 30:14
portion 28:23
  62:25 75:5 77:13
  160:21 166:14
  219:24 243:25
portions 119:8,12
pose 133:11
posita 29:24
  151:11
position 13:15,25
  138:4 157:11
  170:21 222:7
positions 14:9
possible 50:19
  75:1 126:12
  220:25
potentially 13:9
  53:13 220:7
power 100:5 109:7
practicum 241:2
preamble 137:8
  159:24 160:2
precise 29:10
  192:7
preferred 235:24
preparation 10:17
  12:16 209:18
  245:6
prepare 9:14
  10:12
preparing 12:23
  117:13
present 5:21 13:15
  86:9,13 90:4,11
  91:16 100:23
  101:5 111:11

114:13 115:7,24
  117:18 119:2
  120:12 121:17
  123:2,22 128:9
  131:14 135:24
  136:12,25 143:25
  148:4 149:6
  150:18 153:14
  155:19 156:3,20
  175:6,18 178:19
  180:25 181:15,22
  182:9 185:15
  186:10 187:7,20
  188:13 189:1
  191:14 194:3
  196:24 197:11
  198:7 235:12
  243:12
presently 235:23
presumption
  144:9 145:19
pretty 45:2
prevalent 30:19
prevented 237:20
previous 173:13
  174:21 182:11
  187:8 188:15
  189:3 205:7
previously 114:12
  120:12 121:16
  124:22 125:15
  131:13 142:3
  177:5 181:18
  190:22 195:18
  196:19
primarily 14:20
primary 14:16
prior 6:7 10:16
  23:12 31:11 33:19
  34:6 37:11 50:6
  130:17 231:1,8,24

232:24 233:17
  234:17 235:2
  237:17 242:8
priority 242:9
private 14:9
probably 6:6 8:6
  50:12,14 59:3
  114:24 176:7
  177:7 214:15
problem 51:12
problems 230:25
  231:9 232:1 233:8
  233:16 234:16
  235:3 237:23
procedure 1:21
procedures 219:9
proceeding 7:25
  8:2
proceedings 15:14
process 23:19 24:1
  24:4,5 25:4,9 26:1
  26:6,7,24 218:11
  236:15 237:8
processed 22:12
processes 20:8
  43:3
processing 42:6
  208:9,20
product 3:23
  200:15
professor 13:18,24
  14:2,4,10
program 3:23
  13:21 14:22 43:15
  55:18,24 58:9
  145:9 146:4 147:4
  200:15 211:21
  212:15 214:23
  215:1 230:6
programmed
  177:14 208:13

**programming**
14:21 241:4
**programs**  14:23
58:16,18 60:12
212:10,12
**prosecution**  209:9
**protected**  199:16
**protection**  199:14
**protocol**  17:15
19:13 20:15,25
22:5,9 26:13
30:12,15,24 31:1
35:1 36:16 37:20
39:21 42:16 43:13
43:16 44:3,7,12,14
44:17,20,22,25
45:3,7,12,16,21
46:1,10 48:9,13
64:15 65:3,5,13
68:6,10,13,14
72:23 74:13,21
75:13,18 76:9,14
76:24 77:4,12
78:2,7,13,17,21
79:7,20 80:1,7,10
80:20 81:1,10,21
81:24 82:1,3,12,15
83:16,19,21,25
84:9,22,25 85:8,16
87:13,18,25 88:5,6
88:19 89:2,4
90:16,17,25 92:11
92:15 93:1,7,15
94:9,12,19,25 95:6
97:3,16,18,20 98:2
99:6 101:12,19
103:4,6,18,21,25
104:5,9,12,15
106:4,9 107:9
108:20,23,24
109:4 111:3,5,7,8

116:7,13,15,20
118:3 122:5,7,17
125:22 126:13
128:17 149:15,16
151:18 153:2,5,17
153:21,23 154:20
155:2 157:3
210:16,21 216:12
216:13,22 218:9
218:17,22 219:2,8
219:23 220:7,15
220:18,24 221:12
221:16 222:1,3
223:4,7 231:11,22
238:18 239:8,12
239:16,20 247:8
**protocols**  17:4
18:17,25 19:9,19
20:19 21:3,12
25:15 27:4 30:20
34:17 36:9 40:1
42:13 43:20 45:15
45:18,23 46:3,6,7
46:13 48:11 64:13
66:20,22,24 67:12
67:15,21 68:1,3
81:4,6,16 83:12
84:20 85:18,22
88:20,24 93:3,4
102:23 104:21
105:4,13 107:11
109:2 113:25
116:24 117:2,12
117:12 119:24
121:8 122:8,10
125:8,16,25 129:2
153:7 155:21,23
178:14 215:20
217:8 218:1,6
222:13 223:14,17
223:21 231:23,23

232:12,13,24
233:2 237:14,19
238:10,13 244:5
244:25 245:1,3,7
245:15,18,20
**provide**  19:21
55:19 56:18 68:11
85:14 98:13 125:8
125:16 145:8
146:3 207:13
210:11 211:25
218:18 219:4
222:16 223:18
234:5
**provided**  54:16
67:16 126:4,8
147:12 179:23
202:15 217:9
228:18 231:4
241:15 242:2
**provider**  50:16,24
50:25
**provides**  53:6
56:10 59:15 61:24
85:9 88:23 106:23
110:18 112:16
185:20 236:10
**providing**  58:11
161:6 204:15
**provision**  38:16
180:11 238:24
239:1
**provisional**  3:17
10:3 32:6,17,24
34:11 37:7,12,13
38:4,23 40:17
47:4,11,17 48:20
51:22 52:7,11,21
63:12 134:21
179:19 217:13
222:14,20 224:1

230:11,13,16,25
231:4,10,16 232:1
232:7,17 233:21
234:15 235:1,25
236:4,8 237:1,5,6
237:18,22,23
238:7 239:5
242:22 243:7,9,16
244:3,10 246:2
**provisionals**  46:24
**proxy**  48:20 49:5
49:9,13,15,19,25
50:6,9 236:16
**ptab**  7:25 8:1
**public**  1:19 4:14
249:3 252:19
**publications**  15:13
**publish**  16:8
**published**  15:3,9
**pull**  32:12
**purport**  243:17
**purporting**  237:11
**purpose**  208:10,22
**purposes**  44:6
**pursuant**  1:20
83:21 84:22
105:12 153:15
**put**  7:19 13:5
154:6 234:14

**q**

**qualifications**
29:15
**quality**  23:2 39:12
**question**  4:10 8:24
33:16 42:17 74:23
75:2 76:5,7,17
80:11 82:21 93:25
97:6 117:19
123:18 124:11
132:9 133:9
145:15 164:13,18

166:11 174:15
180:4 182:3 188:7
190:20 191:9
192:1 193:3,16
194:17 195:7
196:2,19 197:7,22
199:2 201:24
207:16 224:3
243:22 246:4,17
**questions** 9:5
120:6 129:15
155:17 156:17
174:3 176:13
199:12 200:3
224:17,18,24
225:13 230:11
232:9 239:4
242:14,20
**quick** 109:6
**quickly** 108:2
110:23 122:2
207:23
**quite** 160:23
**quotation** 92:6
**quote** 233:3
235:11 236:2,3
**quoting** 235:8,17

**r**

**r** 2:1 5:1 249:1
251:3,3
**radio** 35:14,16
233:14
**rage** 33:11
**raises** 118:8
**range** 31:13,18
33:18 34:8 35:16
39:17 72:15,16,23
72:23 74:11 77:19
77:20 78:5 84:18
85:17 86:24,25
87:6,12,17 90:15

91:19 94:6 101:7
101:25 106:2,7
108:18,21 111:2
113:24 121:7
122:4,6,11,16
128:4,16 160:4
178:12 219:21
232:10
**read** 10:3,4,5
20:12 41:6,13
45:7 51:7 63:1
73:17 75:1,6 92:6
97:11 108:9 119:6
132:17 144:18
160:19,22 166:15
170:9 173:11
174:18 184:20
215:6 218:3
230:22 234:3
236:2,5,7 243:21
244:1 250:9 252:5
**reading** 37:12
62:24 71:8 135:4
141:12 148:18
160:12 184:23
188:16 215:6,21
215:23 220:16
238:25 243:24
**reads** 135:10
**ready** 150:22
**realize** 135:5
**really** 26:3 30:12
51:11 206:23
226:21 228:5
235:17
**reason** 9:9 16:2
111:24 142:25
250:11 251:6,9,12
251:15,18,21
**reasonable** 162:9

**reassembled** 22:20
**rebroadcast** 77:8
77:10
**rebutted** 144:11
145:20
**recall** 6:12,24 7:3
9:23 13:3 26:23
27:2,13 30:25
31:8,14 47:1 50:8
52:7 54:25 58:8
66:23 67:19 69:15
116:21 117:8
125:21 126:2,10
172:7 208:24
209:3,14,15 212:3
212:5,21,25 214:1
214:8 220:2
**recap** 84:14
**receipt** 75:11,25
77:1,17 78:10
83:3 94:12 101:13
109:24 110:12
113:18 126:2,4
127:12 130:7
131:6 148:11,21
151:6 219:19
220:4,20 221:1
226:17 228:25
229:10 250:18
**receive** 36:6 51:24
54:11 75:10,24
77:1 79:5,19 80:5
80:16,25 87:23
92:14,19,24 97:14
110:11 118:15
163:18 220:20
226:16 228:24
229:5
**received** 27:1
42:11 76:22 78:9
78:12,16 87:15

94:20 103:24
113:17 118:16
125:12,20 128:3
159:7 163:6,11,24
164:1,3 213:17,22
219:19 221:1
**receives** 83:2
**receiving** 26:20
35:19,22,23 67:4
67:16,17 77:3,24
81:19,25 93:9,14
104:8 208:8,18,19
220:3 221:14
**recess** 109:10
167:16 224:15
**recipient** 26:25
41:24 125:17
126:8,17,20
**recitation** 171:14
174:5 176:16
185:10 188:24
197:8 198:13
199:3 228:1
**recite** 113:17
128:23 145:22
146:12 147:16
191:18
**recited** 104:24
114:3 124:1 129:5
139:9 143:15
157:15,22 158:4
165:20 166:25
170:7 172:5 177:8
182:6 183:23
189:20 190:25
191:17 192:5,19
193:6,19 194:15
194:22 195:15
196:7 199:5 208:2
215:13 217:10,12
221:10 226:11

227:3,11 228:17
229:15
**recites**  113:8
144:12 145:21
151:16 157:3
165:8 187:23
189:7 191:3 195:2
197:2,15 198:4,19
199:9 229:23
**reciting**  144:12
167:20 190:12
196:11,20 210:20
223:13
**recognize**  23:21
**recognized**  168:20
169:10
**recollection**  10:25
12:20,24 26:15
76:20 127:20
213:3
**record**  5:10 54:19
54:21,23 63:1
69:21 75:6 100:12
100:14 160:22
166:15 167:15
244:1
**redundancy**  23:6
42:7,10
**redundant**  22:15
**refer**  20:24 29:21
52:5 55:4,10
57:20 67:2,3 74:2
85:7 86:10 89:21
93:21 113:15
131:19 136:1
154:9 165:1
166:12 171:6
172:23 215:15
220:14 228:13
240:1 246:8,23

**refereed**  15:14
**reference**  32:1
33:10 38:19 39:23
47:4,15 49:18
59:13 70:20 71:2
71:17 72:7,14
73:23 74:11 76:8
79:11 81:3 82:22
84:18,19 87:17
89:10 90:15 91:11
96:24 97:2 98:16
107:9 122:16
139:13 170:11
175:15 176:20
185:17 194:20
195:8 196:3
204:18 209:8
223:17 247:17
**referenced**  40:16
91:20 93:4 138:11
149:23 150:8
170:2 250:6
**references**  16:13
48:20 73:18 98:23
99:3 118:22
154:15
**referencing**  96:9
**referred**  32:6 34:8
47:23 54:24 58:22
74:18 81:6 97:9
98:18 112:16
138:15 139:1
152:3,4 157:13
177:3 182:12
184:3 194:24
246:5
**referring**  29:23
31:20 55:7 72:1
79:12 82:18 88:21
97:8 128:2 133:2
170:18 174:11

184:7 185:18
194:14 195:16
205:18 229:3,14
232:5 233:7,9
234:14 239:6
243:4,5
**refers**  30:9 31:19
33:23 38:12 48:10
51:15 90:24 98:24
109:19 119:13,17
119:23 122:3
128:14,15 130:2,5
136:2 149:14
162:12 164:4
170:6 177:4
181:24 182:20
204:19 232:16,18
246:12 247:22
**reflected**  111:1
112:21
**refresh**  20:23
76:20 127:20
**regard**  11:24
111:16 136:17
**regarding**  6:23
139:17 176:14
212:20 216:21
218:12
**regards**  6:17
**region**  23:18
**regions**  50:11,11
**related**  41:19
215:19 218:24
225:13 241:6
249:11
**relayed**  169:9
**relevance**  171:13
**relevancy**  3:24
200:16 204:15
205:19

**relevant**  92:7
142:20 154:17,18
155:10 169:24
226:25 247:4,10
**reliable**  42:7,11
**reliably**  22:14
23:10
**relied**  172:2
**relying**  146:22
**remark**  36:15
180:17
**remember**  9:25
172:12
**render**  240:16
**repeat**  118:1
137:20 183:4
194:8
**repeated**  74:24
**rephrase**  42:17
**reporter**  1:19 8:13
11:12,19 12:5
32:16 69:9 166:13
200:13
**represent**  49:22
**represented**  5:16
**requested**  62:25
75:5 160:21
166:14 243:25
**requesting**  233:11
**require**  19:20
101:19 103:20
**required**  34:15
146:13 208:1
221:13,20 252:13
**requires**  76:22
245:16
**requiring**  159:16
221:22
**reread**  159:20
**research**  14:17,18
14:20 16:3

reserved 4:10
reside 81:18
102:24 161:21
residing 43:22
44:19
resolving 241:14
242:1
resources 58:19
211:7
respect 59:21
64:12 65:5 71:1
81:16 86:8 88:13
90:8 94:4 98:6
105:1 108:4 115:2
115:5,7 120:6,20
121:5,16 123:1,18
123:19 124:11,16
124:22 128:7
129:15 130:12
133:7 136:7,22
141:25 156:18
174:4 188:8,22
195:4,22 240:16
respective 4:4
respond 178:7
responding 178:5
responds 178:3
response 5:20 79:8
80:6 87:25 91:5
92:11,14,24 97:16
130:7 131:6,6
148:21 153:13
154:16 229:5,10
247:8
responses 8:12
responsible
178:24
rest 110:12 148:24
148:25
restate 7:11

result 105:14
retained 6:15
retrieve 57:8
return 250:13,15
250:17
review 10:21
69:17 76:18 90:10
94:2 108:1 114:23
117:11 123:7
127:19 172:16
209:17 212:6
217:16 218:10
245:2 250:7
reviewed 9:15,24
10:8,10 12:12,17
20:20 98:12
209:11,24 219:1
245:6
reviewing 10:19
52:3 107:12
209:14
right 13:16 26:3
32:11 52:3 55:3
61:14 65:14 67:4
79:13 89:19 91:7
98:2 111:13,19
118:18,20 121:25
127:19 132:12
135:18 139:20
142:22 145:1
149:1 156:15
161:11 167:24
171:1 178:19
184:10 190:16
192:8 199:16,18
205:3 207:15
215:5 218:22,23
222:10 224:4
236:7 237:4
245:12

ring 46:23 47:10
roadside 47:18
232:18 233:15
role 169:20
rough 68:2
route 40:11
236:17
router 29:5
routing 17:5,25
237:9 238:11,14
238:20 244:6,8
rscs 233:15
rsu 47:18 232:21
233:10
rules 1:20 6:5 8:7
19:2,4,19 20:7
21:7 43:3 66:21
67:23 68:12,20
219:9 245:22
run 14:23
running 43:5
56:11 76:25 82:13
162:2

**s**

s 2:1 3:10 4:1,1
6:16 7:22,22 10:9
251:3
satisfy 134:18
saying 27:1 36:23
67:24 134:24
192:9 195:12,13
201:24 203:3,6,20
203:22 204:22
205:10 214:25
223:6 229:2
245:13
says 23:21 24:23
33:11 34:14,25
47:18 49:17 70:9
70:12 71:18 75:23
77:6 78:8 90:23

92:20 102:7
103:12 111:7
127:11 148:21
151:5 163:13,18
164:3 173:25
175:10 176:4
186:19 201:11
202:1,6 205:4
206:19,21 214:15
226:21 234:4
235:11 240:7,12
244:12 245:8
246:7,20 247:3
scheme 69:2
schemes 41:15
42:4,8
science 13:18,22
55:17 59:18
240:24,25
scope 133:20
140:10 153:9
167:6 199:14,15
203:24 204:11
206:11 207:6,7,11
207:12,15
screen 62:4 134:9
211:17 214:11
215:10
sealing 4:5
search 220:24
searching 223:22
second 11:16 32:1
32:5 47:17 69:5
87:24 88:4,18,18
90:24 97:15 98:1
101:24 102:13
106:6 108:20,23
128:3 140:5
149:14 151:17
153:2 154:17
158:14,14 231:14

232:16 233:2
248:1
**section** 234:24,25
235:25 237:18
240:5,8
**sector** 14:9
**security** 38:24
46:6
**see** 15:18 31:24
32:1 33:5,9 34:18
34:19 35:2,17
36:1,3 38:22 39:1
51:7 55:2 56:12
59:15 61:2 70:11
70:24 72:1,14
73:21,23,24 74:8
74:10,14 77:21
79:8 83:4,6 87:16
87:19 88:1,10
95:17 101:8,14
102:16 103:14
105:25 107:25
112:13 113:20
114:19 115:20
119:21 130:8
131:8 137:10
138:19,22 141:19
155:15 159:3,18
161:11 163:6,8
164:2,6 166:9
168:21,22 170:1,3
171:12,24 174:2
175:8,12 181:9,10
182:22 183:4,13
185:5,23 187:1
188:5 191:8,25
196:1,17 198:11
198:24 201:5
202:23 205:8
209:8 210:9,19
217:9 218:15,23

221:9 222:15
223:9,17 224:12
225:14,17 228:1
231:2,19 232:20
233:25 234:10
235:4,13 241:6
243:14 244:21
247:21
**seeking** 161:19
**seen** 41:11 52:20
69:13 167:11
**select** 54:2,12
60:14 73:2,13
**selected** 64:25
**send** 26:25 42:1
78:6 233:11
**sender** 125:19
**sending** 24:17
66:25 112:19
116:16 117:3
221:14 234:6
**sends** 106:8
125:18
**sense** 30:2 44:18
68:2 160:18,23
178:1 225:22
**sensor** 27:10,12,14
27:15
**sent** 19:3,6,6,16
22:23 23:12,15
26:20,22 27:1
35:23 36:4,11,18
36:20 42:23 46:12
65:10,24 75:12
83:21 92:9 106:3
116:17 117:5
125:9,12 126:16
126:18,19 127:12
153:20 247:6
250:14

**sentence** 34:13,24
35:13 144:19
204:23 233:9
**sentences** 34:19
**separate** 41:18
141:2 165:11
**september** 15:15
**sequence** 226:7
**series** 19:20
**serve** 50:10
**server** 49:5,5,6,9
49:19,25 50:6,20
51:23 57:16 73:19
79:6 84:19 87:24
88:3 89:10 91:11
96:25 97:15 103:9
104:6,8,16,19
105:8 107:9
108:24 111:7
112:19 119:25
128:24 155:21
160:8 168:12
178:13 236:16
241:5 247:7
**server's** 49:15
89:13 103:15
**servers** 48:21,25
49:1,13 50:1,10,21
51:23 57:9,9
178:15
**service** 47:20,21
55:19 56:18
**serviced** 23:18
**set** 26:1 48:10
50:20 51:23 140:6
168:5 169:6
180:18 182:16
185:24 195:1
196:10,21 197:25
202:12 206:10,14
207:12 216:4

225:23 226:1
227:10,16,19
235:2
**sets** 50:2 243:7
**setting** 86:11
89:25 181:12
**seven** 34:11 37:8
38:18 47:16 86:3
86:6,10,19 89:21
90:5 91:21 94:5
98:7 100:2,3,18
101:3 102:5,7
106:12 110:21
115:4,17,18,24
117:15 118:13,17
119:12 121:22
130:22 131:1,1,11
131:14,24 132:15
135:17,23,24
136:1,7,15,21
138:15 152:5
158:21 169:23
173:6 174:5 176:6
181:1,2,7,15 182:1
184:16,17,24
185:20 195:5,16
225:14 232:15
**share** 10:6 25:15
**sheet** 250:11
**shelf** 54:13 56:20
57:17 60:13,24
61:19 62:19,20
63:4,24 64:7
147:5,14
**short** 31:13,18
33:11,18 34:8
72:15,16,23,23
74:11 77:20 78:5
84:18 86:25 87:6
87:12,17 90:15
91:19 94:6 100:8

**[short - specialized]**                                          Page 34

101:7,25 106:1,7
108:18,21 111:2
113:24 121:7
122:4,6,11,16
128:4,16 160:4
178:12 219:21
232:10
**shorthand**   1:18
**shot**   75:3
**showing**   144:11
**shown**   49:21
**sic**   233:15
**sign**   250:12
**signal**   23:2 59:6
**signature**   249:16
**signed**   4:13,15
   250:20
**significant**   169:11
**similar**   24:5 25:4
   25:12 28:24 39:25
   60:10 95:10 105:9
   110:16 122:23
   128:1 131:4 132:6
   141:24 178:8
   187:8,21 188:15
   189:3 190:21
   194:17 195:6
   240:25
**similarities**   155:8
**similarity**   25:16
   104:23
**similarly**   92:16
**simpler**   25:20
**simply**   220:13
**single**   29:10 41:17
   68:6,7 214:9
   229:19
**singular**   246:15
   247:18
**sisvel**   7:17,20

**sitting**   47:1 48:1
   67:19 116:21
   117:8 241:9,21
**six**   33:8 69:2,24
   70:18,22 71:1
   74:3,19 79:13
   86:2 99:8,13
   105:2 110:21
   115:4 144:8,17
**skill**   29:16 40:24
   41:4,5 44:22 45:7
   52:21 75:14 76:2
   76:10 82:12 84:1
   85:16 97:22 103:4
   120:21 122:15
   123:4 124:18,24
   127:3,13 128:12
   128:18 130:14
   133:18 135:4
   136:9,16 137:16
   139:16 141:5,11
   142:5,9 146:2,20
   146:23 147:2
   149:9 151:10
   156:24 157:5
   158:8 179:15
   180:1 210:22
   211:6,11 214:7,9
   214:17,23 215:23
   220:16 221:6,22
   236:22 238:25
   239:23 240:2,7,14
   240:17,23 241:10
   241:23 242:8
**skill's**   123:13
   146:15 221:24,25
**skilled**   40:19 44:4
   44:13,18 53:11,23
   56:21 60:14 61:9
   63:17 64:3,14
   65:18 72:9 74:17

79:21 81:5 82:2
83:15,18 92:16
93:6 96:7 97:19
99:16 112:5 114:2
116:2 117:21
121:10 123:24
129:8 131:15
140:12 145:8
156:1 211:4 213:6
**slight**   148:23
**slightly**   76:6
   132:15 193:3
   197:19
**small**   122:12,12
**smaller**   22:7 28:21
**software**   29:18
   43:5,7,14 44:5,19
   48:25 53:14 54:13
   54:14 55:24 56:3
   56:8,11 58:9,16,18
   60:1,4,9,11,12,18
   60:25,25 61:7,17
   61:21 63:24 64:16
   65:1 66:9 72:3,11
   73:1,13 75:19
   76:2,11 78:19
   79:23 80:18,24
   81:8,17,24 82:5,13
   89:1 90:19 92:17
   93:8,13 95:3 96:3
   96:10 97:25
   101:20 104:11,14
   145:9 146:4 147:4
   147:5,14,18
   152:18 155:22
   167:9,13 210:2,17
   211:2,8 212:4
   213:5,12,24 214:3
   214:6,13,19 215:9
   215:16,25 216:15
   221:15 225:23

226:2,7 227:9,15
239:23 241:3,11
**solely**   170:23
   172:2
**solicitation**   77:10
   219:20
**solution**   235:1
   236:1,25
**solutions**   250:23
**solve**   235:3 237:23
**somebody**   71:8
**somewhat**   25:20
   27:11 45:22
   172:19
**soon**   34:4
**sorry**   7:11 16:21
   16:25 28:24 43:7
   48:7 52:2 54:4
   72:15 92:25 93:12
   94:14 97:7 115:14
   122:2 145:3
   148:14 160:20
   174:12 176:6,8
   192:12 200:8,9
   207:10,22
**sort**   42:6
**sought**   237:23
**sounds**   59:10,10
   162:9 199:17
**sources**   39:14
**space**   20:13
**speak**   8:20 16:24
   161:3
**speaking**   107:3
   164:23
**speaks**   172:11
   216:25
**specialized**   208:13
   239:23 241:10,22
   242:8

**specially** 177:14
208:13
**specific** 8:4 20:15
56:17 68:25 83:11
107:15 185:12
186:24 212:16
213:2 217:25
223:13 237:8
**specifically** 36:23
74:4 92:20 96:11
111:6 202:6
226:21 238:23
**specification**
143:9 169:18
179:19 199:20
200:7 202:9,16
204:19 208:2
216:6 217:12,17
217:20 220:22
221:3 222:21
**specifications**
134:22 217:3,25
**specifics** 10:7
**specified** 145:9
146:4 177:1
188:18 189:6
207:4 234:9
**specifies** 186:12
192:23 193:9,22
195:19
**specify** 166:22
178:23
**specifying** 160:16
161:17 184:11
195:11
**spectrum** 34:14
**speculation**
162:15 177:24
**speed** 177:15
**speeds** 49:8

**spelled** 218:9
**spelling** 7:20
**spotify** 7:18
**stack** 17:16
**stand** 172:13
**standard** 31:7
34:21,22 39:10,25
40:6 41:7,12 43:8
43:9 44:23 45:8,9
65:17 116:22
127:7,11,14,17
210:2,17 213:5
214:2,19 215:15
221:7 244:15,17
**standardized** 45:6
**standards** 18:20
26:14 38:19 40:13
40:16,18 42:22
65:22 67:20 68:7
117:9 126:11,24
127:1,2,5,20 209:2
222:13 223:17
239:6 244:18
**stands** 45:20
111:17
**start** 122:21
129:24 171:8
**started** 135:23
**starting** 11:7 70:2
73:20 76:16 92:21
93:11 109:17
110:2 111:21
135:12 138:23
148:10,16 158:20
181:6 195:16
229:8 236:5 240:6
**starts** 77:7 110:4
130:6
**state** 1:19 5:11
61:13 144:9
145:18 200:18

201:15 249:4
**stated** 144:7
171:25
**statement** 144:22
172:11 204:2
243:1
**statements** 179:24
199:23
**states** 1:1 38:23
77:9 202:18
**stating** 167:2
202:21
**station** 21:8 22:12
22:20 23:1,7,8,10
23:14 24:3,6,16,22
24:23 25:3 26:3,9
36:17 37:2 39:20
40:9 42:23 43:5
43:12,13,22 64:18
**stationary** 20:1
25:5,11,13,21
27:19 30:11,20
**steer** 183:20
**stenographic**
249:9
**step** 67:1 80:13
**stick** 130:24
189:10
**stipulated** 4:3,8,12
**stipulations** 1:21
**stop** 34:4
**store** 51:25 57:14
64:11
**stored** 64:10
**storing** 50:2 208:8
208:17,19
**street** 2:7 5:14
**strike** 40:15 44:1
44:14 45:12,12
48:7 56:1 60:8
66:25 67:13 82:20

82:20,23 83:17
96:6,23 116:25
120:17 124:19
144:20,25 145:3
157:24 164:16
188:22 203:1
207:16
**structural** 84:15
85:4,9 88:12,12
90:1,11 94:3
95:20 98:5 99:4
100:22 104:23
106:16,24 107:15
108:3 111:1,10
112:23 114:11,21
115:6,22 117:16
120:11,16,19
121:15 122:25
123:23 124:15,21
128:8 129:4
130:11 131:12
136:5 137:13,15
137:24 142:2,16
149:5,7,17 151:9
152:10 155:18,24
156:19,22 157:21
158:2 165:11
167:21 168:8
170:12,23 171:16
172:6 173:8 174:8
175:17 176:17
181:21 182:8
185:14 186:9
187:6,19 188:12
188:25 190:24
191:13 192:4,18
193:5,18 194:21
195:10 196:6,23
197:10,24 198:14
**structure** 7:9,14
71:6,13 72:20

84:6,10 85:1,14
88:23 91:24 92:2
93:18 95:24 98:13
99:17 104:16,18
107:19 110:18
123:12,21 125:3
128:19 143:14,24
144:13 145:7,22
146:2,12 147:1,8
151:21 154:1
166:4 169:16
179:14,18,22,25
180:7,9 199:4
202:15 203:23
207:13 210:4,12
216:8 217:2,19
218:13 219:5
220:13 221:23
222:23
**student** 14:5,13
**students** 50:13
**studies** 14:10
**stuff** 160:9 207:23
**subcomponents**
164:22 178:24
**subject** 144:1
**submitted** 5:21
6:23 7:4 10:23
12:1
**subnet** 28:22 29:1
**subnetwork** 28:17
28:22
**subnetworks**
28:10 29:7
**subroutines** 211:2
**subscribed** 252:14
**subsequent** 26:8
42:25 139:10
159:11,17 205:7
**subset** 151:15
212:11

**substance** 147:22
**substantial** 104:22
**succinctly** 165:5
**sufficient** 19:22
143:14,24 144:13
145:7,22 146:1
147:1,7 169:16
179:13,18,25
180:7,9 210:4
214:5,22 217:19
218:13 219:5
220:13
**sufficiently** 42:11
212:16
**suit** 68:23 180:13
205:21
**suite** 2:7 38:19,24
**sum** 166:24
**summarize** 115:2
**summarizes**
235:25 237:5
**summarizing**
236:24
**summary** 234:23
234:25 240:18
243:7,11
**summer** 14:12
**support** 19:7 21:9
44:25 65:2 82:14
103:6 166:20
169:17 217:10,21
219:4 222:16
223:18,22 230:3
234:8 244:13
245:9,11
**supported** 68:19
179:25 208:9,21
220:4
**supporting** 18:18
166:23

**supports** 81:23,25
82:11
**sure** 26:14 29:21
31:15,21 34:3
40:5 41:16 42:14
42:20 54:23 61:4
76:19,19 77:5,5
86:17,19 94:1
104:20 108:8,10
109:9 121:24
144:17 150:15,21
150:21,24 156:15
161:1 163:2 171:5
173:1 180:18
183:2 184:19
189:24 194:10
201:23 207:24
245:25
**suspect** 210:11
**sworn** 4:15 5:3
249:6 252:14
**symbol** 214:2,4,13
214:18,21 215:7
215:10
**symbols** 214:11,12
215:9
**symposia** 15:14
**synonymous** 51:1
**synonymously**
51:13
**system** 3:18,23
32:18,25 35:14
49:17 53:7 54:7
56:13,24 68:9
78:4 158:16 159:6
160:3,10,14,16
161:13,18,22,24
162:13,17,20,22
163:4 164:15,19
164:22,25 165:3,8
165:15,16,19,23

166:1,17,19,24
167:3,9,12,18
168:19,24 169:5,9
169:12,19 170:2,6
170:11,21 171:9
171:14,23,25
173:5,12,17,23,25
174:6,16,20 175:7
175:10,15 176:4
176:10,15,16,21
176:22,25 177:3
178:12,19,22
181:19,24,24
182:6,11,13
183:15 185:11,18
185:19,21 186:5
186:13,20,20
187:11,17,22,24
188:9,17,24 189:5
189:8,19 190:13
190:14,14 191:3,5
191:16,19 192:22
192:24 193:8,10
193:21,23 194:14
194:20,24,25
195:3,9,14,17,20
196:3,7,10,12,21
197:1,3,14,16
198:3,5,18,20
199:8,10 200:14
200:20 201:7,8,12
202:7 203:11,21
203:23 204:2
210:25 233:14
**systems** 51:9
231:1,8,17,24
233:17 234:4,17
235:3 241:5
242:21

**t**

**t** 3:10 4:1,1 249:1
  249:1 251:3,3
**tablet** 55:22
**take** 13:12 34:1
  46:25 47:12 67:1
  69:16 75:3 92:25
  108:10 109:6,20
  109:25 114:22
  123:6 135:21
  148:5 150:16
  166:6 213:21
**taken** 1:18 109:10
  167:16 224:15
**talk** 88:15 200:6
  231:15
**talked** 7:8 41:3
  45:14 79:10 82:16
  83:7 85:21 89:16
  110:20 153:13
  212:8 215:18
  229:7
**talking** 21:20 26:5
  63:4 86:18 87:11
  105:3 110:17
  112:8 132:9,25
  154:12 178:17
  185:5 208:16
  212:10 214:10
  225:6 244:25
**talks** 92:5 113:22
  113:23 164:24,25
  204:13 223:1
**target** 1:7 12:1
  250:4 251:1 252:1
**tcp** 17:15 48:3,8
**teach** 17:4,13
**teaching** 17:3,5
**technical** 59:11
  241:1

**technically** 19:12
**technologies** 30:5
  62:17 63:5 245:11
**technology** 18:6
  243:19
**tell** 30:9 76:21
  134:19 138:8
  154:4,7 166:21
  178:6
**telling** 62:1
**tells** 23:8
**ten** 129:23,24,24
  130:15,20 133:7
  135:13,22 138:24
  204:13 236:3
  243:6,10
**tenured** 13:17,24
**term** 18:11,14
  20:25 26:3 27:16
  27:20 29:7,10,11
  29:22 30:18 31:12
  33:25 38:14 41:15
  41:17 45:15 46:3
  46:16,18 47:2
  48:21 49:10 50:6
  50:9,15 51:17
  52:11,19 55:14
  58:5 59:6,18
  66:15,17,18 67:5
  69:1,2,23 70:18,22
  71:1 74:3,19
  79:13 82:17 83:8
  85:15 86:2 100:18
  101:3 102:7
  106:11 115:14,15
  115:25 118:10,12
  118:12,17,23
  119:3 120:23
  121:11,19 123:5
  123:14 124:1,10
  124:19,25 125:4

127:22 128:1,13
128:14,21 129:6,9
130:15,20,21
131:10,17 133:20
135:13,24 136:10
136:17,22,24
137:5,18 138:3,14
139:4,19 140:14
141:12,15,20
142:1,7,12 144:24
145:3,10 148:1,3,7
149:10,14,20
150:8,10,14,24
151:13,16 154:15
155:4,10 156:2,25
157:2,7,10,14,23
158:5,6,17,24
161:10 164:14
165:10 166:2
167:19 173:7,23
174:11,12,25
175:3,4,23 176:1
176:24 180:23,25
181:4,13,14 182:4
182:23 183:22
184:15,20,22
185:25 186:7,14
188:1 189:13,16
189:25 190:1,17
190:23 191:11,22
192:3,3,12 193:12
194:3,16 195:23
196:15,22 197:6,8
197:19,23 198:7
198:13 199:1,3
212:4,15 214:4,9
214:20 215:7
219:13 222:4
225:22
**term's** 144:1

**terminals** 35:15
  233:10 236:18
**terminology** 48:19
  52:3 67:2
**terms** 3:22 7:5,6
  12:25 14:17 15:7
  18:16 25:8 28:2,6
  35:21 38:6,11
  41:18,19,21 50:13
  51:1 66:23 69:11
  69:19 107:14
  108:12 109:13
  115:4 116:9 118:2
  121:2,25 123:10
  125:2 129:23
  132:23,24 135:18
  157:4 167:6,21
  172:5 186:5
  215:13,18 216:11
  216:24 217:4
  222:12 245:4,23
**test** 146:14
**testified** 5:3 6:16
  31:5 152:17 166:9
  181:23 182:10
  225:21 246:19
**testifying** 6:24
**testimony** 9:11
  10:9,20 12:18
  31:10 123:9
  130:17 136:14
  212:6 217:15
  225:24 226:10
  227:12 228:18
  229:17 231:25
  232:2 233:12
  241:16 242:2
  250:9,18 252:8
**texas** 1:1 12:2
  241:13

thank   7:23 30:7
  35:7 55:13 109:6
  174:13 175:1
  183:13 224:19,22
  248:6
theoretical   16:11
thereof   77:16
thing   115:17 134:6
  143:1 209:6
things   8:14 20:19
  28:10 29:13 49:8
  69:21 96:16 105:5
  119:19 129:17
  141:6 160:6,8,17
  161:19 178:2
  199:25 245:22
think   9:25 20:2
  21:2 25:13,14
  31:4 32:8 34:23
  40:23 47:14,22
  49:4 52:21 57:1
  58:7,22 62:15
  68:4 71:14 73:8
  78:3,11,25 80:7
  85:20,25 89:15
  93:20 95:7 96:1
  96:13 100:7 103:2
  103:23 104:3
  105:16,18 109:5
  109:12 110:19
  114:8,25 122:19
  124:3 125:20,23
  125:25 127:10
  133:16 135:4,22
  136:14 137:6,24
  140:7,23 141:10
  142:8,25 147:20
  148:2 149:1,13,24
  151:3,21 154:23
  156:15 159:1
  174:15 175:24,25

176:2 177:6,16,25
  180:17 181:8
  184:23 189:22
  192:25 195:12,24
  203:7 205:3
  206:11 212:8
  214:24 215:1
  217:6 218:15
  219:6 221:13
  223:20 224:11,13
  225:8 226:9
  230:16 232:5,7
  233:20 235:16
  239:3 240:3,4
  242:15 247:19
third   34:12,13
  232:4
thought   190:7
thousands   20:7
  21:3,7 43:3 66:21
  67:23,25 68:11,20
three   12:11 49:17
  49:19,21 51:14
  52:22 77:14 93:3
  129:20 219:25
  227:1
threshold   186:25
tie   179:4
tied   29:24
till   100:6
time   1:17 4:11
  11:11,18 12:4
  13:1 14:13 20:22
  31:6 32:15 34:1
  62:8 69:8 99:25
  99:25 108:10
  123:6 127:16
  164:8 172:22,25
  182:19 200:12
  218:25 224:19
  230:23 242:22

248:9 250:19
timeframe   36:19
  36:20 250:8
times   6:2 8:6
timing   36:17,22
today   5:17 8:15
  9:9 128:9 220:5
  224:21 241:10,22
today's   9:14 10:13
  234:4
tool   162:2
top   33:6 45:25
  46:9 187:14
  195:25 245:15,18
  245:21
total   185:18
touched   62:15
tough   21:18
  134:18
tower   23:4,19
  25:19
training   239:23
  241:11,23 242:8
transcript   8:21
  209:8 250:6,20
  252:5,8
transcription
  249:8
transfer   45:16,18
  45:21 46:3 48:9
  48:13 57:10 82:19
  233:1
transferred   20:3
  105:12
transferring   45:19
  57:12
transmission   42:7
  42:10 49:7
transmissions
  25:3

transmit   23:22
  39:15,19 41:24
  52:9
transmits   52:17
transmitted   19:11
  21:15 22:13,19
  23:9 24:15 26:17
  26:19 31:1 35:16
  217:9 245:24
transmitting
  21:20 50:2
trial   4:11 10:8,8
  10:20 12:18 209:8
tried   225:19
trigger   204:15
  205:19
triggered   183:12
triggers   3:24
  200:16
trouble   132:8
true   12:21 16:10
  45:1 65:4 183:18
  249:8 252:8
truthful   8:9 9:10
try   34:4 42:19,21
  53:21 69:20 70:25
  76:5,6 107:16
  129:16 145:16
  158:18 200:25
trying   29:21 31:10
  60:15 113:3
  122:24 144:25
  148:15 174:15
  177:6,16 182:19
  200:2 220:24
turn   62:2 86:6
  92:4 93:20 100:16
  107:22 158:22
  173:18 174:22
  175:1,21 176:9
  186:16 187:13

193:24 196:13
197:4,17 232:6,8
**turned**  25:24
**turning**  182:2
184:14 187:25
188:21 191:6
195:21 198:6,21
230:18
**twenty**  190:6
**two**  41:18,19,21
88:20 95:2 123:10
132:24 141:7
201:6 207:3
224:12 234:20
241:1
**type**  17:9 37:19
45:2 48:9 53:13
56:24 84:1 104:11
125:10 126:3
154:24 177:14
196:18 221:15
243:17 244:23
**typemock**  212:23
**types**  19:16 27:4
49:12 53:8 64:5
65:20,23,25 154:5
154:9
**typically**  18:19
28:22 39:16 43:4
46:11 50:20 72:22
**typo**  33:12 148:22
176:3 181:12
**tyson**  2:8 3:8 9:18
14:19 16:5,15,19
16:23 17:2,11
18:1 20:5 21:16
24:19 25:6 26:10
28:14 31:2 36:13
37:22 38:7 39:5
40:3,21 43:17
44:8 45:4 47:8

49:2 51:3 53:17
53:19 54:19 56:6
57:4 58:13 59:7
60:16 61:11 62:22
63:9,13,21 64:20
65:7 66:3 73:6
74:22 75:7,21
78:23 79:14 80:2
81:11 82:8 83:23
85:11 86:14 98:20
99:9,19 100:7,11
102:25 113:5
114:16 115:9
116:3,18 117:6,23
118:25 119:4
120:24 125:13
126:6,21 127:8
129:11 132:19
138:20 139:5,21
140:15,21 143:6
143:18 144:3
145:12 146:8
147:9 150:4 152:8
152:14 153:10
154:3 157:18
158:9 162:5,14,25
168:1 171:2 173:9
177:19,23 179:6
202:24 204:8
205:2 207:8 210:6
211:13 213:8,18
215:3 217:14
220:10 221:17
224:23 225:2,5
242:13 250:1

**u**

**u**  4:1 46:21
**u.s.**  3:13 11:9,13
**ultimate**  180:4
**ultimately**  22:18

**unbounded**
206:18
**understand**  5:19
8:9,23 9:1,7 27:3
35:18 36:25 41:7
41:13,25 42:14
44:14,24 45:8
46:17 48:17 52:15
52:16,22 59:9
61:5 67:10 71:18
72:19 74:1,17
75:15 76:2,3
79:22 81:7 83:20
84:2,13,13 85:25
91:10 93:7 96:8
97:23 103:17
107:8 113:14
114:2 118:6,11,16
119:5 120:22
121:10 122:15
123:4,25 124:18
124:25 127:5
128:12,18 129:9
130:15 131:16
132:4 133:19
134:7,23 136:16
140:12,18 141:11
142:10 143:13,23
149:10 151:11
152:1 154:8
157:11 160:10,13
161:23,25 168:19
169:7 170:6,17,20
172:15,15 178:21
179:15 180:3,5,21
180:21 199:13
201:23 204:17
207:25 222:6
236:16 239:1
**understandable**
174:14

**understanding**
28:6 31:17 33:22
39:8 49:24 69:17
70:17 119:9 122:5
123:13 124:9
128:20 130:20
136:9 137:17
139:12 143:21
144:6 145:18
146:11,18 147:11
149:19 161:4
162:16 175:14
185:8 207:24
208:3 220:12
221:19 228:12
229:22 240:11
246:20,25 247:16
**understood**  30:4
65:19 99:15 116:1
117:21 142:6,18
150:3 151:13
152:13 156:2,25
158:7 214:18
221:2 246:21
**unit**  47:18 52:12
72:17 74:12 77:20
78:6 84:18 87:1,7
91:19 94:6 101:8
101:25 106:2,7
108:19,21 111:2
113:24 118:4
121:7 128:4,16
160:5 219:21
232:18
**united**  1:1
**units**  52:4 105:5
168:10 170:16
178:13 233:15
**unpack**  70:25
**unsolicited**  77:16

**use** 25:10 34:14
35:20 56:22 61:18
62:20 63:5 67:5
69:20 103:21
127:6 132:23
133:8,24 160:14
166:1,17 171:25
181:12,19,23
184:6 187:17
188:9 205:19
211:11 213:7,12
237:24 243:18
247:10
**useful** 57:2
**user** 51:11 52:25
53:2,5,6,9,12,24
54:3,5,9,11,13,17
55:19 56:10,18,19
58:12,17,20,24,25
59:6,24 60:10,24
60:25 61:2,10,18
61:19,20 62:13,17
63:18,25 64:8,24
73:8 159:7,14,17
163:6,10,19,24,25
211:25 214:8,11
215:7
**users** 57:8
**uses** 236:14,24
**utilize** 211:4
**utilized** 21:6 37:21
64:5 65:21
**utilizing** 245:22

**v**

**v** 7:17,22 37:15
250:4 251:1 252:1
**value** 16:10 77:15
92:9 220:1 222:8
247:5
**variety** 27:5 60:12
65:20 72:25 151:8

155:18 236:18
242:20 244:13
**various** 17:16 28:6
36:9 45:17 63:18
64:4 67:21 81:3
84:20 117:11
119:23 121:7
129:2 149:5 153:7
155:23 160:6
165:24 177:10
178:14 202:20
211:3,7 215:19,23
223:16 230:25
231:9,17 234:16
245:22
**vehicle** 37:6 38:2
232:14
**vehicles** 41:1
**vehicular** 38:20
223:8
**verb** 59:20 71:19
71:21
**verbal** 8:12
**verbatim** 208:2
**verification** 14:22
**verify** 250:9
**veritext** 250:14,23
**version** 59:25
**versus** 57:22 71:19
89:24 149:12
151:25
**vicinity** 233:10
**view** 51:10 112:6
206:12 208:23
**viewed** 51:11
187:9
**virtue** 75:16 96:8
**visual** 102:13,13
131:22 132:1,4,7
133:3,13,14
134:11,15,25

135:2 137:23
140:5 141:4
152:24 159:4,10
159:12 183:11
185:12 186:22
226:24 229:12
247:15

**w**

**w** 37:15
**waco** 1:2
**waived** 4:7
**walk** 68:21 70:23
90:9 101:1,5
108:5 123:8
**walking** 103:8
**want** 13:12 18:5
33:12 41:23 42:14
47:11 51:7 53:2
61:4 66:19 68:25
69:16 86:16,17
90:10 94:2 96:2
100:5 101:5
104:20 108:1
148:4 150:12,16
158:14 172:3,23
200:3 203:4
206:20 207:5,22
207:23 213:21
230:9
**wanted** 12:15 54:4
54:9,10 64:1
70:23 73:12,14
114:9 128:5 176:3
183:19 200:23
211:16,16
**wants** 213:11,14
**washington** 2:8
**waters** 171:21
**wave** 37:15,20
38:3,21 223:9

**way** 24:18 26:21
97:11 100:10
123:3 135:9
142:11 145:1
170:9 202:2,3,3
203:3,4,8 206:12
206:20,21,22,23
207:5 212:18
220:8,19,25
223:20 227:14
237:9 243:2
245:10
**ways** 37:1 42:8
202:19
**we've** 40:2 45:24
46:13 98:12
107:15 116:8
128:9,17 130:11
130:18 131:13
137:13 142:2
153:19 155:17
156:7,19,22
167:11 210:20
216:11
**web** 51:8 57:7,9,20
82:18
**went** 222:21
**western** 1:1 12:2
241:13
**whatsoever**
243:19
**whichever** 108:6
**whichever's** 90:12
**wi** 25:15,23 27:23
34:23 239:14
244:14
**wide** 244:13
**widely** 85:24
**wilmington** 2:4
**wimax** 25:15
27:23 30:8,17

31:1 231:19,23
239:10 244:16
**wire**  52:10
**wireless**  18:18,19
20:2,19 25:5,11,14
25:22 27:19 30:12
30:20 36:22 40:25
42:24 74:13,20
75:17 76:9,13,23
77:11 78:1 79:7
79:20,25 80:6,9,19
87:12,18,24 88:5
88:19 90:15,24
93:14 94:8,18,24
95:5 97:15 98:1
101:12 106:4,8
108:19,23 111:4,8
116:6,12,14,24
117:1,11 119:23
122:4,8,12,16
128:17 149:14
151:17 153:2,5,16
153:20 155:1,20
157:3 219:22
220:6,14,18,23
221:11 222:1,3
223:8 236:18
237:13 239:8,11
239:15,19
**wireline**  236:19
**wires**  38:20
**witness**  1:16 3:3
5:2 11:6 100:9
109:9 207:10
224:22 249:5
250:8,10,12,19
**word**  25:11 35:4
66:6,7 166:2
168:21 169:5,10
169:20 236:24

**worded**  75:3
**words**  25:17 52:22
84:10 122:11
133:24 140:1
207:25
**work**  12:22 13:13
14:16 16:3,8,11,13
17:7 42:15 68:8
212:21 241:2
**worked**  17:10
**working**  16:18
28:4 38:15 40:25
41:10
**works**  39:11
**write**  225:19
**written**  174:6
**wrong**  49:1,5 96:2
135:12 147:1
183:20 212:9
225:20

**x**

**x**  1:3,9 3:1,10

**y**

**yale**  14:6,10
**yeah**  19:14 35:4
59:5 64:8 71:7
84:13 86:3 92:1
93:10,23 104:6
111:15 117:25
129:18 131:6
140:23 168:9,22
194:1 206:25
**year**  13:11 50:13
**years**  14:1 41:10
241:1
**yesterday**  9:20
172:16
**york**  1:11,11,20
5:14,14 249:4

**yup**  17:2 56:14
205:16

Texas Rules of Civil Procedure

Part II, Section 9, Evidence and Discovery

Rule 203

203.1 Signature and Changes.

(a) Deposition transcript to be provided to witness. The deposition officer must provide the original deposition transcript to the witness for examination and signature. If the witness is represented by an attorney at the deposition, the deposition officer must provide the transcript to the attorney instead of the witness.

(b) Changes by witness; signature. The witness may change responses as reflected in the deposition transcript by indicating the desired changes, in writing, on a separate sheet of paper, together with a statement of the reasons for making the changes. No erasures or obliterations of any kind may be made to the original deposition transcript. The witness must then sign the transcript under oath and return it to the deposition officer. If the witness does not return the transcript to the deposition officer within 20 days of the date the transcript was provided to the witness or the

witness's attorney, the witness may be deemed to have waived the right to make the changes.

(c) Exceptions. The requirements of presentation and signature under this subdivision do not apply:

   (1) if the witness and all parties waive the signature requirement;

   (2) to depositions on written questions; or

   (3) to non-stenographic recordings of oral depositions.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.