EXHIBIT 3

Page 1

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                    WACO DIVISION
         Case No. 6:19-cv-00179-ADA
3

4        - - - - - - - - - - - - - - - - - - - -x

         DYFAN, LLC,
5

6                              Plaintiff,

7                 -against-

         TARGET CORPORATION,
8

9                              Defendant.

         - - - - - - - - - - - - - - - - - - - -x
10
                               1540 Broadway
11                             New York, New York
12                             November 12, 2019
                               9:42 a.m.
13

14

15        DEPOSITION of BENJAMIN GOLDBERG, an
16       Expert witness in the above-entitled
17       action, held at the above time and place,
18       taken before Arthur Hecht, a Shorthand
19       Reporter and Notary Public of the State of
20       New York, pursuant to the Federal Rules of
21       Civil Procedure, and stipulations between
22       Counsel.
23
24                    *      *      *
25

1    how that is achieved with a stationary

2    wireless network, I think you said the

3    manner in how the messages are transferred

4    in the network?

5              MR. TYSON:  I object to the

6         form.

7         A.    So there are thousands of rules

8    in different handshaking processes that go

9    on, I'm more familiar with some, less

10   familiar with others.

11        Q.    Okay.

12        A.    But I've certainly -- I've read

13   lots of code in that space.

14        Q.    Okay.  Does Bluetooth have a

15   specific protocol?

16        A.    Yes.

17        Q.    Are you familiar with that one?

18        A.    Less than with the other

19   wireless protocols, 3G, 4G, things like

20   that.  I'd have -- I have reviewed a fair

21   amount of Bluetooth documentation, but

22   it's been a long time, so I'd have to

23   refresh my memory.

24        Q.    Okay.  Would you refer to

25   protocol itself as a term of art?

1          A.     Certainly.

2          Q.     And I think you mentioned that

3     there are thousands of different protocols

4     that are out there in existence?

5          A.     Well, that --

6          Q.     Or are being utilized.

7          A.     There are thousands of rules

8     that the cell phone and the base station

9     have to follow in order to support all the

10    operations that cell phones can perform.

11         Q.     If you wouldn't mind, for the

12    protocols that you are familiar with, I

13    guess we can do, like, 3G, could you

14    describe in a high level how a message is

15    transmitted?

16              MR. TYSON:  Objection.

17    Foundation.  Form.

18         A.     That's tough at a high level,

19    it's so complicated, but the idea is

20    that -- you're talking about transmitting

21    from a cell phone to somewhere else, to

22    some destination --

23         Q.     Yes.

24         A.     -- on the internet?

25         Q.     We can do that, yes, that's

1    handshaking process to set up the

2    communication parameters between the base

3    station, is really the right term, and the

4    device.

5        Q.    Okay.  And so again, talking

6    about the handshaking process, does the

7    handshaking process occur with every

8    subsequent communication between the base

9    station and the cell phone?

10                MR. TYSON:  I object to the

11        form.

12        A.    I'd have to look at the

13    individual -- individual protocol

14    standards to answer that for sure.

15                My recollection is no, once some

16    initial handshake goes on, the data can go

17    ahead and be transmitted back and forth.

18        Q.    Okay.  When that data's

19    transmitted, is there first any message or

20    information sent to the receiving cell

21    phone that a message is on the way or that

22    a message has been sent?

23        A.    That I don't recall.  There's an

24    acknowledgment process where the -- the

25    recipient has to send back a message

1      patents that we're dealing with.  Am I
2      making sense?  Was that clear?
3          A.    Yes.  When you said this field,
4      I understood it to be the field, the
5      technologies that I've identified in
6      paragraph 16.
7          Q.    Okay, okay, excellent, thank
8      you.  You had mentioned WiMAX, could you
9      please tell me briefly what that refers
10     to?
11         A.    That's another stationary
12     wireless network protocol that really
13     hasn't caught on, Bluetooth became much
14     more popular.  It was just another
15     competing protocol.
16         Q.    Okay.  But that's still
17     considered -- excuse me, WiMAX would still
18     be considered a term of art, though it's
19     not as prevalent as some of the other
20     stationary wireless network protocols?
21         A.    Correct.
22         Q.    And I believe you said that you
23     weren't entirely familiar at this moment
24     with the protocol for Bluetooth, do you
25     happen to recall how messages are

1    transmitted using the WiMAX protocol?

2              MR. TYSON:   I object to the

3         form.

4         A.    I don't.  I think what I

5    testified, Mr. Dahlgren, was that it's

6    been a long time since I looked at the

7    Bluetooth standard, and I just don't

8    recall.

9         Q.    Yes, and that's fair, I wasn't

10   trying to mischaracterize your testimony.

11             Prior to your involvement in

12   this case, had you heard of the term

13   dedicated short-range communications?

14        A.    I don't recall.  I may have, I'm

15   just not sure.

16        Q.    And since your involvement in

17   this case, do you have an understanding as

18   to what dedicated short-range

19   communications refers to?

20        A.    Are you referring to something

21   in the patent?  I'm not sure what context.

22        Q.    Yes, so let's --

23        A.    In my declaration?

24        Q.    Let's see where I can point you

25   to that most easily.  Bear with me one

1          Q.     If at any time you need to take
2     a break, please just let me know.
3          A.     Sure.
4          Q.     And I'll try to stop as soon as
5     we can.
6          A.     So prior to this case, I was not
7     familiar with the DSRC, dedicated
8     short-range communications referred to in
9     Exhibit 4.
10         Q.     And if you look at, it's page
11    seven of 35 of Exhibit 4, the provisional
12    application, the beginning of the third
13    paragraph, that's the third sentence, it
14    says however, to make use of this spectrum
15    in a mobile environment required
16    development of new communications
17    protocols.
18         A.     I see that, yes.
19         Q.     And then you see the sentences
20    following that where it discusses some
21    IEEE standard?
22         A.     IEEE 802.11 standard is what we
23    think of as Wi-Fi.
24         Q.     And so the following sentence
25    says that it was modified to allow what is

Page 35

1     known as association-less protocol
2     identified as IEEE 802.11p, do you see
3     that?
4          A.    Yeah, I believe the word is
5     association-less.
6          Q.    Association-less, excuse me if I
7     misspoke, thank you.
8                Do you know what modifications
9     were made?
10         A.    I do not, other -- beyond what's
11    explained in this paragraph.
12         Q.    Okay.  And further down in the
13    same paragraph, the sentence beginning
14    because a system is radio based, all
15    terminals can hear all messages
16    transmitted within radio range?
17         A.    I see that.
18         Q.    Do you understand hearing a
19    message to be different than receiving it?
20    I was just curious about the use of the
21    different terms.
22         A.    Yes.  Receiving a message means
23    receiving the data sent over the air that
24    is intended for that device.  Hearing, as
25    it's being used here, means being able to

Page 37

1    correctly, there's different ways that a
2    base station may notify a cell phone that
3    this message is for you?
4         A.    Yes.
5         Q.    Okay.  Are you familiar with
6    vehicle infrastructure integration, it's
7    also discussed in the provisional
8    application, I believe it's page seven of
9    35 of Exhibit 4 in the very first
10   paragraph?
11        A.    I was not familiar with it prior
12   to reading this provisional, my knowledge
13   of it is based on the provisional.
14        Q.    Okay.  So are you familiar with
15   the DSRC/WAVE, W-A-V-E, concept?
16        A.    Not beyond what's described in
17   this document.
18        Q.    And so it's fair to say that
19   you're not familiar with the type of
20   communication protocol that DSRC/WAVE
21   utilized?
22             MR. TYSON:   I object to the
23        form.
24        A.    That's correct, beyond what was
25   described in this document.

1      Q.    And given that your familiarity

2   with vehicle infrastructure integration

3   and DSRC/WAVE is based on the information

4   in Exhibit 4, provisional application, is

5   it fair to say that you couldn't opine on

6   whether those are terms of art?

7               MR. TYSON:  I object to the

8        form.

9      A.    I guess independent of what is

10  disclosed here, I would not have known

11  those to be terms of art.  The fact that

12  they are -- it refers to the DSRC as a

13  particular mode of communication, it

14  appears to be a term of art for people

15  working in that area, but I wouldn't have

16  known it independently of this provision.

17     Q.    Okay.  At the bottom of page

18  seven of 35 of Exhibit 4, there's a

19  reference to a suite of standards known as

20  IEEE 1609 wires access in vehicular

21  environments wave.

22     A.    I see that.

23     Q.    And the provisional states that

24  this suite address is security net,

25  networking and messaging, as well as

1      channel management, do you see that?

2          A.     I do.

3          Q.     What is meant by channel

4      management?

5                 MR. TYSON:   I object to the

6          form.

7          Q.     To the best of your

8      understanding.

9          A.     I'd have to -- to look at the

10     standard.  In general, it means choosing

11     the mode of communication that works given

12     the channel, the quality of the channel,

13     which is how much interference there is

14     from other sources over the air.  And also

15     who gets to transmit on what channel.

16                 So a channel is typically some

17     range of frequencies, and different mobile

18     devices could be assigned different

19     channels to transmit on, and so the base

20     station has to assign channels depending

21     on the protocol, assign channels to

22     different mobile devices.

23         Q.     Okay.  And the reference to

24     networking and messaging that is addressed

25     by this standard, is that similar to the

Page 40

1      network communications protocols that

2      we've been discussing at a high level?

3                   MR. TYSON:   I object to the

4          form.

5          A.      Again, I can't answer for sure

6      not looking at this IEEE standard, but

7      that's what I would expect, that defines

8      how the initial association between a

9      mobile device and a base station and the

10     definition of what a message actually is,

11     a packet, a message, and how to route

12     them.

13         Q.      Okay.  And the IEEE standards

14     that are identified here, those are --

15     strike that.

16                 The IEEE standards referenced in

17     the provisional application of Exhibit 4,

18     those are standards that would be well

19     known to a person skilled in the art, is

20     that fair to say?

21                 MR. TYSON:   I object to the

22         form.

23         A.      Well, I think it would have been

24     known to a person of skill in the art who

25     happened to be working in wireless access

Page 45

1      Q.    And that would hold true with

2   pretty much every type of communication

3   protocol for networks, is that fair?

4              MR. TYSON:   I object to the

5       form.

6      A.    Every standardized communication

7   protocol, yes, one of skill could read the

8   standard and understand that there is code

9   implementing that standard on the devices.

10     Q.    Okay.  And the code that would

11  be implemented on the devices for using a

12  particular protocol -- strike that, strike

13  that, I'll get back to that.

14             So we talked about communication

15  protocols, are you familiar with the term

16  transfer protocol?

17     A.    I am.  There are various

18  transfer protocols that are used for

19  transferring files, for example, large

20  blocks of data.  FTP, which stands for the

21  file transfer protocol, comes to mind.

22     Q.    Okay.  So that is somewhat

23  different than the communication protocols

24  that we've been discussing?

25     A.    It's built on top of the

1    communication protocol.

2         Q.    Okay.  And would you consider

3    transfer protocols to be a term of art?

4         A.    In the context that I was just

5    discussing, yes.

6         Q.    And the security protocols, are

7    those also protocols that, if I

8    mischaracterize what you said before,

9    please correct me, that are kind of on top

10   of the communication protocol?

11        A.    Yes, typically they define how

12   data is encrypted before being sent via

13   the communication protocols we've been

14   discussing.

15        Q.    Okay.

16        A.    As a general term.

17        Q.    Understand.  And have you heard

18   of the term back haul network?

19        A.    Say that again?

20        Q.    Back haul network?

21        A.    H-A-U-L?

22        Q.    Correct.

23        A.    It didn't ring a bell.  If it's

24   in the patents provisionals of my

25   declaration, I'd be happy to take a look,

Page 56

1          Q.    So then -- strike that.

2                If one had, like, a module of

3     software code that could perform some

4     functions, is that equivalent to an

5     application?

6                MR. TYSON:  I object to the

7          form.

8          A.    It depends what that software

9     code did.  So an application is something

10    that provides information to a user.  So

11    there's lots of software running on your

12    computer that you never see, such as the

13    operating system.

14         Q.    Yup.

15         A.    So that would not be considered

16    an application.  An application is

17    something that performs a specific

18    function to provide a service to the user.

19         Q.    Okay.  And as with user

20    interfaces, are there off-the-shelf

21    applications that a person skilled in the

22    art would be aware of that they could use

23    depending on their needs in developing

24    some type of network system?

25         A.    Certainly.

Page 57

1          Q.    Can you think of any examples of
2      applications that might be useful in the
3      context of a network?
4                MR. TYSON:   I object to the
5          form.
6          A.    Well, there are -- certainly
7      there are web browsers, for example, that
8      allow users to retrieve documents, when
9      servers interact with web servers.  There
10     are file transfer applications, I
11     mentioned FTP applications, that are used
12     for transferring files.
13               I mean, there are numerous apps
14     that you can buy from the app store that
15     cause communication between a mobile
16     device and a server, so the answer is yes,
17     there's lots of off-the-shelf applications
18     you can buy to operate in the context of a
19     network.
20         Q.    And when you refer to web
21     browsers, that would include those that
22     are configured for mobile devices versus
23     PCs?
24         A.    Certainly.
25         Q.    So Chrome on my Android phone,

Page 58

1      would that be an example of an

2      application?

3            A.    Yes.

4            Q.    So is it fair to say application

5      is a term of art?

6            A.    Yes.

7            Q.    And I think we already covered

8      this, but if I recall correctly, you said

9      that a software program encompasses more

10     than what an application encompasses, the

11     latter being limited to providing

12     information to a user, is that fair?

13                 MR. TYSON:   Objection to the

14           form.

15           A.    Yes, applications are an example

16     of software programs where they interact

17     with the user, and as I mentioned, there

18     are lots of software programs that are not

19     applications because they manage resources

20     on a device without the user being aware

21     of them.

22           Q.    And I think we may have referred

23     to this, but mobile devices can have a

24     user interface, correct?

25           A.    Mobile devices do have a user

1      Q.    And given that your familiarity

2   with vehicle infrastructure integration

3   and DSRC/WAVE is based on the information

4   in Exhibit 4, provisional application, is

5   it fair to say that you couldn't opine on

6   whether those are terms of art?

7           MR. TYSON:  I object to the

8       form.

9      A.    I guess independent of what is

10  disclosed here, I would not have known

11  those to be terms of art.  The fact that

12  they are -- it refers to the DSRC as a

13  particular mode of communication, it

14  appears to be a term of art for people

15  working in that area, but I wouldn't have

16  known it independently of this provision.

17     Q.    Okay.  At the bottom of page

18  seven of 35 of Exhibit 4, there's a

19  reference to a suite of standards known as

20  IEEE 1609 wires access in vehicular

21  environments wave.

22     A.    I see that.

23     Q.    And the provisional states that

24  this suite address is security net,

25  networking and messaging, as well as

Page 39

1       channel management, do you see that?

2           A.     I do.

3           Q.     What is meant by channel

4       management?

5                  MR. TYSON:   I object to the

6           form.

7           Q.     To the best of your

8       understanding.

9           A.     I'd have to -- to look at the

10      standard.  In general, it means choosing

11      the mode of communication that works given

12      the channel, the quality of the channel,

13      which is how much interference there is

14      from other sources over the air.  And also

15      who gets to transmit on what channel.

16                 So a channel is typically some

17      range of frequencies, and different mobile

18      devices could be assigned different

19      channels to transmit on, and so the base

20      station has to assign channels depending

21      on the protocol, assign channels to

22      different mobile devices.

23          Q.     Okay.  And the reference to

24      networking and messaging that is addressed

25      by this standard, is that similar to the

Page 40

1    network communications protocols that

2    we've been discussing at a high level?

3              MR. TYSON:   I object to the

4         form.

5         A.    Again, I can't answer for sure

6    not looking at this IEEE standard, but

7    that's what I would expect, that defines

8    how the initial association between a

9    mobile device and a base station and the

10   definition of what a message actually is,

11   a packet, a message, and how to route

12   them.

13        Q.    Okay.  And the IEEE standards

14   that are identified here, those are --

15   strike that.

16             The IEEE standards referenced in

17   the provisional application of Exhibit 4,

18   those are standards that would be well

19   known to a person skilled in the art, is

20   that fair to say?

21             MR. TYSON:   I object to the

22        form.

23        A.    Well, I think it would have been

24   known to a person of skill in the art who

25   happened to be working in wireless access

Page 67

```
 1              Just to take a step back for
 2      terminology, when I refer to a
 3      communications network, if I refer to,
 4      like, a receiving node, is it all right to
 5      use that as a generic term, it could be a
 6      cell phone or some other -- like a laptop
 7      or a desktop --
 8          A.    Yes.
 9          Q.    -- is that fair?
10          A.    Yes, I understand that.
11          Q.    So are you aware of any
12      communication protocols that would --
13      strike that.
14              Are you aware of any
15      communication protocols where the
16      receiving node is provided an advanced
17      notification that it will be receiving a
18      message?
19          A.    Sitting here, I don't recall,
20      I'd have to look at the standards for the
21      various communication protocols.
22          Q.    Okay.  And I know you mentioned
23      thousands of rules, I wasn't clear -- it
24      wasn't clear to me if you also were saying
25      there's thousands of communication
```

Page 68

```
1      protocols, if you had to just ballpark and
2      just in a rough sense, like how many
3      different communications protocols do you
4      think there are in existence?
5           A.    So if you're defining
6      communication protocol as a single -- a
7      single collection of standards that all
8      work together to implement one network
9      system, so for example LTE or 3G, so I
10     would consider each of those a protocol
11     that are -- that provide thousands of
12     rules that the devices must follow in
13     order to implement that protocol.
14              And so if the protocol is that
15     at the level of LTE or 3G or 2G, you know,
16     I don't know how many are out there, but
17     I'm aware of 20 or 30 of them.
18          Q.    Okay.
19          A.    And each one is supported by
20     hundreds or thousands of rules.
21          Q.    Okay.  So I would like to walk
22     through some of the claims in the patent
23     suit, Exhibit 1 and Exhibit 2.  And first
24     I'd like to go to claim one of the 899
25     patent.  And I want to focus on a specific
```

1      looking at -- it's line 61, the
2      application receives an indication of a
3      receipt of one or more messages, to
4      paraphrase that limitation, do you see
5      that?
6           A.    I see that passage, yes.
7           Q.    And earlier we talked about
8      messages, and messages are a term of art,
9      correct?
10          A.    Yes.
11          Q.    And messages can have specific
12     formats depending on the protocols that
13     are being used, correct?
14          A.    Yes.
15          Q.    And if a person skilled in the
16     art knew of the particular protocol being
17     used would -- strike that.
18               A person skilled in the art,
19     knowing the protocol, would then
20     understand the makeup of the message that
21     was being sent pursuant to that protocol,
22     is that fair?
23               MR. TYSON:  I object to the
24          form.
25          A.    Depending on the protocol used

Page 164

1     input is received.

2          Q.    Yes, and you see before column

3     29, it says received an indication, and

4     then later in column 30, it refers to the

5     indication?

6          A.    Yes, I see that.

7          Q.    And you're familiar with patent

8     drafting, that the first time something is

9     introduced, it's like an or a, and then

10    later it's the or said?

11         A.    Yes.

12         Q.    Okay.  So going back to the

13    question I was asking before, if you look

14    at disputed claim term 16 and what the

15    system is configured to do, much of

16    those -- strike that.

17              Going back to my earlier

18    question, if you look at disputed claim 16

19    and what the system is configured to do in

20    that wherein clause, much of that is --

21    appears to be done by kind of

22    subcomponents of the system, is that fair?

23         A.    Generally speaking, I would say

24    yes, but it talks -- where the wherein

25    clause talks about the system being

Page 165

1    configured to do something, it could refer

2    to one of the already mentioned components

3    of that system doing it.

4         Q.    That was -- you made that point

5    much more succinctly than I was able to

6    do.

7              And so again, looking at this,

8    the wherein clause recites that the system

9    was configured to achieve the limitation

10   of disputed claim term 16, it's not adding

11   any new or separate structural element to

12   the claim, is that fair?

13        A.    It's not adding any new

14   component, but rather describing what the

15   system already introduced can also do or

16   perhaps constraining what the system can

17   do.

18        Q.    Okay.  And as we discussed, that

19   system is all of the components that were

20   recited in claim one, essentially,

21   correct?

22        A.    Yes.

23        Q.    Okay.  And so here as system is

24   defined as all these various components in

25   claim one of the 899 patent, you would

Page 209

1    when you were being informed of the legal

2    standards, so I was just curious.

3         A.    I don't recall.

4         Q.    Okay.  In looking at the

5    materials listed in your declaration, and

6    you said that the only other thing you had

7    looked at aside from that was some Agis

8    trial transcript, I didn't see reference

9    to the prosecution histories of the 899

10   patent or the 292 patent, were those not

11   part of the materials that you reviewed in

12   forming your opinions?

13        A.    I don't -- that's correct, I

14   don't recall reviewing those.

15        Q.    Okay.  You don't recall or you

16   didn't or --

17        A.    I certainly didn't review them

18   in preparation for this deposition.

19        Q.    Okay.

20        A.    And to the best of my knowledge,

21   this list is complete.

22        Q.    Okay.

23        A.    So I don't -- I don't believe I

24   reviewed the file histories for the 899

25   and 292.

1       Q.    Okay.  You would agree that
2   there's standard modules of software code
3   that are well known and can be identified
4   by name as connoting sufficient structure
5   in a claim?
6           MR. TYSON:   I object to the
7       form.
8       A.    I mean, I'd have to -- I guess
9   I'd have to see the context, but if they
10   were identified by name in a claim, I
11   suspect that would provide some -- some
12   structure, but I'd have to look at the
13   actual example.
14      Q.    And I don't know if, like for
15   example, a Bluetooth communication
16   protocol would be considered like a
17   standard module software code identified
18   by name, that might be a bad example.
19      A.    I'd have to see the context, but
20   as we've discussed, you know, reciting the
21   Bluetooth communications protocol does
22   inform one of skill about certain features
23   of the Bluetooth --
24      Q.    Okay.
25      A.    -- system.

Page 211

1        Q.    And are there classes of
2   software subroutines that are well known
3   to perform various functions that a person
4   skilled in the art could utilize if they
5   were developing a network?
6        A.    Yes, so one of skill would know
7   about various resources for getting
8   software for network communications.
9        Q.    And are there common graphic
10  libraries with corresponding APIs that a
11  person with skill in the art can use to
12  generate images on display?
13             MR. TYSON:   I object to the
14        form.
15        A.    If a developer knew what they
16  wanted -- what images they wanted to
17  generate on the screen, then there are
18  common libraries that can be used to do
19  that.
20        Q.    And they would have a
21  corresponding application program
22  interface that could be used in connection
23  with that?
24        A.    Yes, most graphics libraries or
25  user interface libraries provide APIs that

1      can be used by a developer.

2           Q.     Okay.  You had mentioned this

3      Agis matter, do you recall opining on the

4      term CPU software?

5           A.     I don't recall, I didn't notice

6      that in my review of my testimony in that

7      case.

8           Q.     We talked, I think, a little bit

9      before, and correct me if I'm wrong, we're

10     talking about applications and programs,

11     and I believe applications were a subset

12     of programs, is that correct?

13          A.     Yes.

14          Q.     Are you aware that courts have

15     found that the term program is

16     sufficiently specific so that it does not

17     fall under means plus function?

18          A.     I'm not -- I'm not aware one way

19     or the other, I don't know the case law

20     regarding that.

21          Q.     Okay.  Do you recall doing work

22     for a party, I believe it's called

23     Typemock?

24          A.     Yes.

25          Q.     Do you recall opining on a

Page 213

1    computational apparatus?

2         A.    I don't have any specific

3    recollection.

4         Q.    And would you agree that there's

5    standard modules of software that a person

6    that's skilled in the art would know to

7    use to generate a display?

8              MR. TYSON:   I object to the

9         form.

10        A.    Yes.  Again, if the developer

11   knows what he wants to display, then there

12   are software modules he can use to

13   generate the display of the content that

14   he wants to display.

15        Q.    And would you agree that also

16   applies to outputting a message that's

17   based on information that's received?

18             MR. TYSON:   I object to the

19        form.

20        A.    Well, if the developer knows

21   exactly how they want to take information

22   that's been received and generate a

23   message from that, then the developer

24   would know how to do that using a software

25   library.

Page 214

1      Q.     Do you recall opining that a

2  symbol generator is a standard module

3  software code that was well known in the

4  art, and that the term symbol generator

5  would have been sufficient to identify

6  these modules of software code to one with

7  skill?

8      A.     So I recall opining that a user

9  -- one of skill using the term single

10  generator, we're talking about displaying

11  symbols on the screen, that the user could

12  figure out how to generate symbols, a

13  symbol generator, but using a software

14  library.

15      Q.     What it says, and probably I

16  didn't get copies of this, furthermore,

17  one of ordinary skill in the art would

18  have understood that a symbol generator as

19  a standard module software code that was

20  well known in the art and that the term

21  symbol generator would have been

22  sufficient to identify these modules of

23  program code to one of ordinary skill in

24  the art, so I don't think that you were

25  saying that one would then have been able

1    to create the program code, I think you

2    said it was already available?

3              MR. TYSON:   Objection.

4       Foundation.

5         A.    Right, what I said was that --

6    well, you read it, but upon reading the

7    term symbol generator, the user would then

8    know, oh, I can go get this piece of

9    software that displays symbols on the

10   screen, which is what the claim symbol

11   generator does.

12        Q.    Did you consider whether any of

13   the claim terms that are recited on your

14   declaration, whether any of those were

15   well known to art and refer to standard

16   modules of software code?

17        A.    Well, I did for some of the

18   terms that we talked about, such --

19   related to the various communications

20   protocols.  In the Agis case which you're

21   reading from, I was asked by Counsel to

22   opine on whether a person upon -- a person

23   of skill upon reading the various claim

24   elements would be able to identify

25   software that accomplished the functions

                                    Page 216

1          listed in the claim, and that was from
2          Counsel in the Agis case.
3               Q.    Okay.
4               A.    In this matter, as I set forth
5          in my declaration, I was asked to
6          determine if the patent specification of
7          the claims themselves disclosed the
8          structure for performing the functions in
9          the claims, and so it was a different
10         exercise, but certainly for some of the
11         claim terms that we've discussed,
12         including internet protocol, Bluetooth
13         protocol, you know, I knew immediately
14         that that corresponded to certain
15         libraries of software that one could have,
16         that one could get.
17              Q.    You can't include that
18         information in your declaration, however,
19         correct?
20              A.    Well, I was not asked to opine
21         on the limitations regarding Bluetooth or
22         internet protocol.
23              Q.    Even as they were contained in
24         some of the disputed claim terms?
25              A.    Well, my declaration speaks for

Page 217

1    itself, and that is I was asked to

2    determine whether there was structure in

3    the claims or in the specifications for

4    the claim terms as a whole that I listed

5    in my declaration.

6         Q.    Do you think that it was a

7    mistake not to examine some of the

8    communication protocols and how messages

9    were transmitted to see if it provided

10   support for the functionality recited in

11   the claims, and to the extent that

12   specification was recited in the

13   provisional or in the 197 application?

14              MR. TYSON:   I object to the

15        form.  Mischaracterizing testimony.

16        A.    I was asked to review the claims

17   and the specification for certain

18   limitations, and asked to opine on whether

19   there was sufficient structure disclosed

20   in the claims and the specification to

21   support the claim functionality that I was

22   asked to opine about.

23              Certainly I would have

24   considered citations within the

25   specifications of the claims to specific

1    protocols, for example, I would have

2    considered those in forming my opinions.

3             As you'll read in my

4    declaration, the bases for my opinions was

5    not due to ignoring any communications

6    protocols.

7        Q.    I'm just curious, you know, for

8    example, when the Bluetooth communication

9    protocol was explicitly spelled out in the

10   claim that you didn't, I guess, review

11   parts of that in the process of forming

12   your opinion regarding whether there was

13   sufficient structure in the claim for

14   performing the function.

15       A.    I think you'll see in my

16   declaration that my opinions were not

17   based on what the Bluetooth protocol did

18   or did not provide, but rather what was

19   disclosed in the patent.

20       Q.    Okay.  And which also -- I mean,

21   the patent did disclose Bluetooth

22   communication protocol, right?

23       A.    Right, you see that my opinions

24   are not related to that aspect.

25       Q.    Okay.  And at this time, since

Page 219

1    you haven't recently reviewed the
2    Bluetooth communication protocol, you
3    can't opine on whether or not it actually
4    would provide any support for the claims
5    having sufficient structure, is that fair?
6         A.    No, I don't think that's fair.
7         Q.    So without knowing the Bluetooth
8    communication protocol and, for example,
9    the procedures and rules and details for
10   exchanging messages, you can still --
11   maybe it's best if I give an example.
12              So for example, it was disputed
13   claim term eight, I'm looking at the 899
14   patent, claim one, it's lines 58 through
15   64, and it was an application configured
16   for execution by a plurality of mobile
17   devices.  The application when executed
18   configured to and then for disputed claims
19   were made received indication of a receipt
20   without solicitation from the at least one
21   broadcast short-range communications unit
22   and via the Bluetooth wireless
23   communications protocol of one or more
24   messages including the address portion and
25   the identifier including at least three

Page 220

1    fields and at least one value.

2          And if I recall, you took issue

3    with the receiving and indication of

4    receipt as not being supported, and based

5    on our discussion of today, it seems that

6    the Bluetooth wireless communications

7    protocol could potentially have that be

8    part of the way messages are handled in a

9    network?

10          MR. TYSON:  Objection to the

11      form.

12      A.    So my understanding is that

13    there's not sufficient structure to simply

14    refer to the Bluetooth wireless

15    communications protocol and assume that

16    the one of skill reading the claim would

17    need to dig through every aspect of the

18    Bluetooth wireless communications protocol

19    to figure out if there's any way to

20    receive an indication of a receipt, even

21    though it's not disclosed in the patent

22    specification, and so I did not dig into

23    the Bluetooth wireless communications

24    protocol trying to search for every

25    possible way that an indication of a

1    receipt could be received, but rather

2    understood that that should be disclosed

3    in the patent specification.

4        Q.    And so it's not your opinion

5    that the hypothetical person of ordinary

6    skill in the art would have known the

7    Bluetooth standard, it's your opinion that

8    they would not have dived through it to

9    see if the particular functionality

10   recited in the disputed claim made was

11   part of the Bluetooth wireless

12   communications protocol, which we, I

13   think, agreed required that both the

14   sending node and receiving node have some

15   type of software so that they can abide by

16   that protocol?

17            MR. TYSON:   I object to the

18       form.

19       A.    My understanding is that the

20   patentee is required to disclose such -- a

21   claimed element like this without

22   requiring one of skill to be able to

23   construct the structure for this element

24   based on one of skill's knowledge, in this

25   case, one of skill's knowledge of the

Page 222

1      wireless communications protocol.

2           Q.    You agreed earlier that

3      Bluetooth wireless communication protocol

4      is a term of art, correct?

5           A.    Yes.

6           Q.    Okay.  Okay.  I understand your

7      position, I don't necessarily agree, but I

8      don't know if there's value in belaboring

9      the point.

10          A.    Right.

11          Q.    But it did occur to me that

12     there were certain disclosures in terms of

13     standards and communication protocols and

14     the like in the provisional that you did

15     not discuss any detail to see if they may

16     provide support for the claim limitations,

17     is that fair that you did not go through

18     that exercise?

19          A.    You know what?  I certainly did

20     for the provisional, and for the

21     specification of the 197, I went through

22     the exercise of determining what exactly

23     was identified as structure and how it

24     correlated to the claims.

25          Q.    But I guess my point is that you

Page 223

1      did not go further when it talks about,

2      for example, modifying IEEE 802-11 to

3      be -- to allow what is known as a

4      association-less protocol --

5           A.    Association-less?

6           Q.    I keep saying that, association-

7      less protocol, correct.  There was also

8      the IEEE 1609 wireless access in vehicular

9      environments wave, and I didn't see much

10     of -- any discussion of that.

11          A.    Correct.

12          Q.    You know, with some of the

13     claims reciting very specific

14     communication protocols, you know, such as

15     Bluetooth.  You did not go through the

16     exercise of diving into those various

17     standards or protocols to see if reference

18     to them was enough to provide support for

19     the claim limitations, is that correct?

20          A.    I -- I think the way to say it

21     is I did not dive into those protocols

22     searching for support for a particular

23     function claimed in the 899 or the 292

24     patent.

25          Q.    Okay.

Page 224

1          A.     And I'll note the provisional

2      only mentions Bluetooth in passing.

3          Q.     I guess that begs the question,

4      it's still mentioned, though, right?

5          A.     It does appear once.

6          Q.     And it does appear in some of

7      the -- certain claims as well, correct?

8          A.     Of these later patents?

9          Q.     Yes.

10         A.     Certainly.

11              MR. DAHLGREN:  Yes.  I think I

12         just need a minute or two to see if I

13         have anything left, I think I may have

14         covered it all.

15              [A recess was taken.]

16              MR. DAHLGREN:  Unless your

17         Counsel has any questions for you, I

18         don't have any further questions at

19         this time, and thank you very much,

20         Dr. Goldberg, I appreciate your

21         participation today.

22              THE WITNESS:  Thank you.

23              MR. TYSON:  I've just got a

24         couple, couple of questions.

25              MR. DAHLGREN:  Then I may