# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | |
|---|---|
| DYFAN, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>TARGET CORPORATION,<br><br>    Defendant. | C.A. No. 6:19-cv-00179-ADA |

## DEFENDANT'S REPLY CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

                                                                       **Page**

I. Introduction ..................................................................................................................... 1

II. Means Plus Function Limitations (Terms 6-30) ............................................................. 2

    A. *Williamson* Overruled Earlier Cases Finding that the § 112, ¶ 6 Inquiry Ends if a Limitation Does Not Use a Nonce Word ................................................. 2

    B. Controlling Precedent Requires Examination of the Particular Recited "Code" and "System" Functions to Determine Whether Sufficiently Definite Structure is Claimed ..................................................................................... 5

    C. Dyfan's Evidentiary Arguments Are Irrelevant and Lack Substance ...................... 6

        1. The Prosecution History Does Not Support Dyfan's Arguments ............... 6

        2. The Availability of Off-The-Shelf Software Is Only Relevant If It can Perform the Particular Recited Function Without Special Programming ... 7

III. The Constructions of Terms 1-5 Should Not Be Divorced From the Teachings of the '584 Provisional and '197 Application .......................................................................10

        1. "identifier including at least three fields" ('899 cl. 1) (Term 3) ............... 10

        2. "an address portion" ('899 cls. 1, 7, 9, 11, 30; '292, cl. 4) (Term 4) ........ 11

        3. "shopping mall" ('899 cls. 2, 7, 12, 30; '292 cls. 4, 13, 26, 29) (Term 2) 13

        4. "building including a plurality of facilities therein" ('292 cls. 1, 15, 28) (Term 1) ................................................................................................... 13

        5. "output, via the at least one mobile device" / "causing to be output, via the at least one mobile device" / "cause to be output, via the at least one mobile device" ('899 cls. 1, 7, 9, 11; '292 cls. 1, 15, 28) (Term 5) .......... 14

# **TABLE OF AUTHORITIES**

**Cases**

*Advanced Ground Info. Sys. v. Life360, Inc.*, No. 14-80651, 2014 WL 12652322
(S.D. Fla. Nov. 21, 2014), *aff'd on other grounds*, 830 F.3d 1341
(Fed. Cir. 2016) ................................................................................................. 6, 9-10

*Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*, 382 F.Supp.3d 586
(E.D. Tex. May 10, 2019) .................................................................................. 5, 9-10

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572 (Fed. Cir. 1996) ...................... 14

*Global Equity Mgmt. (SA) Pty. Ltd. v. Expedia, Inc.*, 2016 WL 7416132
(E.D. Tex. Dec. 22, 2016) ......................................................................................... 5

*King Pharms. Inc. v. Purdue Pharma L.P.*, 718 F. Supp. 2d. 703 (W.D. Va. 2010) ........................ 4

*Kit Check, Inc. v. Health Care Logistics, Inc.*, No. 2:17-CV-1041,
2019 U.S. Dist. LEXIS 148398 (S.D. Ohio Aug. 30, 2019) ............................................ 5, 9-10

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351
(Fed. Cir. 2008) ............................................................................................... 13-14

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ........................................ 1-3, 5

*Zeroclick, LLC v. Apple Inc.,* 891 F.3d 1003 (Fed. Cir. 2018) ................................................ 2, 5

**Statutes**

35 U.S.C. 112 .................................................................................................................. 1

**I.      INTRODUCTION**

As reflected in Dyfan's Responsive Claim Construction Brief (Dkt. 41, "Dyfan Resp. Br."), the bulk of the parties' disputes relate to whether a series of terms should be construed according to 35 U.S.C. 112, ¶ 6. For these 25 terms, Dyfan's arguments reflect:

(i) a misunderstanding and misapplication of the law, and

(ii) evidentiary arguments that are red herrings intended to distract from the unrebutted evidence that supports Target's constructions.

For the § 112, ¶ 6 limitations, Dyfan first accuses Target of "stretch[ing] the case law far beyond its limits" and "mischaracterizing the law." It is Dyfan, however, that fails to address head-on the applicable case law, and Dyfan instead focuses on district court cases decided before the Federal Circuit's seminal *Williamson* decision. Then, rather than applying the applicable law to the actual claim language, it is Dyfan that relies on non-precedential, fact-specific cases, without identifying any substantive *facts* in the present, atypical, case that would necessitate constructions different than those supported by Target's unrebutted evidence.

Second, Dyfan's evidentiary-focused arguments sidestep, rather than substantively rebut, Target's analysis of the intrinsic record and the opinions of its expert. For example, Dyfan accuses Target's expert, Dr. Goldberg, of "egregious" conduct that Dyfan contends should entitle his opinions to "little to no weight." According to Dyfan, the Court should disregard Dr. Goldberg's testimony because it does not reflect an analysis of the patent file histories or existing wireless communication standards. Notably, however, Dyfan fails to identify any statement in the file histories or wireless communication standards that would have necessarily impacted Dr. Goldberg's opinions. With respect to the file histories, Dyfan only points to its prosecution counsel's self-serving statement that Dyfan did not "intend" the functional limitations to be governed by § 112, ¶ 6, which the Federal Circuit has found to be legally irrelevant to this fact-

1

intensive inquiry. *See* Target Responsive Brief, Dkt. 40 ("Target Resp. Br.") at 4. Likewise, with respect to the existing wireless communication standards, Dyfan fails to connect the dots between any particular disclosure of a standard and any single disputed special-purpose computer function actually recited in the Asserted Claims. Moreover, like the file histories, Dyfan ignores controlling precedent that such standards are again legally irrelevant absent a showing that such extrinsic disclosure is specific to performing the entirety of the particular disputed functions recited in the claims.

In other words, when one digs below the surface, it becomes clear that Dyfan's Responsive Brief is heavy on bluster, but light on substance.

## II.     MEANS PLUS FUNCTION LIMITATIONS (TERMS 6-30)

### A.     *Williamson* Overruled Earlier Cases Finding that the § 112, ¶ 6 Inquiry Ends if a Limitation Does Not Use a Nonce Word

The Federal Circuit's seminal *Williamson* decision changed the landscape with respect to a § 112, ¶ 6 claim construction analysis. Prior to *Williamson*, courts simply concluded that § 112, ¶ 6 did not apply if the subject term was not a nonce word, but the Federal Circuit expressly changed the analysis:

> Our opinions in *Lighting World*, *Inventio*, *Flo Healthcare* and *Apple* have thus established a heightened bar to overcoming the presumption that a limitation expressed in functional language without using the word 'means' is not subject to §112, para. 6. **Our consideration of this case has led us to conclude that such a heightened burden is unjustified and that we should abandon characterizing as 'strong' the presumption that a limitation lacking the word 'means' is not subject to §112, para. 6.** That characterization is unwarranted, is uncertain in meaning and application, and has the inappropriate practical effect of placing a thumb on what should otherwise be a balanced analytical scale. It has shifted the balance struck by Congress in passing §112, para. 6 and has resulted in a proliferation of functional claiming untethered to §112, para. 6 and free of the strictures set forth in the statute . . . Henceforth, we will apply the presumption as we have done prior to *Lighting World*, without requiring any heightened evidentiary showing and expressly overrule the characterization of that presumption as 'strong.' We also overrule the strict requirement of 'a showing that the limitation essentially is devoid of anything that can be construed as structure.' The standard

is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure . . . **When a claim term lacks the word 'means,' the presumption can be overcome and §112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'**

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348-49 (Fed. Cir. 2015) (emphasis added). The upshot of Williamson is that the Court should look at both the disputed term and related function to determine whether the term recites sufficient structure to perform the function.

While Dyfan pays lip service to *Williamson*, it does not follow the *Williamson* framework and, instead, focuses on the term (*e.g.*, code) without considering whether that term has sufficient structure to perform the recited function. *See, e.g.*, Dyfan Resp. Br. at 17-18, 25. Dyfan remarkably makes *no* reference to the actual claimed functions performed by the claimed "code" (Terms 6-15 and 20). Instead, Dyfan argues that "the Federal Circuit and numerous district courts have held post-*Williamson* that 'code' and 'application' were not substitutes for 'means'", *i.e.* are not "nonce" words. *Id*. at 18-20. Dyfan's "form over substance" nonce-word argument is what the Federal Circuit rejected in *Williamson*. *Williamson*, 792 F.3d at 1348-49.

Target does not argue that "code" (or "application" or "computer code" variations) is necessarily a "nonce" word. *See* Target Op. Br. at 9-20; Target Resp. Br. at 3-8. Indeed, Target acknowledges that there may be "certain circumstances" in which "'code,' as recited in a claim, may constitute sufficient structure to perform a function." Target Op. Br. at 14. However, as Target has briefed extensively, in the Asserted Claims, "code" does not connote sufficient structure to perform any of the claimed functions in dispute. *Id*.

Dyfan similarly misapplies *Williamson* to the "system" limitations (Terms 16-19 and 21-30). Dyfan again makes *no* reference to *any* of the actual claimed functions to be performed by the system limitation and, instead, hinges its substantive argument on the idea that the "claimed

3

systems" include structural components such as "a building, broadcast short-range communication units, a server, and an application or code executable by mobile devices in communication range of one or more of the broadcast short-range communication units", rather than nonce words. Dyfan Resp. Br. at 25-26. Again, Dyfan's nonce-word argument falls short. Regardless of whether "system" or the other recited limitations are nonce words, a proper §112, ¶ 6 analysis should be premised on whether the claimed system recites sufficiently definite structure for performing the claimed function. Target has explained why the claimed system does not (including through its expert witness); and Dyfan still has not provided an explanation for why or how the system does. In fact, Dyfan has not even taken a position on which component or combination of components of the system that it contends performs the recited functions. Target Op. Br. at 20-23; Target Resp. Br. at 8-10, Exh. J at 168:16-169:21[1].

As extensively briefed by Target and wholly ignored by Dyfan, the Asserted Claims are not typical claims. Indeed, the facts of this case easily distinguish it from any case cited by Dyfan in which the Court found § 112, ¶ 6 does not apply. Here, and as detailed in Target's Opening and

---

[1] Dyfan appears to argue that the word "wherein" adds a "presumption" that the "system" Terms are not governed by §112, ¶6. Dyfan Resp. Br. at 25-26. To the extent that Dyfan is making this argument, Dyfan's failure to submit any evidence contrary to Target's evidence that each of the "system" Terms recite an additional function to be performed and not simply the result of the preceding claim limitations, renders Dyfan's argument moot. *King Pharms. Inc. v. Purdue Pharma L.P.*, 718 F. Supp. 2d. 703, 712-713 (W.D. Va. 2010) (the relevant inquiry is "whether the 'wherein' clause in [the claims] expresses an inventive component or merely the result of the delineated limitations") (internal citations omitted). *See, e.g.,* Target Op. Br. at 20-23, Exh. I at ¶¶122-171; Target Resp. Br. at 8-10, Exh. J at 166:16-167:14 ("[B]y using 'system' to perform some feature, support some claim feature, you can't tell or it didn't specify which component is performing or supporting that feature."), 176:12-177:5, 184:6-13, 185:8-21 ("[T]he reference of the system here is referring to, in total, all the components of the system already laid out in [the claim], and this provides an additional function of that system."), 186:4-13 (same), 187:2-12 (same), 188:6-20 (same), 190:20-191:5 (same), 191:9-19 (same), 192:17-24 (same), 193:1-10 (same), 193:15-23 (same), 194:13-195:3 (same), 195:7-20 (same), 196:2-12 (same), 196:18-197:3 (same), 197:7-16 (same), 197:21-198:5 (same), 198:12-20, 199:2-10 (same).

4

Responsive Briefs, this case is set apart by, (i) the purely functional nature of the disputed "code" and "system" limitations, (ii) the length of the particular claims and the functional phrases, (iii) the applicants' obvious prosecution decision to entirely divorce the claimed functions, especially those in dispute, from the clearly stated invention in the '584 Provisional, and (iv) the applicants' reliance on language from the '197 Application, which attempts to distinguish any mention of structure from the invention.  Target Op. Br. at 1-7, 9, 15-23; Target Resp. Br. at 2-3, 5-10.  These distinctions are relevant to the claim construction analysis, which does not end with a nonce-word inquiry, as suggested by Dyfan.

> B.  **Controlling Precedent Requires Examination of the Particular Recited "Code" and "System" Functions to Determine Whether Sufficiently Definite Structure is Claimed**

In the context of computer-implemented functional claiming, the first step of the § 112, ¶ 6 analysis *requires* a fact-dependent determination as to whether (i) the particular recited function in dispute is a special-purpose computer function, and, if so, (ii) whether the claim itself recites sufficiently definite structure to perform this particular recited function entirely (*e.g.*, "whether the recited objectives and operation of the code connote sufficiently definite structure").  *See, e.g., Williamson*, 792 F.3d at 1348-1349; *Zeroclick, LLC v. Apple Inc.,* 891 F.3d 1003, 1005 (Fed. Cir. 2018).[2]  Accordingly, Dyfan's Opening and Responsive Briefs invite error by suggesting the Court

---

[2] *See also, e.g.*, *Kit Check, Inc. v. Health Care Logistics, Inc.*, No. 2:17-CV-1041, 2019 U.S. Dist. LEXIS 148398, at *19 (S.D. Ohio Aug. 30, 2019) (finding "information processing system" limitations as governed by § 112, ¶ 6 when the recited functions were special purpose computer functions and finding a "computer-executable instructions" limitation as not governed by § 112, ¶ 6 where the claims recited "how the processors receive [the claimed] information" and the "objectives and operations" of the instructions); *Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*, 382 F.Supp.3d 586, 615-616, 629, 635 (E.D. Tex. May 10, 2019) (finding various "code" limitations as governed by §112, ¶ 6 where the particular recited functions were special purpose computer functions and the claims did not recite the "objectives and operations" of the code); *Global Equity Mgmt. (SA) Pty. Ltd. v. Expedia, Inc.*, 2016 WL 7416132, *29-30, 31, 32-33 (E.D. Tex. Dec. 22, 2016) (finding various "program code" limitations as governed by §112, ¶ 6 where

can determine the Terms are not means-plus-function limitations without even considering the actual claimed functions of "code" and "system." *See* Dyfan Op. Br. at 12-16; Dyfan Resp. Br. at 17-26 (both failing to analyze the claimed functions).[3] Simply put, Dyfan has failed to rebut Target's function-by-function analysis that is supported by the intrinsic and extrinsic evidence of record (Target Op. Br. at 1-7, 9, 15-23, Exh. I at ¶¶ 28-171), and has waived the opportunity to do so in its Reply or at the *Markman* hearing.

### C. Dyfan's Evidentiary Arguments Are Irrelevant and Lack Substance

#### 1. The Prosecution History Does Not Support Dyfan's Arguments

Dyfan's bluster in its Responsive Brief includes several accusations that Target's expert, Dr. Goldberg, has engaged in "egregious" conduct in rendering his opinions and that his opinions should be entitled to "little to no weight," because he did not review the file histories of the Patents-in-Suit. Dyfan Resp. Br. at 22-23, 26. Yet, Dyfan does not identify any substantively-relevant statement from the prosecution histories that Dr. Goldberg allegedly should have considered to determine whether the claims or specification of the priority applications disclose sufficiently definite structure for performing the various identified functions. The only statement Dyfan identifies is its own self-serving statement as to its "intent", but the Federal Circuit has deemed statements of this type to be legally irrelevant. *Id.*; Target Resp. Br. at 4 (internal citations

---

the particular recited functions were special purpose computer functions and where the claims did not recite how such particular functions were accomplished); *Advanced Ground Info. Sys. v. Life360, Inc.*, No. 14-80651, 2014 WL 12652322, *6-7, 8 (S.D. Fla. Nov. 21, 2014) (finding various "CPU software" limitations as governed by §112, ¶ 6 where the particular recited functions were special purpose computer functions and the claims did not recite how such particular functions were accomplished), *aff'd on other grounds*, 830 F.3d 1341 (Fed. Cir. 2016).

[3] Notably, Dyfan has not provided *any* evidence that (i) commercial, off-the-shelf software, nor (ii) existing wireless communication protocols, were known or available to perform *any* of the actually recited functions; instead, it relies on mischaracterizations of Dr. Goldberg's testimony. Dyfan Resp. Br. at 21-22, 25. Dr. Goldberg's testimony in his declaration, and during his deposition, is consistent and conclusive that this was not the case. *See* § I.C.2 below.

omitted). Accordingly, Dyfan has not identified how the Court's analysis should differ from Dr. Goldberg's based on statements in the prosecution histories.

        2.        The Availability of Off-The-Shelf Software Is Only Relevant If It can Perform the Particular Recited Function Without Special Programming

Dyfan makes much ado of Dr. Goldberg's "admissions" that "a POSITA would have been aware of various commercial off-the-shelf software that could perform many of *these functions*" and "that there were a limited number of communication protocols that dictated the software code that would be used to achieve *the alleged functions*." Dyfan Resp. Br. at 21-22, 26 (emphasis added). As a threshold matter, Dyfan's arguments are misleading, at best. While Dyfan suggests that Dr. Goldberg testified about the availability of off-the-shelf software to perform the claimed functions (*see, e.g.*, Dyfan Resp. Br. at 21-22), the cited testimony was about subject matter that was wholly disconnected from the functions in the disputed terms (Terms 6-30) in the Asserted Claims. *See e.g.,* Exh. J at 56:1-57:19 (responding to question about "examples of applications that may be useful in the context of a network" rather than for performing the claimed functions in dispute). Dyfan has not provided *any* evidence that (i) commercial, off-the-shelf software, or (ii) existing wireless communication protocols, were known or available to perform the entirety of any of the actually claimed functions in the "code" or "system" terms in dispute. *Id*.

Indeed, Dyfan does not identify any particular structure in any off-the-shelf software or existing wireless communication standard specification (*e.g.*, Bluetooth specification mentioned in passing in the '584 Provisional) that is specific to performing the entirety of any of the particular recited functions of disputed Terms 6-30. Dyfan Resp. Br. at 20-26; Target Resp. Br. at Exh. J at 223:12-224:10. For example, Dyfan does not point to any particular structure in any off-the-shelf software, or existing wireless communication standard specification, that is specific to performing the entirety of any of the particular recited functions of the representative "code" and "system"

7

terms presented in Target's Opening Brief:

- "code" configured to "cause to be output, via the at least one mobile device, the visual information based on the particular location-relevant information" "[in response to /after] the receipt of the response message including the particular location-relevant information" ('899 cls. 1, 7, 9, 11; '292 cls. 1, 15, 28) (Terms 10, 11, 12);

- "code" configured to "cause to be output, via the at least one mobile device, the second visual information based on the second location-relevant information" (i) "[in response to /after] the receipt of the response message including the second location-relevant information", (ii) "after the first visual information is caused to be output based on the first location-relevant information," and (iii) "after the at least one mobile device is moved in the building" ('292 cls. 1, 15, 28) (Terms 13, 14, 15);

- "system" configured to "cause" "subsequent output of different visual information" at least (i) "after the indication of the user input is received", and (ii) "after an initial instance of the output of the visual information is caused" ('899 cls. 1, 7, 9, 11, 25; '292 cl. 12) (Terms 16, 17, 21, 28, 29); and

- "system" configured to "automatically cause to be output" (i) "the first visual information" "without requiring communication of the [at least one / first] message with the first broadcast short-range communications unit after the receipt of the indication of the receipt of the one or more first broadcast messages" and (ii) "the second visual information" "without requiring communication of the [at least one / second] message with the second broadcast short-range communications unit after the receipt of the indication of the receipt of the one or more second broadcast messages." ('899, cls. 18, 19; '292 cls. 1, 8, 15, 21, 28) (Terms 23, 24, 25)

*See, e.g.*, Dyfan Resp. Br. at 20-26; Target Op. Br. at 15-23; Target's Resp. Br. at Exh. J at 137:12-138:9, 142:14-143:12, 146:10-147:18, 149:2-150:8, 150:9-151:21, 155:16-156:7, 156:17-157:8. Likewise, Dr. Goldberg's unrebutted declaration and deposition testimony is consistent and conclusive that no (i) commercial, off-the-shelf software, nor (ii) existing wireless communication protocols, were known or available to perform the entirety of *any* of the actually recited functions in dispute, such as without further unclaimed configuration or without further unclaimed informational inputs and/or boundaries. *See, e.g.,* 72:24-73:15; 213:4-25; 217:6-218:6; 225:19-230:8.

Moreover, off-the-shelf software, including commercial software for existing wireless

8

communication protocols, is *only* relevant to the means-plus-function determinations *if* the particular recited function at issue is achievable in its entirety without special programming. *See, e.g., Kit Check*, 2019 U.S. Dist. LEXIS 148398, at *23-24 ("[I]f the [recited] functions . . . are functions typically found in a commercially available off-the-shelf processor, then a skilled artisan might understand the term 'processor' to provide sufficient structure for performing those functions . . . But, if the functions are not those typically available in an off-the-shelf processor, then 'the structure disclosed in the specification [must] be more than simply a general purpose computer.'") (internal citations omitted); *Cypress Lake*, 382 F.Supp.3d at 616-617 ("Although the examples given in the [] patent might enable [a POSITA] to make and use the invention, they do not recite the particular structure that performs the function and to which the means-plus-function claim is necessarily limited . . . The fact '[t]hat various methods might exist to perform a function is precisely why the disclosure of specific programming is required' . . . .In the Asserted Patents, however, there is 'nothing in the specification to help cabin the scope of the functional language: The patentee has in effect claimed everything that [performs the functions] under the sun.'") (internal citations omitted); *Advanced Ground*, 2014 WL 12652322 at *18-21 ("[A]ttempting to fill in the gaps of the specification by importing off the shelf software or asserting that individuals of ordinary skill in the art would understand how to accomplish the function described with the assistance of such off the shelf software does not solve the inadequacy of the disclosure.")

Here, Dyfan does not dispute that each of the disputed Terms 6-30 recite special-purpose computer functions, *i.e.*, every disputed limitation requires special programming of a general-purpose computer to perform the entirety of the recited function. Target Op. Br. at 12-13, 15-23, Exh. I at ¶¶ 56, 68, 81, 94, 107, 126, 135, 144, 152, 155, 161; Dyfan Resp. Br. at 20-27. As such, Dyfan's attempt to fill in the undisputedly missing structure from the claims (for step 1 of the

9

§112, ¶6 analysis), and/or from the disclosure of the priority applications (for step 2 of this analysis), not only lacks substance, but it is also wholly misplaced and contrary to the law. Dyfan Resp. Br. at 20-26; *Kit Check*, 2019 U.S. Dist. LEXIS 148398, at *23-24; *Cypress Lake*, 382 F.Supp.3d at 616-617; *Advanced Ground*, 2014 WL 12652322 at *18-21.[4]

Finally, Dyfan's argument that existing wireless communication standards somehow provide the missing structure needed to perform various recited functions of the claims is inconsistent with the explicit statement in the '584 Provisional that "the invention" *is an improvement* over these existing wireless communication protocols. Target Op. Br. at 1-7, Exh. I at ¶¶ 31-54 (internal citations omitted); Target Resp. Br. at 1-2, Exh. J at 230:9-239:21, 242:19-246:2.[5]

### III. THE CONSTRUCTIONS OF TERMS 1-5 SHOULD NOT BE DIVORCED FROM THE TEACHINGS OF THE '584 PROVISIONAL AND '197 APPLICATION

1. <u>"identifier including at least three fields" ('899 cl. 1) (Term 3)</u>

Dyfan acknowledges that this dispute "centers on" "the admittedly well-known term 'fields.'" Dyfan Resp. Br. at 9. Target's argument is that its construction is consistent with the meaning of this well-known term, as supported by the applicable specification; and that Dyfan

---

[4] Dyfan's citations to Dr. Goldberg's testimony in the *Advanced Ground* and *Typemock* cases is a red herring. Dyfan Resp. Br. at 20, n.5. Unlike Dyfan, which only focuses on a nonce word analysis, Dr. Goldberg's testimony in those cases and this case, focus on the particular claim language at issue. For example, as identified by the court in *Advanced Ground*, Dr. Goldberg's testimony, while credible, was irrelevant to the issue of whether the claims (or specification) disclosed sufficient structure to perform the entirety of the recited function, specifically because "it only seems to discuss how the claim language is sufficient to enable one skilled in the art to create software for" performing the recited function. *Advanced Ground*, 2014 WL 12652322 at *19-21. That testimony was fact-based and is not inconsistent with the fact-based testimony here.

[5] If the Court determines that § 112, ¶ 6 applies, Dyfan has not made any arguments in its Opening or Responsive Briefs as to the appropriate structure to perform the claimed functions. Accordingly, Dyfan has waived any such arguments and the claims should be found indefinite for the reasons explained in Target's briefs.

appears to be arguing an inconsistent construction based on its infringement contentions. Notably, after acknowledging that the term is well-known, Dyfan makes no effort to explain why Target's proposed construction is inconsistent with how it would be understood by a POSITA. Instead, Dyfan now argues that the proposed construction: (i) is inconsistent with the claim language itself and (ii) only reflects certain *examples* of fields disclosed in the specification. *Id*. at 10-11.

First, the claim language identified by Dyfan is not inconsistent with Target's proposed construction. The fact that an identifier may be part of a message and a message may contain more parts than just the identifier does not inform a POSITA as to meaning of an identifier including at least three fields. Certainly, there is nothing inconsistent between the context provided by the claims and Target's proposed construction.

Second, Dyfan argues that the intrinsic record only provides examples of identifiers and that a construction should not be limited to those examples. But Target is not limiting its construction to certain embodiments in the specification. Target is proposing a construction that is consistent with the well-known meaning of the terms and, in doing so, Target identified intrinsic support for that position. Dyfan's argument is devoid of any discussion as to how Target's proposed construction is inconsistent with either the intrinsic record or the well-understood meaning of the terms.

        2.    "an address portion" ('899 cls. 1, 7, 9, 11, 30; '292, cl. 4) (Term 4)

Dyfan's three primary challenges to Target's proposed construction appear to be that the proposed construction: (i) creates a claim differentiation problem, (ii) introduces new terms into the claims, and (iii) reads out of the claim a "broadcast" embodiment. These challenges are not credible.

First, Dyfan's claim differentiation argument focuses on the use of the term "header" in dependent claim 30. Dyfan Resp. Br. at 12. However, the use of header in that claim is not

11

inconsistent with Target's proposed construction. Claim 30 refers to "at least one of the plurality of fields is part of a header" and "the plurality of fields are part of a header." These limitations appear to be referring back to the claim 11 (on which claim 30 depends) phrase "one or more messages including an address portion **and a plurality of fields**." (Emphasis added). In other words, the claim 30 reference to "header" simply confirms that some or all of the separate "plurality of fields" of the message is part of the header. Those references in claim 30 do not suggest or conflict with Target's proposed construction that uses the term "header" to construe "an address portion" of a message.

Second, Target is not aware of any claim construction principle that precludes using new terms as part of a claim construction. To the contrary, constructions frequently incorporate terms that are not otherwise present in the claims, but are supported by the intrinsic record. By clarifying that "address portion" refers to the "header" of and "destination" of the message, Target is proposing a construction that is consistent with how the term is used in the claims and the inventors' disclosure of their invention. The fact that the specification may refer to other portions of the message is of no consequence, particularly if those portions are not the subject of the claims, and Dyfan has not made any showing that they are. Instead, Dyfan cherry picks terms from the specification without drawing any connection between those terms and the claims.

Third and finally, Dyfan argues that the "broadcasting" embodiment would be excluded by Target's construction. Dyfan appears to argue that "destination" should not be included in the construction because it "suggests a single destination" and "would read out the 'broadcast' embodiment . . . because there are *multiple* resulting locations where the message is received. . . ." Dyfan Resp. Br. at 14 (emphasis in original). This contrived argument, however, improperly focuses on the receipt of a message, whereas the claims focus on the address portion of a message,

*i.e.*, to where it is sent. Consistent with the specification and the inventors' description of their invention, an address portion refers to the intended destination, not where the message may happen to have been received. *See also* Target Resp. Br. at 13.

       3.    <u>"shopping mall" ('899 cls. 2, 7, 12, 30; '292 cls. 4, 13, 26, 29) (Term 2)</u>

Dyfan first argues that Target's construction is in conflict with a series of dependent claims that add a limitation that a building includes a shopping mall. According to Dyfan, the fact that a building can include both a shopping mall and other things, such as a "garage," means Target's construction should be rejected. Dyfan Resp. Br. at 8. There is no such conflict between Target's proposed construction and the dependent claims. The fact that a building can include more than just a shopping mall, *i.e.*, it also can include a garage, is of no import. Target's construction merely confirms that a shopping mall is within a building that contains two or more distinct independent retail locations. If a garage is added to the building, that does not change the proper construction of "shopping mall."

Dyfan also argues that Target's construction could invite further claim construction disputes. *Id*. While Target disagrees, Dyfan's argument does not justify avoiding the present claim construction dispute altogether, as Dyfan proposes to do with its non-construction. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

For these reasons and those set forth in Target's Opening and Response briefs, which address Dyfan's other two arguments, Target's proposed construction should be adopted.

       4.    <u>"building including a plurality of facilities therein" ('292 cls. 1, 15, 28) (Term 1)</u>

Dyfan first argues that Target's construction is in conflict with dependent claims 4 and 26 of the '292 Patent. *Id*. at 7. Again, there is no such conflict. Those dependent claims refer to "facilities" that include, *i.e.*, can be further sub-divided into, "spaces" and "departments." The fact

that a facility can be sub-divided into spaces or departments does not mean that the claimed "plurality of facilities" is a plurality of departments, as argued by Dyfan in its infringement contentions, as opposed to a plurality of distinct venues or stores, each built, installed or established to serve a particular purpose, brand or company, as taught by the specification.

Dyfan also argues that Target's construction could invite further claim construction disputes. Again, Target disagrees and Dyfan's argument does not justify avoiding the present claim construction dispute. *O2 Micro*, 521 F.3d at 1362.

For these reasons and those set forth in Target's Opening and Response briefs, which address Dyfan's other two arguments, Target's proposed construction should be adopted.

> 5. <u>"output, via the at least one mobile device" / "causing to be output, via the at least one mobile device" / "cause to be output, via the at least one mobile device" ('899 cls. 1, 7, 9, 11; '292 cls. 1, 15, 28) (Term 5)</u>

The crux of the parties' dispute appears to be the meaning of "output." For context, the claims require that visual information is "output" or "caus[ed] to be output." Moreover, the claims explicitly distinguish between the "output" of "visual information" and the "display" of something such as ". . . display . . . of an option for causing first visual information and second visual information to be output." *See, e.g.*, '292 cls. 1. *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996) (different claim terms presumably have different meanings). While Target proposes a construction that is consistent with the claim language and the disclosure at the time of the invention that equates output with delivery (Target Op. Br. at 28), Dyfan makes several disjointed arguments intended to avoid a construction so that it can continue to pursue its flawed infringement claims.

For example, Dyfan argues claim differentiation based on the presence of the term "delivery" in a dependent claim, which it contends precludes the use of the term "delivery" to construe "output". Dyfan Resp. Br. at 15-16. Dyfan's argument is flawed in that it considers both

14

terms in a vacuum.  Moreover, it is telling that Dyfan's arguments are premised on its contention that outputting should be found to include displaying, even though "output" and "display" are separately used in claimed limitations, such as in claim 1 of the '292 Patent.  In other words, to the extent claim differentiation should be applied, it should be to distinguish output and display, not output and delivery.

As a second example, Dyfan raises a defective hypothetical regarding visual information that is output, which Dyfan equates with "display[ing] something", but not received by a user.  *Id*. at 15.  This hypothetical does not make sense and is inconsistent with the plain language of the claims.

As a third example, Dyfan argues that disclosed embodiments would be excluded if "output" is construed as being distinguishable from "display."  Again, Dyfan incorrectly assumes that output can include display, despite the fact that the claims plainly and unequivocally distinguish the two terms.  *Id*. at 14.

Dyfan's series of flawed arguments begs the question, what does Dyfan contend the term "output" means?  While Dyfan does not answer this question, Target's contention of the term's meaning is based on the disclosure in the intrinsic record.  For these reasons and those set forth in Target's Opening and Responsive Briefs, which address Dyfan's other two arguments, Target's proposed construction should be adopted.

| | |
|---|---|
| Date:  December 4, 2019 | */s/ Gilbert A. Greene*<br>Gilbert A. Greene<br>**DUANE MORRIS LLP**<br>Las Cimas IV<br>900 S. Capital of Texas Highway, Suite 300<br>Austin, TX 78746<br>Tel.: 512-277-2246<br>Fax: 512-597-0703<br>Email: BGreene@duanemorris.com |

Matthew S. Yungwirth (admitted *pro hac vice*)
**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 2000
Atlanta, GA  30309-3929
Telephone:  404-253-6900
Email:  msyungwirth@duanemorris.com

Christopher J. Tyson (admitted *pro hac vice*)
**DUANE MORRIS LLP**
505 9th Street N.W., Suite 1000
Washington, DC 20004-2166
Tel:  202.776.5213
Email: cjtyson@duanemorris.com

**Daniel M. Lechleiter**
Faegre Baker Daniels LLP
300 North Meridian Street
Suite 2700
Indianapolis, IN 46204-1750
(317) 237-1070
Fax: (317) 237-1000
Email: daniel.lechleiter@faegrebd.com

**Lauren M.W. Steinhaeuser**
(admitted *pro hac vice*)
Faegre Baker Daniels LLP
90 S. Seventh St., Suite 2200
Minneapolis, MN 55402
Tel: 630-766-6879
Fax: 612-766-1600
Email: lauren.steinhaeuser@faegrebd.com

*Counsel for Target Corporation*

16

**CERTIFICATE OF SERVICE**

I certify that on December 4, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Gilbert A. Greene*