Page 59

1        interface.
2            Q.    Wouldn't be that effective if
3        they didn't, probably.
4            A.    It would be ineffective.
5            Q.    Yeah.  Are you familiar with the
6        term user interface signal?
7                MR. TYSON:  Objection.
8        Foundation.
9            A.    I can understand it, but it
10       sounds like something -- sounds more
11       legalese than technical.
12           Q.    And I'll make a note that
13       there's a reference somewhere in Exhibit
14       4, and I will find that during a break and
15       point you to it and see if that provides
16       any more clarification.
17                Would you consider display to be
18       a term of art in the computer science
19       field?
20           A.    Yes, both the noun and the verb.
21           Q.    With respect to the noun, how
22       would you define display in this field?
23           A.    It's a hardware component that
24       allows data to be displayed to a user.
25           Q.    Does the noun version of display

1   have any software elements in addition to
2   the hardware component?
3        A.    Well, there is certainly
4   software associated with a display that
5   actually causes the display of data on the
6   hardware display.
7        Q.    And is it accurate that --
8   strike that.
9             Is the software that can be
10  associated with a display similar to user
11  interface software in that there are a
12  variety of different software programs
13  available off the shelf that a person
14  skilled in the art could select if they
15  were trying to develop a display?
16            MR. TYSON:  I object to the
17       form.
18       A.    So the software that is
19  associated with the hardware display is
20  often called a driver, this is computer
21  code that knows about the particular
22  hardware and is able to interact with the
23  hardware.  That driver then can be used by
24  either off-the-shelf user interface
25  software or custom user interface software

1    to cause the display of a particular
2    format that the user can see and interact
3    with.
4         Q.   I just want to make sure I
5    understand that correctly, but is it fair
6    to say then that a display would have
7    associated software that would come along
8    with it in the form of a driver that a
9    person skilled in the art could then
10   implement with a desired user interface?
11             MR. TYSON:  I object to the
12       form.
13        A.   Let me just state, you had it
14   almost exactly right.
15        Q.   Okay, please correct it for me.
16        A.   Yes, associated with a display
17   is driver software that a developer can
18   then use to either build a custom user
19   interface or can find off-the-shelf user
20   interface code to effect a user interface.
21        Q.   And again, the driver software
22   that is associated with the display, what
23   was the, again, the functionality that it
24   provides?
25        A.   That's the -- the low level

1  and the type of message, one of skill
2  would understand the format of the
3  message, but of course wouldn't know what
4  the content is.
5      Q.   Would you consider the format of
6  a message to be structure in the context
7  of the claim?
8      A.   For a given communications
9  protocol, the format of a message is one
10 aspect of structure, in other words, how
11 one communicates.  Again, it doesn't say
12 anything about the content of the message.
13     Q.   Understand, yeah, understand.
14          So just to recap, some of the
15 structural elements that we identified in
16 claim one, we have mobile device, a
17 display of a mobile device, the broadcast
18 short-range communications unit, reference
19 to a server, there was reference to
20 various communication protocols, and
21 finally, we just discussed the message,
22 and the message pursuant to protocol
23 having a format.
24     A.   So -- so the particular format
25 of a message for a particular protocol is

1    one aspect of -- of structure, yes.
2         Q.   Okay.  And the other elements
3    that I mentioned, mobile device, display,
4    you would agree that those are structural
5    aspects as well?
6         A.   Yes, I believe so.
7         Q.   And also when we refer to the
8    communications protocol itself, that
9    provides information on the structural
10   aspects?
11             MR. TYSON:  I object to the
12        form.
13        A.   Well, certainly Bluetooth does
14   provide structure about certain -- certain
15   aspects of the claim, and given the term
16   communications protocol, one of skill
17   would know what the range of choices are
18   for communication protocols, they could
19   fill that in with their knowledge.
20        Q.   Okay.  There are -- and I think
21   we talked about this, you said 20 or 30
22   protocols that you're familiar with.
23        A.   Yes, but only a handful are
24   widely used.
25        Q.   Understand, okay.  I think it's

1      participate in that second wireless
2      communications protocol, right?
3           A.    Yes.
4           Q.    So you would agree that claim 11
5      has essentially the same structural
6      components that we discussed with respect
7      to claims one, seven and nine with the
8      exception of the difference between
9      application and computer code, is that
10     fair?
11          A.    Yes, these -- the claims that we
12     reviewed do have the elements that we've
13     discussed that provide some structure.
14          Q.    And you would agree that the --
15     taking claim 11, for example, that the
16     later reference to said application or
17     mobile device application, that that would
18     inform what was being referred to as the
19     an application on line 65 of column 35?
20               MR. TYSON:   I object to the
21       form.
22          A.    Well, I would say those
23     references to said application and mobile
24     device application refers to the an
25     application introduced on line 65 of

1       column 35.
2            Q.   Okay.  And so to the extent that
3       the later references in the claim include
4       additional structural components, like
5       compliant with a different communications
6       protocol, that that would inform the
7       application that is part of disputed claim
8       six, is that fair?
9                 MR. TYSON:  I object to the
10          form.
11           A.   It would describe some aspects,
12      some additional aspects of the application
13      mentioned in disputed claim six, of course
14      only some of the aspects.
15           Q.   Understood, but it would give a
16      person skilled in the art some information
17      about the structure and meaning of the
18      application, fair?
19                MR. TYSON:  I object to the
20          form.
21           A.   It would give some additional
22      information, I agree with that.
23                MR. DAHLGREN:  Now there is a
24          disputed -- well, I don't know what
25          time it is, if this is a good time for

1      is essentially broader than displaying
2      some visual information on the mobile
3      device's display?
4           A.    I think one of skill reading
5      that would realize that this may be --
6      this may be broader, that as long as
7      you're causing the information to be
8      output and you're using the mobile device
9      to do so in some way, then maybe that
10     reads on this claim.  It's hard to know.
11          Q.    Okay.  So going back, we were
12     starting on, excuse me if I'm wrong, we
13     did disputed claim term ten, correct, and
14     we did 11?
15          A.    Yes.
16          Q.    We did the 899 patent claim
17     seven, nine and 11 for disputed claim
18     terms 11, is that right?
19          A.    I believe so.
20          Q.    You would agree that -- I mean,
21     as we -- actually, take that back.
22                Yes, I think we did ten and we
23     started on 11 with claim seven, disputed
24     claim term 11 is present in claims seven,
25     nine and 11 of the 899 patent.  Claim

1    seven and nine refer to computer code,
2    claim 11 refers to application, I believe?
3        A.   Yes, that's correct.
4        Q.   So aside from those differences,
5    you would agree that the structural
6    elements that we have discussed with
7    respect to claims seven, nine and 11 of
8    the 899 patent would inform a person of
9    ordinary skill in the art's understanding
10   of disputed claim term 11?  And if you
11   need me to point to where those are
12   present in any of the other claims, please
13   let me know.
14       A.   No, I think my testimony about
15   claim seven, about what -- what one of
16   skill would and would not understand with
17   regard to disputed claim term 11 applies
18   to claim nine of the 889 patent as well.
19       Q.   Okay.  And also claim 11?
20       A.   Yes, my opinions I've just
21   expressed about claims seven and nine with
22   respect to claim term 11 also apply to
23   claim 11 of the 899 patent.
24       Q.   So for 11, disputed claim term
25   11, it's also present in claim one of the

1    292 patent, and claim one again of 292
2    patent begins on column 30 of Plaintiff's
3    Exhibit 2.
4              The language of disputed claim
5    term 11, I believe, is on column 32 with
6    the exception of, I think, the said code
7    when executed further configured to, not
8    preamble, but the, kind of, opening, and
9    then it's ellipsed to line four of column
10   32, do you see that?
11        A.    I do.
12        Q.    Okay.  And so again, the
13   structural elements that we've identified
14   in claim one of the 292 patent, you would
15   agree that those structural components
16   would inform a person of ordinary skill in
17   the art's understanding of disputed claim
18   term 11, is that fair?
19        A.    Yes, that's fair.  And let me
20   just repeat my -- the caveat, that the
21   cause to be output limitation, because it
22   doesn't say on which display or how the
23   visual information is output, I don't
24   think is informed by the structural
25   element discussed which is the display of

1    a mobile device.
2         Q.    Okay.  So in that case for that
3    particular part of disputed claim term 11,
4    it's your position that the display of the
5    mobile device may not have bearing on the
6    output via the at least one mobile device,
7    is that fair?
8         A.    Yes, in fact, one can't tell if
9    it has bearing or not.
10        Q.    Okay.  Now, you would agree,
11   however, that the code that is referenced
12   in claim one of the 292 patent that is
13   further configured to achieve disputed
14   claim term 11, that that code is the same
15   code that is referred to on line seven of
16   column 31 that also is configured to cause
17   display via display of the at least one
18   mobile device of an option for causing, et
19   cetera, do you see that?
20              MR. TYSON:  I object to the
21       form.
22        A.    I do, I see the line, the cause
23   display via a display limitation starting
24   at line ten.
25        Q.    And so the code that is being

1       referred to as being configured to cause a
2       display, that's the same code that is
3       further configured to achieve disputed
4       claim term 11, correct?
5                MR. TYSON:  I object to the
6           form.
7           A.   I agree that the said code at
8       line 64, which is further configured to
9       contain certain features recited in the
10      subsequent limitations, is the same code
11      as found on line eight of column 31.
12          Q.   And so with that understanding,
13      you would agree that the reference to
14      configured to cause display via display of
15      at least one mobile device, that would
16      still inform a person of ordinary skill in
17      the art regarding how the code should be
18      interpreted, and that is the same code
19      that is involved in disputed claim term
20      11, right?
21               MR. TYSON:  I object to the
22          form.
23          A.   What I would say, the same code
24      as identified as causing to the display
25      via a display of the mobile device an

1     option is the same code, in other words, a
2     part of the same code base, as the code
3     that is claimed to cause to be output via
4     at least one mobile device, either the
5     first or second visual information in
6     column 32.  It's the same set of code, but
7     I think that's all you can say.
8          Q.    Yes, and my point is only that
9     because that earlier discussion of display
10    does have some bearing on scope of the
11    code and the meaning of the code, that a
12    person skilled in the art would understand
13    that it would have some bearing on the
14    interpretation of disputed claim term 11.
15              MR. TYSON:  I object to the
16       form.
17         Q.    For example, they would
18    understand that the code is configured to
19    achieve both of the claim elements, is
20    that fair?
21              MR. TYSON:  I object to the
22       form.
23         A.    Yeah, I think what's fair to say
24    is that the code, which has many features,
25    as claimed, has the feature of being able

Page 164

1  input is received.
2       Q.    Yes, and you see before column
3  29, it says received an indication, and
4  then later in column 30, it refers to the
5  indication?
6       A.    Yes, I see that.
7       Q.    And you're familiar with patent
8  drafting, that the first time something is
9  introduced, it's like an or a, and then
10 later it's the or said?
11      A.    Yes.
12      Q.    Okay.  So going back to the
13 question I was asking before, if you look
14 at disputed claim term 16 and what the
15 system is configured to do, much of
16 those -- strike that.
17            Going back to my earlier
18 question, if you look at disputed claim 16
19 and what the system is configured to do in
20 that wherein clause, much of that is --
21 appears to be done by kind of
22 subcomponents of the system, is that fair?
23      A.    Generally speaking, I would say
24 yes, but it talks -- where the wherein
25 clause talks about the system being

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1   configured to do something, it could refer
2   to one of the already mentioned components
3   of that system doing it.
4        Q.   That was -- you made that point
5   much more succinctly than I was able to
6   do.
7             And so again, looking at this,
8   the wherein clause recites that the system
9   was configured to achieve the limitation
10  of disputed claim term 16, it's not adding
11  any new or separate structural element to
12  the claim, is that fair?
13       A.   It's not adding any new
14  component, but rather describing what the
15  system already introduced can also do or
16  perhaps constraining what the system can
17  do.
18       Q.   Okay.  And as we discussed, that
19  system is all of the components that were
20  recited in claim one, essentially,
21  correct?
22       A.   Yes.
23       Q.   Okay.  And so here as system is
24  defined as all these various components in
25  claim one of the 899 patent, you would

Page 182

1      laid out in claim seven.
2           Q.     And turning to claim nine, the
3      same question, and again, this is disputed
4      claim term 19 language at the bottom of
5      column 34, but again, you would agree that
6      because the system recited in the wherein
7      clause does not add any additional
8      structural components to the claim that
9      are not already present, correct?
10          A.     So as I've testified in my
11     previous answer, in fact, the system
12     referred to at the bottom of column 34,
13     line 59 is the system of claim nine
14     introduced at line 47 of column 33
15     consisting of a collection of components
16     already set forth in the claim nine.
17          Q.     Okay.  Now, if we look at
18     disputed claim 20, we have a wherein
19     clause, this time -- I'm trying to find
20     where it is here -- it refers to the
21     application, and this is claim 11 of the
22     899 patent, and you can see the disputed
23     language of claim term 20 towards the
24     bottom of column 36.
25          A.     Give me a moment to look at

Page 183

1     that --
2         Q.    Sure.
3         A.    -- disputed claim 20.  Can you
4     repeat where in claim 11 I could see that?
5         Q.    In claim 11, I believe that you
6     will find it around line 53 of column 36.
7     Further wherein, the application when
8     executed is configured to permit a
9     determination as to whether the one or
10    more mobile device application actions
11    including causing to be output to visual
12    information is triggered.
13        A.    Okay, I see it, thank you.
14        Q.    And that was not grouped in the
15    system claims in your declaration, and
16    just so you know, you address it beginning
17    on page 49, it appears.
18        A.    Yes, that's true.
19        Q.    So I wanted to make that
20    clarification, not to steer you wrong.
21              Now, you would agree that the
22    application in disputed claim term 20 is
23    the same application that is recited on
24    line 65 of column 35 that's also in claim
25    11 of the 899 patent?

1       A.      I agree.
2       Q.      And it's also the same
3    application that's referred to in
4    column -- excuse me, column 36, line 32?
5       A.      I agree.
6       Q.      And so you'd agree that the use
7    of the wherein clause referring to the
8    application is not adding an additional
9    component to claim 11 of the 899 patent,
10   right?
11      A.      I agree, it's specifying
12   additional function of the said
13   application.
14      Q.      Turning to disputed claim 21,
15   disputed claim term 21 found in claims
16   seven and nine of the 899 patent.  So
17   beginning with claim seven --
18      A.      Give me a moment --
19      Q.      Sure.
20      A.      -- to read disputed claim term
21   21.
22      Q.      Yes, disputed claim term 21, and
23   I think it will just inform your reading
24   of claim seven if you note that in column
25   32, line 58 there is a break where it's

1      Q.    Okay.  You would agree that
2   there's standard modules of software code
3   that are well known and can be identified
4   by name as connoting sufficient structure
5   in a claim?
6           MR. TYSON:  I object to the
7      form.
8      A.    I mean, I'd have to -- I guess
9   I'd have to see the context, but if they
10  were identified by name in a claim, I
11  suspect that would provide some -- some
12  structure, but I'd have to look at the
13  actual example.
14     Q.    And I don't know if, like for
15  example, a Bluetooth communication
16  protocol would be considered like a
17  standard module software code identified
18  by name, that might be a bad example.
19     A.    I'd have to see the context, but
20  as we've discussed, you know, reciting the
21  Bluetooth communications protocol does
22  inform one of skill about certain features
23  of the Bluetooth --
24     Q.    Okay.
25     A.    -- system.