1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE WESTERN DISTRICT OF TEXAS

3                        WACO DIVISION

4   DYFAN, LLC                    *
                                  *
5                                 *
    VS.                           * CIVIL ACTION NO. W-19-CV-179
6                                 *
    TARGET CORPORATION            *     December 19, 2019
7
        BEFORE THE HONORABLE ALAN D ALBRIGHT, JUDGE PRESIDING
8                        MARKMAN HEARING

9   APPEARANCES:

10  For the Plaintiff:       Derek F. Dahlgren, Esq.
                             Devlin Law Firm LLC
11                           1526 Gilpin Avenue
                             Wilmington, DE 19806
12
    For the Defendant:       Christopher J. Tyson, Esq.
13                           Duane Morris LLP
                             505 9th Street, N.W., Suite 1000
14                           Washington, DC 20004-2166

15                           Gilbert Andrew Greene, Esq.
                             Duane Morris LLP
16                           900 S. Capital of TX Highway, Ste 300
                             Austin, TX 78746
17
                             Matthew S. Yungwirth, Esq.
18                           Duane Morris LLP
                             1075 Peachtree Street NE, Suite 2000
19                           Atlanta, GA 30309

20  Court Reporter:          Kristie M. Davis
                             United States District Court
21                           PO Box 20994
                             Waco, Texas 76702-0994
22

23

24      Proceedings recorded by mechanical stenography, transcript

25  produced by computer-aided transcription.

```
01:05    1        (December 19, 2019, 1:05 p.m.)

01:05    2        DEPUTY CLERK:  Markman hearing in Civil Action

01:05    3   W-19-CV-179, styled Dyfan, LLC vs. Target Corporation.

01:05    4        THE COURT:  If you all would be so kind as to introduce

01:05    5   yourself on the record and let me know who will be speaking

01:05    6   primarily for each side.

01:05    7        MR. DAHLGREN:  You have Derek Dahlgren here from Devlin

01:05    8   Law Firm for Dyfan.

01:05    9        THE COURT:  You need to stand up.

01:05   10        MR. DAHLGREN:  Oh, sorry, sir.  Derek Dahlgren from Devlin

01:05   11   Law Firm for plaintiff Dyfan, LLC.

01:05   12        THE COURT:  Okay.

01:05   13        MR. GREENE:  Good afternoon, Judge Albright.  Bert Greene

01:05   14   from Duane Morris.  Here with me, my colleagues, Matt Yungwirth

01:05   15   and Chris Tyson.  Mr. Tyson is going to be presenting the

01:06   16   argument today.

01:06   17        THE COURT:  Very good.

01:06   18        Have you all discussed which -- how you all want to do it

01:06   19   as in terms of going back and forth?  Have y'all had any

01:06   20   discussions?

01:06   21        MR. GREENE:  No specific discussions, Your Honor.  I think

01:06   22   we probably do have a preference as to which term we might

01:06   23   start with, if the Court would indulge that.  We're happy to do

01:06   24   it however the Court would prefer.

01:06   25        THE COURT:  What claim term did you want to start with?
```

01:06  1      MR. GREENE:  I'll leave that to Mr. Tyson.

01:06  2      MR. TYSON:  Your Honor, we would believe that the group B

01:06  3 terms for the second code term would be the preference.

01:06  4      THE REPORTER:  Counsel, I need you to turn that microphone

01:06  5 on.

01:06  6      MR. TYSON:  Gotcha.

01:06  7      THE COURT:  Okay.  You said group B.  We have -- I have

01:06  8 group 2 terms, terms 13, 14 and 15?  Is that --

01:07  9      MR. TYSON:  Yes, Your Honor.  Those are the same.  We can

01:07 10 call them group 2.

01:07 11      THE COURT:  I'm happy to start with those.

01:07 12      MR. TYSON:  All right.  I'll proceed, Your Honor.

01:07 13      THE COURT:  Okay.

01:07 14      MR. TYSON:  May it please the Court.  Good afternoon, Your

01:07 15 Honor.

01:07 16      THE COURT:  Yes, sir.

01:07 17      MR. TYSON:  Very honored to be here today.

01:07 18      THE COURT:  Happy to have you.

01:07 19      MR. TYSON:  There's been a -- number one, I would like to

01:07 20 start by thanking Mr. Yi and yourself for giving us some

01:07 21 guidance on the arguments that you really wish to hear today.

01:07 22 Obviously there were a lot of terms, and this really helped

01:07 23 streamline everything.  So I appreciate your indulgence there.

01:07 24      THE COURT:  You're more than welcome.  You should

01:07 25 primarily thank Dr. Yi.

| | | |
|---|---|---|
| 01:07 | 1 | MR. TYSON: Dr. Yi. I will. Thank you. |
| 01:07 | 2 | There's been a lot of briefing in this case, so I think it |
| 01:07 | 3 | would just be useful, as we've done in at least our opening |
| 01:07 | 4 | brief, just to give a little bit of context in terms -- |
| 01:08 | 5 | THE COURT: I think my court reporter is going to scream |
| 01:08 | 6 | at me if I don't tell you to slow down a little bit. |
| 01:08 | 7 | MR. TYSON: All right. |
| 01:08 | 8 | THE COURT: Okay. |
| 01:08 | 9 | MR. TYSON: Yes, Your Honor. So I'm just going to give a |
| 01:08 | 10 | little context for the argument as well. If we can go to Slide |
| 01:08 | 11 | 2, please. And everyone can see the slides, I presume? |
| 01:08 | 12 | THE COURT: I can. Yes, sir. |
| 01:08 | 13 | MR. TYSON: All right. Thanks, Your Honor. |
| 01:08 | 14 | As we've discussed, there are -- the two patents at issue, |
| 01:08 | 15 | the '899 patent and '292 patent, arose from an application that |
| 01:08 | 16 | was filed initially in 2011 that is referenced here. This is |
| 01:08 | 17 | an excerpt from the related application section of the '899 |
| 01:08 | 18 | patent and it references specifically the application serial |
| 01:08 | 19 | number 13/410,197, which we refer to as the '197 application in |
| 01:08 | 20 | our briefing, as well as the provisional application |
| 01:09 | 21 | 61/517,584, which we refer to in our briefing as the '584 |
| 01:09 | 22 | provisional. And specifically the patents expressly note that |
| 01:09 | 23 | they each -- each of those applications are incorporated by |
| 01:09 | 24 | reference in their entirety. And the reason that's important, |
| 01:09 | 25 | if we can go to Slide 3, is that there's been some discussion, |

01:09   1   especially in the latest set of briefing, in the reply

01:09   2   briefing, as to what is a provisional application in terms of

01:09   3   the disclosure of a patent and specifically for claim

01:09   4   construction.  And as we're identifying here, the Federal

01:09   5   Circuit -- and these are only three example decisions.  Two of

01:09   6   these are provided directly in our opening brief -- identify

01:09   7   that priority applications like this provisional, the '584

01:09   8   provisional, are intrinsic evidence.  They're part of the

01:09   9   record and should be used as intrinsic evidence for claim

01:09   10  construction purposes.  There's actually a quote that I'll read

01:10   11  from --

01:10   12      THE COURT:  I --

01:10   13      MR. TYSON:  Don't need it?  Got it.  Got it, Your Honor.

01:10   14  So we can move on.

01:10   15      THE COURT:  I not only got it, but I agree.

01:10   16      MR. TYSON:  Thank you.

01:10   17      And I think it's actually really important in a case like

01:10   18  today where we're dealing with means plus function limitations.

01:10   19  And we've identified a separate case for that as well in our

01:10   20  opening brief.

01:10   21      If we can go to Slide 4.  So setting the kind of context

01:10   22  was, in the provisional it really does detail the problem that

01:10   23  the patents were trying to solve.  And the problem that the

01:10   24  patents were trying to solve dealt with using standard routing

01:10   25  protocols that were available in existing wireless

| | | |
|---|---|---|
| 01:10 | 1 | communication standards.  So the one that is called out in |
| 01:10 | 2 | these excerpts is the internet protocol.  It identifies a |
| 01:10 | 3 | number of issues with simply routing based on the internet |
| 01:10 | 4 | protocol, especially when you have mobile devices that change |
| 01:10 | 5 | locations fairly frequently. |
| 01:10 | 6 | And the statement really at the bottom of the excerpt |
| 01:10 | 7 | here, it is obvious that today's systems do not provide a |
| 01:11 | 8 | convenient method of directly sending data messages to a |
| 01:11 | 9 | certain physical location and do not support the efficient |
| 01:11 | 10 | collection of certain data messages from specified physical |
| 01:11 | 11 | locations.  We identify that as really being a summary of the |
| 01:11 | 12 | over 12 pages of kind of the background that the patent gives |
| 01:11 | 13 | as the problem that it's trying to solve. |
| 01:11 | 14 | If we can go to the next slide, which is Slide 5.  The |
| 01:11 | 15 | provisional application both in the summary and then in the |
| 01:11 | 16 | first paragraph of the detailed description gives a very |
| 01:11 | 17 | concise description of how it solves that problem.  And it |
| 01:11 | 18 | specifically says, you know, the present invention describes a |
| 01:11 | 19 | relationship between these various entities within a network |
| 01:11 | 20 | and supports a novel approach to network data routing based on |
| 01:11 | 21 | location in various service attributes. |
| 01:11 | 22 | And, secondly, it says, the invention described herein -- |
| 01:12 | 23 | here is the crux of the invention.  The invention described |
| 01:12 | 24 | herein uses a location header to route messages to and from |
| 01:12 | 25 | mobile terminals via a variety of wireless and wireline |

01:12  1   communication networks.

01:12  2        So it is this introduction of a modification to these

01:12  3   existing protocols which is what the provisional application

01:12  4   and the parent of the patents at issue here it's identifying as

01:12  5   the solution.  It is using a location header instead of or in

01:12  6   lieu of an IP address.  It's almost using a location address so

01:12  7   you can route to a specific location.  You can receive data

01:12  8   from a specific location, but you're not tethered to this IP

01:12  9   address that we would otherwise use.

01:12  10       Now, we've also detailed sort of the history of these

01:12  11  applications as they proceeded through the Patent Office.

01:12  12       If we can go to Slide 6.  You can see what the -- was

01:13  13  originally -- the filed application original -- Claim 1 in the

01:13  14  '197 application.  So a year after the provisional was filed,

01:13  15  this was the claim that was filed with the '197 application.

01:13  16       And we've talked about the progression in our opening

01:13  17  brief of how this -- these applications sort of came to be, how

01:13  18  the claims came to be what they are.  And there was a clear

01:13  19  diversion from the original invention at the time of this

01:13  20  amendment that I'm showing here in 2014.  And as we detailed in

01:13  21  our briefing, this claim is actually claiming something that

01:13  22  was in the prior art, even in the admitted prior art, in the

01:13  23  background section of the patent.  It is no longer tied to this

01:13  24  concept of location-based routing, and it is -- it is literally

01:13  25  just having a wireless component provide an identifier such

01:13  1   that the location of the mobile device is capable of being

01:13  2   identified and then just using the identifier of this wireless

01:14  3   component to perform some generic operation.

01:14  4        If we can go to Slide 7.  In 2017 this slide is intended

01:14  5   to show that what happened in the '197 application eventually

01:14  6   is the claim got a little -- they added a little bit more meat

01:14  7   on the bones.  But, in essence, that claim got appealed to the

01:14  8   Patent Trial and Appeal Board in May of 2019.  And then it was

01:14  9   ultimately abandoned after a final decision by the Patent Trial

01:14  10  and Appeal Board.  You can see the claim.  I'm not going to

01:14  11  recite the claim, but notice the structure of the claim, and

01:14  12  that is as of 2017 when it was appealed, that same year is when

01:14  13  the application leading to the '899 patent is filed.

01:14  14       If we can go to Slide 8.  So it's not possible to fit any

01:14  15  of these independent claims on a single slide, but we're doing

01:14  16  our best here.  And, again, the appeal process for the '197

01:14  17  application is happening in 2017.  The '899 patent is filed in

01:15  18  October of 2017.  And there are 929 words in this claim

01:15  19  spanning almost two columns.  And what was really added to the

01:15  20  claim that was originally at the Patent Trial and Appeal Board

01:15  21  were these at least 12 functional claim limitations.  And those

01:15  22  span from really where it starts in that green section all the

01:15  23  way down to where the end of the yellow section happens.  Those

01:15  24  are the 12 functional software-based applications, limitations

01:15  25  that were added, and that encompasses over 600 words.

01:15  1      We've only -- you know, out of abundance of streamlining

01:15  2  and the like, we've only identified five, and those are five

01:15  3  within this claim that we are disputing and identifying as

01:15  4  being -- that we believe are subject to 112-6 means plus

01:15  5  function limitation.

01:15  6      So essentially what was added to the PTAB invalidated

01:15  7  claims were these 12 functional limitations.  And as we've

01:16  8  detailed in our briefing, I believe this to be a very unique

01:16  9  case.  I've personally never seen claims of this length.  The

01:16  10  '292 patent even has a claim, dependent Claim 4, that goes over

01:16  11  seven and a half columns long.  It has over 100 different

01:16  12  alternative limitations that you can have.

01:16  13      So these are unique claims.  This is a unique

01:16  14  specification.  We've detailed this with so much qualifying

01:16  15  language that it really devoids any semblance of a specific

01:16  16  structure to any of this described functionality within that.

01:16  17  It was a unique prosecution strategy initially to sort of

01:16  18  divorce the claims in 2014 from the disclosures stated

01:16  19  invention, then introducing a column and a half, over 600 words

01:16  20  of functional software-based language.

01:16  21      And then it continues to be a unique case in that we have

01:16  22  a unique argument that an attorney can simply tell the Patent

01:17  23  Office that when it added these 627 words that are functional,

01:17  24  that it did not intend 112-6 to apply, and that when it did --

01:17  25  when the attorney does so, it magically -- those self-serving

01:17  1   statements, regardless of their impact on patentability, are

01:17  2   forever binding on Your Honor, all courts, Article 3 courts, on

01:17  3   the Patent Trial and Appeal Board and would prevent yourself

01:17  4   and other adjudicating bodies from ever examining the vast

01:17  5   majority of the claim language, like a column and a half of

01:17  6   this claim language.

01:17  7        Well, of course that's not the law.  Otherwise, tomorrow

01:17  8   every patent attorney would do exactly what Dyfan's attorney

01:17  9   did in this case and just write down a statement to the Patent

01:17  10  Office and say, these claims, you know, are not subject to

01:17  11  112-6, and the claims that we're dealing with today would be

01:17  12  the norm rather than the extreme outlier.

01:18  13       And the critical point I think here is one I know Your

01:18  14  Honor understands very well, and that is it's the notice

01:18  15  function that's served by claims.  And functional claiming is

01:18  16  permitted.  Even a column and a half of functional claiming is

01:18  17  permitted.  But that goes along with the requisite quid pro quo

01:18  18  associated with that.  If you don't give the public the

01:18  19  structural metes and bounds of the claim, either in the claim

01:18  20  itself or in the disclosure, then the notice function fails,

01:18  21  and the public doesn't recognize what these -- what are the

01:18  22  metes and bounds of the claim.  And that's a critical component

01:18  23  of all claims.

01:18  24       So if we can go to the next slide.  What this slide is

01:18  25  really attempting to do is show what we did in our briefing --

01:18 1   this took a lot of effort and energy from the team -- was to

01:18 2   streamline for the Court what we see as the significant issues

01:18 3   raised by these, you know, over 12 functional limitations in a

01:18 4   single claim.  And given the sheer length of the claim, it was

01:19 5   obviously a lot of work.  The fact is we have over 50 asserted

01:19 6   claims against us, for Target, including seven independent that

01:19 7   look a lot like that '899 patent Claim 1.  And the fact is that

01:19 8   over two thirds of these claims are functionally drafted.

01:19 9        And so what we've done is we focused our challenges on

01:19 10  just really a handful of these limitations.  We attempted to

01:19 11  group them for Your Honor and Dr. Yi, among these 50 asserted

01:19 12  claims, and then we provided -- although we provided a number

01:19 13  of -- we provided expert testimony.  We provided as much

01:19 14  evidence as we could within the intrinsic record.  What we're

01:19 15  doing here is we're just merely illustrating the five

01:19 16  limitations that we're disputing from this particular claim.

01:19 17  They're software-based functional limitations.

01:19 18       Now, if there aren't any initial questions on any of the

01:19 19  background, I think I want to jump to just the first code term

01:20 20  that we talked about, which is group 2.  And if we could go to

01:20 21  Slide 29.  So here this is representative term 14, and to the

01:20 22  '292 patent it is Claim 15.

01:20 23       THE COURT:  And you're on Slide 29.

01:20 24       MR. TYSON:  I'm on Slide 29, I believe.  Yeah.

01:20 25       Okay.  And this is a -- again, it's a code configured to

01:20  1    execute by at least one of a plurality of mobile devices, and

01:20  2    the code when executed is configured to perform a function.

01:20  3    And we've identified -- in green we've identified what we

01:20  4    consider the immediate structure of this claim limitation.  And

01:20  5    then in orange we've reflected what we believe to be the

01:20  6    function associated with this claim.

01:20  7        If we can go to Slide 30.  So here there's -- we're not --

01:21  8    no one's disputing that rather than means for this claim --

01:21  9    claims code configured to be executed and when executed further

01:21  10   configured to perform a function.  That's not in dispute.  I

01:21  11   also don't believe that there is actually a dispute over the

01:21  12   fact that this particular function requires special programming

01:21  13   of a general purpose computer.  And we've reflected how we've

01:21  14   drafted this term in our briefing as well as in Dr. Goldberg's

01:21  15   declarations, is that the function is to cause to be output via

01:21  16   the at least one mobile device, the second visual information

01:21  17   based on the second location relevant information.

01:21  18       And then there's three criteria.  One is that caused to be

01:21  19   output is in response to the receipt from at the least one

01:21  20   server and via the second wireless communication protocol, the

01:21  21   second response message, including the second location relevant

01:22  22   information.  So that's one criteria.

01:22  23       Another criteria, the cause to be output function or

01:22  24   action has to be performed after the first visual information

01:22  25   is caused to be output.  It also the caused to be output has to

13

01:22  1   happen after the at least one mobile device is moved in the

01:22  2   building.  And so this is clearly not a function that would

01:22  3   simply be performed by plugging in a computer that you buy at

01:22  4   Best Buy or somewhere else or by downloading some software.

01:22  5   This is a function that must be specially programmed in order

01:22  6   to be performing.

01:22  7       So we can go to the next slide.  And the next series of

01:22  8   slides, what we tried to do here is associate a number of

01:22  9   different -- we basically identified what we -- what we

01:22  10  consider the patent owner, Dyfan here, arguing as far as

01:23  11  structure from the surrounding claim language.

01:23  12      I think what I'd like to do is, even before we get to that

01:23  13  term, would be to go back to Slide 11 and talk about what

01:23  14  Dyfan's strategy is really -- and what their arguments really

01:23  15  are for both of these terms, all the code terms.  And

01:23  16  essentially what I believe Dyfan's arguments are, and

01:23  17  Mr. Dahlgren can correct me if I mischaracterize anything.

01:23  18  It's not intentional.  The first is that code -- their first

01:23  19  argument is that code is not a nonce term and, therefore, by

01:23  20  itself is sufficiently definite structure regardless of the

01:23  21  function.  And that would only be true if this was a general

01:23  22  purpose function.  Because it's a special purpose function,

01:24  23  regardless of whether code is a nonce term or not a nonce term,

01:24  24  you must look at what -- the sufficient structure must be

01:24  25  looking at what the special purpose function is in determining

01:24   1   whether it is sufficient to perform that special purpose

01:24   2   function.

01:24   3        Their second argument is -- was essentially shown on that

01:24   4   last slide, Slide 30, was that code executing on the mobile

01:24   5   devices where that mobile device sends messages and receives

01:24   6   messages from either the broadcast communication unit or a

01:24   7   server and it sends those messages using first and second

01:24   8   wireless communication protocols, that that is the structure.

01:24   9   That structure recite is sufficiently definite for every single

01:24  10   functional limitation that's in dispute today.  And that's in

01:24  11   the -- in any of the patents.  So all of those 12 functional

01:24  12   limitations would have this same structure.  That's all that's

01:24  13   needed according to the patent owner.

01:25  14        Now, Dyfan, notably, these are their two points that they

01:25  15   rest on.  Nowhere in their briefing do they point to a single

01:25  16   disclosure in the specification of the patents, including the

01:25  17   incorporated by reference documents for any limitation.

01:25  18   They're not -- they're not looking at a particular

01:25  19   limitation -- a particular function and saying, okay.  For this

01:25  20   function we need to look at the specification.  We need to

01:25  21   identify anything.  Everything -- all of their arguments are

01:25  22   the same, and they're all based on these two points.  And I

01:25  23   think that's very telling, especially with the unique

01:25  24   circumstances, especially the unique claims we have here.

01:25  25        And if we can go to Slide 12.  Again, this is a little bit

01:25  1   closer view of a portion of the '899 patent Claim 1.  But for

01:25  2   all of these 25 disputed limitations, both system and code

01:25  3   limitations, including the three shown here, besides the claim

01:26  4   language, the only other source of structure that Dyfan is

01:26  5   pointing Your Honor to and the public is that during both Step

01:26  6   1 and Step 2 of the Williamson analysis are existing wireless

01:26  7   communication protocols at the time of the invention.

01:26  8       And that really begs a question.  The threshold question

01:26  9   is what could possibly be inventive about these claims if the

01:26  10  PTAB, the Patent Trial and Appeal Board, invalidated the claim

01:26  11  of the '197 application and all of the structure of this column

01:26  12  and a half of functional claim language is in existing wireless

01:26  13  communication protocols?  That can't really be the case.

01:26  14      And so I think what's even more telling is during Step 2

01:26  15  of the analysis Dyfan again doesn't point at all to the patent

01:26  16  disclosure.  What Target did is we did our best.  We looked

01:26  17  at -- for each disputed limitation we looked to find the

01:27  18  closest description we could possibly find in the disclosure of

01:27  19  the patents and the incorporated documents and we said, here's

01:27  20  what we think is the closest structure to these limitations.

01:27  21  But that structure was not sufficient.  There were gaps.

01:27  22  There's a lot of things missing.  You still don't get how you

01:27  23  would achieve those claimed functions from the disclosure, and

01:27  24  the reason for that was clear.  It was really the prosecution

01:27  25  strategy of the patent owner in this case.

01:27  1    And I think it's telling that if Your Honor were to find

01:27  2    even one of these limitations -- and we think all 25 would be

01:27  3    governed by means plus function, but if one of -- if you were

01:27  4    to find that one of these limitations should be governed by

01:27  5    means plus function, the patent owner has given you absolutely

01:27  6    no guidance as to what it thinks would be the disclosure.  It

01:27  7    simply argues that our evidence, both extrinsic and intrinsic,

01:28  8    doesn't meet the clear and convincing standard of

01:28  9    indefiniteness.  But how do you meet that standard?  You

01:28  10   identify what you think is the closest you can.  You identify

01:28  11   the gaps, and presumably a patent owner would then argue, well,

01:28  12   no.  You're missing this, and this is part of the disclosure,

01:28  13   but they haven't done that in this case.  They just keep

01:28  14   pointing to existing wireless communication protocols in an

01:28  15   invention that specifically says that our invention is a

01:28  16   modification of those protocols.  So, again, this goes back to

01:28  17   the notice function and the importance of the notice function

01:28  18   associated with it.

01:28  19   Now, if we can go to Slide 13, you know, it's our position

01:28  20   that Dyfan can't come up here today and all of a sudden have a

01:28  21   new position.  It's already submitted its briefing.  In its

01:28  22   briefing it doesn't make any reference to any of the actual

01:28  23   claimed functions that are performed by any of the code

01:28  24   limitations, any of the system limitations that are in dispute.

01:28  25   So that's for Williamson Step 1.

01:28  1    And like I said, in the event that the Court were to find

01:29  2    that all or one of these terms were to be governed by means

01:29  3    plus function, they provided Your Honor with no identified

01:29  4    disclosure as an algorithm for performing the entire function

01:29  5    recited.  And so it can't do so today.  It can't do so here.  I

01:29  6    mean, its points -- that was the date it wanted to bring to the

01:29  7    dance, and it can't tonight, when the slow song comes on, pick

01:29  8    another date.  It's got to come to the dance with the date it

01:29  9    brought.

01:29  10    Go to Slide 14.  And so again this was the -- this was the

01:29  11   point I'm making.  A threshold question that needs to be asked

01:29  12   when we're dealing with post-Williamson computer-implemented

01:29  13   functions is you ask yourself -- you have to look at the

01:29  14   function, and the reason you have to look at the function is

01:29  15   you say is this function a general purpose function or a

01:29  16   special purpose function because that dictates what aspect of

01:29  17   the Williamson test you apply.

01:29  18    And so Dyfan's first argument is that you look at code,

01:30  19   code is not a nonce word and, therefore, you don't need to look

01:30  20   at the function.  Regardless of the function, code is not a

01:30  21   nonce word.  It's sufficiently a definite structure.  That's

01:30  22   its first argument.  That's just absolutely not the law.

01:30  23    And because you have to look at the function, that

01:30  24   position would only hold true once you look at the function and

01:30  25   you say this is something I can plug into the wall and it

01:30  1   works.  That's something performs.  So that's the only time

01:30  2   that you would not be looking at -- need to look further than

01:30  3   whatever -- to say does this have a sufficiently definite name

01:30  4   for a structure?

01:30  5        If we can go to Slide 15.  And I briefly made reference to

01:30  6   this argument.  I don't want to belabor this point, but Dyfan's

01:30  7   point -- the statement that they made in their reply brief is

01:30  8   that the patentee repeatedly and consistently stated that no

01:30  9   terms -- and all of the emphasis in this slide is from their

01:31  10  briefing -- no terms were governed by 112-6, and thus

01:31  11  unequivocally disclaimed any such interpretation.  The

01:31  12  statement that, according to the patent owner, unequivocally

01:31  13  disclaimed 112-6 are sitting on this slide.  These are

01:31  14  self-serving statements made by a patent attorney.

01:31  15       Your Honor's very well aware of the prosecution history

01:31  16  disclaimer from the Festo case revolves around whether

01:31  17  amendments or arguments are made to overcome a rejection, that

01:31  18  they narrow the scope of the claim and that they result in

01:31  19  allowance of the claim.  That's what a disclaimer is.  And

01:31  20  those facts certainly don't exist here.  It's not even clear

01:31  21  that anyone at the Patent Office even looked at these

01:31  22  sentences.

01:31  23       In a rule like Dyfan would seek the Court to adopt would

01:31  24  single-handedly unwind what the Federal Circuit did in the

01:31  25  Williamson decision.  If you read the Williamson decision,

01:32   1   there is a very explicit reason why it decided to overturn the

01:32   2   precedent that it was.  And there were two reasons.  One, it

01:32   3   said we're putting a thumb on the scale.  And we can't do that.

01:32   4   We're inappropriately putting the thumb on the scale.

01:32   5        And, number two, there was a trend of proliferation of

01:32   6   functional claiming that was, quote, untethered to 112-6, and

01:32   7   three of the strictures that were set forth in that statute in

01:32   8   adopting a rule like this would excoriate means plus function.

01:32   9   So that should not be -- that is not the standard.

01:32   10       So if we can go back -- with that background again, let's

01:32   11  go back to our example -- group 2 example function, Slide 31.

01:32   12  And, again, what we have here, these -- this is what the patent

01:32   13  owner has identified as being the structure for performing this

01:32   14  function.  And the question is -- you've got code configured

01:32   15  for execution on a mobile device.  You have a plurality of

01:33   16  mobile devices communicating via wireless protocols and at

01:33   17  least one communicating with a server via another wireless

01:33   18  protocol.  And the question that really -- is that sufficiently

01:33   19  definite structure to perform this special purpose function of

01:33   20  causing to be output via the mobile device visual information

01:33   21  and with these three categories in response to the receipt of

01:33   22  the second response message.  So the question is, how does it

01:33   23  do that?  How does the code perform that in receipt of the

01:33   24  second response message?  How does the code perform that caused

01:33   25  to be output after the first visual information is caused to be

20

01:33  1    output?  We don't know.  The claim doesn't say it, and

01:33  2    apparently the disclosure doesn't say it either or the patent

01:33  3    owner would have identified it.

01:33  4        And how does the code perform this function of cause to be

01:33  5    output after the at least one mobile device is moved in the

01:33  6    building?  Essentially what you have here is purely functional

01:33  7    claiming.  It is trying to capture every single technique for

01:34  8    ever doing this, and that is contrary -- that is 100 percent

01:34  9    contrary to the quid pro quo.  They need to tell us what the

01:34 10    metes and bounds are either in the claim or otherwise, and

01:34 11    that's just not present here.

01:34 12        So with this -- this is a very -- I think a very clear-cut

01:34 13    example of a function for which there is not structure that is

01:34 14    sufficiently definite to perform this function that's claimed.

01:34 15        And we can go to Slide 32.  So going to Williamson Step 2,

01:34 16    as we discussed above, we did our best to try to identify what

01:34 17    we think are the closest aspects of the description and to

01:34 18    identify what we think is missing at the same time.  And,

01:34 19    again, Dyfan hasn't provided any disclosure at all.  It hasn't

01:34 20    pointed in the specification for this function, this particular

01:34 21    function in term 14 a representative term for group B.  It

01:34 22    hasn't identified any disclosure for any function.  It's --

01:35 23    there are clearly gaps, and there's no disclosure that anyone

01:35 24    can identify, and I think that's telling.

01:35 25        So the closest aspect of the patents's disclosure you're

21

01:35 1    going to find are essentially the same in each of these -- each

01:35 2    of these various limitations, and there's a reason for that.

01:35 3    And the reason for that is simply they added a lot of

01:35 4    functional limitations that weren't tied to the specification,

01:35 5    and that's what we're dealing with.

01:35 6        And so we have here -- we identified a number of places in

01:35 7    Figure 12 where it talks about a mobile terminal receiving a

01:35 8    message and taking an action based on the payload or the header

01:35 9    data.  They're talking about that location header data in the

01:35 10   message and then displaying elements.

01:35 11       And then it has a number of -- there's -- you can take an

01:36 12   action.  It could be to display certain elements of the message

01:36 13   payload.  It could be to produce other types of user interface

01:36 14   signals usable by the mobile terminal.

01:36 15       Again, when you read this, it looks like a flowchart, and

01:36 16   it is a flowchart.  It's a flowchart for how data is

01:36 17   distributed in the system.  It is not a flowchart that

01:36 18   describes anything other than results.  It doesn't say how you

01:36 19   take information and display it.  It doesn't say how you take

01:36 20   information and you produce -- use other types of user

01:36 21   interface signals, and it certainly doesn't show you how you

01:36 22   cause to be output visual information based on the payload or

01:36 23   the header.  That's not even what's claimed.  And it doesn't

01:36 24   show you that you do it in response to the receipt of the

01:36 25   message and after the first visual information is caused to be

01:36 1    output and after the at least one mobile device is moved in the

01:36 2    building.  There's nothing even remotely related to that in

01:36 3    this figure.

01:37 4        So then we went to the '197 application.  The '197

01:37 5    application has this identical figure.  And the '197

01:37 6    application adds Figures 3 and 4.  It adds this concept of a

01:37 7    location based trigger and a relevancy based trigger.  Neither

01:37 8    of those are claimed in any of these representative functions.

01:37 9        But the problem with the '197 application is that it

01:37 10   intentionally devoids any structure from being associated with

01:37 11   any of these functions, including the functions that itself

01:37 12   describes.  And we identified a list, and we enumerated this

01:37 13   extensively in our opening brief, but we provided a number of

01:37 14   those things.  So the question is can this type of description

01:37 15   fill in the gaps of Figure 12 from the provisional, and the

01:37 16   answer is no.  Because there is really no structure that's tied

01:37 17   to that function.  Is there structure tied to causing to be

01:37 18   output via the mobile device, the second visual information

01:38 19   based on the second location relevant information after those

01:38 20   three things in response to receiving the second location

01:38 21   relevant information in a response message, after the first

01:38 22   visual information is output from the mobile device and after

01:38 23   the -- and after the at least one mobile device is moved in the

01:38 24   building.  The answer is no.  Because that's not what

01:38 25   this -- that's not what the provisional said was the invention.

01:38   1   That's not what the '197 application, which is the same

01:38   2   specification as the patents, other than the summary of the

01:38   3   invention, which is just a copy of the claims.  That's not what

01:38   4   these patents are about.

01:38   5       So they added this column and a half of limitations,

01:38   6   including this limitation, and there is no -- there is no

01:38   7   structure.  There's no disclosed algorithm.  This is a special

01:38   8   purpose function.  There's no disclosed algorithm for

01:38   9   performing this.

01:38   10       If we go to Slide 35.  And the reason that there is no

01:39   11   disclosed algorithm -- because the patent, it does show

01:39   12   displaying content in the -- from the message payload or the

01:39   13   message header of a received message.  It does show producing a

01:39   14   user interface signal based on the payload and header data.

01:39   15   What it does not do is clearly link that -- those

01:39   16   descriptions -- those high level results -- again, that's not

01:39   17   an algorithm -- those high level results to even resolve claim,

01:39   18   that functional resolved claim.  It's not tied to that.

01:39   19       And then they don't detail -- they don't even provide any

01:39   20   detail, the provisional doesn't, on how the high level

01:39   21   displaying, the high level producing results happen.  So it

01:39   22   doesn't even show how to do -- how to -- how to perform the

01:39   23   results that are specified in a couple steps of its flowchart,

01:39   24   and it certainly doesn't provide the algorithm, the

01:39   25   step-by-step algorithm for how this recited function is

24

01:40  1   performed.

01:40  2        And Williams demands this -- an element -- a

01:40  3   limitation-by-limitation, a function-by-function fact-dependent

01:40  4   analysis for each claim limitation.

01:40  5        And one thing before I maybe turn it over, if we're going

01:40  6   to do some ping-pong, would be, I actually want to go and just

01:40  7   show you because there's been a lot of briefing on other

01:40  8   examples of claims that courts have found to be either means

01:40  9   plus function or not means plus function.

01:40  10        And let's go to Slide 20 first.  So this is a Cypress Lake

01:40  11  decision.  This is -- in our briefing it's 382 F.Supp. 3d 586.

01:40  12  This is one of the claims that Judge Payne found that all of

01:40  13  the functions in red -- in orange were means plus function

01:40  14  limitations, and one of those four functions was found to be

01:40  15  indefinite for failure to disclose any corresponding structure

01:40  16  in the specification.

01:41  17        And what you can see here is you've got -- the structure

01:41  18  that's provided here for these functions are a computer program

01:41  19  product embodying on a nontransitory computer readable medium

01:41  20  comprising -- and then there's various elements of code.  One

01:41  21  of the elements of code is code for detecting a user input and

01:41  22  corresponding to the first navigation control.  And essentially

01:41  23  what the Court found is that you disclose structure where the

01:41  24  code was run.  It was run on this tangible computer readable

01:41  25  medium.  Use disclosed code.  But other than that, the only

01:41  1    thing this claim has is it's reciting the function.  These are

01:41  2    all, the Court found, are special purpose computer functions.

01:41  3         So looking at the code, it did not turn, rise and fall on

01:41  4    whether code was a nonce term.  No.  It rose and fall because

01:41  5    all of these can't be performed when you plug -- by plugging a

01:41  6    computer into the wall that you buy at Best Buy.

01:42  7         And a critical point is that -- in the Cypress Lake is

01:42  8    that Judge Payne said that although there are examples in the

01:42  9    Patent Office for this kind of -- that would kind of -- it's

01:42  10   similar to the situation we have here.  They're kind of related

01:42  11   to what is claimed but not really.  He said just because one of

01:42  12   those disclosures might enable a person to make and use the

01:42  13   invention -- and this is the exact performance that Williamson

01:42  14   did in its limitation.  Just because you could -- because a

01:42  15   person could create a program, a person of ordinary skill could

01:42  16   create a program, that's not sufficient under Step 1 of

01:42  17   Williamson and it's not sufficient under Step 2 of Williamson.

01:42  18   And Judge Payne noted that here.

01:42  19        If we go to the next slide, 21.  This is another claim

01:42  20   which -- in the Advanced Ground case, which we also cite in our

01:42  21   briefing, where again this was a claim that did not recite

01:42  22   sufficient structure to perform a special purpose function.

01:43  23   And this is -- this is one that went up to the Federal Circuit

01:43  24   and for -- and was affirmed.

01:43  25        And here I think there's kind of a parallel to what we

26

01:43  1   have claimed in our claims, even though our claims are a heck

01:43  2   of a lot longer than this.  You have a cellular phone

01:43  3   transmitter and receiver.  That's structure.  You have a CPU.

01:43  4   That's structure.  It's connected to the cellular phone

01:43  5   transmitter and receiver.

01:43  6       And then it claims CPU software for performing a function.

01:43  7   Well, what's the function say?  Selectively pulling other

01:43  8   participants with a cellular phone.  It's very similar to our

01:43  9   situation where we've got -- there's some structure.  Nobody's

01:43  10  denying there's some structure.  We looked at that.  We

01:43  11  examined it.  Our expert examined it.  The whole point is we're

01:43  12  not saying there's no structure.  We're saying that there is

01:43  13  not sufficient structure to perform the function in the claim.

01:43  14  That's what we're saying.

01:43  15      If we go to Slide 22.  This is another Global Equity case,

01:44  16  another Judge Payne decision.  And, again, what he's looking at

01:44  17  here is, again, special purpose computer functions, and he's

01:44  18  saying, is there sufficient structure claimed to perform these

01:44  19  functions?  So you have a little bit more here than maybe you

01:44  20  did in either of the Cypress Lake case or the Advanced Ground

01:44  21  case.  You have a little bit more structure talking about the

01:44  22  program product.  You have a memory.  You have a display.  You

01:44  23  have an operating system.  You have computer reasonable medium

01:44  24  running the code, and then you have program code.  And for each

01:44  25  of these limitations in orange Judge Payne said they're all

01:44  1   means plus function because that's not sufficient structure for

01:44  2   performing special purpose computer functions like manipulating

01:44  3   the virtual cabinet record through the cabinet visible

01:44  4   partition window.  All of these were not only found to be

01:44  5   governed by 112-6 under Williamson but were also found to be

01:45  6   indefinite by Judge Payne.

01:45  7      If we go to Slide 24.  So Slide 24 is a case that the

01:45  8   patent owner cites in its briefing.  And this has got a lot of

01:45  9   green.  And the reason this has so much green is because what

01:45  10  these claims -- what the functions actually claim -- and this

01:45  11  is a system.  It's an enclosed system.  Okay?  It is a system

01:45  12  for managing pharmacy kits.  And all of the functionality is

01:45  13  being claimed as being interactive within, you know, what

01:45  14  appears to be sort of a single box.  And you're receiving -- so

01:45  15  the concept of receiving tag information, that function, of a

01:45  16  plurality of RFID tags, the function is disclosed right below

01:45  17  that.  It says exactly how you do that.  How do you receive

01:45  18  them and how do you know that they're tied to these medicinal

01:45  19  containers.

01:45  20     You go to the next function, verify the plurality of

01:46  21  medications using the tag information.  The algorithm is

01:46  22  literally the next three green sections there.  That is the

01:46  23  algorithm for performing the verify function.  And all of these

01:46  24  elements are tied together in this box.

01:46  25     And then you get to the Zeroclick decision, which is one

28

01:46  1   that has been briefed a lot.

01:46  2       If we can go to Slide 23.  And, again, this is a claim

01:46  3   where you have a device, and the device -- the entire purpose

01:46  4   of this device is what the functions are performing.  And so

01:46  5   you can see the function here is user interface code configured

01:46  6   to detect one or more locations touched by a movement of the

01:46  7   user's finger on the screen without requiring the exertion of

01:46  8   pressure and determine therefrom a selected operation.

01:46  9       If you look at the first three limitations -- and this is

01:46  10  exactly what the Federal Circuit said.  Number one, it said

01:46  11  this was a relatively simple function, not what we have in this

01:46  12  case.  And if you read those first four limitations of

01:47  13  structure, it is identifying the exact structure by which you

01:47  14  would perform that function.

01:47  15      And the other thing that the Federal Circuit looked at is

01:47  16  it said, okay.  Let's look at the Spec 2, and the spec just

01:47  17  confirmed that all the -- all this function was doing was

01:47  18  claiming a minor modification to what was in an existing

01:47  19  touchscreen.  And so it was -- there was already -- it was

01:47  20  identifying there was already code for doing exactly this, and

01:47  21  we tell you exactly how to make the modification.  So Zeroclick

01:47  22  is -- again, this is a -- this is not the case we have here.

01:47  23  This is not the case we have here.  This is with claims that

01:47  24  are just divorced from -- devoid of structure and then looking

01:47  25  to a specification where -- the reason that the claims don't

01:48  1    have them is because the patent owner intentionally expanded

01:48  2    the scope to cover something it didn't invent.

01:48  3        If the patent owner had covered its invention, if it had

01:48  4    talked about using a location header in a message, if it had

01:48  5    talked about how that message is used and followed a flowchart

01:48  6    and then explained how it would be done, we might not be here.

01:48  7    There would be a couple reasons we wouldn't be here.  One, we

01:48  8    wouldn't be here because that claim would not be a means plus

01:48  9    function claim, potentially.  But, number two, we wouldn't be

01:48  10   here because no one in the industry practices that, including

01:48  11   Target.  Nobody's using location headers, and that's why the

01:48  12   patent owner went the path it did in 2014, presumably.

01:48  13       So with that, that's really the first limitation.  It

01:48  14   gives you an overview of our arguments.  What I'll say about

01:48  15   the other limitations, both the code limitations and the system

01:48  16   limitations, we walk through, look at each of those functions,

01:48  17   and we are looking at what is the example structure, what's the

01:49  18   max structure that can be identified in the claim, including

01:49  19   based on the patent owner's arguments, and we look to the

01:49  20   specification in Step 2.  What you'll notice is that for each

01:49  21   of those limitations the disclosure that we've -- the closest

01:49  22   disclosure we can identify is the same as what we went over.

01:49  23   And the closest claim elements that we can identify

01:49  24   as performing -- as providing structure are in -- are virtually

01:49  25   identical with a few tweaks based on which claim it is, but

30

01:49  1   other than that, they're the same.  So a lot of this is really

01:49  2   streamlined and provided to you within this first example

01:49  3   representative limitation.

01:49  4       But if you don't have any questions, Your Honor, I can

01:49  5   have Mr. Dahlgren come up, and I can address the other

01:49  6   limitations after that.

01:49  7       THE COURT:  Sounds good.

01:49  8       MR. TYSON:  Thank you.

01:49  9       MR. DAHLGREN:  Your Honor, if it pleases the Court if

01:53  10  you're ready.  What we've heard today is, I think, more of the

01:53  11  same.  Plaintiff is attempting to turn this into a priority

01:53  12  contest on one hand.  And if you go to Slide 18 --

01:53  13      (Brief off-the-record discussion.)

01:54  14      MR. DAHLGREN:  Maybe I could take you up on your offer to

01:54  15  help.  I apologize.

01:55  16      So looking at this slide, I think it's noteworthy that the

01:55  17  bottom case, the Uniloc case, was cited by defendant in their

01:55  18  briefs, and there actually the Federal Circuit said that the

01:55  19  proper analysis or the term priority involving construing

01:55  20  claims under 112-6 is to first determine the claim under 112-6

01:55  21  and then look to whether or not there's original disclosure

01:55  22  described in the priority documents, and it's not looking at

01:55  23  that original disclosure in the first instance to determine if

01:55  24  the claim is governed by 112-6, and that goes in vein with the

01:55  25  Trading Techs case and the legal case where written description

01:56  1   is noted to be distinct from claim construction.  And so I

01:56  2   think the entire line there and in terms of the alleged

01:56  3   prosecution's history strategy is about adding numerous

01:56  4   amendments, which as we know those narrow the claims, and to

01:56  5   the extent that there's columns and columns of amendments,

01:56  6   that's columns and columns of narrowing amendments.  So that --

01:56  7   I don't think there's anything inherently improper in doing

01:56  8   that.  And I think that kind of misses the point.

01:56  9          And so what I'd like to do now -- what we did was, we

01:56  10  created a claim trying -- again, because, as defendant notes,

01:56  11  it's hard to fit this all into one screen.  And I have copies.

01:56  12         Oh, it's working now?  I'll just keep using the ELMO.

01:57  13  Thank you.

01:57  14         And if it's alright if I could bring copies of these up

01:57  15  just for your assistant.

01:57  16         THE COURT:  Sure.

01:57  17         MR. DAHLGREN:  So I'm on -- it's representative term 14,

01:57  18  which is the second term -- I guess the term out of the second

01:57  19  grouping.  It's on Page 7 is where it starts.  And what we

01:57  20  attempted to do -- excuse me.  Term 14, yeah, Claim 15.  Of the

01:57  21  two -- of the -- should be the '292 patent.  There's a typo

01:57  22  there.  I apologize.

01:57  23         But what we have here is a -- I apologize for the

01:58  24  highlight, but we tried to go through, as identified by

01:58  25  highlight, what's the structure in the claim and what is kind

01:58  1   of more like the functionality, the language that recites the

01:58  2   objectives of the claim gives it context?

01:58  3       And if you turn to -- it's Page 12 and 13.  So in 12 you

01:58  4   have the beginning of the disputed term, said code when

01:58  5   executed further configured to.  And then on 13 you have the

01:58  6   remainder.  And here what we know is that there's a lot of

01:58  7   structure in this claim, and I think it is undisputed that the

01:58  8   law allows for the claim to also recite the -- essentially the

01:58  9   manner in which the accused functionality is performed.  And

01:59  10  here there's a lot of structure that goes to how the claim is

01:59  11  achieving this.  And you also have to consider that it's

01:59  12  referring to -- again, if you go back to Page 12, said

01:59  13  application -- or excuse me.  Said code.  And so that

01:59  14  necessitates going further back and looking at where the code

01:59  15  is first introduced, which is on Page 8.

01:59  16      And so here you have code that performs a variety of

01:59  17  functions, and it's noteworthy that defendant's own expert,

01:59  18  Dr. Goldberg, noted in a declaration in a different matter that

01:59  19  we thought was fairly similar that while the claim may -- if

01:59  20  you look at it, the function, isolation -- be quite broad or

02:00  21  whatever.  It -- it does specify a very specific manner for

02:00  22  doing it, and that is Paragraph 18 -- or excuse me -- 19 of

02:00  23  Exhibit 1 of our responsive brief which I will put up for you

02:00  24  momentarily if I can locate it.

02:00  25      But his own expert gave a lot of testimony in, you know,

02:00  1   his declaration in that case supporting claims that we think

02:00  2   were quite similar and supporting them on the basis that the

02:00  3   claim language itself provided an adequate algorithm for that.

02:00  4        I apologize.  I belive I misspoke about the exact cite for

02:01  5   that.  Okay.  No.  So here it is.  But here you have the

02:01  6   limitation.  Computational apparatus for testing the software

02:01  7   application by imposing a fake behavior onto at least one

02:01  8   coupled software component, wherein imposing includes removing

02:01  9   or replacing expected behavior of at the least one coupled

02:02  10  software component during runtime.

02:02  11       And at the end -- excuse me.  Well, and what he says is

02:02  12  that the claim limitation provides both the function of the

02:02  13  claimed computational apparatus as well as a structure, and

02:02  14  that is the function testing software application specifically

02:02  15  supported by algorithmic structure imposing a fake behavior on

02:02  16  the at least one coupled software component, wherein imposing

02:02  17  includes removing or replacing expected behavior of the at

02:02  18  least one coupled software component during runtime.

02:02  19       And the last sentence, I think, is what's most critical

02:02  20  that stood out to me.  Although there are of course many ways

02:02  21  to perform this function of testing the software, the claim

02:02  22  element recites only a particular way of doing so in a manner

02:02  23  whose scope is clear to a person of ordinary skill in the art.

02:02  24  I would say that the same holds true for the accused or alleged

02:03  25  112 Paragraph 6 limitations that Target has identified.

34

| | | |
|---|---|---|
| 02:03 | 1 | Here what you have is code configured to after first |
| 02:03 | 2 | visual information is caused to be output based on the first |
| 02:03 | 3 | location relevant information after the at least one mobile |
| 02:03 | 4 | device is moved in the building and in response to receipt from |
| 02:03 | 5 | the at least one server and via the second wireless |
| 02:03 | 6 | communication protocol of the second response message, |
| 02:03 | 7 | including the second location relevant information used to the |
| 02:03 | 8 | output via the at least one mobile device, the second visual |
| 02:03 | 9 | information based on the second location relevant information. |
| 02:03 | 10 | That's a very, very, very specific way of implementing the |
| 02:04 | 11 | function.  A very intricate way.  And so I would say that that |
| 02:04 | 12 | provides sufficient algorithmic support itself in the claim, |
| 02:04 | 13 | notwithstanding all the other structural elements that are also |
| 02:04 | 14 | already present. |
| 02:04 | 15 | Now, they also -- counsel spoke about the prosecution |
| 02:04 | 16 | history and its use, you know, in this case, and in our reply |
| 02:04 | 17 | brief we cited to a fairly recent Federal Circuit decision, MTD |
| 02:04 | 18 | Products.  So MTD Products vs. Iancu.  And we cited to, you |
| 02:04 | 19 | know, another passage because we wanted to make it clear that |
| 02:04 | 20 | this was kind of a reverse situation.  The party had found |
| 02:05 | 21 | themselves in a -- patentee had found themselves in an IPR and |
| 02:05 | 22 | was actually arguing for means plus function and the board |
| 02:05 | 23 | found that they had basically, you know, disclaimed it based on |
| 02:05 | 24 | statements in the prosecution history during the original |
| 02:05 | 25 | prosecution about -- alleging, you know, structural components |

35

02:05  1    of the claim.  But at the very end the Court noted that given

02:05  2    the lack of any clear and undisputed statement, foreclosing the

02:05  3    application of 112 Paragraph 6, we conclude that the board

02:05  4    erred in giving dispositive weight to the equivocal statements

02:05  5    it cited in the prosecution history.

02:05  6         And I would say that compared to the statements there

02:05  7    where the patentee said, well, there is, you know, some

02:05  8    structure in the claim, here we have repeatedly and

02:05  9    consistently throughout prosecution of this patent family

02:06  10   stated that none of these terms are intended to be governed by

02:06  11   112 Paragraph 6, and not once has the Patent Office said that,

02:06  12   you know, that was wrong.

02:06  13        And as we pointed out in the Markman case, yes, subjective

02:06  14   intent is -- is given little weight in many instances, like an

02:06  15   inventor testifying after the fact that a claim has a certain

02:06  16   meaning, which is one of the cases that they cited to, that the

02:06  17   District Court cited to when they said that the Federal Circuit

02:06  18   has soundly rejected this, which I think is a far cry from what

02:06  19   actually is the case.  But after the fact and better testimony,

02:06  20   sure.  You could say that their intents, as they're saying it

02:06  21   now, doesn't really matter.  But when it's a part of the

02:06  22   official record, the file history and is repeatedly stated

02:06  23   during that file history, the public is on notice.  They have

02:06  24   been informed.  Counsel talked a lot about the public notice

02:06  25   function of claims in the intrinsic record, and I think this

36

02:07   1   goes just to that.  And I think with the Federal Circuit case,

02:07   2   the recent case on our side -- and I think the prosecution

02:07   3   history is a significant factor in this case.

02:07   4        And that leads me to kind of, I think, the larger point.

02:07   5   What we argued primarily in our briefs was that, you know, we

02:07   6   group all these terms together because to us there was no

02:07   7   getting past Step 1.  The claims themselves had sufficient

02:07   8   structure disclosed in them.  And when we deposed Dr. Goldberg,

02:07   9   he recognized repeatedly that he did not consider various

02:07   10  wireless protocols, that, yes, you know, the server and even

02:07   11  message and all these things connoted structure and they were

02:07   12  all things that did not factor into his analysis.  And so it's

02:07   13  basically a failure of meeting their burden.  And even if it's

02:07   14  a preponderance standard, I still submit that they haven't met

02:07   15  that burden.  And so there's no need to go to the

02:07   16  specification.  For us they never passed the -- you know, the

02:08   17  first step.  So, you know, did not pass go.  Do not collect

02:08   18  their $200 or whatever it is, the Monopoly reference.

02:08   19       But we believe firmly that they didn't make that even

02:08   20  threshold showing and that any resortment to the specification

02:08   21  then is unnecessary and improper.  And the claims provide

02:08   22  significant details about how the various functions are

02:08   23  achieved.  And a person of skill in the art would rarely

02:08   24  understand that.  And Dr. Goldberg, in fact, testified in prior

02:08   25  cases regarding similar claims that that was, in fact, the

02:08  1  case.

02:08  2      And so given his statements about acknowledging the

02:08  3  structure and not considering it in his analysis and not

02:08  4  considering the file history, you know, we believe that, you

02:08  5  know, these claims essentially, you know, aren't -- don't fall

02:08  6  under a means plus function of the exception and just should be

02:08  7  given their ordinary meaning, which I don't think they've

02:09  8  identified any dispute other than the output dispute of the one

02:09  9  claim.  And so there's other disputes within these many claims

02:09  10 that they thought were there additionally, you know, they could

02:09  11 have identified them as well, but since they haven't, there

02:09  12 doesn't seem to be any disagreement that if it doesn't fall

02:09  13 under 112-6 that they can't, you know, understand -- reasonably

02:09  14 discern the scope of the claims.

02:09  15     So, Your Honor, if you have any questions, it's -- for us

02:09  16 it's a fairly simple argument.  It's kind of a threshold issue.

02:09  17     THE COURT:  I have no questions.

02:09  18     MR. DAHLGREN:  Okay.

02:09  19     THE COURT:  Josh?

02:09  20     (Conference between the Court and Mr. Yi.)

02:10  21     THE COURT:  The Court finds that the terms in group 2 or

02:10  22 group B, whichever we want to call it or reference is, recite a

02:10  23 function, and thus are governed by Section 112 Paragraph 6.

02:10  24 The Court also finds the claims and specification do not recite

02:10  25 sufficient structure.  This term appears to be similar to the

38

02:10  1   Advanced Ground case cited on Slide 21 of Target's slide deck;

02:10  2   therefore, the Court finds that the term is indefinite for lack

02:10  3   of sufficient structure.

02:10  4        What group do we want to take up next?

02:11  5        MR. TYSON:  Your Honor, we can -- we can speak to -- give

02:11  6   me one second.

02:11  7        So if we can go to Slide 18, please.  This will be the --

02:11  8   oh, sorry, Your Honor.  Actually it's Slide 17.

02:11  9        THE COURT:  With respect to the ones in group 1, which

02:11 10   will be terms 10, 11 and 12, are there any substantive

02:11 11   arguments that were not just made?

02:12 12        MR. TYSON:  No, Your Honor.  It's very similar.  The only

02:12 13   thing that I would add is, in case this was not clear from my

02:12 14   original presentation, was that a lot of the structure that

02:12 15   is -- that counsel is talking about is outside of the phone.

02:12 16   It's outside of the device.  It has nothing to do with what's

02:12 17   happening on the phone, what's happening with that application.

02:12 18   I think that's a really critical distinction from the Typemock

02:12 19   case and it sort of puts it more in parallel to, as Your Honor

02:12 20   identified with the group 2 terms, the AGIS case.  But I have

02:12 21   no substantive differences to our view with respect to the

02:12 22   group 1 terms.

02:12 23        THE COURT:  Mr. Dahlgren, do you have any substantive

02:12 24   arguments to make in addition to what you've already done for

02:12 25   the group 1 terms, which would be terms 10, 11 and 12?

02:12  1       MR. DAHLGREN:  Your Honor, we briefed the terms together,

02:13  2  so it's really the same arguments.

02:13  3       THE COURT:  And it will be the same claim construction.

02:13  4       MR. DAHLGREN:  Okay.

02:13  5       THE COURT:  Why don't we move to the next set that contain

02:13  6  wherein clauses?

02:13  7       MR. TYSON:  Slide 37.  And again, Your Honor, for the

02:13  8  system limitations that are in dispute, the wherein clauses

02:13  9  that include a system, again, this is sort of a unique

02:13  10  argument.

02:13  11       THE COURT:  Well, let me know which group you're talking

02:13  12  about.

02:13  13       MR. TYSON:  I'm going to start with group 3.

02:13  14       THE COURT:  And that's terms 16, 17, 21, 28 and 29?

02:13  15       MR. TYSON:  Yes, Your Honor.

02:13  16       THE COURT:  Yes, sir.

02:13  17       MR. TYSON:  And on Slide 37, again, what I tried to do was

02:14  18  summarize what I believe the plaintiff's arguments are here,

02:14  19  and this is a little bit different than the code arguments in

02:14  20  that the argument is again that system is not a nonce word in

02:14  21  these particular claims, and the argument is that because this

02:14  22  system, the recited system, includes a building, a short-range

02:14  23  communications unit, a plurality of mobile devices, the code

02:14  24  and server.

02:14  25       But again, the argument is, again, because it has these

02:14  1   five components which are structure, some structure, that you

02:14  2   don't need to look at the function because there's structure

02:14  3   recited in the claim.  And so regardless of whatever the

02:14  4   structure -- regardless of the function, that that -- this

02:14  5   composite combination or, you know, component of the system

02:14  6   would be sufficient to perform that.  And I think again that

02:14  7   that's contrary to the law.  That structure is not -- is

02:15  8   disconnected to the functional language for the same reason I

02:15  9   talked about before.  This is -- these are functions -- in

02:15  10  large part with these system claims, you know, it's hard to

02:15  11  tell where they're operating.  It's hard to tell which is

02:15  12  performing it.  The patent owner hasn't identified which of

02:15  13  these -- what the combination or if it's just one of these

02:15  14  components, if it's any of these components.  It's not clear.

02:15  15      THE COURT:  What impact does the use of the wherein

02:15  16  limitation have on this?

02:15  17      MR. TYSON:  Well, I think the case that the patent owner

02:15  18  cited actually supports our position because it says that you

02:15  19  still need to look at what the function is -- what it's saying.

02:15  20  So just because there's a wherein clause doesn't mean that,

02:15  21  again, it's sort of like it doesn't mean that this language is

02:15  22  not subject to anything else.  So if it's only claiming a

02:15  23  result of something that happened earlier, if that's all that

02:15  24  it's claiming -- and I can actually show you kind of where that

02:15  25  comes in.  And, in fact, let me show you that really quick.

41

02:15  1          THE COURT:  Okay.

02:16  2          MR. TYSON:  Let's go to Slide 39.  And so one of the

02:16  3  things when Dr. Yi identified term 28 -- this is an

02:16  4  important -- this was actually directly to your point, Your

02:16  5  Honor, is that Claim 25 would not be representative, in our

02:16  6  opinion, of this group 3 terms because without its dependency

02:16  7  on Claim 11, without the dependency on the function of Claim

02:16  8  11.  And so the reason that we included 28 was merely because

02:16  9  rather than include a whole separate category to group in Claim

02:16  10 28, we identified it in with this other group.

02:16  11         But essentially what you have here is because you have the

02:16  12 wherein the system is configured that -- and, again, we have

02:16  13 this sort of two criteria, after the indication of the user

02:16  14 input is received and after the output of the visual

02:16  15 information is caused, now we have subsequent output of

02:16  16 different visual information is caused as the mobile device is

02:16  17 moved among plurality of facilities of the building.

02:17  18         So that's very clearly a new function.  It is a function

02:17  19 that is newly performed.  It's not simply referring back to

02:17  20 some function that was previously performed.  These are

02:17  21 functions that are performed.  And Claim 25 has the language

02:17  22 that wherein the subsequent output of the different visual

02:17  23 information is capable of being caused without additional user

02:17  24 input.  So here that's not claiming the performance of a

02:17  25 function.  That is claiming a capability.  And in that case

02:17  1   it's likely that for this particular term would not -- would

02:17  2   not by itself be representative of the additional function.

02:17  3       So -- and if we go to Slide 40, this is just another way

02:17  4   of looking at that -- of seeing this function is coming out.

02:17  5   It's written a little, you know, strangely, but it is a

02:17  6   function.  I mean, it is absolutely saying that the system is

02:17  7   configured to cause subsequent output of different visual

02:18  8   information as the at least one mobile device is moved among a

02:18  9   plurality of facilities of the building.  And then again, it's

02:18  10  after the indication of the user input is received as well as

02:18  11  the output is after the output of the visual information is

02:18  12  caused.

02:18  13      And -- and so again, if we can contrast that -- again, now

02:18  14  let's go to the -- let's just look briefly at the group 4 term

02:18  15  in term 28.  At Slide 45.  I'm sorry.

02:18  16      Here is where you have Claim 19, Your Honor, which is

02:18  17  again dependent on that same Claim 11.  Now, Claim 19 is

02:18  18  actually adding an additional functional limitation on to Claim

02:18  19  11.  So you have the Claim 11 function that we said was being

02:18  20  performed by the system.  Well, we now have the system in Claim

02:18  21  19 performing the additional function that the visual

02:19  22  information is automatically caused to be output without

02:19  23  requiring further communication with the at least one broadcast

02:19  24  short-range communication unit and again after the receipt of

02:19  25  the indication of the receipt of the one or more messages.

43

02:19  1        So looking at that claim on Slide 46, what Claim 19 did

02:19  2   is, we went from causing subsequent output of different visual

02:19  3   information as the at least one mobile device is moved among

02:19  4   the plurality of the facilities of the building to

02:19  5   automatically causing that subsequent output, and then it adds

02:19  6   these additional criteria.  We had the two criteria from Claim

02:19  7   11.  Now we have four criteria that are being added onto this

02:19  8   thing.

02:19  9        So this is -- I think that your question was very astute

02:19 10   and it was directly on point that I think these claims are

02:20 11   showing the difference.  If we're just claiming wherein a

02:20 12   capability is happening or wherein -- wherein a phrase that is

02:20 13   not tied to a function that is being performed, then -- then we

02:20 14   may not be here.  We may not be having this conversation.  But

02:20 15   that's the -- I can't remember the exact case that they cited.

02:20 16   I don't have it off the top of my head, but that case -- in our

02:20 17   reply brief we identify how that case actually supports our

02:20 18   position because it is looking at this and saying is this a

02:20 19   function?  Is this a new function that's being performed?  And

02:20 20   that's exactly what we have here.

02:20 21        If we can go -- sorry for jumping around here, but if we

02:20 22   can go to slide -- let's go to Slide 41 again.  So 41, this is

02:20 23   where we're looking at, you know, the combination of Claim 11

02:20 24   and 25 and the function really being what's in Claim 11, and 25

02:20 25   adds a slight modification to that.  But the structure here is

44

02:20  1   identical with one exception to what we talked about with code,

02:21  2   is that here we now have these five other components that might

02:21  3   be part of the structure.  The patent owner hasn't told us

02:21  4   whether they are, whether one of them are, whether two of them

02:21  5   are, whether all five of them are.  We don't really know.

02:21  6        And again so what we have is, it really comes down to

02:21  7   the -- this nonce argument that simply because system is not a

02:21  8   nonce word that we don't have to consider what this -- and

02:21  9   because it's a wherein clause, we don't have to read what the

02:21  10  claim is saying.  We don't have to read this function.  And we

02:21  11  have to because this is absolutely a function that's being

02:21  12  recited.  We have a system here, and the system is now -- it's

02:21  13  not saying code.  If this was code, we'd still have the same

02:21  14  issue we had before.  But now we don't know what is -- what

02:21  15  is -- how is this happening?  Is it a combination of code, some

02:21  16  kind of unknown code that isn't described in this claim for the

02:22  17  same reason as it isn't described for the other limitations,

02:22  18  along with -- you know, how does it know that the mobile device

02:22  19  is moved among the building?  Is the Bluetooth -- is the

02:22  20  short-range communications unit providing some communication?

02:22  21  I mean, the concept here is, again, this is claiming every

02:22  22  single possible way that you could perform this function

02:22  23  without any metes and bounds.

02:22  24       And that's why we're here.  We think these are actually,

02:22  25  you know, slightly even more difficult for anyone to resolve

02:22    1   what the actual structure is than even the code limitations

02:22    2   because now we've had this added layer of ambiguity with the

02:22    3   system.

02:22    4       And I will say -- if we go to Slide 42, all I'll say is

02:22    5   that this function we're identifying the identical -- what we

02:22    6   thought was the closest disclosure we could find.  And it's

02:22    7   identical to what we presented for the group 1 and 2 terms.

02:22    8   And so I will just say that again we looked for it.  We

02:23    9   identified that there were gaps in this disclosure in the

02:23   10   specification, and the patent owner has never even pointed to a

02:23   11   single thing in -- in the patent, any of the disclosure that

02:23   12   kind of resolved that dispute.

02:23   13       And so we've done our homework as far as clear and

02:23   14   convincing evidence goes.  We did the best we could and looked

02:23   15   at the entire specification.  We identified what we thought was

02:23   16   related.  We said here are the gaps we see.  And, you know,

02:23   17   it's hard to prove a negative in this case, but we've done, I

02:23   18   think -- I think it's clear and convincing.  And then to have

02:23   19   the patent owner not provide any rebuttal to that kind of

02:23   20   demonstrates -- demonstrates the evidentiary amount that we've

02:23   21   already provided.

02:23   22       And I'll do the same thing with the group 4 terms.  If we

02:23   23   go to Slide 46.  Again, this is the group 4 term up here.

02:24   24   Here's the function being recited, with the inclusion of Claim

02:24   25   19 here.  So Claim 19's adding the automatically and it's

02:24  1    adding these other two requirements onto the first two

02:24  2    requirements that Claim 11 already had to perform this

02:24  3    function.  And, again, it's a special purpose function.  It's

02:24  4    not something you plug into the wall.

02:24  5        And, again, we go to Slide 47.  For these group 4 terms --

02:24  6    again, we did the same process that we did for all the terms,

02:24  7    looked at the provisional and looked at the application.  We

02:24  8    looked at the disclosure as a whole, the intrinsic record as a

02:24  9    whole, and we identify what we thought was the closest.  And,

02:24 10    again, we identified what we thought was the closest.  We

02:24 11    identified gaps.  We provided that in our briefing.  We

02:24 12    provided it extensively in Dr. Goldberg's testimony, and the

02:24 13    patent owner, tellingly, did not identify any differences

02:24 14    between what we identified and what else was in the disclosure.

02:24 15    And so those gaps remain.

02:24 16        And so it's our belief that both the group 3 terms and

02:25 17    group 4 terms are also means plus function terms under the

02:25 18    Williamson case and that there is not corresponding structure

02:25 19    disclosed in the specification to perform the entirety of those

02:25 20    functions.

02:25 21        And so with that, Your Honor, unless you have questions,

02:25 22    that is actually all the terms that we have to cover today.

02:25 23        THE COURT:  Okay.  That is also all the claim terms?

02:25 24        MR. TYSON:  Well, what I would say is, Your Honor, is that

02:25 25    those are the ones that we've -- we decided to -- that Your

02:25  1   Honor asked us to argue today.

02:25  2        THE COURT:  Okay.

02:25  3        MR. TYSON:  I think we can rest on the briefing and our

02:25  4   evidence that's already provided for the other terms.

02:25  5        THE COURT:  Okay.  Counsel?

02:25  6        Give me one second.

02:26  7        (Conference between the Court and Mr. Yi.)

02:26  8        THE COURT:  I'm ready for you, but let me just go ahead

02:26  9   and read into the record, with regard to the following claim

02:26 10   terms, building, including a plurality of facilities therein,

02:26 11   shopping mall and identifier including at least three fields

02:26 12   and address portion and output via the at least one mobile

02:26 13   device\causing to be output via the at least one mobile

02:27 14   device\caused to be output via at the least one mobile device,

02:27 15   these will all be plain and ordinary meaning as the proper

02:27 16   construction if there's no disclaimer and no lexicography.  So

02:27 17   I just wanted to get that on the record.  That's consistent

02:27 18   with what we're already saying.  And if you can go ahead and do

02:27 19   a rebuttal argument to what counsel just said.

02:27 20        MR. DAHLGREN:  Yes, Your Honor.  Thank you.

02:27 21        So in the third grouping of claims and representative term

02:27 22   28, what we have is a system that's configured such that

02:27 23   subsequent output of different visual information is capable of

02:27 24   being caused without additional user input after the user

02:27 25   input.  Dr. Goldberg conceded that messages connote structure

— 48

02:28  1    during his deposition, cited in our briefing.  You know, user

02:28  2    input, visual information, additional user input types of

02:28  3    messages that are received amongst the various components here.

02:28  4    So we -- we do think it's a structure in the claim of the

02:28  5    threshold matter.  And also the fact that, you know, output,

02:28  6    you know, via the at least one mobile device -- caused to be

02:28  7    output via the at least one mobile device that Your Honor gave

02:28  8    those are plain and ordinary meaning.  I also think militates

02:28  9    in favor of finding this does not qualify as a means plus

02:28  10   function term because it would be readily understood that the

02:28  11   function that's being performed here is of the type that courts

02:28  12   have found to be simplistic enough that no detailed algorithm

02:28  13   was necessary.  And I say that not even in context of the spec

02:29  14   but also just in the claim itself.  The claims don't have to

02:29  15   recite, you know, structure precisely.  There's a very long

02:29  16   line of case law noting that you can describe classes of

02:29  17   structure and things of that nature.  And I think here for

02:29  18   outputting that that would be sufficient.

02:29  19        With respect to counsel's statements about, you know,

02:29  20   Figure 12, we did fault them in our briefing for not looking,

02:29  21   you know, to the descriptions.  You know, one that, you know,

02:29  22   they're exemplary and non limiting but also that you have on

02:29  23   the provisional on Page 24.  It's actually 16 of 35 of the

02:29  24   docket number.  And this is Exhibit A to their opening brief.

02:29  25   You know, in Step 10 it talks about various actions that can be

02:29   1   taken at the mobile terminal singly or collectively in any

02:30   2   order and, you know, displaying certain elements of the message

02:30   3   content in the form of text, images or videos.  Here what we

02:30   4   have is outputting different visual information where it's

02:30   5   supposed to be incapable and being configured to do that.  I

02:30   6   think that, you know, what's even in the provisional, not even

02:30   7   going into the patents but provides support for that alleged

02:30   8   functionality.  And I would, you know, take issue with the, you

02:30   9   know, functionality being defined the way it is.

02:30   10       I think again that the way that defendant has defined the

02:30   11   functionality in these claims encompasses a lot of what

02:30   12   actually kind of breathes life into the claims and gives

02:30   13   meaning.  It's the, you know, context that was discussed in the

02:30   14   Zeroclick case.  It was the objectives in the way of achieving

02:30   15   it that was discussed in, you know, other lines of cases.  And

02:31   16   so I think that, you know, what we have here is a situation

02:31   17   that really stems on all fours with controlling Federal Circuit

02:31   18   law that there really is enough here.

02:31   19       And I would just go to the briefing here -- or not

02:31   20   briefing -- excuse me -- our slide deck, and starting at Slide

02:31   21   47, kind of going to legal standards.  But essentially, you

02:31   22   know, we have the Zeroclick case where, you know, they faulted

02:31   23   the party for taking the claim term out of context.  That was

02:31   24   one of the three issues they took with the case.

02:31   25       But then you go down to, you know, the Apex decision, and

02:31   1   really again it was relying on words in isolation as opposed to

02:31   2   the limitation as a whole.

02:31   3       And if you go to the next slide, I think the case law is

02:32   4   even more on point.  And defendant faulted us for relying on

02:32   5   some pre Lighting World -- or Williamson cases that maybe

02:32   6   involved Lighting World.  The Linear Tech case, as best I could

02:32   7   tell in 2004, it did not make any reference to the strong

02:32   8   presumption.  And here what you have is a court noting that use

02:32   9   of the term "circuit" in the asserted claims in addition to

02:32   10  these other qualifiers, you know, was sufficient.  It coupled

02:32   11  the description with the operation, and that provided

02:32   12  sufficient structural meaning to a person of skill in the art.

02:32   13  And given Dr. Goldberg's admissions regarding the system claims

02:32   14  and his failure to consider all the other structural elements

02:32   15  recited in there, you know, I think that that's, you know, a

02:32   16  failure of proof even under the preponderance standard.  And

02:32   17  certainly I don't think he made that showing under clear and

02:33   18  convincing standard.

02:33   19      And then, you know, you have the Apple case, and I will

02:33   20  admit that this case did make one reference, I think, or two

02:33   21  references to the strong presumption, so I don't want to

02:33   22  mislead the Court in any regard there.  But I still think that

02:33   23  analysis would hold up under either standard.

02:33   24      There it was a heuristic, but the operation was disclosed

02:33   25  in the context of the invention, you know, input, output and

02:33   1   how certain outputs are achieved, and it recited the objectives

02:33   2   of the claim.  And, you know, then you have the Aloft Media

02:33   3   case, and, you know, again that's going back to relying on

02:33   4   Linear Tech.  But, you know, it's talking about computer code,

02:33   5   and, you know, it's a component, but if you describe its

02:33   6   operation with a wherein clause, then that gives it sufficient

02:33   7   structural meaning implicitly, impliedly.  And here the wherein

02:33   8   clause is the system, and this system includes all the

02:33   9   structural components.

02:33   10      And what we're talking about in this particular claim is

02:34   11   the output, and if you look at Claim 11, there's a very long,

02:34   12   lengthy description about, you know, what's going on here in

02:34   13   terms of, you know, what the application is doing.  And part of

02:34   14   what the application is doing in part is, you know, causing the

02:34   15   output of different information, and it does so in a very

02:34   16   specific manner that I think again is in line with these -- you

02:34   17   know, these cases that I just put, you know, before you that it

02:34   18   should take it out of any risk of it being with an ambit of

02:34   19   112-6.  I think that there's just really no basis for doing

02:34   20   that.

02:34   21      And I understand that we did make the argument initially

02:34   22   about the wherein clause, and, you know, I think that still

02:35   23   holds because our understanding of their argument essentially

02:35   24   was that you're just adding this functionality in the wherein

02:35   25   clause where there's just no structure tied to it, and that's

02:35   1   simply not true.  What they didn't account for was that, you

02:35   2   know, it referred to the system, but, you know, taking them at

02:35   3   their words, that wouldn't be a 112 Paragraph 6 because 112

02:35   4   Paragraph 6 is meant to allow a patentee to recite a structural

02:35   5   element functionally.  So it was based on the way we understood

02:35   6   their argument was how we were, you know, taking that approach.

02:35   7        But certainly a wherein clause can recite additional

02:35   8   functionality for a component that's previously recited in the

02:35   9   claim.  And here we think that that, you know, again is

02:35   10  supported in the language of the claim itself and, you know, at

02:35   11  least the portion of the provisional application as they

02:35   12  continue to harp on that I identified.

02:36   13       If there's no further questions, that's all I have on that

02:36   14  term.

02:36   15       THE COURT:  Okay.  Thank you.

02:36   16       With respect to group 3, terms 16, 17, 21, 28 and 29 and

02:38   17  group 4, terms 23, 24 and 25, the Court finds that the terms in

02:38   18  group 3 and 4 or C and D, either one, recite functions and thus

02:38   19  are governed by Section 112 Paragraph 6.  The Court also finds

02:38   20  the claims and specification do not recite sufficient

02:38   21  structure, therefore, the Court finds that the terms are

02:38   22  indefinite for lack of structure.

02:38   23       My understanding is that resolves all the terms that we

02:38   24  were going to fuss over today?

02:38   25       MR. TYSON:  Yes, Your Honor.

53

02:38  1      THE COURT:  Very good.  I would hope that you --

02:38  2      (Conference between the Court and Mr. Yi.)

02:38  3      THE COURT:  The trial is set for October 22nd of 2020.

02:38  4  Hard to say 2020.  I'm trying to get used to that.  I certainly

02:38  5  hope you guys have a wonderful -- is there anything else we

02:38  6  need to take up?

02:39  7      I hope you have a wonderful Christmas or whatever it is

02:39  8  you celebrate.  I hope you give my good friend Mr. Devlin my

02:39  9  very best.  I probably haven't seen him since -- I don't think

02:39  10  I've seen him since either he or I left Fish.  So it's probably

02:39  11  been ten years, but he's certainly a wonderful lawyer.

02:39  12      MR. DAHLGREN:  I'll make sure to pass that along.

02:39  13      THE COURT:  I hope he's doing well.

02:39  14      So I appreciate everyone being here.  I think that's all

02:39  15  that we have.  I look forward to seeing you -- I look -- I

02:39  16  hope -- like unusually, I think, for most judges, I hope that

02:39  17  the case goes to trial.  I like good lawyers.  I like patent

02:39  18  trials.  And so if you don't settle, I will see you, if not

02:39  19  sooner than -- between now and then, next -- I'll see you, I

02:39  20  guess, counsel next October or sooner.

02:39  21      (Hearing adjourned at 2:39 p.m.)

02:39  22

23

24

25

54

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS    )

3

4       I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of Texas, do

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8       I certify that the transcript fees and format comply with

9   those prescribed by the Court and Judicial Conference of the

10  United States.

11      Certified to by me this 12th day of January 2020.

12

13                          */s/ Kristie M. Davis*
                            KRISTIE M. DAVIS
                            Official Court Reporter
14                          800 Franklin Avenue, Suite 316
                            Waco, Texas 76701
15                          (254) 340-6114
                            kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25